DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

*Electronically Filed*

----------------------------------------------------------------X

AXIS REINSURANCE COMPANY,

                    Plaintiff,

      v.

PHILLIP R. BENNETT, et al.,

                    Defendants.

     :  No. 07-CV-07924-GEL

----------------------------------------------------------------X

In re

REFCO, INC., et al.,

                    Debtors.

     :  Chapter 11

     :  Case No. 05-60006-RDD

     :  Jointly Administered

----------------------------------------------------------------X

AXIS REINSURANCE COMPANY,

                    Plaintiff,

      v.

PHILLIP R. BENNETT, et al.,

                    Defendants.

     :  Adv. Proc. No. 07-01712-RDD
        <u>Reference Withdrawn:</u>
        No. 08-CV-03242-GEL
        <u>Appeals:</u>
        (1) No. 07-CV-09420-GEL
        (2) No. 07-CV-09842-GEL
        (3) No. 07-CV-10302-GEL

----------------------------------------------------------------X

TONE N. GRANT, et al.,

                    Plaintiffs,

      v.

AXIS REINSURANCE COMPANY,

                    Defendant.

     :  Adv. Proc. 07-02005-RDD
        *consolidated with 07-01712-RDD*
        <u>Reference Withdrawn:</u>
        No. 08-CV-03243-GEL
        <u>Appeals:</u>
        (1) No. 07-CV-09843-GEL
        (2) No. 07-CV-10302-GEL

----------------------------------------------------------------X

LEO R. BREITMAN, et al.,

                    Plaintiffs,

      v.

AXIS REINSURANCE COMPANY,

                    Defendant.

     :  Adv. Proc. No. 07-02032-RDD
        *consolidated with 07-01712-RDD*
        <u>Reference Withdrawn:</u>
        No. 08-CV-03303-GEL
        <u>Appeal:</u>
        (1) No. 07-CV-10302-GEL

----------------------------------------------------------------X

## <u>DECLARATION OF JOAN M. GILBRIDE</u>

State of New York      )
                       )ss:
County of New York  )


    I, Joan M. Gilbride, declare under penalty of perjury that the following declaration is true and accurate and made based on my personal knowledge except where otherwise stated:

    1.    I am a member of Kaufman Borgeest & Ryan LLP, attorneys for plaintiff AXIS Reinsurance Company ("AXIS") in this action.

    2.    This Declaration is submitted, pursuant to Local Rule 56.1 and FRCP 56(f), in support of AXIS's opposition to the Summary Judgment Motions filed by Klejna, Sexton, Sherer, Silverman, Breitman, Gantcher, Harkins, Jaeckel, Lee O'Keklley, Schoen, Murphy, and Grant..

    3.    Attached as Exhibit A is a true and accurate copy of the March 6, 2006 letter from Wayne E. Borgeest to Pam Sylwestrzak.

    4.    Attached as Exhibit B is a true and accurate copy of the October 24, 2007 transcript of the proceedings before Bankruptcy Judge Drain.

    5.    Attached as Exhibit C are true and accurate copies of examples of reservation of rights letters sent on behalf of the Underlying Insurers, U.S. Specialty (a/k/a HCC) and Lexington.

    6.    Attached as Exhibit D are true and accurate copies of examples of interim funding agreements between the Underlying Insurers, U.S. Specialty (a/k/a HCC) Lexington, and Mr. Klejna.  Based on information and belief, similar interim funding agreements were executed between the Underlying Insurers and the other Insureds.

7.     Attached as Exhibit E is a true and accurate copy of AXIS's Securexcess Policy RNN 506300 (the "AXIS Policy").

8.     Attached as Exhibit F is a true and accurate copy of the December 19, 2007 transcript of the proceedings before Magistrate Judge Ellis.

9.     Attached as Exhibit G is a true and accurate copy of the February 15, 2008 transcript of the proceedings before Judge Buchwald.

10.    Attached as Exhibit H is a true and accurate copy of the February 20, 2008 transcript of the proceedings before Judge Buchwald.

11.    Attached as Exhibit I is a true and accurate copy of U.S. Specialty's Directors, Officers and Corporate Liability Insurance Policy 24-MGU-05-A10821 (the "Primary Policy").

12.    Attached as Exhibit J is a true and accurate copy of the U.S. Specialty Application signed on February 8, 2005 by Philip Bennett as authorized agent for all proposed insureds (the "Application").

13.    Attached as Exhibit K is a true and accurate copy of the November 13, 2007 Order of Judge Lynch.

14.    Attached as Exhibit L are true and accurate copies of a collection of letters sent to counsel for Mr. Klejna on behalf of AXIS.

15.    Attached as Exhibit M are true and accurate copies of: (1) the October 10, 2007 Reply Memorandum of Defendants Dennis Klejna, William M. Sexton, Gerald Sherer and Philip Silverman in Support of their Motion for Summary Judgment to Require AXIS to Advance Defense Costs in the Underlying Litigations; and (2) the January 28, 2008 Appellee Insureds' Joint Response to AXIS Reinsurance Company's Supplemental Brief Concerning Effect of Maggio Plea.

16.     Attached as Exhibit N is a true and accurate copy of the March 12, 2008 letter sent to Bankruptcy Judge Drain by Wayne E. Borgeest, Joan M. Gilbride and Robert A. Benjamin.

17.     Attached as Exhibit O is a true and accurate copy of the Warranty Letter signed on January 21, 2005 by Philip Bennett, on behalf of all Insureds (the "Warranty Letter").

18.     Attached as Exhibit P is a true and accurate copy of a April 17, 2008 letter to New York State Supreme Court Judge Freedman by John H. Eickemeyer.

19.     Attached as Exhibit Q is a true and accurate copy of a portion of the April 17, 2008 transcript of the proceedings before Judge Buchwald.

20.     Attached as Exhibit R is a true and accurate copy of the October 19, 2007 Order of Bankruptcy Judge Drain (including the October 22, 2007 Errata Order).

## Statement Pursuant to FRCP 56(f)

21.     AXIS's Adversary Proceeding Complaint was dismissed by the Bankruptcy Court. *See* Exhibit S, which is a full and complete copy of the August 31, 2007 Order of Bankruptcy Judge Drain.

22.     The Insureds dictated, and the Bankruptcy Court agreed, that the AXIS action must "take a back seat" to the Underlying Litigation.

23.     AXIS filed a similar complaint for declaratory judgment in the District Court on September 7, 2007, Index No. 07-CV-07924-GEL (SDNY) (the "AXIS Complaint").

24.     The AXIS Complaint was stayed by Order of this Court dated November 13, 2007. *See* Exhibit K.

25.    Based on the foregoing, AXIS has not had any opportunity to conduct any discovery whatsoever, because the complaint it filed in the Bankruptcy Court was dismissed and the complaint it filed in the District Court was stayed.

26.    Prior to any coverage litigation between AXIS and the Insureds, AXIS made reasonable requests for information from the Insureds. *See e.g.*, Exhibit A. None of the Insureds responded to any of AXIS's reasonable requests for information.

27.    AXIS has continued to make informal requests for information from certain Insureds, none of whom have provided any meaningful response.

28.    The Bankruptcy Court previously held that, prior to the filing of a similar Summary Judgment Motion in the Bankruptcy Court by Mr. Klejna, discovery was necessary and must take place. The Bankruptcy Court directed Mr. Klejna's counsel to propose a discovery schedule to AXIS. Counsel never proposed such a schedule. *See* Exhibit B, at p. 27-28.

29.    Neither Mr. Klejna, nor any of the other Movants have requested any discovery from AXIS whatsoever.

30.    The instant Summary Judgment Motions are premature in the absence of any discovery. AXIS has not had any opportunity to examine relevant documentary evidence contained within Refco's files, its broker's files, or the Insureds' files. AXIS has not had any opportunity to depose the people involved in the underwriting process, including Marsh employees and Refco employees. AXIS has not had any opportunity to depose Mr. Bennett, the individual who signed the Warranty Letter and the Application on behalf of all Insureds.

31.    The Movants rely heavily on the factual Declarations of Ellen Brooks, Pamela Sylwestrzak, and Helen Kim.  None of these declarants has been subject to cross-examination by AXIS, and none has produced a single document for AXIS's review.

32.    AXIS is confident that, if given the opportunity to conduct reasonable discovery, it will be able to present additional facts and admissible evidence essential to justify its opposition to these Motions for Summary Judgment and prevail on its own motion for Summary Judgment.


I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Dated:  Valhalla, New York
        May 2, 2008


Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
200 Summit Lake Drive
Valhalla, New York 10595
(914) 741-6100 (Telephone)
(914) 741-0025 (Facsimile)
jgilbride@kbrlaw.com

# EXHIBIT A

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN†
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER*
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN°
MARGARET J. DAVINO*††

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
THOMAS GIBBONS
HEATHER LASCHEWER*
CAROL S. DOTY†††
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON
ROCCO P. MATRA°
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
FRANK K. STAIANO††
JACQUELINE B. TOMASSO
JENNIFER PILZ
GINA M. HOGUE*
MICHAEL R. JANES
YAEL WEPMAN*

R. EVON HOWARD*°
LEONARD B. COOPER††
JULIE ANN LEVINSOHN□×
JOHN B. MULLAHY*
JEFFREY C. GERSON††
CATHERINE KELLEHER*
REBECCA GOODMAN
PETER IANNACCI††
ANDREW R. JONES
CHRISTOPHER GOMPRECHT
JAMES T. DE SILVA
KEITH L. KAPLAN††
DANIEL C. LYNCH*
VINCENT C. ANSALDI††
BRENDA CORREA*
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY E. MCCARTHY*
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSO††
KATHERINE J. HOOPER††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*°

MATTHEW M. FERGUSON*
JEANNE M. VALENTINE
EDWARD R. NORIEGA°
MATTHEW SPERGEL
PAUL T. CURLEY

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
‡ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
※ ADMITTED IN FL ONLY
□ ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
✻ ADMITTED IN NJ & MA ONLY
× ADMITTED IN CA, VA, DC ONLY
○ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES

March 6, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

Re:  
| Insured | : | Refco, Inc. |
| Claimant | : | Various – *See* Exhibit A, attached |
| Policy No. | : | 506300 |
| Claim No. | : | BH 9826 |
| Our File No. | : | 481.001 |

Dear Pam:

As you know, we represent AXIS US Insurance ("Axis"). This is further to our December 16, 2005 letter, wherein we generally reserved all of Axis's rights in law and equity, as well as our March 1, 2006 letter regarding the issued policy. We are attaching to this letter, as Exhibit A, a schedule of all matters for which Axis has received notice under the captioned policy (the "Noticed Matters"). **We request that you immediately review the attached Exhibit A and advise us if you believe any matter noticed to Axis is not listed.** We again also ask that all communications on this matter be directed to the undersigned, on behalf of Axis.

We are directing this letter to you as the authorized agent of the Insureds, including the individual Insured Persons. To the extent that you are not acting as the authorized representative for any of the Insureds, please immediately advise us of the proper representative for any such Insureds.

The purpose of this letter is to describe the workings of the Axis Policy, to convey Axis's position regarding coverage, and to reserve Axis's rights. Axis has reviewed the Noticed Matters in light of the Policy provisions. Please be aware that we do not

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26635 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91302
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150

attribute any merit to the Noticed Matters, and reference them herein only to describe the matter submitted for coverage. In this letter we also make certain requests for information. Those requests are generally in bold. Should further pertinent information come to light, Axis may revise its position accordingly, and it reserves the right to do so. Nothing in this letter, including any requests for information, is intended to waive any rights Axis may have under the Policy, at law, or in equity, all of which are expressly reserved. Axis's position is necessarily based upon information that has been made available to us at this point. If you have any other information we should consider, please let us know. Axis will reevaluate its coverage position described herein upon the receipt of any relevant information.

We have had the opportunity to review the Noticed Matters, as well as the various coverage letters submitted by the primary carrier, US Specialty Insurance Company ("HCC" and the "Primary Policy") and the first excess carrier, Lexington Insurance Company ("Lexington" and the "Lexington Policy"). For the reasons set forth below, Axis is denying coverage for each of the Noticed Matters. Additionally, Axis expressly reserves its right to rescind the captioned policy and any prior policy.

## THE LITIGATION

### Noticed Matters

To date, Axis has received notice of twenty-four matters. *See* Schedule of Litigation, attached at Exhibit A. The Noticed Matters consist of: (1) federal securities putative class actions; (2) a derivative action; (3) a criminal action; (4) state court tort actions; (4) a breach of contract and fraud action (Sillam); (5) adversary proceedings brought in bankruptcy court; and (6) an action based on fraudulently obtaining a loan (BAWAG).

### Securities Class Actions

1. Frontpoint Financial Services, Inc., et al. v. Refco Inc., et al., No. 05-cv-08663-GEL, complaint filed (S.D.N.Y., 10/11/05);

2. Jonathan Glaubach, et al. v. Refco Inc., et al., No. 05-cv-08692, complaint filed (S.D.N.Y., 10/12/05);

3. Miriam Lieber, et al. v. Refco Inc., et al., No. 05-cv-08667-LAP, complaint filed (S.D.N.Y., 10/12/05);

4. Sandra E. Weiss, et al. v. Refco Inc., et al., No. 05-cv-08691-GEL, complaint filed (S.D.N.Y., 10/12/05);

5. <u>Anthony L. Wakefield, et al. v. Refco Inc., et al.</u>, No. 05-cv-08742-GEL, complaint filed (S.D.N.Y., 10/14/05);

6. <u>Jacob Baker, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08923, complaint filed (S.D.N.Y., 10/19/05);

7. <u>Craig Becker, et al. v. Refco Inc., et al.</u>, No. 05-cv-08929-GEL, complaint filed (S.D.N.Y., 10/20/05);

8. <u>Bruce Nathanson, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08926-GEL, complaint filed (S.D.N.Y., 10/20/05);

9. <u>American Financial International Group – Asia, LLC, et al. v. Refco Inc., et al.</u>, No. 05-cv-08988-PKC, complaint filed (S.D.N.Y., 10/21/05);

10. <u>Ravindra Mettupatti, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-09048, complaint filed (S.D.N.Y., 10/24/05);

11. <u>Todd Weiss, et al. v. Phillip R. Bennett and Gerald M. Sherer</u>, No. 05-cv-09126, complaint filed (S.D.N.Y., 10/26/05);

12. <u>Scott K. Weit, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-09611-GEL, complaint filed (S.D.N.Y., 11/11/05);

13. <u>City of Pontiac General Employees' Retirement System, et al. v. Phillip R. Bennett, et al.</u>, No. No. 05-cv-09941, complaint filed (S.D.N.Y., 11/23/05).

**Shareholder Derivative Action**

14. <u>Verun Mehta, et al. v. Phillip R. Bennett, et al.</u>, No. 05-cv-08748, complaint filed (S.D.N.Y. 10/14/05).

**Criminal Proceedings**

15. <u>United States of America v. Phillip R. Bennett, et al.</u>, No. 05-MAG 1720, complaint filed (S.D.N.Y. 10/12/05).

**State Court Actions**

16. <u>Banesco Holding C.A., et al. v. Refco Inc., et al.</u>, No. 05603681 (Supreme Court of New York, 10/17/05);

17. <u>Miura Financial Services v. Refco Inc., et al.</u>, No. 05603683 (Supreme Court of New York, 10/17/05);

18. <u>Multiplicas Casa De Bolsa v. Refco Inc., et al.</u>, No. 05603683 (Supreme Court of New York, 10/17/05).

**The <u>Sillam</u> Action**

19. <u>Bankruptcy Trust of Gerard Sillam v. Refco Group, LLC, et al.</u>, No. 05603931 (Supreme Court of New York 11/04/05).

**Adversary Actions**

20. <u>Markwood Investments v. Refco Capital Markets, Ltd and Refco Securities LLC</u>, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05);

21. <u>Banco De America, S.A. v. Refco Capital Markets, Ltd.</u>, No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05);

22. <u>BAC International Bank v. Refco Capital Markets, Ltd.</u>, No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05);

23. <u>Reserve Invest (Cyprus) Ltd v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis</u>, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

**The <u>BAWAG</u> Action**

24. <u>BAWAG P.S.K., et al. v. Refco, Inc., et al.</u>, No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

## <u>D&O INSURANCE PROGRAM</u>

Refco, through its broker Marsh, approached various insurers in July 2004 attempting to place a tower of Private Company D&O insurance in anticipation of an eventual public offering. As a result of this solicitation, Refco Group Ltd., LLC was insured by a tower of D&O insurance with a Policy Period from August 5, 2004 to August 5, 2005. This was later extended to August 11, 2005 (the "04/05 Policy"). After the August 11, 2005 IPO, Refco, Inc. ("Refco") was insured by a tower of Public Company D&O insurance with a Policy Period from August 11, 2005 to August 11, 2006 (the "05/06 Policy").

### <u>Private Company Policy Tower – The 04/05 Policy</u>

**HCC Primary** – The Primary Policy on the 04/05 Policy tower (the "04/05 Primary") was written by HCC. The 04/05 Primary provided a $10 million Limit of Liability, excess a retention of $500,000. This 04/05 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made against them during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

(B) The Insurer will pay to or on behalf of the Insured Organization Loss arising from Claims first made against it during the Policy Period or Discovery Period (if applicable) for Wrongful Acts.

The 04/05 Primary excluded Claims based on Wrongful Acts allegedly committed prior to June 4, 2004. Coverage for E&O clams also was excluded.

**Greenwich First Excess** – The Greenwich first excess layer to the 04/05 Policy tower (the "Greenwich 04/05 Policy") insured $10 million excess of the $10 million 04/05 Primary. The Greenwich 04/05 Policy followed form to the terms and conditions of the 04/05 Primary Policy.

The Greenwich 04/05 Policy included a Pending and/or Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending prior to August 5, 2004.

**Axis Second Excess** – The Axis second excess layer to the 04/05 Policy tower (the "Axis 04/05 Policy") insured $10 million excess of the $20 million in Underlying Limits. The Axis 04/05 Policy followed form to the 04/05 Primary, or any more restrictive Underlying Policy. The Axis 04/05 Policy repeats the exclusion for Pending and/or Prior Litigation as of August 5, 2004.

The Axis 04/05 Policy also contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 2 is marked effective August 5, 2004 and is dated April 25, 2005.

## Public Company Policy Tower – The 05/06 Policy

**HCC Primary** – The Primary Policy on the 05/06 Policy tower (the "05/06 Primary") was written by HCC. The 05/06 Primary provided a $10 million Limit of Liability, excess retentions of nil/$500,000/$500,000. This 05/06 Primary provided coverage pursuant to two Insuring Agreements:

(A) The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B) The Insurer will pay to or on behalf of the Company Loss arising from:

(1) Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

(2) Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

Coverage also was extended pursuant to Endorsement 11, to include Derivative Demand Investigative Costs:

The Insurer will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing to the Insurer during the Policy Period or the Discovery Period, if purchased, up to the amount of the Derivative Demand Investigation Costs Sub-Limit [$250,000].

Coverage was further extended pursuant to Endorsement 15, to include Controlling Shareholder Coverage:

The Insurer will pay to or on behalf of the Controlling Shareholder Loss arising from a Securities Claim first made during the Policy Period or the Discovery Period (if applicable) against such Controlling Shareholder for Wrongful Acts, provided, that one or more Insured Persons and/or the Company are and remain co-defendants in such Securities Claim along with such Controlling Shareholder.

Phillip Bennett was defined as the Controlling Shareholder. A $300,000 retention was to apply to Defense Costs under this coverage extension, but did not apply to any other Loss under the extension.

**Lexington First Excess** – The Lexington first excess layer to the 05/06 Policy tower (the "Lexington 05/06 Policy") insures $7.5 million excess of the $10 million 05/06 Primary. The Lexington 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy.

The Lexington 05/06 Policy also includes a Pending and Prior Litigation Exclusion at Endorsement 5 which excludes Claims related to litigation pending on or prior to August 4, 2004.

**Axis Second Excess** – The Axis second excess layer to the 05/06 Policy tower (the "Axis 05/06 Policy") provides a Limit of Liability of $10 million excess of $17.5 million in Underlying Limits. The Axis 05/06 Policy follows form to the terms and conditions of the 05/06 Primary Policy, or any more restrictive Underlying Policy.

The Axis 05/06 Policy contains a Manuscript Application Endorsement at Endorsement 5, stating:

> In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

> Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

Endorsement 5 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy also contains a Knowledge Exclusion Endorsement at Endorsement 6 which states:

> In consideration of the premium charged, it is agreed that this Policy does not respond to Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the Policy Period, any Insured had knowledge and had reason to suppose might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy.

Endorsement 6 is marked effective August 11, 2005 and is dated September 11, 2005.

The Axis 05/06 Policy notes a Prior and Pending Claim Date of June 4, 2004.

**February 8, 2005 HCC Application**

Phillip Bennett completed an HCC application "for Directors, Officers and Private Organization Liability Coverage" and signed it on February 8, 2005. This application asks at Question 12:

(a) Have any claims been made during the last 5 years against any person or entity proposed for this insurance in his or her capacity as a director, officer or trustee of any corporation or organization? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

(b) Is any person or entity proposed for this insurance aware of any fact, circumstance or situation involving the Applicant or any Insured Person or Organization which he, she or it has reason to believe might result in a claim being made? __ Yes    __ No
If yes, please provide complete details (use a separate sheet of paper, if necessary):

Without prejudice to any other rights of the Insurer, it is understood and agreed that the Insurer will not be liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).

Bennett did not check either box for Questions 12(a) and 12(b).

**January 14, 2005 Axis Warranty**

Axis requested and received a warranty (the "Axis Warranty"). The Axis Warranty states:

(a) No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT: [Louis Capital Markets, LP v. Refco Group Ltd., LLC, et al.]

(b) No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

The Axis Warranty is dated January 14, 2005, and was signed by Phillip Bennett, "on behalf of all Insureds under the Policy," on January 21, 2005.

## COVERAGE DISCUSSION

The Noticed Matters are excluded from coverage under both the Axis 04/05 Policy and the Axis 05/06 Policy based on: (1) the Axis Warranty; and (2) the Application for the Axis 04/05 Policy and the Axis 05/06 Policy. Moreover, the Noticed Matters are additionally excluded under the Axis 05/06 Policy based on: (1) the Claim made date; and (2) the Knowledge Exclusion. Axis also reserves its rights to rescind both Policies based on material misrepresentation in the application. Finally, additional terms and conditions further serve to exclude or limit coverage if coverage were otherwise available, which it is not. All of the foregoing is detailed below.

Each of the Noticed Matters is excluded from coverage under the Axis 04/05 Policy and the Axis 05/06 Policy pursuant to the Axis Warranty, attached at Exhibit B. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. It is inconceivable that Mr. Bennett was not aware of the alleged fraud when he executed the Axis Warranty "on behalf of all Insureds under the Policy." The Axis Warranty explicitly excludes coverage for all Insureds for any Claim arising from the undisclosed knowledge. Accordingly, each of the Noticed Matters is excluded from coverage for all Insureds and Axis hereby denies coverage.

Each of the Noticed Matters also is excluded from coverage based on the Application for the Axis 04/05 Policy and the Axis 05/06 Policy.[1] Question 12(b) to the Application required disclosure of any known "fact, circumstance or situation. . . [which]

---

[1]    The Axis 04/05 Policy contains a Manuscript Application Endorsement at Endorsement 2, stating:

In consideration of the premium charged, it is agreed by the Insurer and the Insureds that the application or proposal dated February 8, 2005 and submitted to Axis Reinsurance Company on U.S. Specialty Insurance Company's form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above. The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

The Axis 05/06 Policy also contains similar wording at Endorsement 5. Accordingly, the February 8, 2005 application was explicitly incorporated as the application for the Axis 04/05 Policy (Private Company) and again when Axis issued the Axis 05/06 Policy (Public Company).

might result in a claim being made." The Application further states that Axis will not be "liable under any policy that may be issued on the basis of this Application to make any payment of Loss, including Defense Costs, in connection with any Claim arising out of, based upon or attributable to any claim, fact, circumstance or situation disclosed or required to be disclosed in response to questions 12(a) and 12(b)." Mr. Bennett had a duty to disclose the alleged financial fraud in answer to Application question 12(b). His failure to disclose such fraud excludes coverage for any Claim brought in connection with the financial fraud. Accordingly, Axis is further denying coverage for each of the Noticed Matters because each is brought in connection with information which should have been disclosed in Application question 12(b).

We note that the Axis Warranty and the Application do not contain an adjudication requirement. We further note that Axis's denial of coverage on these two grounds is as to all Insureds. The Axis Warranty and the Application were filed on behalf of all Insureds. Accordingly, Axis denies coverage for each of the Noticed Matters because each of the Noticed Matters arises out of information which was known to Mr. Bennett, and others, at the time he completed the Axis Warranty and the Application, on behalf of all Insureds.

In addition to the Axis Warranty and the Application, Axis separately denies coverage under the Axis 05/06 Policy for each of the Noticed Matters because each is a Claim first made before the inception of the Axis 05/06 Policy, on August 11, 2005. The Noticed Matters are interrelated, as defined in Condition (C) of the 05/06 Primary Policy.[2] All of the Noticed Matters arise out of the financial fraud allegedly orchestrated by Mr. Bennett, and others whereby unreported loans were made between various entities in an effort to disguise financial losses. This alleged fraud was reflected in the financial statements which are the subject of the Noticed Litigation. Additionally, the BAWAG action concerns Mr. Bennett's loan transactions in connection with the alleged fraud. The bankruptcy court adversary proceedings and state court tort actions arise from Refco customers' inability to access assets held by Refco – which assets were inaccessible due to the alleged fraud. Finally, the Sillam action alleged fraud in the Refco financial statements issued in connection with the IPO. Accordingly, each of the Noticed Matters is connected to the allegedly fraudulent scheme to manipulate Refco's financial results and Axis is treating each of the Noticed Matters as a single interrelated Claim. The Noticed Matters are deemed a Claim first made on the date the first such Noticed Matter was made. The Sillam action raised related allegations in its earlier June 30, 2005 complaint. This places a Claim made date for the Noticed Matters at least as early as June 30, 2005.[3] As this is prior to the August 11, 2005 inception of the Axis 05/06

---

[2] Condition (C) of the 05/06 Primary Policy states:

> All Claims alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single Claim and will be considered to have been made at the time the earliest such Claim was made.

[3] The Sillam action references an earlier September 8, 2004 complaint which would also potentially bring the Claim Made date prior to the inception of the Axis 05/06 Policy.

Policy, the Noticed Matters would constitute a Claim Made prior to the Axis 05/06 Policy Period.

Axis further denies coverage under the Axis 05/06 Policy based on the Knowledge Exclusion Endorsement. The Knowledge Exclusion Endorsement excludes coverage for any Claims based on facts any Insured had knowledge of at the inception of the Policy. Each of the Noticed Matters is brought in connection with the alleged financial fraud orchestrated by Mr. Bennett, among others. As with the Axis Warranty, we think it inconceivable that Mr. Bennett was not aware that his actions "might give rise to a Claim that would fall within the scope of the insurance afforded by this Policy" on the inception date of the Axis 05/06 Policy, August 11, 2005. Coverage on this basis is not only denied as to Mr. Bennett, but also as to all Insureds under the Policy.

In addition to the above grounds for denial of coverage for the Noticed Matters, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy on the basis of fraud in the Application. The Application required Refco to attach, as part of the Application, audited financial statements for the two years preceding the Application. Refco has since admitted that its financial statements from 2002 through 2005 cannot be relied on. As noted above, both the Axis 04/05 Policy and the Axis 05/06 Policy were issued in material reliance upon the Insured's representations in all parts of the Application, including the attached financial statements. Accordingly, Axis reserves its right to rescind the Axis 04/05 Policy and the Axis 05/06 Policy. Axis explicitly reiterates our March 1, 2006 letter wherein Axis issued the Axis 05/06 Policy, which letter is hereby incorporated by reference. In that letter Axis noted that the issuance and delivery of the Axis 05/06 Policy should not be interpreted as a ratification of the existence of a valid insurance contract.

<div align="center">*    *    *</div>

While the foregoing is dispositive of Axis's coverage responsibilities in connection with the Noticed Matters, additional terms and conditions would serve to limit or exclude coverage if the Noticed Matters were not excluded in their entirety, which they are. For the sake of completeness, we will detail those terms and conditions which would also limit or exclude coverage of the Noticed Matters.[4]

---

The Sillam action further references an earlier April 25, 2003 complaint brought in France. We do not currently have a translated version of this April 25, 2003 complaint, but it may contain related allegations which would dictate a Claim Made date for the Noticed Matters of April 25, 2003, prior to the inception of the 04/05 Policy. Accordingly, coverage would also be denied under the Axis 04/05 Policy.

[4] The Noticed Matters have only been submitted to Axis for coverage under the Axis 05/06 Policy. Accordingly, our discussion in this section focuses only on the Axis 05/06 Policy. Axis has herein denied coverage for the Noticed Matters under the Axis 04/05 Policy, but other coverage limitations may exist if coverage were otherwise afforded under the Axis 04/05 Policy, which it is not. Axis will provide a more detailed coverage analysis under the Axis 04/05 Policy if Insureds were to submit the Noticed Matters for coverage under the Axis 04/05 Policy. Axis reserves all rights available in the Axis 04/05 Policy, in law, and in equity, including, but not limited to, the right to rescind the Axis 04/05 Policy.

The Axis 05/06 Policy follows form to the Primary Policy, or more restrictive Underlying Insurance. Axis directs your attention to the definition of Loss in the Lexington 05/06 Policy. The Lexington 05/06 Policy does not include Defense Costs within its definition of Loss. Accordingly, Axis adopts this more restrictive definition of Loss. As such, Defense Costs are not covered by the Axis 05/06 Policy.

The Axis 05/06 Policy, at Clause IX(A), requires that the Insured give notice of any Claim to Axis contemporaneously and in the same manner as notice is required to be given to HCC. The Primary Policy, at Condition B(1) and (4), requires that notice of Claims be given as soon as practicable, in writing, and by certified mail. To the extent that Axis did not receive notice as soon as practicable and in the prescribed manner, Axis reserves its rights.

As noted above, the 05/06 Primary Policy only insures the Refco entity (and Refco Subsidiaries) for Securities Claims and Derivative Demand Investigative Costs. Certain of the Noticed Matters do not name individual defendants and do not qualify as Securities Claims. The 05/06 Primary Policy, at Condition D(3), provides for an allocation where a Claim contains covered and non-covered matters. Axis reserves its right to exclude from coverage any Claims that are not Securities Claims against Refco or any of its Subsidiaries.

The 05/06 Primary Policy provides coverage pursuant to Insuring Agreements A and B(1) for Insured Persons. Insured Persons is defined to include present and past directors or officers of Refco, and employees solely with respect to Securities Claims. **For each individual named as a defendant in the Noticed Matters at Exhibit A, please identify: (1) current position, if currently employed; (2) date the current position was assumed; (3) any prior positions and dates prior positions were held; and (4) whether Refco will be indemnifying the individual. If Refco is permitted or required to indemnify and/or if Refco has determined that it will or will not indemnify any of the individual defendants, please provide us with a copy of the Board resolution providing such indemnification decision.**

The 05/06 Primary Policy also provides coverage based on Refco Subsidiaries. Subsidiary is defined at Definition (O) of the 05/06 Primary Policy as any entity:

(1) during any time on or before the inception of the Policy Period in which [Refco Inc] owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other Subsidiaries; or

(2) created or acquired during the Policy Period during any time in which, as a result of such creation or acquisition, [Refco Inc.] owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent

thereof), either directly or indirectly through one or more other Subsidiaries.

An entity ceases to be a Subsidiary when [Refco Inc.] ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or legal equivalent thereof), wither directly or indirectly through one or more other Subsidiaries. The coverage afforded under this Policy will respect to Claims against a Subsidiary or any Insured Person thereof will apply only in respect of Wrongful Acts committed or allegedly committed after the effective date that such entity becomes a Subsidiary and prior to the time that such entity ceases to be a Subsidiary.

**For each entity named as a defendant in any of the Noticed Matters at Exhibit A, please identify: (1) whether such entity is or ever was a Subsidiary; (2) the effective date such entity became a Subsidiary; and (3) if applicable, the effective date such entity ceased to be a Subsidiary.** Axis reserves its right to deny coverage for any entity named as a defendant in the Noticed Matters which is not Refco Inc. or a Subsidiary, as defined above.

Endorsement 15 of the 05/06 Primary Policy extends coverage to Philip Bennett as Controlling Shareholder for Securities Claims where he is co-defendant with another Insured Person or the Company. To the extent that certain of the Noticed Matters are not Securities Claims, coverage would not be available under this Endorsement. Also, even if certain of the Noticed Matters are Securities Claims, coverage under this Endorsement 15 would only be available where, and so long as, another Insured Person and/or the Company is a co-defendant with Mr. Bennett. Axis also notes Clause (8) of Endorsement 15 which amends the Change in Control section of the 05/06 Primary Policy. This change limits coverage under Endorsement 15 to Wrongful Acts allegedly committed prior to Refco's bankruptcy filing on October 17, 2005. Axis reserves its rights to deny coverage under this Endorsement 15 for any Claims based on Wrongful Acts allegedly committed on or after October 17, 2005.

Additionally, the definition of Loss is limited to amounts insurable by law. It is well-settled that Loss does not include the restoration or disgorgement of ill-gotten gain. Thus, insurance cannot be used to pay an Insured for amounts an Insured wrongfully acquires or is forced to return, or to pay the corporate obligations of the Insured. Accordingly, pursuant to the well-known <u>Vigilant</u>, <u>Conseco</u>, and Level 3 cases, any amounts eventually sought as disgorgement would not be recoverable as Loss.

Exclusion (A) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a

final adjudication adverse to such Insured establishing that the Insured gained such a profit or advantage

To the extent that any Insured is subject to a final adjudication establishing that the Insured received any profit or advantage to which such Insured was not legally entitled, Axis reserves the right to deny coverage for such Insured.

Exclusion (B) of the 05/06 Primary Policy excludes Loss in connection with a Claim:

Arising out of, based upon or attributable to the commission by any Insured of any criminal or deliberately fraudulent or dishonest act; provided that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such Insured establishing that the Insured so acted

To the extent that any Insured is subject to a final adjudication establishing that the Insured committed a criminal or deliberately fraudulent or dishonest act, Axis reserves the right to deny coverage for such Insured.

Axis has not yet identified and established the relationship between or among each of the parties to each of the Noticed Matters. The "Insured vs. Insured" exclusion at Exclusion (F) of the 05/06 Primary Policy, as modified by Endorsement 15, may serve to exclude certain of the Noticed Matters from coverage. Axis reserves its rights accordingly.

Further to Axis's above denial based on the Claim made date of this interrelated Claim, Axis specifically notes Exclusion (H) of the 05/06 Primary Policy which excludes Claims:

Arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time

**Please provide us with copies of any notices of claims or circumstances sent in respect of any policy of which this Policy is a renewal or replacement, including, but not limited to, the 04/05 Policy tower.** Axis reserves its rights to deny coverage for any matters excluded subject to this Exclusion (H).

The Axis 05/06 Policy only applies excess of and does not contribute with any other valid and collectable insurance, pursuant to Condition (G)(1) of the 05/06 Primary Policy. **Please provide us with a schedule of any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons which is not otherwise noted in**

**this letter.** To the extent that other insurance is available to such Insureds, Axis reserves it right to deny coverage.

Certain of the Noticed Matters allege that Refco improperly denied access to customer accounts as a result of the alleged fraud orchestrated by Mr. Bennett, and others. Endorsement 6 to the 05/06 Primary Policy excludes Claims, in relevant portion:

> Arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the Company or by any Insured Person, any service for others for a fee; provided, that this exclusion will not apply to a Claim against an Insured Person for a Wrongful Act in connection with the management or supervision of the Company or any division or group therein.

Axis reserves its right to deny coverage for any matter properly excluded by this Endorsement 6.

Refco has been the subject of a well-publicized SEC investigation.[5] Endorsement 14 to the 05/06 Primary Policy notes that the "Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any [Wells Notice or SEC Investigation]." It appears that several of the Noticed Matters are based upon the SEC Investigation. Accordingly, any Claim "arising out of, based upon or attributable to" the SEC Investigation would be excluded and Axis reserves its rights.

Axis reminds Insureds of Condition (D)(1) of the 05/06 Primary Policy which states, in relevant part:

> The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlement, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

No settlement of a covered Claim will be binding upon Axis without Axis's express consent and Axis reserves its rights accordingly. Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent.

Axis further reminds Insureds, especially given the Insured's bankruptcy posture, of Condition (K) to the 05/06 Primary Policy which states that "[n]o assignment of

---

[5] We are also aware that Refco received a Wells Notice during the Policy Period, but are not privy to the subject matter thereof. **Please provide us with a copy of the Wells Notice and any response thereto.** Axis reserves its rights in connection with this Wells Notice accordingly.

interest under this Policy will bind the Insurer without the Insurer's written consent." Axis specifically notes that consent by an Underlying Insurer is not a substitute for Axis's consent and Axis specifically reserves its rights in this regard.

Finally, Axis notes Condition (H)(1) to the 05/06 Primary Policy which notes, in relevant part, that "the Insureds will give the Insurer all information, assistance and cooperation that the Insurer my reasonably request."

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions or exclusions of the Axis 04/05 Policy or the Axis 05/06 Policy. Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the Axis 04/05 Policy or the Axis 05/06 Policy, at law, or in equity, all of which are expressly reserved. Axis reserves the right to alter, supplement or modify this statement of its coverage position as other and additional information may become available. Axis's denial of coverage of the Noticed Matters is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know.

If you have any questions in connection with the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

Enclosures
Exhibit A – Noticed Matters
Exhibit B – Axis Warranty

cc:
Tracy Forsyth, Axis
Leslie Ahari, Ross Dixon & Bell LLP, Counsel to US Specialty
Barbara Seymour, D'Amato & Lynch, Counsel to Lexington

KAUFMAN BORGEEST & RYAN LLP
442053_1                    Page 16

## EXHIBIT A

### Schedule of Noticed Litigation

1. Frontpoint Financial Services Fund, LP, On Behalf of Plaintiff and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., No. 05-cv-08663-GEL, (S.D.N.Y. 10/11/05).

2. Jonathan Glaubach, Individually and on Behalf of all Others Similarly Situated v. Refco Inc., Phillip R. Bennett, Gerald Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley and Scott A. Schoen, No. 05-cv-08692, (S.D.N.Y. 10/12/05).

3. Miriam Lieber, Individually And On Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities, LLC., Merrilly Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., and Grant Thornton LLP, No. 05-cv-08667-LAP, (S.D.N.Y. 10/12/05).

4. United States of America v. Phillip R. Bennett, No. 05-MAG-1720, (S.D.N.Y. 10/12/05).

5. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08691-GEL, (S.D.N.Y. 10/12/05).

6. Varun Mehta, Derivatively on Behalf of Refco Inc. v. Phillip R. Bennett, William J. Sexton, Gerald M. Sherer, Joseph J. Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston, Goldman, Sachs & Co., Banc Of America Securities LLC, Deutsche Bank Securities, JP Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, L.P., HSBC And Thomas H. Lee Partners, L.P., and Refco, Inc., A Delaware corporation, No. 05-cv-08748, (S.D.N.Y. 10/14/05).

7. Anthony L. Wakefield, Individually and on Behalf of All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald J. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc Of America Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Inc. Deutsche Bank Securities, Inc., J.P. Morgan Securities Inc., Sandler O'Neill

& Partners, L.P., HSBC Securities (USA) Inc., William Blaire & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P., No. 05-cv-08742-GEL, (S.D.N.Y. 10/14/05).

8.  Banesco Holding C.A., Banesco International Bank Corp., Banesco International Bank Inc. and Banesco Banco Universal C.A. Panama Branch v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603681 (Supreme Court of New York, 10/17/05).

9.  Miura Financial Services v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603682 (Supreme Court of New York, 10/17/05).

10. Multiplicas Casa De Bolsa v. Refco, Inc. and Refco Capital Markets, Ltd., No. 05603683 (Supreme Court of New York, 10/17/05).

11. Jacob Baker, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-08923, (S.D.N.Y. 10/19/05).

12. Craig Becker, On Behalf of Himself and All Others Similarly Situated v. Refco, Inc., Phillip R. Bennett, Gerald M. Sherer, Leo R. Brietman, David H. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton, LLP, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Liberty Corner Capital, Refco Group Holdings Inc., No. 05-cv-08929-GEL, (S.D.N.Y. 10/20/05).

13. Bruce Nathanson, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Grant Thornton LLP, Credit Suisse First Boston, Goldman, Sachs & Co., Banc of America Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities, Inc., JP Morgan Securities Inc., Liberty Corner Capital, and Refco Group Holdings Inc., No. 05-cv-08926-GEL, (S.D.N.Y. 10/20/05).

14. American Financial International Group – Asia, LLC, individually and on behalf of all other similarly situated v. Refco, Inc., Refco F/X Associates, LLC, Phillip R. Bennett and Does 1 through 50, et al., No. 05-cv-08988-PKC, (S.D.N.Y. 10/21/05).

15. Ravindra Mettupatti v. Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, Nathan Gantcher, David Harkins, Scott L. Jaeckel, Thomas Lee, Ronald L.

O'Kelley, Scott A. Schoen, Credit Suisse First Boston LLC, Goldman, Sachs & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., JP Morgan Securities Inc., Pierce, Fenner & Smith Inc., No. 05-cv-09048, (S.D.N.Y. 10/24/05).

16. Todd Weiss, Individually and On Behalf of All Others Similarly Situated v. Phillip R. Bennett and Gerald M. Sherer, No. 05-cv-09126, (S.D.N.Y. 10/26/05).

17. Bankruptcy Trust Of Gerard Sillam, Gerard Sillam v. Refco Group LLC, Refco Overseas Ltd., Phillip Bennett, Refco Group Holdings Inc, Liberty Corner Capital, New York Stock Exchange Inc, Grant Thornton LLP, Grant Thornton UK LLP, Thomas H Lee Partners LP, Thomas H Lee Partners Fund V, Thomas H Lee, Scott A Schoen, David V Harkins, Gerald M Sherer, Leo R Breitman, Scott Jaeckel, Nathan Gantcher, Ronald O Kelley, Halim Saad, Dennis A Klejna, Mark Slade, Julian Courtney, Richard Reinert, David Campbell, Credit Suisse First Boston LLC, Goldman Sachs & Co, Bank Of America Securities LLC, Merrill Lynch Pierce Fenner & Smith Inc, Deutsche Bank Securities Inc, JP Morgan Securities Inc, Sandler O Neil & Partners LP, HSBC Securities USA Inc, William Blair & Company LLC, Harris Nesbitt Corp, CMG Institutional Trading LLC, Samuel A Ramirez & Company Inc., Muriel Siebert & Co Inc, The William Capital GLP, Utendahl Capital Partners, et al., No. 05603931 (Supreme Court of New York 11/04/05).

18. Scott K. Weit, Individually and On Behalf of All Others Similarly Situated v Phillip R. Bennett, Gerald M. Sherer, Leo R. Breitman, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, Scott A. Schoen, Nathan Gantcher, Credit Suisse First Boston, Goldman, Sachs & Co., Grant Thornton LLP, Banc of    America Securities LLC, Merrill Lynch Pierce, Fenner & Smith Inc., Deutsche Bank Securities, Inc., J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., William Blair & Company, L.L.C., Harris Nesbitt Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, L.P., Liberty Corner Capital, and Refco Group Holdings, Inc., No. 05-cv-09611-GEL, (S.D.N.Y. 11/11/05).

19. Bawag P.S.K. Bank Für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft v. Refco, Inc.; Refco Group Holdings, Inc.; The Phillip R. Bennett Three Year Annuity Trust; Refco Capital Markets, Ltd.; Refco Group Ltd., LLC; Bersec International LLC; Kroeck & Associates, LLC; Marshall Metals LLC; New Refco Group Ltd., LLC; Refco Administration LLC; Refco Capital LLC; Refco Capital Holidings LLC; Refco Capital Management LLC; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial LLC; Refco Fixed Assets Management LLC; Refco F/X Associates LLC; Refco Global Capital Management LLC; Refco Global Finance Ltd.; Refco Global Futures LLC; Refco Global Holdings LLC; Refco Information Services LLC; Refco

Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summitt Management, LLC; Refco Securities LLC; Refco Clearing LLC; Phillip R. Bennett; John Does 1-10; And XYZ Corporations 1-10, The Last Two Names Being Fictitious, Inc., et al., No. 05-03161-rdd (Bankr. S.D.N.Y., 11/16/05).

20. Markwood Investments v. Refco Capital Markets, Ltd. and Refco Securities LLC, No. 05-03166-rdd (Bankr. S.D.N.Y., 11/17/05).

21. Banco De America Central, S.A. v. Refco Capital Markets, Ltd., No. 05-03171-rdd (Bankr. S.D.N.Y., 11/18/05).

22. BAC International Banks, Inc. v. Refco Capital Markets, Ltd., No. 05-03170-rdd (Bankr. S.D.N.Y., 11/18/05).

23. Reserve Invest (Cyprus) Ltd. v. Refco Capital Markets, Ltd., Michael W. Morrison, and Richard Heis, Michael W. Morrison, and Richard Heis, No. 05-03168-rdd (Bankr. S.D.N.Y., 11/18/05).

24. City of Pontiac General Employees' Retirement System, On Behalf of Itself and All Others Similarly Situated v. Phillip R. Bennett, Thomas H. Lee Partners, L.P., Thomas H. Lee, Gerald M. Sherer, Scott A. Schoen, Bank of America Corp., Banc of America Securities LLC, Deutsche Bank AG, Deutsche Banc Securities, Inc., Credit Suisse Group, Credit Suisse First Boston LLC, Goldman Sachs Group, Inc., Goldman Sachs & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase & Co., Merrilly Lynch, Pierce, Fenner & Smith, Inc., Merrill Lynch & Co., Inc. Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc., HSBC Holdings plc and Grant Thornton LLP, No. 05-cv-09941, (S.D.N.Y. 11/23/05).

**EXHIBIT B**

Axis Warranty[1]

 **REFCO**

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

    a.  No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

*See attached*

    b.  No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: *Refco Group STD. LLC*

Signature: *[signature]*

Title: *PRESIDENT & CEO.*
(Chairman of the Board or President)

Date: *Jan 21, 2005.*

---

[1] Also attached to the Axis Warranty, but not included here are: (1) a January 14, 2005 memo from Ellen Brooks to Phillip Bennett requesting Bennett complete the warranty; and (2) a January 14, 2005 letter from Grant Cornehls to Ellen Brooks describing and attaching the Louis Capital Markets, L.P. v. Refco Group Ltd., LLC, et al. suit. It appears the letter and suit were both attached to the memo sent to Bennett. Axis does not contend that the Luis Capital Markets suit is related to the Noticed Matters.

# EXHIBIT B

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                        :
 4   In Re:                             :  Case No. 05-60006
                                        :
 5        REFCO, INC.,                  :
                                        :
 6             Debtor.                  :
                                        :
 7   ------------------------------------X
     AXIS REINSURANCE COMPANY,          :  07-0712-RDD
 8
                    Plaintiff,          :
 9
                    v.                  :  One Bowling Green
10                                      :  New York, New York
     BENNETT, et al.,                   :
11                                      :  October 24, 2007
                    Defendants.         :
12   ------------------------------------X

13

14        TRANSCRIPT OF HEARING ON REQUEST ON BEHALF OF DENNIS KLEJNA
              FOR A CONFERENCE ON WHETHER TO PROCEED WITH
15                    MOTION FOR SUMMARY JUDGMENT
               BEFORE THE HONORABLE ROBERT D. DRAIN
16                 UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:

18   For Axis Reinsurance:       JOAN M. GILBRIDE, ESQ.
                                 ROBERT A. BENJAMIN, ESQ.
19                               Kaufman, Borgeest & Ryan LLP
                                 200 Summit Lake Drive
20                               Valhalla, New York  10595

21   For Dennis Klejna,          HELEN B. KIM, ESQ.
       Gerald Sherer,            Baker & Hostetler LLP
22     William Sexton,           12100 Wilshire Boulevard, 15th Floor
       and Philip Silverman:     Los Angeles, California  90025-7120
23

24

25


                          (Appearances continue on next page.)
```

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2

3    APPEARANCES CONTINUED:

4    For Tone Grant:              NORMAN EISEN, ESQ.
                                  Zuckerman, Spaeder LLP
5                                 1800 M Street NW
                                  Washington, D.C.  20036-5802
6

7

8

9    Court Transcriber:          RUTH ANN HAGER
                                  TypeWrite Word Processing Service
10                                356 Eltingville Boulevard
                                  Staten Island, New York 10312
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


          Proceedings recorded by electronic sound recording,
          transcript produced by transcription service

3

1   (Proceedings began at 2:18 p.m.)

2              THE COURT:  I kept you all waiting because

3   apparently there was some other party in the consolidated

4   adversary proceeding that wanted to be hooked in by phone and I

5   believe a number of them are at this point.  But this is really

6   Ms. Kim's request on behalf of Mr. Klejna for a conference on

7   whether to proceed with a motion for summary judgment, so I

8   have Ms. Kim and Ms. Gilbride in front of me.

9              I had a couple of questions before we get further

10  into this.  What is currently before Judge Lynch in respect of

11  insurance coverage litigation?

12             MS. GILBRIDE:  Your Honor, Axis -- after Your Honor

13  dismissed Axis's complaint, Axis filed a declaratory judgment

14  complaint essentially identical to what was pending in this

15  court.

16             THE COURT:  Okay.

17             MS. GILBRIDE:  And that's what's pending.

18  Additionally, we've just received notice I think yesterday that

19  one of our appeals was assigned to Judge Lynch as well.

20             THE COURT:  Okay.  Has there been any activity in

21  connection with the declaratory judgment action?

22             MS. GILBRIDE:  There has been some letter writing

23  back and forth.

24             THE COURT:  Why am I not surprised?

25             MS. GILBRIDE:  In fact, some of the parties thought

4

1    that Judge Lynch would refer that complaint back to Your Honor,

2    but other than that there's been no activity.  In fact, the

3    complaint hasn't even been served as yet.

4                THE COURT:  Okay.  So there's been no ans --

5    there's obviously been no answer or motion or anything like

6    that.

7                MS. GILBRIDE:  Not as yet, no.  We were --

8                THE COURT:  Was the letter-writing activity to

9    Judge Lynch or was it just between the parties or among the

10   parties?

11               MS. GILBRIDE:  It was to Judge Lynch.

12               THE COURT:  Okay.  And he hasn't responded?

13               MS. GILBRIDE:  We had a call from his clerk who

14   wanted to make sure that all the letters were done, but as of

15   yet there's been nothing official from the Court, no.

16               THE COURT:  Okay.  And the motion to withdraw the

17   reference was just filed the other day.  There's been nothing

18   on that?

19               MS. GILBRIDE:  Yeah, we wrote a letter to Judge --

20   what happened was we had made a motion to withdraw the

21   reference and Judge Koeltl issued an order saying -- denying

22   the motion --

23               THE COURT:  Right.

24               MS. GILBRIDE:  -- without prejudice to renewing it

25   if this court determined that there was still additional

5

1    issues, other than advancement, before this court, so we wrote

2    a letter to Judge Koeltl just letting him know that, in fact,

3    that might perhaps be happening.  We haven't even actually made

4    the motion --

5              THE COURT:  Oh, okay.

6              MS. GILBRIDE:  -- the particular motion.

7              THE COURT:  All right.

8              MS. GILBRIDE:  Although, you know, it is a letter

9    request that the Court considered --

10             THE COURT:  All right.

11             MS. GILBRIDE:  -- could consider as a motion.

12             THE COURT:  Okay.

13             MS. KIM:  If I might just add to that, with respect

14   to the --

15             THE COURT:  Why don't you bring the microphone

16   forward because there are some people on the phone.

17             MS. KIM:  Oh, this is Helen Kim, Your Honor, on

18   behalf of Mr. Klejna.  The letter request to Judge Lynch, which

19   was submitted by Barbara Moses on behalf of all of the

20   defendants was to request Judge Lynch to refer the case to this

21   court, the newly-filed complaint to this court pursuant to the

22   standing order which would require any action related to the

23   bankruptcy proceedings to be referred to this court, so there

24   have been letters back and forth and as Ms. Gilbride noted

25   there has been no action taken by Judge Lynch to date.

6

1                    THE COURT:  Okay.

2                    MS. KIM:  And with respect to the letter yesterday

3        to Judge Koeltl, my understanding was that it was a request for

4        a conference, a premotion conference similar to the request

5        that I made of this court, and there has been no response by

6        Judge Koeltl to that request either.

7                    THE COURT:  Okay.  All right.  Well, why don't we

8        turn to the request?  As you know from the tail end of the last

9        hearing I was somewhat skeptical about it and I want to make

10       sure I understand clearly what it is that you want to have

11       ruled on as far as summary judgment is concerned.

12                   MS. KIM:  Well, Your Honor, as this court noted at

13       the August 30 hearing, the difference -- the distinction

14       between the counterclaim plaintiffs' complaint and the

15       complaint filed by Axis is that in order for Axis to prevail,

16       they have to show two parts.  They have to show that the

17       relevant exclusion exists, whether it's the warranty letter,

18       the exclusion or whatever it is, and that, second, that it has

19       been triggered.

20                   With respect to the counterclaim plaintiffs,

21       however, and I speak solely on behalf of Mr. Klejna, our

22       position is that we only have to show that the exclusion

23       doesn't exist.  If we show that, for example, that the prior

24       knowledge exclusion was slapped on in March of '06 in violation

25       of the policy binder, to us it is absolutely irrelevant as a

7

1 matter of law what Mr. Bennett knew and when, so as a matter of

2 law it would be our position that there is no prior knowledge

3 exclusion and, therefore, the issue of whether it was triggered

4 or not is irrelevant.

5          And the ground for our motion for summary judgment

6 is that with respect to each of the grounds asserted by Axis

7 for disclaiming coverage that they don't operate as a matter of

8 law, specifically because there is a nonimputation or

9 severability provision in the underlying -- the primary policy

10 that limits any exclusion to Mr. Bennett and does not operate

11 as to the knowledge of others.

12          THE COURT:  Well, but isn't there still going to be

13 the issue of whether Mr. Klejna had knowledge or Mr. Klejna was

14 aware of issues that would have led to a breach of the warranty

15 or the application?

16          MS. KIM:  Well, Axis has never asserted that

17 Mister -- if you read their complaint and even their amended --

18 their new complaint against Mister -- against -- that's pending

19 before Judge Lynch at the moment, there's never been any

20 allegation that Mr. Klejna had any knowledge.  The entire

21 complaint rests on the knowledge and intent of Mr. Bennett.

22          MS. GILBRIDE:  Your Honor --

23          THE COURT:  I have to say, I mean, that's not --

24 that's certainly not -- I didn't -- I'll have to move back and

25 look at their complaint, but I didn't --

8

1          MS. KIM:  Yeah, I --

2          THE COURT:  -- read it that way.

3          MS. KIM:  Yes, I --

4          THE COURT:  I mean, I understand that it was

5    easiest for them to argue Bennett because he's along with --

6    you know, he's under a criminal indictment, but --

7          MS. KIM:  Well, Your Honor, while looking at their

8    complaint here it is clearly all along Mr. Bennett,

9    Mr. Bennett, Mr. Bennett, Mr. Bennett, and Mr. Klejna is not

10   among the indicted individuals.  The only complaint that he has

11   been named at all and there are now umpteen different

12   complaints with Mr. Kirschner's complaints and all, the only

13   complaint against him is the securities action.  There's

14   absolutely nothing else.

15         And yeah, Your Honor, we have been proceeding on

16   the assumption that Axis has never asserted the knowledge or

17   intent of anyone other than Mr. Bennett.

18         THE COURT:  Is that right, Ms. Gilbride?

19         MS. GILBRIDE:  Your Honor, it's our position that,

20   of course, it would be easier if -- just to show Mr. Bennett's

21   knowledge, but with respect to any of the insureds if any of

22   the insureds had knowledge that that would bar them from

23   coverage under the complaint -- under the policy.  I have to go

24   back and look at the complaint, but that's certainly been the

25   position we've advocated all along.  It was in our coverage

9

1    letter, our denial letter, and it's the way that the knowledge

2    exclusion works, frankly.  If any insured has knowledge that

3    any claim arising out of that knowledge would be precluded

4    under the policy.

5            MS. KIM:  Well, Your Honor, if the knowledge

6    exclusion doesn't exist, I guess it wouldn't matter, would it?

7            THE COURT:  Well, yes and no,  I mean, I -- I broke

8    it down this way when I was looking at your letters and whether

9    summary judgment would be useful or serve a proper purpose

10   here.  As far as whether the knowledge exclusion was improperly

11   added or is not properly a part of the policy, it's not clear

12   to me whether there's a factual dispute as to that issue.  I

13   don't know and I want to hear about that, I guess.

14           Secondly, there may or may not be a factual dispute

15   preceeding that.  There may or may not be a legitimate

16   ambiguity, but there may or may not be a factual dispute as to

17   the severability issue when applied to the warranty and the

18   application.  I understand how -- I understand the argument as

19   it applies to the knowledge issue.

20           MS. KIM:  Yeah, Your Honor.  Well, I'm --

21           THE COURT:  But then let me just go through it so I

22   can put some structure around this.

23           And then finally, there was the issue as to whether

24   even if one -- even if you were successful in knocking the

25   knowledge exclusion, are you still right in the middle of the

10

1    overlap doctrine because of the application and, arguably, the

2    warranty?

3            MS. KIM:  Okay.  Well, Your Honor, first of all, I

4    just wanted -- with respect to what the complaint asserts, I

5    have a copy of the Axis complaint and I'm relying specifically

6    on counts one, two, three, and four where paragraph 144 it

7    specifically alleges just Bennett's knowledge.  I apologize if

8    I misread this before, but it certainly says under count one,

9    paragraph 144, "As alleged herein as of January 14, 2005,

10   Bennett possessed knowledge of facts, circumstances,

11   situations, acts, errors," blah, blah, blah, blah, "such as

12   would fall within the scope of the Axis policy, so it rests

13   solely on the knowledge of Bennett.

14           Similarly, count two, paragraph 149, "As alleged

15   herein as of February 8, 2005 Bennett was aware of facts,

16   circumstances or situations involving Refco, which Bennett had

17   reason to believe might result in a claim as that term is

18   defined in the primary policy being made."  Again, absolutely

19   no notice to any of the other defendants with respect to any

20   alleged knowledge or information by any other defendant

21   insureds.

22           Similarly, count three, paragraph 154, again "As

23   alleged herein as of August 11, 2005 Bennett possessed

24   knowledge of facts, circumstances, situations," et cetera.

25           So, Your Honor, you know, we approached this

11

1    complaint and Axis's position based upon the pleadings that

2    they filed in this court and I apologize if there's been some

3    misunderstanding, but certainly our --

4              THE COURT:  Yeah, I guess what I'm getting it from,

5    I was focusing on their coverage letter and I know they're not

6    specific in it, but they refer to in a couple of places the

7    alleged -- this a quote -- "alleged financial fraud

8    orchestrated by Mr. Bennett among others."  Now, it's

9    conceivable the "among others" could be, you know, the people

10   at BAWAG, but --

11             MS. KIM:  Well, Your Honor, even with respect to

12   the --

13             THE COURT:  Even to say it was, you know,

14   disguised -- what was Mr. Klejna's job?

15             MS. KIM:  He was the general counsel, Your Honor.

16   And certainly even with respect to the application, which was

17   one of the issues Your Honor just raised, I believe in the

18   Kozlowski [Ph.] case, the courts there specifically said that

19   absent any evidence that Mr. Kozlowski was involved in the

20   application process that any statements in the application

21   would -- could not be imputed to him.

22             So it would be if -- in opposing a motion for

23   summary judgment, it would be Axis's burden to come forward and

24   show that Mr. Klejna had some involvement in filling out that

25   application, Your Honor.  We believe that on the summary --

12

1    motion for summary judgment they would not be able to sustain

2    that burden.

3                As to the warranty letter, we believe that the

4    warranty --

5                THE COURT:  But aren't they -- I mean, aren't

6    they -- aren't we kind of jumping the gun here, though?  I

7    mean, I understand the issue on the advancement of the fees,

8    which was really dealt with on an expedited basis, but for

9    these types of things, like who was involved in preparing the

10   application and who was involved or what was involved with the

11   addition of the knowledge exclusion and even, you know -- I

12   have to confess I was really focusing on the exclusion letter

13   as opposed to the complaint filed by Axis, since that complaint

14   isn't before me anymore, so all I really have is the letter,

15   which is what's referenced in your complaint -- you know,

16   unless they're going to stand up in front of me and say that

17   they're relying only on Bennett's alleged fraud and not on

18   Klejna's, it would seem to me that we have to -- we'd be back

19   at taking (a) discovery as to the facts as to whether the

20   knowledge exclusion could be excised from the policy and

21   whether the application is not attributable to anyone other

22   than Bennett and what that means.  And then (b) again, unless

23   they're going to stand up and say that they are relying only on

24   Bennett's fraud and nothing done by Klejna, even if you win on

25   those points you still have issues as to his role in the

13

1  alleged fraud that they're relying on.

2          MS. KIM:  Well, Your Honor, I -- may I address

3  those points one by one?

4          THE COURT:  Okay.

5          MS. KIM:  Okay.  Starting with the prior knowledge

6  exclusion, we believe that we can show that as a matter of law

7  that because the prior knowledge exclusion conflicts with a

8  policy binder that was issued by Axis on the inception date of

9  the policy on August 11, 2005 that the policy binder is what

10 controls the issue of whether the exclusion exists or not.

11 There's plenty of case law including the recent World Trade

12 Center cases about what is the operative document.

13          And therefore, if we prevail on that issue that the

14 prior knowledge exclusion is not even part of the policy as a

15 matter of law, we don't believe we need to get into what

16 Mr. Klejna knew or didn't know.  As a matter of law, the

17 exclusion would be irrelevant.  I would not be a part of the

18 policy.

19          Going to the second issue on the issue of the

20 application, their position is that because the application is

21 incomplete that that somehow negates coverage, but we believe

22 that as a matter of law, that's not true.  There's plenty of

23 cases that say that where an application is incomplete and that

24 issuer goes ahead and issues the policy in the face of an

25 incomplete application, it is the issuer that assumes the risk

14

1   of liability because the issuer had notice when it received the

2   application that there was information that had not been

3   completed.

4           So even -- again, even if Mr. Klejna had some

5   role -- so even assuming everything in their favor as a matter

6   of law the -- it would be -- the risk would have been assumed

7   by Axis and not by any of the individual insureds.

8           So then I don't even have to get to the --

9           THE COURT:  Even if the application is included and

10  referred to specifically in the policy?

11          MS. KIM:  That's right, Your Honor.  We cited those

12  cases in our preliminary injunction briefs when we dealt with

13  the issue of likelihood of success on the merits, Your Honor.

14          And as to the warranty letter, Your Honor, we

15  believe the warranty letter frankly speaks for itself and makes

16  clear that the warranty letter was issued in connection with

17  the policy for the prior year in 2004 and 2005, not in

18  connection with the application in 2005 to 2006.  Even if we

19  were wrong about that, Your Honor, there is a provision in the

20  underlying policy that was conditioned, oh, which defines what

21  is and is not a part of the 2005-2006 policy.

22          So again, Mr. Klejna's knowledge is absolutely

23  irrelevant as a matter of law.  So we believe that we have an

24  opportunity and should have the opportunity to show that on a

25  motion for summary judgment that never ever touches the issue

15

1    of intent or knowledge and I'm certainly cognizant of the line

2    that this court has drawn with respect to the overlapping --

3    substantial overlapping issues.  We have no intention of

4    touching any of those issues, Your Honor.

5              THE COURT:  What do you think Ms. Gilbride?

6              MS. GILBRIDE:  Well, Your Honor, we certainly were

7    understanding after the August 30th hearing that the narrow

8    issue that this court kept before it was the issue of

9    advancement.  Maybe we were incorrect in that understanding

10   that that was, you know, as I reread the transcript and reread

11   the ruling that that was my understanding of the position that

12   was being advanced by all of the insureds if that was the only

13   issue -- that was the pressing issue, they had a financial need

14   for advancement of defense costs, and that was the issue that

15   didn't overlap with any of the issues in the underlying case

16   and that was the issue that this court determined it should

17   keep.

18              So I think as a threshold matter that was certainly

19   how we were proceeding all along.  It's why we didn't ask for

20   any discovery on these other issues that Ms. Kim has raised,

21   but certainly it would be our position that if the Court is

22   going to proceed with these other issues that there are factual

23   disputes as to, I think, each of the issues that were raised by

24   Ms. Kim.

25              With respect to the knowledge exclusion, certainly

16

1    it's our position in the first instance that it's part of the

2    policy, but there's an issue raised as to the binder.  If we

3    get into the binder then the court has to look at all of the

4    extraneous negotiations that went on in connection with the

5    binder.  There are negotiations back and forth between the

6    broker.  I -- we don't know yet because we haven't taken any

7    discovery what role all of the individual insureds played in

8    that process, but we certainly believe that that information

9    would be relevant to the Court's determination whether or not

10    the prior knowledge -- the knowledge exclusion was a part of

11    the policy.

12              With respect to the warranty letter, I don't know

13    how we get around the fact that --

14              THE COURT:  Can we stop on the knowledge exclusion

15    for a second?  As I understand Ms. Kim's position it's

16    essentially that -- correct me if I'm wrong -- that Axis

17    slipped this in?

18              MS. KIM:  Yes, Your Honor, that it is not in the

19    policy binder that would --

20              THE COURT:  But --

21              MS. KIM:  Which lists the exclusions.

22              THE COURT:  I mean, but didn't --

23              MS. GILBRIDE:  It's in the policy.

24              THE COURT:  But I mean, Refco got the policy,

25    right?  I mean, it didn't --

17

1              MS. KIM:  In March of '06.  This policy started
2    in --
3              THE COURT:  Did it ever protest and say, this isn't
4    part of the deal or anything like that?
5              MS. GILBRIDE:  Not to my knowledge, Your Honor.
6              MS. KIM:  Well, Your Honor, the policy binder was
7    issued in August of '05.
8              THE COURT:  Right.
9              MS. KIM:  It lists the exclusions, that those
10   exclusions do not include the prior knowledge of it.
11             THE COURT:  No, I understand that, but --
12             MS. KIM:  The policy was issued in March of '06
13   with a cover letter from Axis stating that it was subject to
14   rescission, so we were in a dispute from the get-go.  This
15   was -- the policy was issued after the claims had already been
16   tendered and made.
17             MS. GILBRIDE:  Your Honor, just to back date the
18   history of the negotiations, if you look at the underwriting
19   file and the broker's file, what happened here was that that
20   Axis asked for a knowledge exclusion.  They were told that the
21   primary carrier was going to include that exclusion in their
22   policy.  Based upon that representation by the broker, Axis
23   issued a binder.  As the Axis carrier, it wouldn't have that
24   provision in its binder.
25             When the primary policy was issued without the

18

1   knowledge exclusion, Axis issued a knowledge exclusion, because

2   that was the representation that was made to it by the broker

3   on behalf of the insured.  So there's certainly factual issues

4   and it's certainly --

5                   THE COURT:  Okay.

6                   MS. GILBRIDE:  -- not Axis's position that it's

7   lifted anything in.

8                   THE COURT:  So I interrupted you.  You were going

9   on to the next issue.

10                  MS. GILBRIDE:  Yes.  With respect to the warranty

11  letter, Your Honor, it's our position that the warranty letter

12  was signed by Mr. Bennett on behalf of all insureds.  We

13  don't -- our position is that the severability or imputation

14  language does not apply to that warranty letter and if there

15  are any factual issues with respect to the warranty letter as

16  raised by Ms. Kim, it would be -- we would need to take

17  discovery to find out what the insured intended that warranty

18  letter to mean, and that would be Mr. Bennett.

19                  It's Mr. Bennett who signed that warranty.  It's

20  Mr. Bennett who could answer the question of what it was

21  intended to -- whether it was intended to apply to this policy

22  or to something else.  You know, there's no issue as a matter

23  of law.  There's certainly a factual dispute as to what that

24  warranty letter applies to.  There's no issue that the Court

25  can determine as a matter of law.

19

1          THE COURT:  The application is referred to

2     expressly in the policy; the warranty letter isn't.  Am I right

3     on that?

4          MS. GILBRIDE:  Yes, Your Honor.

5          MS. KIM:  And, in fact, the second page of the

6     warranty letter said that -- refers explicitly to the policy,

7     our present D&O coverage that was placed August 5, 2004.

8          MS. GILBRIDE:  The warranty letter refers to the

9     proposed insurance, which the proposed insurance at that point

10    in time was the policy that incepted in August of 2006.  And

11    all of this just shows that there are disputed issues of

12    fact --

13         MS. KIM:  Well, in that case, Your Honor --

14         MS. GILBRIDE:  -- with respect to this.

15         THE COURT:  Well, I'm sorry.  Just --

16         MS. KIM:  -- I'll renew my motion -- oh.

17         THE COURT:  Just a minute.  I'm just looking at the

18    severability provision.  Okay.  What were you saying, Ms. Kim?

19         MS. KIM:  What I was saying, Your Honor, I did not

20    understand this to be a full-blown motion.

21         THE COURT:  No, no, but it -- I -- I was just

22    trying to see --

23         MS. KIM:  It just means that I'll lose my motion if

24    they can raise -- if they can show the genuine -- the existence

25    of genuine issues of material fact --

20

1          THE COURT:  But we haven't had any discovery yet.
2   I mean, I think what I'm trying to figure out is whether this
3   is something, as often happens with insurance policies, that
4   you can do on the document itself or whether you have to have a
5   reasonable period for discovery because it's not really the
6   document itself that controls.  It's what people did with and
7   to or in connection with the documents, *i.e.,* did they sneak in
8   a provision without Refco knowing or was there a history there
9   that --
10          MS. KIM:  Well, Your Honor, we both have the
11  underwriting files.  I've got the underwriting files --
12          THE COURT:  Well --
13          MS. KIM:  -- from [inaudible].  They've got the
14  underwriting files.  I mean, we -- it's not like we're
15  litigating on a blank slate here.
16          THE COURT:  Well, I know.  That did -- but all that
17  says is there's a source for discovery.
18          MS. GILBRIDE:  And, Your Honor, if I just may raise
19  a fundamental issue here is that there are all -- other parties
20  to this dispute and those other parties are not before the
21  Court, but they are before the Court in the coverage action
22  that we filed.
23          So, you know, pursuant to the federal rules there
24  are necessary parties to this dispute who are not before Your
25  Honor and they are parties to the contract.  Whatever Your

1   Honor rules is going to affect their rights one way or the

2   other and I think that's a fundamental issue that we have to

3   deal with.

4            MS. KIM:  Well, that last point, Your Honor, I

5   don't understand.  It's my understanding that's why everyone is

6   on the phone is they have an interest in this policy, but I

7   think there is no -- I think everyone understands that not

8   everybody -- not all of the insureds stand in the same

9   position.  I have no doubt, for example, that there are certain

10  defendants who want nothing but the advancement with respect to

11  defense costs to be paid out ad infinitum.  And there are

12  others who want to be able to settle out of this litigation,

13  but who aren't able to settle out because there is a dispute

14  with respect to the fundamental issue of coverage and --

15           THE COURT:  Let me tell you, this is where I'm

16  coming out.  It seems to me that it is conceivable that the

17  points raised by Ms. Kim on behalf of Mr. Klejna could fall

18  outside the overlap rule.

19           However, I think to properly and fairly determine

20  whether that's the case the parties would have to have a

21  period -- an appropriate period to engage in discovery, *i.e.*,

22  Mr. Klejna's contention is that at the end of the day the bases

23  for Axis's denial of coverage can be overcome on arguments that

24  go to the -- to what's in the policy or what's properly in the

25  policy and that if he's successful on that point, there won't

22

1    need to be -- because it would be irrelevant -- an inquiry into

2    Mr. Klejna's own knowledge of fraud, wrongdoing, or whatever,

3    and it's that issue, the issue of knowledge of fraud or

4    wrongdoing or the like that is the basis for the overlap with

5    the District Court actions.

6            But to get to that point, unlike simply reading the

7    provisions of the policies as they pertain to defense cost

8    advancement, I think you -- there are currently credible

9    nonspeculative contentions by Axis that there are factual

10   issues, *i.e.,* did it sneak it in, *i.e.,* did it sneak in the

11   endor -- the prior knowledge endorsement or was that something

12   that was understood with the broker and/or Refco from the get-

13   go or was it agreed upon at some point in the middle of the

14   process?

15           Similarly, as far as the application is concerned,

16   since I think that the argument ultimately depends upon a

17   theory of waiver, I could envision there being factual issues

18   as to that point.

19           And finally, as to the argument that the warranty

20   doesn't apply except as to Mr. Bennett, I think your strongest

21   argument by far on that point is that the warranty doesn't

22   apply to this policy at all in the first place, but even that,

23   I believe, is a factual issue given the language of the

24   warranty.  If it does arguably apply to this policy, the

25   severability provision doesn't refer to it -- it refers to the

23

1   application, so I would assume that Axis would need a suitable

2   period to take discovery as to -- and you would, too -- as to

3   what the warranty was meant to apply to.

4           And all of that suggests that after that discovery

5   process, assuming that one or more district judges hasn't

6   decided that the matter is properly before him, you'll be back

7   here asking for summary judgment, but I don't think it's right

8   to schedule summary judgment at this point.  I think you needed

9   to go through discovery.

10          MS. KIM:  Your Honor, if I may just address the

11  point of discovery, Your Honor.  We were here at a status

12  conference in July and --

13          THE COURT:  I know, but that's not the issue.

14          MS. KIM:  No.  But -- well, then in all fairness --

15          THE COURT:  That's not really fair.  The focus on

16  that was first and foremost the dispositive motion to dismiss

17  Axis's complaint, and obviously there wasn't going to be

18  discovery while that was pending.

19          MS. KIM:  No, the understanding based on the July

20  status conference was that 21 days after the Court's ruling --

21  August 30 ruling, they would be entitled to proceed with

22  discovery.  And even in the face of the motion for summary

23  judgment in which they --

24          THE COURT:  But they don't -- but their complaint

25  was dismissed.

24

1          MS. GILBRIDE:  But all the plaintiffs, they had --

2          MS. KIM:  But our --

3          THE COURT:  But --

4          MS. KIM:  But our counterclaims were not dismissed.

5    The pleadings were there.  It's not like anyone was surprised.

6          THE COURT:  No, but, Ms. Kim, the whole -- I mean,

7    I think -- and I -- you know, I look at people from the bench

8    and except for you everyone in the courtroom was surprised at

9    the end of the last hearing when you stood up and said, "we

10   want to move for summary judgment on another issue."  I mean,

11   no one contemplated --

12         MS. KIM:  That's --

13         THE COURT:  -- I believe -- and certainly I

14   didn't -- that there would be any more activity in this

15   litigation beyond the ruling on discovery costs and --

16         MS. KIM:  If I may, Your Honor, it appears --

17         THE COURT:  I just don't think it's fair to say

18   that Axis's time to conduct discovery is gone.

19         MS. KIM:  I'm not saying -- Your Honor, I'm not

20   suggesting that their time to conduct discovery is gone.  I do

21   think, though, that, Your Honor, a properly briefed motion for

22   summary judgment it is their burden to show what questions of

23   fact would exist and whether discovery would address them, and

24   I think that --

25         THE COURT:  Well, no, they --

25

```
 1              MS. KIM:  And --
 2              THE COURT:  I don't agree with that.  I think we
 3   have this conference to see whether there needs to be any
 4   discovery in the first place or whether this is really a
 5   documentary case or the parties basically agree on the facts
 6   and the like, but if I believe that there's a reason to have
 7   discovery, I'm going to let people have discovery.  I just --
 8              MS. KIM:  That's right.  And I don't object to them
 9   having discovery, Your Honor, but I do want to address this
10   issue of Mr. Klejna being the only one.  There is a reason for
11   that.  Mr. Klejna is the only one --
12              THE COURT:  No, I'm not bothered by that.
13              MS. KIM:  Right.  I mean, he's the only one that --
14              THE COURT:  Axis can make a motion or if
15   somebody -- one of the other parties can make a motion on that
16   point, but I'm not going to deal with that today as to who may
17   be or may not be a necessary party on this issue.
18              MS. KIM:  Oh, no, not a question of unnecessary --
19              THE COURT:  That's not --
20              MS. KIM:  -- party.  It's a question of why
21   Mr. Klejna stands differently --
22              THE COURT:  But either way he has a settlement.
23              MS. KIM:  He's got a settlement, exactly.  Here
24   nobody else does.
25              THE COURT:  But that may not be at the end of the
```

26

1    day, but I understand why he's different, but that ultimately

2    may not be -- I'm not ruling today that that's a meaningful

3    distinction.  I understand why you're making the motion and I

4    understand that in that sense he is different, but I certainly

5    am not ruling out the possibility that someone may make a

6    motion to the effect that, you know, this has to involve

7    everybody or shouldn't go forward or the like.  I mean --

8              MS. KIM:  Well, Your Honor, we're happy to -- if

9    the Court will permit discovery --

10             THE COURT:  But, you know, I -- that -- I'm not

11   going to send people -- people know how to do those types of

12   motions and they can do them if they think it's appropriate.

13   You know, I'm not sure it would be, ultimately.  I don't know

14   who other than Axis would be affected parties, but --

15             MS. KIM:  Well, of course, any motion would be

16   subject to notice by everyone --

17             THE COURT:  Yes.

18             MS. KIM:  -- but I would just at this point, Your

19   Honor, since the Court believes that discovery is appropriate,

20   I would like to proceed with discovery, and then come back at

21   the conclusion of discovery, and be able to come back again to

22   request a briefing schedule if it looks appropriate at that

23   time, but that's limited to the issue of what's part and parcel

24   of this policy, Your Honor.

25             THE COURT:  Okay.  Well, on that score what I'm

27

1   going to suggest is as follows.  The same issue ultimately has

2   been raised before Judge Lynch and he's going to have to decide

3   or perhaps Judge Koeltl will decide what to do about that.

4         I would assume that Axis is not trying to start

5   fresh in this matter, since its also appealed my ruling, but

6   this issue -- when I say "fresh," start fresh with Judge Lynch

7   and ignoring the earlier rulings I made as to overlap -- the

8   first ruling -- and then the last ruling as to the defense

9   costs, but this issue is not something I've ruled on, the issue

10  you've raised as to coverage and he may or may not decide that

11  it's related.  I mean, that's -- or he may say Judge Koeltl

12  should deal with it first.

13        So what I'd like you to do is to meet and confer,

14  you and Ms. Gilbride, as to a suitable discovery schedule and

15  come back to me in sufficient time to give the district judge

16  some -- judge or judges -- some time to think about this.  They

17  may be perfectly happy to have me deal with this issue or they

18  may think at this point it's more efficient to keep it at

19  their -- you know, in the District Court's bailiwick.  I

20  understand that they're very busy and it may take them a little

21  while to rule on it and I'm trying to weigh that with a

22  plaintiff who has a settlement's desire to get on with life.

23  So I think you should come back to me and report in two weeks

24  about where things stand in the District Court and propose a

25  discovery cutoff date.

28

1           MS. KIM:  Will do, Your Honor.

2           THE COURT:  And I sincerely hope you'll agree on

3    that.  I think you will.  You're both professionals and you

4    pretty much know what sorts of documents the witnesses will

5    look at, and obviously as with any discovery schedule there's

6    going to be some play in it based upon unexpected twists and

7    turns in the discovery as far as whether a new witness gets

8    identified as a result of the depositions or a document along

9    the way.

10          So I can schedule something, although I'd be just

11   as happy to hear about it in a letter from the two of you

12   together as opposed to separate dueling letters.

13          MS. KIM:  I'm sorry?

14          THE COURT:  As opposed to dueling letters.  And, of

15   course, we have -- so that would be the 7th or 8th.  The 7th

16   would work better for me.

17          MS. GILBRIDE:  Your Honor, I have another

18   obligation on the 7th unfortunately.

19          THE COURT:  Okay.

20          MS. GILBRIDE:  I apologize.

21          MS. KIM:  Your Honor, the 8th is fine with me, Your

22   Honor.

23          MS. GILBRIDE:  It's a three-day out-of-town trip

24   actually, 7th, 8th, and 9th.

25          THE COURT:  Yeah.  No, the 8th doesn't work for me.

29

1  Let's do it, then, November 14th.  But again, it's the type of

2  thing that I would think you could just as easily handle in a

3  letter to the Court.

4            MS. KIM:  Yeah, why don't we report jointly by

5  letter?

6            THE COURT:  So I'm just leaving that date in case

7  you need to hear from me on some basis, but --

8            MS. KIM:  I have to -- can't do the 14th, Your

9  Honor.

10            THE COURT:  In all likelihood, it will be in the

11  form of a letter.

12            MS. KIM:  Yeah, Your Honor, I --

13            THE COURT:  Memorializing a discovery cutoff date,

14  assuming that the District Court, one of them, hasn't done

15  something about it in the meantime, which I'd also like you to

16  let me know about.  And you should copy in on that letter the

17  other parties to these -- this proceeding.

18            MS. KIM:  Your Honor, I'm actually not available

19  November 14th, but I'm actually being installed as an NAPABA

20  president in Las Vegas November 14th, 15th.

21            THE COURT:  Installed as a what?

22            MS. KIM:  The president of the National Asian

23  Pacific American Bar Association.

24            THE COURT:  Oh, okay.  I just heard the Las Vegas

25  part.  I didn't hear the --

30

1           MS. KIM:  Oh, yeah.  It happens to be in Las Vegas.
2    The convention starts that day.

3           THE COURT:  All right.

4           MS. KIM:  But I'm sure we can work it out, Your
5    Honor, by letter.

6           THE COURT:  If you need a date, then just get it
7    from my courtroom deputy.

8           MS. KIM:  I'll do that, Your Honor.

9           MS. GILBRIDE:  Your Honor, I just wanted to clarify
10   one thing for the record, because I think it's important
11   enough.  The Court is aware of this.

12          Based upon Your Honor's ruling with respect to
13   advancement of defense costs, the proposed settlement exceeds
14   our policy limits, so I just think that needs to be clear on
15   the record.

16          MS. KIM:  Well, Your Honor, I think it's also clear
17   on the record that if it turns out we're right on the coverage
18   issue and they have advanced defense costs and paid it out to
19   everybody, it turns out that our settlement was -- had priority
20   because it was submitted earlier, we believe they're on the
21   hook.

22          THE COURT:  If.

23          MS. KIM:  So, if.  That's right.  Big "if."

24          THE COURT:  So maybe that's the only issue for
25   summary judgment, for you, Ms. Gilbride?

31

1           MS. KIM:  That's right, Your Honor.

2           MS. GILBRIDE:  I tried to raise priority a few

3    times, but --

4           THE COURT:  Well --

5           MS. GILBRIDE:  -- unsuccessfully.

6           MS. KIM:  Well, Your Honor --

7           MS. GILBRIDE:  I don't think it's the final

8    obligation.  It's not actually a settlement.  It's a

9    conditional -- it's never been raised to any other party to any

10   court.

11          MS. KIM:  Well, Your Honor, we all understand this

12   is all if, if, if, but since the process starts with consent by

13   the carrier and we understand that the carrier understands the

14   risk, that's fine.  They can go ahead and pay with the

15   understanding that the risk they incur is that if they're wrong

16   on the coverage issue they're going to come --

17          THE COURT:  Well, there is -- let me just -- this

18   is --

19          MS. KIM:  We can't ignore the Court's --

20          THE COURT:  This is not going to change what I've

21   just gone through.  There is additional excess insurance,

22   right?  There is --

23          MS. KIM:  Yes, Your Honor.

24          THE COURT:  -- other excess coverage.

25          MS. KIM:  But those are subject to different

32

1    conditions and the other policies, I'm not aware of a position

2    where anyone saying their prior knowledge exclusion doesn't

3    exist unlike here.  So if it turns out that the other carriers

4    have a basis to --

5              THE COURT:  Well, I was going to say have the

6    other --

7              MS. KIM:  -- deny, but may do not.

8              THE COURT:  Have the other -- the other carriers

9    have not --

10             MS. KIM:  They've all --

11             THE COURT:  -- said anything --

12             MS. KIM:  No --

13             THE COURT:  -- as to whether they're going to pay

14   or not pay?

15             MS. KIM:  They've all denied -- well, first of

16   all --

17             THE COURT:  They've all denied coverage?

18             MS. KIM:  They've all denied coverage and, more

19   importantly, they take the position that because Axis's

20   coverage has not been exhausted, any obligation, even if it

21   existed hasn't been triggered so, you know, we're basically

22   caught between a rock and a hard place.

23             MS. GILBRIDE:  Well, so are we because we have a

24   court order that says we have to advance defense costs and we

25   can't exceed our policy limits by doing something beyond those

33

1    limits.  I'm sure you're not suggesting that we ignore the

2    Court's order.

3              MS. KIM:  No, of course, we're not suggesting that

4    they ignore the Court's order, but the Court doesn't -- the

5    Court's order doesn't say that they're entit -- that the order

6    takes them off the hook.

7              THE COURT:  I was going in a different direction,

8    which is maybe your fight is with another insurer who's maybe

9    not willing to fight with -- maybe happy not to fight with you,

10   but it sounds like they're going to fight with you, too, so --

11             MS. KIM:  They're going to fight, Your Honor,

12   and --

13             THE COURT:  And including based on provisions of

14   the Axis policy, including the prior knowledge exclusion.

15             MS. KIM:  But no, they have their own separate

16   exclusions, Your Honor.

17             THE COURT:  They're on separate --

18             MS. KIM:  They have their own separate exclusions

19   and those were a part of their policy binders, unlike the Axis

20   policy which -- where there is a dispute, I guess, as to

21   whether --

22             THE COURT:  Okay.

23             MS. KIM:  -- it was, so we --

24             THE COURT:  Well, then I'll repeat.  Maybe,

25   Ms. Gilbride, you have a potential for summary judgment, too,

34

1    because remember what that order said, is that it's meant not

2    making any ruling as to priority.  I didn't rule on your

3    motion, so that's not -- the order is not res judicata on that

4    point by any means.

5                MS. GILBRIDE:  No, I understand.  No, I --

6                THE COURT:  You know, you could make some sort of

7    motion, too, if you wanted to.

8                MS. GILBRIDE:  We'll try to be creative.

9                THE COURT:  Well, I'm not sure I recommend going

10   that far, but --

11               MS. GILBRIDE:  Okay.

12               THE COURT:  Okay.

13               MR. EISEN:  Your Honor, it's Norman Eisen,

14   Mr. Bennett's [inaudible].  Would this be an appropriate time

15   for me to raise a perhaps related question?

16               THE COURT:  Okay.

17               MR. EISEN:  We had understood based on the Court's

18   previous ruling following the other complaints in the federal

19   District Court and court's order that the -- you know, we had

20   [inaudible] permanent, I believe at the moment with this court.

21   There are -- there is, however, a counterclaim, which Axis has

22   filed against the three criminal defendants [inaudible] and we

23   had -- we're perfectly prepared to -- of course, still trying

24   to act on structuring a response date.  I thought that may be

25   due as --

35

1           THE COURT:  Let me cut through.  Are you going
2     forward with the counterclaim or --
3           MS. GILBRIDE:  No, Your Honor.  I apologize if
4     Mr. Eisen didn't get a copy of the letter, but we've agreed to
5     voluntarily dismiss the counterclaims based on the Court's
6     prior rulings.
7           THE COURT:  Okay.  Did you hear --
8           MS. GILBRIDE:  So we are --
9           THE COURT:  Did you hear that, Mr. Eisen?
10          MR. EISEN:  I did and it is -- Ms. Gilbride, that's
11    [inaudible] did not get a copy of the letter or if I did it
12    hasn't made its way to me, so my understanding, then, is that
13    once there's no -- nothing left for us to plead in response to
14    those Axis claims in Bankruptcy Court, I think it's
15    [inaudible].
16          MS. GILBRIDE:  Yes, that's correct.
17          MR. EISEN:  Thanks.
18          THE COURT:  Okay.  All right.  Anything else?
19    Okay.  Thank you.
20          MR. EISEN:  Okay.
21          MS. GILBRIDE:  Thank you, Your Honor.
22          (Proceedings concluded at 3:06 p.m.)
23                    *  *  *  *  *  *
24
25

36

1                          * * * * * *

2            I certify that the foregoing is a court transcript

3      from an electronic sound recording of the proceedings in the

4      above-entitled matter, except where, as indicated, the Court

5      has modified the transcript.

6

7

8                                _____

9                                          Ruth Ann Hager

10     Dated:   October 25, 2007

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. ● Washington, D.C. 20006-1040 ● *p* (202) 662-2000 *f* (202) 662-2190

**GARY V. DIXON**
DIRECT DIAL:    (202) 662-2003
EMAIL: GDIXON@RDBLAW.COM

**LESLIE S. AHARI**
DIRECT DIAL:    (202) 662-2036
EMAIL: LAHARI@RDBLAW.COM

November 10, 2005

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

| Re: | Insured: | Refco, Inc. |
|-----|----------|-------------|
|     | Policy No.: | 24-MGU-05-A10821 |
|     | Claimants: | Various |

Dear Andrea:

This firm represents U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for all of the Insureds, including the individual Insured Persons, under the Policy. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

By our October 27, 2005 letter, U.S. Specialty acknowledged receipt of and generally reserved its rights with respect to the complaints filed in the following twelve lawsuits: (1) *Glaubach v. Refco, Inc., et al.*, No. 05 CV 8692 (S.D.N.Y.); (2) *Frontpoint Financial Services, Inc. v. Refco, Inc., et al.*, No. 05 CV 8663 (S.D.N.Y.); (3) *Lieber v. Refco, Inc., et al.*, No. 05 CV 8667 (S.D.N.Y.); (4) *Sandra Weiss v. Refco, Inc., et al.*, No. 05 CV 8691 (S.D.N.Y.); (5) *Mehta v. Bennett, et al.*, No. 05 CV 8748 (S.D.N.Y.); (6) *Wakefield v. Refco, Inc., et al.*, No. 05 CV 8742 (S.D.N.Y.); (7) *Baker v. Bennett, et al.*, No. 05 CV 8923 (S.D.N.Y.); (8) *Becker v. Refco, Inc., et al.*, No. 05 CV 8929 (S.D.N.Y.); (9) *Nathanson v. Bennett, et al.*, No. 05 CV 8926 (S.D.N.Y.); (10) *United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.); (11) *American Financial International Group – Asia, LLC v. Refco, Inc., et al.*, No. 05 CV 8988 (S.D.N.Y.); and (12) *Mettupatti v. Bennett, et al.*, No. 05 CV 9048 (S.D.N.Y.). Following our October 27 letter, U.S. Specialty received the complaint filed in *Todd Weiss v. Bennett, et al.*, No. 05 CV 9126 (S.D.N.Y.). On U.S. Specialty's behalf, this will discuss potential coverage for these matters under the Policy. For the reasons set forth below, U.S. Specialty is proceeding

WASHINGTON ● IRVINE ● SAN DIEGO ● CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 2

subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to all of these matters.

## I. The Litigation

### A. The Securities Class Action Lawsuits

Eleven of the thirteen suits listed above (*Glaubach, Frontpoint, Lieber, Sandra Weiss, Wakefield, Baker, Becker, Nathanson, American Financial, Mettupatti,* and *Todd Weiss*) are purported shareholder class actions alleging violations of the securities laws. All of the suits were filed in October 2005 in the federal district court for the Southern District of New York.

Several of the shareholder class action complaints purport to sue on behalf of the class of all purchasers of Refco's publicly traded common stock, while other of the complaints seek to sue on behalf of the purchasers of all of Refco's securities. The alleged class periods in the complaints differ somewhat, with all alleging a beginning class period of August 11, 2005, and the ends of the class periods varying between October 7 and October 18, 2005. Refco, Inc. is named as a defendant in several of the complaints. One or more of the following individuals, who are identified as Refco directors and/or officers, also are named in some or all of the lawsuits: Philip Bennett, Gerald Sherer, Leo Brietman, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, Nathan Gantcher, and Scott Schoen. Various other defendants are named in some of the complaints, including Grant Thornton, Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, Merrill Lynch Pierce Fenner & Smith, Deutsche Bank Securities, J.P. Morgan Securities, Liberty Corner Capital, Sandler O'Neill & Partners, HSBC Securities (USA) Inc., William Blair & Co., Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert & Co., The Williams Capital Group, Utendahl Capital Group, Refco Group Holdings Inc., and Refco F/X Associates, LLC.

The class action complaints generally allege that on August 11, 2005, Refco completed its IPO, selling 26.5 million shares of common stock at $22/share for proceeds totaling $538 million. At that time, Mr. Bennett and other Refco insiders allegedly sold 5.375 shares in the IPO, and netted $145 million in personal gross proceeds. Mr. Bennett also allegedly gained from a provision that allowed him and other insiders to divide up the proceeds when the underwriters exercised options to purchase additional shares. In connection with the IPO, Refco filed a Form S-1 Registration Statement and Prospectus in August 2005.

Plaintiffs allege that Refco's Registration Statement and Prospectus were materially false and misleading. The complaints allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer, and that Refco's financial statements issued since 2002 could no longer be relied on. By the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. The common

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 3

stock fell further on October 11, 2005, after a five hour trading halt on the New York Stock Exchange was lifted, following the additional disclosure that the $430 million receivable was largely comprised of uncollectible debts dating back to 1998. Refco's shares closed at $13.85/share on October 11, 2005. On October 12, 2005, *The Wall Street Journal* reported that an investment firm controlled by Mr. Bennett had paid Liberty Corner Capital to help him hide that he owed Refco hundreds of millions of dollars, and that the Securities Exchange Commission ("SEC") had launched an investigation. That same day, the United States Attorney announced that Mr. Bennett had been arrested and indicted for securities fraud in connection with the IPO. On October 12, 2005, the stock fell further to close at $10.85/share. On October 13, 2005, trading in Refco's stock was delayed at the opening of the market. Later that morning, Refco announced that it had hired advisors and imposed a 15 day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE again halted trading, Refco's stock was trading at $7.90/share. Then, on October 18, 2005, Refco filed for Chapter 11 bankruptcy protection after it negotiated an agreement to sell its primary business to J.C. Flowers & Co.

The securities class action complaints allege violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. The complaints seek class certification, unspecified damages, and attorneys' fees and costs.

## B. The Shareholder Derivative Action

The *Mehta* lawsuit is a shareholder derivative action filed on October 14, 2005 in federal court in New York. The *Mehta* complaint names as defendants eleven individuals identified as directors and/or offices of Refco: Philip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, and Scott Schoen. The *Mehta* complaint also names as defendants Credit Suisse First Boston, Goldman Sachs, Banc of America Securities, Deutsche Bank, J.P. Morgan, Merrill Lynch & Co., Sandler O'Neill & Partners, HSBC and Thomas H. Lee Partners. The *Mehta* complaint is based generally on the same allegations contained in the securities class action complaints. It alleges that demand on Refco's board to file suit against the defendants on behalf of the company would be futile. The complaint contains six counts: (1) for breach of fiduciary duty against the individual defendants and Thomas H. Lee Partners; (2) abuse of control against the individual defendants and Thomas H. Lee Partners; (3) gross mismanagement against the individual defendants and Thomas H. Lee Partners; (4) waste of corporate assets against the individual defendants and Thomas H. Lee Partners; (5) unjust enrichment against the individual defendants and Thomas H. Lee Partners; and (6) aiding and abetting against the IPO Underwriter Defendants. The complaint seeks unspecified damages, equitable and/or injunctive relief, the imposition of a constructive trust on defendants' assets and restriction of defendants' trading activities, restitution, disgorgement, corporate reforms, enhanced shareholder representation on the board of directors, attorneys' fees and costs.

## ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 4

### C. The Criminal Proceedings

On October 12, 2005, the United States of America filed a criminal complaint against Mr. Bennett in federal court in New York, alleging one count for violation of the federal securities laws, 15 U.S.C. §78j(b). *See United States of America v. Bennett*, No. 05 MAG 1720 (S.D.N.Y.).

The six page complaint alleges that from at least in or about 2004 up to October 2005, Mr. Bennett hid from investors in the August 2005 IPO the existence of hundreds of millions of dollars of related party transactions between Refco and Refco Group Holdings, Inc. ("RGHI"), a company controlled by Mr. Bennett. The complaint alleges that Mr. Bennett caused Refco to file a false and fraudulent S-1 Registration Statement with the SEC in August 2005 in connection with the IPO. Specifically, the S-1, which contained Refco's audited financial statements as of February 28, 2005 and unaudited financial statements as of May 31, 2005, did not disclose hundreds of millions of dollars of transactions with and debts owed to Refco by RGHI. The complaint asserts that Refco's books show a "multi-hundred million dollar receivable" from RGHI throughout 2005, including in late February 2005, except for quarter-end periods. In this regard, in February 2005, Mr. Bennett allegedly caused Refco to engage in a series of transactions designed to disguise the related-party nature of this $300 million-plus debt owed to Refco by RGHI by temporarily paying off the debt and transferring it from RGHI to another entity unrelated to Mr. Bennett. The complaint alleges that this temporary re-positioning of debt was carried out so that the debt would not appear to be owed by RGHI over Refco's February 28, 2005 fiscal-year end.

More particularly, the complaint alleges that on February 23, 2005, Refco Capital Markets, a subsidiary of Refco, loaned $335 million to a Refco customer unrelated to Mr. Bennett, to be repaid on March 8, 2005. On the same day, the customer loaned $335 million to RGHI, with a March 8, 2005 repayment date. The loan agreement allegedly was executed by Mr. Bennett on behalf of RGHI, and the interest rate was 75 basis points higher than the loan from Refco Capital Markets to the customer, thereby assuring the customer a profit. Also on February 23, 2005, Mr. Bennett allegedly signed a letter of guaranty to the customer on behalf of Refco Group, Ltd., providing assurance that should RGHI default, Refco Group Ltd. would make the customer whole. The $335 million loan to RGHI was used to pay down a portion of the existing RGHI debt to Refco. The result of these transactions was to substitute a $335 million debt to Refco by the customer for a $335 million debt by RGHI. The transactions then were unwound on March 8, 2005, after the end of Refco's fiscal year on February 28, 2005. The complaint further alleges that similar transactions took place at the close of the quarters ended May 31, 2005, November 30, 2004, and August 31, 2004.

Finally, the government's complaint asserts that on October 10, 2005, Refco issued a press release announcing that it had discovered a $430 million debt owed by an entity controlled by Mr. Bennett, and that Mr. Bennett had repaid the entire sum to Refco that day. Following this

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 5

announcement, the market price of Refco's common stock plummeted from its October 7, 2005 closing price of $28.56/share to $13.85/share, its closing price on October 11, 2005, resulting in a market capitalization loss of over $1 billion.

## II. Coverage Discussion

U.S. Specialty's Policy provides a $10 million maximum aggregate limit of liability, inclusive of **Defense Costs**. *See* Policy Declarations Item 3; Policy Conditions (A)(1), (2). **Defense Costs** are a part of, and not in addition to, the Policy's limit of liability and the payment of **Defense Costs** reduces and may totally exhaust the limit of liability. The Policy provides for a $0 retention under Insuring Agreement (A), and a $500,000 retention applicable to **Securities Claims** under Insuring Agreements (B)(1) and (B)(2), which applies to **Defense Costs**. *See* Policy Declarations Item 4, as amended by Endorsement No. 12; Policy Conditions (A)(2), (4), (5). Pursuant to Policy Condition (A)(3), the $500,000 retention stated in Declarations Item 4(b) applies to **Loss**, including **Defense Costs**, which the insured **Company** is required to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the insured **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency.

Based on the limited information presently available, U.S. Specialty has undertaken a preliminary review of these matters to identify potential coverage issues for the Insureds' guidance in proceeding. The discussion below of the coverage potentially available under the Policy is not intended to be exhaustive or exclusive, and U.S. Specialty reserves the right to raise other defenses to coverage under the Policy and applicable law as additional information becomes available. Please note further that U.S. Specialty's review of these matters necessarily is based on the unsubstantiated allegations in the complaints, and that U.S. Specialty is not expressing any view on the truth of such allegations. U.S. Specialty also invites the Insureds to provide for its consideration any additional information or documentation that they believe may be relevant to the coverage issues discussed below.

The Policy contains four Insuring Agreements potentially applicable here, subject to all of the Policy's other terms and conditions.[1] First, under Insuring Agreement A, U.S. Specialty will pay on behalf of the **Insured Persons Loss** arising from **Claims** first made during the **Policy Period** against them for **Wrongful Acts**, except and to the extent that the **Company** (defined by Policy Definition (C) to mean Refco Inc. or any **Subsidiary**) has paid such **Loss** to or on behalf of the **Insured Persons** as indemnification or advancement. Second, Insuring Agreement B(1) provides that U.S. Specialty will pay to or on behalf of the **Company Loss** arising from **Claims** first made during the **Policy Period** against **Insured Persons** for **Wrongful Acts** if the **Company** has paid such **Loss** to or on their behalf as indemnification or advancement. Third, Insuring Agreement B(2) states that U.S. Specialty will pay to or on behalf

---

[1] Policy Endorsement No. 11 adds a fifth Insuring Agreement in connection with **Derivative Demands**, which is not applicable here.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 7

Second, the Policy defines "Insured Persons" to mean any past, present or future director or officer of the Company; employees of the Company but only with respect to Securities Claims; the Insurance Manager and General Counsel; and Employed Lawyers. *See* Policy Definitions (F), as amended by Endorsement Nos. 3, 5. U.S. Specialty requests the insureds verify that Philip Bennett, William Sexton, Gerald Sherer, Joseph Murphy, Leo Breitman, Nathan Gantcher, David Harkins, Scott Jaeckel, Thomas Lee, Ronald O'Kelley, and Scott Schoen each is or was a director, officer, employee, insurance manager, general counsel or employed lawyer of Refco. Pending receipt of such verification, U.S. Specialty reserves the right to deny coverage for any person who is not an Insured Person under the Policy.

Third, the only entities that are Insureds under the Policy are Refco Inc. and its Subsidiaries. *See* Policy Definitions (E), (H). As stated more fully in the Policy, "Subsidiary" means an entity in which Refco Inc. owns more than 50% of the issued and outstanding securities representing the right to vote for the election of the entity's directors, either directly or indirectly through one or more other Subsidiaries. *See* Policy Definitions (O). U.S. Specialty requests that Refco advise us whether Refco Group Holdings Inc. and/or Refco F/X Associates LLC are Subsidiaries of Refco – that is, does Refco owns more than 50% of the issued and outstanding securities representing the right to vote for those entities' directors. Pending receipt and review of this information, U.S. Specialty reserves the right to deny coverage as to Refco Group Holdings and Refco F/X Associates LLC. In addition, and other than Refco Inc., the Policy does not provide coverage for any of the other entities named as defendants in the lawsuits, including Credit Suisse First Boston LLC, Goldman Sachs & Co., Banc of America Securities, Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith, Sandler O'Neill & Partners, Thomas H. Lee Partners, Grant Thornton, Deutsche Bank Securities, J.P. Morgan, J.P. Morgan Securities, Liberty Corner Capital, HSBC Securities (USA) Inc., William Blair & Co., Harris Nesbitt Corp., CMG Institutional Trading, Samuel A. Ramirez & Co., Muriel Siebert & Co., The Williams Capital Group, and Utendahl Capital Group.

Fourth, potential coverage under all of the Insuring Agreements is limited to "Loss," which the Policy defines as Defense Costs, and any damages, settlements, judgments, pre-judgment interest, post-judgment interest or other amounts (including punitive or exemplary damages and the multiplied portion of a multiplied damage aware if and where insurable by law), that the Insureds are legally obligated to pay for a covered Claim or Securities Claim. However, "Loss" does not include wages, fines, taxes or penalties, nor matters which are uninsurable under the law pursuant to which the Policy is construed. *See* Policy Definitions (G), as amended by Endorsement Nos. 4, 15. In this regard, U.S. Specialty reserves its right to deny coverage for any amount that does not constitute "Loss" under the Policy or is uninsurable as a matter of law, including but not limited to amounts paid as restitution or disgorgement, amounts attributable to intentional wrongdoing and/or intentional harm, and taxes, fines or penalties. U.S. Specialty further reserves the right to deny coverage for punitive, exemplary or multiplied damages if uninsurable under the law of the jurisdiction applicable to the Claim.

## ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 8

Fifth, "Wrongful Act" means, in pertinent part, any actual or alleged act, error, misstatement, misleading statement, omission or breach of duty by (a) any **Insured Person** while acting in his or her capacity as such, including in an **Outside Capacity**; (b) with respect to **Securities Claims**, by the **Company** or the **Controlling Shareholder** in his capacity as such or by reason of his status as such. *See* Policy Definitions (P), as amended by Endorsement No. 15. Thus, there is no coverage for **Loss** resulting from actual or alleged wrongful acts undertaken in an Insured's personal capacity or other than undertaken in an insured capacity as set forth above. In this regard, and by way of example, the various complaints allege that certain of the defendants engaged in trading of their personally held Refco shares and engaged in other transactions in which they had a financial interest, which may result in damages, settlements and/or defense expenses that are excluded from coverage.

Sixth, the Policy contains various exclusions to coverage, including the profit and fraud exclusions. Specifically, Exclusions A and B provide that U.S. Specialty will not be liable to make payment for **Loss** in connection with a **Claim** –

> (A) arising out of, based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this Exclusion (A) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

> (B) arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this Exclusion (B) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

Policy Exclusions (A), (B). The Policy further provides, for purposes of determining the applicability of the exclusions, that the **Wrongful Act** of any **Insured Person** will not be imputed to other **Insured Persons** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act**. Further, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of an **Insured Person** will be imputed to the **Company**. In this case, the complaints expressly allege that various of the defendants committed criminal, fraudulent and/or dishonest acts, and further allege that certain of the defendants gained a profit or advantage to which they were not entitled. U.S. Specialty therefore reserves the right to deny coverage as to any **Insured Person** finally adjudicated to have engaged in conduct within the scope of Exclusions (A) and (B). U.S. Specialty further reserves the right to deny coverage pursuant to these exclusions with respect to other **Insured Persons** who had actual knowledge or participated in such conduct, and with respect to Refco, if any of the designated executive officers engaged in such conduct.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 9

Seventh, Policy Exclusion (F) provides that U.S. Specialty will not be liable to make payment for Loss in connection with a Claim brought by or on behalf of, or in the name or right of, the Company, whether directly or derivatively, or any Insured Person or Controlling Shareholder, subject to certain exceptions, including the exception for a Claim that is brought and maintained independently of, and without the solicitation, assistance or active participation of, the Company or any Insured Person. Policy Exclusions (F). If it is determined that the *Mehta* action, or any other derivative claim, is not brought or maintained independently of any insured, there would be no coverage under the Policy.

Eighth, Endorsement No. 14 to the Policy provides that U.S. Specialty will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to certain excluded events, that is, a Wells Notice and SEC Investigation. Pending further factual development in the litigation, U.S. Specialty reserves its right to deny or limit coverage pursuant to this exclusion.

Ninth, U.S. Specialty calls to the insureds' attention the Policy's Other Insurance clause, which provides that coverage thereunder is excess to any other valid and collectible insurance. *See* Policy Conditions (G). Please provide us with copies of any other insurance policies which potentially may provide coverage for the matters about which notice has been provided, and all correspondence exchanged with any insurers concerning coverage for this matter. Without limitation of the foregoing, please provide information concerning insurance for the Refco directors affiliated with Thomas H. Lee Partners.

Tenth, under Policy Condition (D)(3), an allocation may be required if Loss covered by the Policy and loss not covered by the Policy are both incurred in connection with a single Claim, either because a Claim contains both covered and uncovered matters, or because a Claim is made both against Insured Persons (or, with respect to Securities Claims, against Insureds) and against others not insured. U.S. Specialty reserves its right with respect to requiring such an allocation in connection with the defense or settlement of any Claim and to deny coverage for any amount allocated to uncovered matters or uncovered persons or entities.

Without prejudice to the foregoing reservations of rights, please note that under the Policy, it is the duty of the Insureds, and not of U.S. Specialty, to defend Claims. *See* Policy Condition (D)(1). No Insured may incur any Defense Costs or admit or assume liability for, enter into any settlement agreement, stipulate to any judgment, or without U.S. Specialty's consent. Such consent will not be unreasonably withheld, provided that U.S. Specialty is entitled to effectively associate in the defense and the negotiation of any settlement of a Claim. *Id.*

In this regard, please advise us of the identities of the law firms and hourly billing rates of each of the assigned attorneys who will be representing the Insureds in the lawsuits. After receipt and review of this information, U.S. Specialty will advise whether it consents to the proposed defense arrangements. Please note further that "Defense Costs" is means "reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal

## ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 10

of a **Claim** against an **Insured Person**" or a **Securities Claim** with respect to Refco, but
excludes salaries, wages, benefits or overhead expenses of directors, officers or employees of
Refco. *See* Policy Definitions (D), as amended by Endorsement No. 1.

Subject to all of the Policy's terms and conditions, U.S. Specialty will pay covered
**Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by
U.S. Specialty are not covered under the Policy, the **Insureds** agree to repay such non-covered
**Defense Costs** to U.S. Specialty. *See* Policy Conditions (D)(1). Because Refco currently is in
bankruptcy, before making any payment under the Policy, U.S. Specialty will seek a ruling from
the bankruptcy court to the effect that the automatic stay provision, 11 U.S.C. § 362, either is not
applicable to the Policy and its proceeds or, if the stay is deemed applicable, granting relief from
the stay in order to permit the advancement of **Defense Costs** under the Policy. Before making
advancement, U.S. Specialty also will request the Insureds to execute an advancement agreement
and undertaking of repayment.

As noted above, the Policy's maximum aggregate limit of liability is $10 million.
**Defense Costs** are a part of the Limit of Liability and the payment thereof by U.S. Specialty will
reduce the Limit of Liability. Policy Condition (A)(1). After payment of its Limit of Liability,
U.S. Specialty shall have no further obligation under the Policy. In this case, it is possible that
the $10 million Limit of Liability will be insufficient to satisfy the Insureds' Loss, including
**Defense Costs**, in the matters about which notice has been provided, and the **Insureds** may incur
loss in excess of the Limit of Liability. *Please let us know immediately if Refco or any Insured
Person objects to U.S. Specialty making payments for Defense Costs for any of the Insureds
under the Policy, which payments will deplete the available Limit of Liability.*

With respect to billing, it will be necessary to provide to us copies of all of defense
counsel's statements for services rendered. Defense counsel's bills should specify the time spent
on each of the tasks performed on a daily basis, the hourly rates being applied, and itemize the
expenses incurred. Block billing is not acceptable.

U.S. Specialty requests that we be kept informed of all significant developments in the
litigation, and provided on a prompt basis with all substantive pleadings, orders and briefs filed
in the lawsuits. U.S. Specialty wishes to exercise its right under the Policy to effectively
associate in the defense and the negotiation of any settlement of a **Claim** pursuant to Policy
Condition (D)(1).

Please direct all further communications concerning this matter to us, except for any
notices of new claims, which should be sent to U.S. Specialty as specified in Item 6 of the Policy
Declarations. We request that you also provide us with a copy of any such notice and new
complaints in order to expedite our review of such materials.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to
coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S.
Specialty's views on coverage as additional information becomes available or as developments
warrant. U.S. Specialty also appreciates that the insureds likewise reserve their rights. Please

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 11

feel free to contact us if you have any questions concerning the Policy or this letter. We look
forward to working cooperatively with you and defense counsel in these matters.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____

Gary V. Dixon
Leslie S. Ahari

cc:     R. Damian Brew, Esq. (by email)
        Wayne E. Borgeest, Esq. (by email)
        Daniel J. Standish, Esq. (by email)
        John D. Hughes, Esq. (by email)
        Cecilia W. Kaiser, Esq. (by email)
        Barbara Seymour, Esq. (by email)
        John Tolan, Esq. (by email)

327793 v 1

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • p (202) 662-2000  f (202) 662-2190

GARY V. DIXON
DIRECT DIAL:  (202) 662-2003
EMAIL:  GDIXON@RDBLAW.COM

LESLIE S. AHARI
DIRECT DIAL:  (202) 662-2036
EMAIL:  LAHARI@RDBLAW.COM

November 10, 2005

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

|      |            |                                                                                      |
|------|------------|--------------------------------------------------------------------------------------|
| Re:  | Insured:   | Refco, Inc.                                                                           |
|      | Policy No.: | 24-MGU-05-A10821                                                                      |
|      | Claimants: | *Banseco Holding, et al. v. Refco, Inc., et al.; Miura Financial Services v. Refco, Inc., et al.; Multiplicas Casa De Bolsa v. Refco Inc., et al.* |

Dear Andrea:

This firm represents U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 issued to Refco, Inc. for the claims-made period August 11, 2005 to August 11, 2006 (the "Policy"). We are directing this letter to you as the authorized insurance representative for all of the Insureds. To the extent that you are not acting as the authorized representative for any of the Insureds, we request that you forward a copy of this letter to that Insured or his or her insurance representative, and advise us with whom we should communicate in the future concerning this matter.

On U.S. Specialty's behalf, this will acknowledge receipt of Marsh's October 28, 2005 letter, enclosing the complaints filed in the following three matters: (1) *Banseco Holding C.A., et al. v. Refco, Inc., et al.*, Index No. 05603681 (Supreme Court, New York Cty., NY); (2) *Miura Financial Services v. Refco, Inc., et al.*, Index No. 05603682 (Supreme Court, New York Cty., NY); and (3) *Multiplicas Casa De Bolsa v. Refco, Inc., et al.*, Index No. 05603683 (Supreme Court, New York Cty., NY). For the reasons detailed below, U.S. Specialty must respectfully deny coverage for these lawsuits.

## I.    The Lawsuits

The complaints in the *Banseco Holding*, *Miura Financial* and *Multiplicas Casa De Bolsa* lawsuits all were filed on October 17, 2005 in New York Supreme Court. Refco Inc. and Refco Capital Markets, Ltd. – referred to collectively in the complaints as "Refco" – are the only two

---

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 2

named defendants in each of the three lawsuits. The plaintiffs in each of the lawsuits identify themselves as owners of brokerage accounts with Refco.

The three complaints, which are substantially similar to each other, allege that pursuant to separate brokerage agreements between plaintiffs and Refco, Refco was obligated to invest, transfer and return funds and investments in plaintiffs' accounts as instructed by plaintiffs. Each of the complaints alleges that on or about October 12, 2005, plaintiffs instructed Refco to transfer the funds in their accounts to other institutions, but that Refco failed and/or refused to do so, and instead announced a "moratorium" on account withdrawals. Each of the complaints contains four causes of action: (1) breach of contract; (2) conversion; (3) imposition of a constructive trust; and (4) unjust enrichment. Plaintiffs each seek compensatory damages in excess of the amounts in their respective Refco accounts (which vary from $2.5 million to $50 million), the imposition of a constructive trust over the funds in the accounts, punitive damages in excess of $100 million, attorneys' fees and costs, and pre-judgment interest.

## II. Coverage Discussion

The Policy provides a $10 million maximum aggregate limit of liability, inclusive of Defense Costs. U.S. Specialty has reviewed the lawsuits for potential coverage under the Policy based on the information that the insureds have made available to it. Based on that information and as explained below, U.S. Specialty is denying coverage for two reasons. First, potential coverage for claims asserted against Refco under the Policy is limited to "**Securities Claims,**" and none of the three lawsuits is a Securities Claim. Second, even assuming the lawsuits were potentially within the scope of any of the Insuring Agreements, coverage would be excluded by the Policy's Errors and Omissions Exclusion.

The Policy contains five Insuring Agreements which address the scope of potential coverage thereunder, subject to all of the Policy's terms, conditions, and exclusions. Here, none of the Insuring Agreements is implicated by the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions, and thus the suits are not within the scope of potential coverage under the Policy.

First, Insuring Agreements (A) and (B)(1) are not implicated here because no individual director, officer or employee is named as a defendant in the three suits. Specifically, Insuring Agreement (A) provides that U.S. Specialty will pay on behalf of "**Insured Persons**" **Loss** arising from **Claims** first made during the **Policy Period** against them for **Wrongful Acts,** except and to the extent that the **Company** (defined by Policy Definitions (C) to mean Refco Inc. and any **Subsidiary**) has paid such **Loss** on their behalf as indemnification or advancement. Insuring Agreement B(1) states that U.S. Specialty will pay to or on behalf of the **Company Loss** arising from **Claims** first made during the **Policy Period** against the "**Insured Persons**" for **Wrongful Acts** if the **Company** has paid such **Loss** to or on their behalf as indemnification or advancement. *See* Policy Insuring Agreements (A), (B)(1). In this regard, the Policy defines

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 3

"Insured Person" to mean any past, present or future director or officer of the Company; employees of the Company with respect to Securities Claims and Claims for Employment Practices Wrongful Acts only; and certain other designated individual persons. *See* Policy Definitions (F), as amended by Endorsement Nos. 2 ¶ (2); 3; 5 ¶ (1). Thus, neither Insuring Agreement (A) or (B)(1) is applicable to the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions because no Insured Persons are named as defendants in any of the suits.

Second, Insuring Agreement (B)(2) provides that U.S. Specialty will pay to or on behalf of the Company Loss arising from "Securities Claims" first made during the Policy Period against the Company for Wrongful Acts. *See* Policy Insuring Agreements (B)(2). The Policy defines "Securities Claim" to mean a Claim which —

(1)   is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or

(2)   arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market.

Policy Definitions (N). Here, the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions are not "Securities Claims" as defined by the Policy because the suits were neither brought by or on behalf of securities holders of Refco or a Subsidiary, nor arise from the purchase or sale of securities issued by Refco or a Subsidiary. Therefore, Insuring Agreement (B)(2) is inapplicable to the lawsuits.

Third, pursuant to Endorsement No. 11, U.S. Specialty will pay to or on behalf of the Company all Derivative Demand Investigation Costs incurred by the Company as a result of a Derivative Demand first received by the Company's Board of Directors and reported in writing during the Policy. "Derivative Demand" means a written demand by one or more shareholders of the Company made upon its Board of Directors to bring a civil proceeding against an Insured Person for a Wrongful Act. *See* Policy Endorsement No. 11. This Insuring Agreement is not implicated here because the *Banseco Holding, Miura Financial* or *Multiplicas Casa De Bolsa* actions do not constitute Derivative Demands.

Fourth, pursuant to Endorsement No. 15, U.S. Specialty will pay to or on behalf of the Controlling Shareholder (defined to mean Philip Bennett) Loss arising from Securities Claim first made during the Policy Period against such Controlling Shareholder for Wrongful Acts so long as one or more Insured Persons or the Company are co-defendants in such Securities Claim. This Insuring Agreement also is not implicated here because the suits are not Securities Claims and Mr. Bennett is not a named defendant in any event.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
November 10, 2005
Page 4

Even assuming arguendo that the *Banseco Holding*, *Miura Financial* or *Multiplicas Casa De Bolsa* actions were within the scope of any of the Policy's Insuring Agreements (which they are not), coverage would be excluded in any event by the Errors and Omissions Exclusion, which provides:

> In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the **Company** or by any **Insured Person**, any service for others for a fee; provided, that this exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in connection with the management or supervision of the **Company** or any division or group therein.

Policy Endorsement No. 6. Therefore, even assuming coverage otherwise was potentially available, the Errors and Omissions exclusion would bar coverage here because each of the three lawsuits arises out of, is based upon, and is attributable to the rendering or failure to render services to others for a fee.

Based on the foregoing, U.S. Specialty is denying coverage for the *Banseco Holding*, *Miura Financial* or *Multiplicas Casa De Bolsa* actions. Without prejudice to its denial of coverage, U.S. Specialty further reserves its right to raise other Policy terms and conditions as defenses to coverage.

Please let us know if the insureds have any question concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____
Gary V. Dixon
Leslie S. Ahari

cc:  R. Damian Brew (by email)
Wayne E. Borgeest (by email)
Daniel J. Standish (by email)
John D. Hughes (by email)
Cecilia W. Kaiser (by email)
Barbara Seymour (by email)
John Tolan (by email)

328223 v 1

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000 *f* (202) 662-2190

GARY V. DIXON
DIRECT DIAL:  (202) 662-2003
EMAIL·  GDIXON@RDBLAW.COM

LESLIE S. AHARI
DIRECT DIAL   (202) 662-2036
EMAIL  LAHARI@RDBLAW.COM

October 10, 2006

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

> Re:  **Insured:**  **Refco, Inc.**
> **Policy No.:**  **24-MGU-05-A10821**
> **Matter:**  **In Re Refco Capital Markets, Ltd. Brokerage Customer**
> **Securities Litigation**

Dear Andrea:

As indicated in our previous letters, we represent U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. ("Refco") for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for the Insureds under the Policy. We are forwarding copies of this letter to counsel for those individual Insureds involved in the above-referenced matter about whom we are aware.

On U.S. Specialty's behalf, this will acknowledge receipt of the Consolidated Amended Complaint filed on September 5, 2006 in *In re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation*, No. 06 Civ. 643 (GEL) (S.D.N.Y.) (the "*RCM Brokerage Customer* Action"). We understand that the *RCM Brokerage Customer* Action previously was captioned *Global Management Worldwide Limited v. Bennett, et al.*, which was one of the matters discussed in our March 28, 2006 letter to you. U.S. Specialty continues to proceed subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to this suit and all of the matters about which it has received notice.

Our March 28, 2006 letter to you discussed the January 26, 2006 complaint filed by Global Management Worldwide Limited. A copy of that letter is enclosed for your convenience. Based on the information we have received, we understand that Global Management subsequently was appointed as lead plaintiff in the case, and on September 5, 2006, filed the Consolidated Amended Complaint. The Consolidated Amended Complaint was filed on behalf

---

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 2

of a class of all securities brokerage customers of Refco Capital Markets LTD. ("RCM") who at
any time from October 17, 2000 to October 17, 2005 placed securities or held securities at RCM
and/or Refco Securities LLC ("RSL") directly or indirectly, as custodian or broker for safe-
keeping, trading or other purposes, and continued to hold positions with RCM on October 17,
2006 or thereafter. The complaint names the following eight directors and officers as
defendants: Mr. Bennett, Mr. Sherer, Mr. Sexton, Mr. Maggio, Mr. Murphy, Mr. Silverman, Mr.
Trosten and Mr. Grant. The complaint also names Thomas H. Lee Partners, L.P. and ten of its
affiliated entities as defendants. Lastly, the complaint names RSL and Grant Thornton as
defendants. Thus, compared to the January 2006 complaint, the amended complaint has dropped
Messrs. Breitman, Harkins, O'Kelley, Gantcher, Klejna and Rotkowitz as defendants, and added
Messrs. Grant and Silverman.

The Consolidated Amended Complaint generally alleges that the suit arises out of an
undisclosed fraudulent scheme to steal billions of dollars in RCM customer assets. The alleged
purpose of the scheme was to conceal undisclosed losses at Refco and to fund Refco's
operations. In that regard, plaintiffs allege that dating back to the late 1990's, certain Refco
customers sustained large trading losses and were unable to pay their debts to Refco. Plaintiffs
claim that Messrs. Bennett and Grant devised a scheme to hide these uncollectible debts and
thereby deceive RCM's customers as to the true financial condition of Refco and RCM. Messrs.
Bennett and Grant allegedly sought to hide the bad debt in order to monetize their equity
interests in Refco.

Plaintiffs claim that the scheme to defraud RCM's brokerage customers had two
components. First, plaintiffs allege that from 1999 to 2005, there were a series of fraudulent
"round robin" transactions between Refco and Refco Group Holdings Inc. ("RGHI"), whereby
RGHI's receivables owed to Refco were temporarily paid off at the end of each accounting
period and replaced on the books with receivables from unrelated entities. These transactions
were then unwound at the beginning of the next period. Second, plaintiffs claim that during the
class period, defendants engaged in a ponzi scheme pursuant to which securities held by RCM on
behalf of its customers were secretly sold, either outright or subject to an agreement to
repurchase, in order to raise cash. The proceeds from such sales allegedly were diverted from
RCM and used to prop up Refco's daily operations, pay down Refco's debt and fund
acquisitions. Plaintiffs assert that the theft of RCM customer assets was accomplished through a
series of intercompany transactions mischaracterized as loans.

In October 2005, after disclosure of the hundreds of millions in dollars of uncollectible
receivables owed by RGHI, Refco imposed a moratorium on customer withdrawals at RCM.
However, plaintiffs claim that without the continued availability of RCM customer assets, Refco
collapsed and filed for bankruptcy on October 17, 2005. By that time, approximately $2.6
billion in RCM customer assets allegedly were missing, and replaced on the books with
uncollectible intercompany receivables owed to RCM by insolvent Refco affiliates. Plaintiffs
claim that Refco's officers benefited from these schemes through both the June 2004 LBO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 3

involving the TH Lee Partner defendants and in the August 2005 Refco IPO. Based on subsequent disclosures filed in the bankruptcy court, plaintiffs allege that about $2.25 billion in RCM customer assets are missing.

The Consolidated Amended Complaint contains two causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934 by all defendants; and (2) violation of Section 20(a) of the Securities Exchange Act by the individual defendants, RSL and the TH Lee Control Group Defendants. Plaintiffs seek unspecified compensatory damages, interest, fees and costs.

In view of the similarities between the January 2006 complaint and the September 2006 Consolidated Amended Complaint, we refer you to the coverage discussion and reservation of rights contained in our previous letters to you, including our November 10, 2005 letter, our December 7, 2006 letter concerning the *Weit* and *City of Pontiac* Actions, and our March 28, 2006 letter, all of which are incorporated herein by reference. U.S. Specialty reiterates its prior requests that the individuals named as defendants in the *RCM Brokerage Customer* Action or their counsel provide us with confirmation that each of them is or was a director, officer, employee, insurance manager or general counsel of Refco or a Subsidiary of Refco. Without limitation of U.S. Specialty's reservation of rights, please note specifically that for the reasons set forth in our March 28, 2006 letter, none of the TH Lee related entities are insureds under the Policy, and there is no coverage for any loss or defense costs incurred by or allocable to them. The Policy further does not provide coverage to acts undertaken by any of the individual defendants in a capacity other than as "Insured Persons" of Refco and its Subsidiaries. There also is no coverage under the Policy for RSL, as the *RCM Brokerage Customer* Action is not a "Securities Claim" and therefore is not within the scope of Insuring Agreement B(2).

As noted in our previous letters, U.S. Specialty requests that we be kept informed of all significant developments in the litigation, and provided on a prompt basis with all substantive pleadings, orders and briefs filed in the lawsuits.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S. Specialty's views on coverage as additional information becomes available or as developments warrant. U.S. Specialty continues to reserve all of its rights under the Policy and applicable law about all of the matters for which notice has been provided, including but not limited to on the bases discussed in all of our previous letters to you and the various insureds, which are incorporated herein by reference.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
October 10, 2006
Page 4


Please feel free to contact us if you have any questions concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _____
    Gary V. Dixon
    Leslie S. Ahari


cc:    R. Damian Brew, Esq. (by email, w/encl.)
       Wayne E. Borgeest, Esq. (by email, w/encl.)
       Daniel J. Standish, Esq. (by email, w/encl.)
       John D. Hughes, Esq. (by email, w/encl.)
       Cecilia W. Kaiser, Esq. (by email, w/encl.)
       James E. Tolan, Esq. (by email, w/encl.)
       Jeffery T. Golenbock, Esq. (by email, w/encl.)
       Paul Ferrillo, Esq. (by email, w/encl.)
       Matthew J. Sava, Esq. (by e-mail, w/encl.)
       Scott Hershman, Esq. (by email, w/encl.)
       Ivan Kline, Esq. (by email, w/encl.)
       Holly Kulka, Esq. (by email, w/encl.)
       Joseph L. Chairez, Esq (by email, w/encl.)
       Blake Hannafan, Esq. (by email, w/encl.)
       Chris Morvillo, Esq. (by email, w/encl.)

327793 v 7

# ROSS, DIXON & BELL, LLP

2001 K Street, N.W. • Washington, D.C. 20006-1040 • *p* (202) 662-2000 *f* (202) 662-2190

GARY V. DIXON
DIRECT DIAL: (202) 662-2005
EMAIL: GDIXON@RDBLAW.COM

LESLIE S. AHARI
DIRECT DIAL: (202) 662-2036
EMAIL: LAHARI@RDBLAW.COM

March 28, 2006

**VIA FACSIMILE AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**

Ms. Andrea Lieberman
Marsh USA
500 West Monroe Street
Chicago, Illinois 60661

Re:    **Insured:**    Refco, Inc.
        **Policy No.:**    24-MGU-05-A10821
        **Claimants:**    Various

Dear Andrea:

As indicated in our previous letters, we represent U.S. Specialty Insurance Company ("U.S. Specialty") in connection with Directors, Officers and Corporate Liability Insurance Policy No. 24-MGU-05-A10821 (the "Policy") issued to Refco, Inc. for the claims-made policy period August 11, 2005 to August 11, 2006. We are directing this letter to you as the authorized insurance representative for the Insureds under the Policy. We are forwarding copies of this letter to those counsel for various of the Insureds about whom we are aware. Please forward copies of this letter to Refco and to the representatives of any other Insureds about whom you are aware.

On U.S. Specialty's behalf, this will acknowledge receipt of the complaints filed against various insureds in the following actions: (1) *Teachers' Retirement System of Illinois, et al. v. Thomas H. Lee, et al.*, (S.D.N.Y.) (the "*Teachers'* Action"); (2) *Gensheimer v. Bennett, et al.*, No. 05 CV 10318 (S.D.N.Y.) (the "*Gensheimer* Action"); (3) *Fine v. Bennett, et al.*, No. 05CV8701 (S.D.N.Y.) (the "*Fine* Action"); and (4) *Global Management Worldwide Limited v. Bennett, et al.*, No. 06 CV 0643 (S.D.N.Y.) (the "*Global Management* Action"). U.S. Specialty is proceeding subject to a full reservation of its rights to deny and/or limit coverage under the Policy and applicable law with respect to these suits and all of the matters about which it has received notice.

WASHINGTON • IRVINE • SAN DIEGO • CHICAGO

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 2

## I. The Lawsuits

### A. The *Teachers'* Action and the *Gensheimer* Action

The *Teachers'* Action, filed in December 2005, and the *Gensheimer* Action, filed on December 8, 2005, are purported shareholder class actions alleging violations of the securities laws. The plaintiffs in *Teachers'* purport to sue on behalf of the class of all purchasers of Refco's 9% bonds in the August 2004 bond offering and all persons who purchased common stock during the class period August 11, 2005 to October 18, 2005. In the *Gensheimer* Action, plaintiff purports to sue on behalf a class of purchasers of all of Refco's common stock in the August 11, 2005 IPO, and all persons who purchased bonds pursuant to the August 2004 offering, and who purchased bonds pursuant to the April 13, 2005 prospectus. The *Gensheimer* Action also purports to sue on behalf of all purchasers of securities between August 5, 2004 and October 18, 2005. One or both complaints name as defendants the following individuals who are identified as directors, officers or employees of Refco, Inc. and/or a Refco subsidiary: Phillip Bennett, Gerald Sherer, Thomas Lee, Scott Schoen, Leo Breitman, David Harkins, Scott Jaeckel, Ronald O'Kelley, Nathan Gantcher, Dennis Klejna, Santo Maggio, Robert Trosten, William Sexton, Joseph Murphy, and Perry Rotkowitz. One or both complaints also name as defendants Thomas H. Lee Partners, LP, Credit Suisse First Boston and related entities, Goldman Sachs & Co. and related entities, Grant Thornton LLP, Mark Ramler, Banc of America Corp. and related entities, Merrill Lynch Pierce Fenner & Smith, Inc. and related entities, Deutsche Bank and related entities, J.P. Morgan Chase & Co. and related entities, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc. and related entities, Liberty Corner Capital and related entities, Terry Pigott, William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, Refco Group Holdings Inc., Mayer Brown & Rowe & Maw, and Joseph Collins.

Like the various securities class action complaints discussed in our November 10, 2005 and December 7, 2005 letters to you, the *Teachers'* and *Gensheimer* complaints generally allege that Refco's registration statements issued in connection with the company's August 11, 2005 IPO and the offering statement issued in connection with the August 2004 bond offering, were false and misleading, and that the defendants made false and misleading statements during the class periods. Plaintiffs allege that on October 10, 2005, Refco announced that it had discovered a $430 million receivable owed to it by an entity controlled by Mr. Bennett, that Mr. Bennett was stepping down as Refco's Chief Executive Officer, and that Refco's financial statements issued since 2002 could no longer be relied on. By the market's close on October 10, 2005, Refco's common stock fell $12.96 per share, or 45.3%, to close at $15.60. On October 12, 2005, Mr. Bennett was arrested and charged with securities fraud. On October 13, 2005, Refco announced that it had hired advisors and imposed a 15 day moratorium on customer withdrawals at Refco Capital Markets. When the NYSE halted trading, Refco's stock was trading at $7.90. On October 17, 2005, Refco filed for Chapter 11 bankruptcy. The *Teachers'* complaint contains

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 3

four counts alleging violations by the various defendants of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The *Gensheimer* Action contains five counts, for violations of Section 11, Section 12(a)(2), Section 15, Section 10(b) and Section 20(a). The complaints seek class certification, unspecified compensatory damages, restitution, and attorneys' fees and costs.

### B. The *Fine* Action

On October 13, 2005, David Fine filed a Verified Shareholder Derivative Complaint against the following eleven directors and officers of Refco: Mr. Bennett, Mr. Sexton, Mr. Sherer, Mr. Murphy, Mr. Breitman, Mr. Gantcher, Mr. Harkins, Mr. Jaeckel, Mr. Lee, Mr. O'Kelley and Mr. Schoen. The complaint also names as defendants Credit Suisse, Goldman Sachs, Bank of America Securities, Deutsche Bank Securities, JP Morgan, Merrill Lynch, Sandler O'Neill, HSBC and Thomas H. Lee Partners, L.P. Like the derivative complaint in *Mehta*, discussed in our November 10, 2005 letter to you, the complaint in the *Fine* Action alleges wrongdoing during the period from August 2005 to the present in connection with Refco's August 5, 2005 IPO, the alleged misrepresentations of Refco's financial condition, the October 2005 disclosures concerning the $430 million in previously concealed debt, and Mr. Bennett's arrest and indictment. The *Fine* complaint contains six counts: (1) breach of fiduciary duty; (2) abuse of control; (3) gross mismanagement; (4) waste of corporate assets; (5) unjust enrichment; and (6) aiding and abetting against the underwriter defendants. The complaint seeks unspecified damages, injunctive relief, restitution, attorneys' fees and costs.[1]

### C. The *Global Management* Action

On January 26, 2006, Global Management Worldwide Limited filed a class action complaint. The suit is on behalf of a class of all brokerage customers of Refco Capital Markets ("RCM") who, at any time between October 17, 2000 to October 17, 2005, entrusted securities to RCM and/or Refco Securities, LLC as custodian and broker for safe-keeping, and who continued to hold positions with RCM on October 17, 2005 or thereafter. The complaint names 38 defendants, including the following fourteen individuals identified as directors, officers or managers of Refco and/or its subsidiaries: Mr. Bennett, Mr. Sherer, Mr. Breitman, Mr. Harkins, Mr. Jaeckel, Mr. Lee, Mr. O'Kelley, Mr. Schoen, Mr. Gantcher, Mr. Murphy, Mr. Sexton, Mr. Maggio, Mr. Klejna, and Mr. Rotkowitz. Also named as defendants are five Lee Partners entities, including Thomas H. Lee Partners, L.P., Thomas H. Lee Equity (Cayman) Fund, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. The complaint further names various securities firms and underwriters as defendants, including entities related to Credit Suisse, Goldman Sachs, Bank of America, Merrill Lynch, J.P. Morgan Chase, Sandler O'Neill, HSBC, William Blair & Co.,

---

[1] We understand that the complaints in both *Mehta* and *Fine* were dismissed by the Court by order dated March 13, 2006.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 4

Harris Nesbitt, CNG Institutional Trading, Samuel A. Ramirez, The Williams Capital Group, and Utendahl Capital. The complaint also names Refco Securities LLC ("RSL") as a defendant.

The complaint alleges that the suit arises out of a scheme to steal assets belonging to RCM's customers in order to cover up billions of dollars of fraudulently undisclosed losses incurred by Refco. Plaintiff alleges that during the class period, RCM and RSL engaged in a practice of surreptitiously selling securities held by RCM in custody for customers with the undisclosed intent to misappropriate the proceeds. Such sales allegedly occurred without the customers' knowledge or consent. Defendants allegedly transferred the proceeds to other Refco affiliates through improper and undisclosed intercompany transactions in order to offset losses which were being incurred by Refco's operating subsidiaries and which were fraudulently omitted from Refco's financial statements during the class period. As part of the alleged scheme, RSL failed to comply with SEC rules and failed to properly maintain and segregate assets belonging to RCM's customers. Plaintiff asserts that Refco's financial statements issued during the class period were false and misleading because they fraudulently failed to disclose that RCM had transferred more than $2 billion in customer assets to Refco affiliates to cover losses. These omissions were material because the $2 billion dwarfed Refco's reported capital.

The complaint further alleges that on October 13, 2005, Refco announced a freeze on RCM customer accounts. On October 17, 2005, Refco and various of its subsidiaries filed for Chapter 11 bankruptcy. On or about December 5, 2005 and later in January 2006, Refco acknowledged the scheme by disclosing that RCM did not have or control more than $2 billion in customer securities that it had represented to customers that it was holding on their behalf. The complaint alleges that whether the securities entrusted to RCM are property of the bankruptcy estate or belong to the customers is now an issue in the bankruptcy proceedings, as Refco claims that the assets are part of the debtors' estate and that the RCM customers must wait in line with other creditors seeking repayment. The December 5, 2005 disclosure further indicated that RCM had held about $1.905 billion in assets, against which there were customer claims of about $3.675 billion, resulting in a $1.77 billion shortfall. The majority of this shortfall was in the form of intercompany IOUs owed to RCM by other Refco affiliates. Thereafter, on December 30, 2005, Refco disclosed that it in fact owes customers $4.16 billion, making the actual shortfall $2.25 billion. Plaintiff claims that the intercompany transfers were part of a scheme to hide losses being incurred at the Refco affiliates and were routine. On December 9, 2005, Refco disclosed that even after the bankruptcy filing, it transferred $170 million in securities from RCM customer accounts to another subsidiary and later sold such securities, in violation of an agreement entered into in connection with the Chapter 11 filing.

The complaint then details the assertion that Refco's financial statements issued during the class period were false and misleading, including the statements issued in connection with the October 2004 registration of senior subordinated notes, the statements issued in connection with the August 2005 IPO Registration Statement and Prospectus, and the statements filed in the June 2005 Form 10-K.

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 5

Based on the foregoing, the *Global Management* complaint contains two counts:
(1) violation of Section 10(b) of the Exchange Act against all defendants; (2) violation of Section
20(a) of the Exchange Act against the individual defendants and the Lee Partners entities. The
complaint seeks compensatory damages, attorneys' fees and costs.

## II. Coverage Discussion

Because of the similarities between the *Teachers'*, *Gensheimer*, *Fine* and *Global
Management* Actions with the various securities class action and derivative lawsuits discussed in
our November 10, 2005 letter and our December 7, 2005 letter concerning the *Weit* and *City of
Pontiac* Actions, we incorporate those letters and the reservations of rights stated therein by
reference. U.S. Specialty continues to reserve all of its rights and defenses to coverage under the
Policy and applicable law with respect to the *Teachers'*, *Gensheimer*, *Fine* and *Global
Management* Actions, and all of the various suits about which notice has been provided, on the
grounds discussed in all of our prior coverage letters.

Moreover, in connection with these actions, please note that only certain of the persons
named as defendants in the lawsuits appear to be "Insured Persons" under the Policy, and that
many of the other persons and entities named as defendants are neither "Insured Persons" nor
"Insureds." Potential coverage under the Policy is not available for any person or entity who is
not an "Insured Person" or an "Insured." In this regard, the Policy defines "Insured" to mean the
"Insured Persons" and the "Company." *See* Policy Definitions (E). "Company" means Refco,
Inc. and any Subsidiary thereof. *See* Policy Definitions (C), (H), (O), Policy Declarations Item
1. "Insured Persons" means any past, present or future director or officer of the Company;
employees of the Company but only in connection with Securities Claims; the insurance
manager and general counsel; and Employed Lawyers. *See* Policy Definitions (F), as amended
by Endorsement Nos. 3, 17.

In light of the foregoing and based on the allegations of the complaints, it presently
appears that only the following individuals named as defendants are potentially within the scope
of Insureds and Insured Persons under the Policy: Mr. Bennett, Mr. Sherer, Mr. Lee,
Mr. Schoen, Mr. Breitman, Mr. Harkins, Mr. Jaeckel, Mr. O'Kelley, Mr. Gantcher, Mr. Klejna,
Mr. Maggio, Mr. Trosten, Mr. Sexton, Mr. Murphy, and Mr. Rotkowitz. With respect to these
individuals listed above who appear to be Insured Persons, U.S. Specialty requests that they or
their respective counsel provide us with confirmation that each of them is or was either a
director, officer, employee, insurance manager or general counsel of Refco or a Subsidiary of
Refco.

However, none of the following persons or entities appear to be either Insureds or Insured
Persons: Thomas H. Lee Partners, LP, Thomas H. Lee Equity (Cayman) Fund, Thomas H. Lee
Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity
(Cayman) Fund V, L.P., Credit Suisse First Boston and related entities, Goldman Sachs & Co.
and related entities, Grant Thornton LLP, Mark Ramler, Banc of America Corp. and related

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 6

entities, Merrill Lynch Pierce Fenner & Smith, Inc. and related entities, Deutsche Bank and related entities, J.P. Morgan Chase & Co. and related entities, Sandler O'Neill & Partners, L.P., HSBC Securities (USA) Inc. and related entities, Liberty Corner Capital and related entities, Terry Pigott, William Blair & Co., LLC, Harris Nesbitt Corp., CMG Institutional Trading, LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., Utendahl Capital Partners, Refco Group Holdings Inc., Mayer Brown & Rowe & Maw, and Joseph Collins. The Policy therefore does not provide coverage for any of them.

With respect to Refco Securities LLC, which is a named defendant in the *Global Management* Action, there is no coverage under the Policy because the suit is not a "Securities Claim" and therefore is not within the scope of Insuring Agreement B(2). Specifically, "Securities Claim" means a Claim which is brought by or on behalf of securities holders of Refco or arises from the purchase or sake of securities issued by Refco. *See* Policy Definitions (N). The *Global Management* Action is therefore not a "Securities Claim" because it is not a suit by the holders of Refco securities and further does not concern the purchase or sale of Refco securities.

U.S. Specialty further calls to the Insureds' attention the Policy's change of control provision, Policy Conditions (F). As more fully stated in that section, in the event that a trustee in bankruptcy, receiver or similar official is appointed with respect to Refco or a Subsidiary, coverage under the Policy continues in force until the end of the Policy Period but is limited to Claims for Wrongful Acts committed before the effective date of such change of control. In this regard, we understand that bankruptcy trustees have been appointed for Refco LLC and RCM. U.S. Specialty fully reserves the right to deny or limit coverage for Claims for Wrongful Acts that post-date such changes of control.

In our prior letters, we have asked for information concerning the defense arrangements for the various Insured Persons. To date, we have been in contact with counsel for some, but not all, of the Insured Persons. Specifically, we are aware of the following counsel arrangements: Kramer Levin and Golenbock Eiseman for Mr. Bennett; Weil Gotshal for Messrs. Lee, Harkins, Jaekel, Schoen, O'Kelley, Gantcher and Breitman; Shapiro Forman for Messrs. Sherer and Murphy; and Baker Hostetler for Mr. Klejna. We have not been contacted by representatives for Messrs. Maggio, Trosten, Sexton, Grant or Rotkowitz. U.S. Specialty requests that Marsh, as agent for the Insureds under the Policy, provide us with contact information for these persons or ask such persons or their representatives to contact us.

Finally, while we previously have provided U.S. Specialty's Defense Counsel Guidelines to various of the insureds and/or their counsel, we are enclosing another copy with this letter. Counsel for the insureds again are requested to review and comply with the Guidelines.

This letter is not intended to be exhaustive or exclusive with respect to the defenses to coverage that U.S. Specialty may assert, and we will supplement this letter concerning U.S. Specialty's views on coverage as additional information becomes available or as developments

# ROSS, DIXON & BELL, LLP

Ms. Andrea Lieberman
March 28, 2006
Page 7

warrant. U.S. Specialty further appreciates that the Insureds likewise reserve their rights under the Policy.

Please feel free to contact us if you have any questions concerning this matter.

Sincerely,

ROSS, DIXON & BELL, LLP

By _Gary Dixon_

Gary V. Dixon
Leslie S. Ahari

Enclosure

cc:   R. Damian Brew, Esq. (by email, w/ encl.)
      Wayne E. Borgeest, Esq. (by email, w/ encl.)
      Daniel J. Standish, Esq. (by email, w/ encl.)
      John D. Hughes, Esq. (by email, w/ encl.)
      Cecilia W. Kaiser, Esq. (by email, w/ encl.)
      James E. Tolan, Esq. (by email, w/ encl.)
      Debora K. Grobman, Esq. (by email, w/ encl.)
      Jeffery T. Golenbock, Esq. (by email, w/ encl.)
      Matthew J. Sava, Esq. (by e-mail, w/ encl.)
      Paul A. Ferrillo, Esq. (by e-mail, w/ encl.)
      Joseph L. Chairez, Esq. (by email, w/ encl.)

327793 v 4

# HCC GLOBAL FINANCIAL PRODUCTS LLC

## DEFENSE COUNSEL GUIDELINES

HCC Global Financial Products LLC ("HCC Global") expects to work closely with counsel and the insured to achieve the best result for the insured in an efficient and cost-conscious manner consistent with counsel's ethical obligations. Defense expenses should accurately reflect the reasonable cost of the work necessary to defend and resolve the claim. Only those reasonable and necessary costs allocable to a covered claim will be considered for payment or used to satisfy any deductible/retention provisions. These Guidelines set forth HCC Global's expectations regarding cooperation and communication as well as explain generally what fees and costs are considered reasonable and necessary. Nothing contained herein is intended to restrict counsel's independent exercise of professional judgment in rendering legal services for the insured or otherwise interfere with any ethical directive governing the conduct of counsel. Any questions regarding these Guidelines should be directed to the HCC Global claims professional as soon as possible.

## I.  COMMUNICATION WITH THE INSURER

Timely and thorough communication among the insured, counsel and the insurer is the key to obtaining resolution of claims on the best terms for all parties involved. Knowledge of critical facts, developments and circumstances concerning a claim should be communicated to and discussed with the claims professional promptly. To that end, HCC Global requires counsel to furnish the reports set forth below. The use of e-mail is encouraged whenever possible to provide reports and other pertinent documents. These reports are also subject to revision as the case requires and are not meant to strictly bind counsel.

   **A.    Litigation Plan and Budget.** Counsel must submit a substantive *Litigation Plan and Budget* within sixty (60) days of the initial communication between insurer and counsel. The Litigation Plan should not include an extensive recitation of the facts of the case or prior documents submitted in the claim. Rather, the *Litigation Plan* is intended to give the claims professional insight into counsel's overall view of the claim, including resolution strategy, valuation and timing. At a minimum, the *Litigation Plan* should include a substantive assessment of liability and potential damages, the likelihood and estimated value of early settlement, and the possibility of pursuing alternative dispute resolution (arbitration, mediation, etc.).

The *Budget* is intended to provide the claims professional a preliminary view of the estimated fees and costs to be incurred through counsel to resolve the claim. The *Budget* should reflect all significant stages and tasks anticipated by counsel in connection with defending the claim, including estimated fees and costs for each.

The *Litigation Plan and Budget* should be viewed as a fluid document that is subject to revision as the claim develops over time. Significant deviations from the original *Litigation Plan and Budget* should be discussed in detail with the claims professional as they are recognized.

**B.    Interim Status Reports.** A status report should be provided whenever there is a significant development in the case. The form of the report will be left to the discretion of counsel and should be based on the significance and complexity of the development, but as noted above, the use of e-mail is encouraged. Please advise the claims professional promptly of all procedural requirements, including critical deadlines and whether the claims professional is required to participate in any event.

Copies of all significant documents in the case, including all pleadings, judgments, orders, etc., should be forwarded to the insurer. It is not necessary or desired that discovery documents be provided, unless otherwise directed by the claims professional. If legal privilege, confidentiality agreement or other protection may preclude sharing certain documents with the insurer, that should be discussed in detail with the claims professional.

**C.    Trial Reports:**    The claims professional should be notified as soon as a trial/arbitration date is set, including any changes to that date. Sixty (60) to ninety (90) days prior to the scheduled trial/arbitration date, counsel should provide a comprehensive pre-trial /pre-arbitration report to the claims professional, which must include a discussion of the significant risk factors in connection with the trial/arbitration (for example, the judge/arbitrator, venue, jury composition, likely ruling on pre-trial motions, the probability of an adverse verdict and the likely range of any monetary award, etc.). Unless directed otherwise, counsel should keep the claims professional informed on a daily basis during the course of any trial/arbitration. We expect to be advised of the results immediately following the trial/arbitration, and if adverse, your recommended course of action.

## II.    CASE MANAGEMENT

**A.    Staffing.** Unless otherwise agreed to in writing with the claims professional, it is expected that counsel will staff each case with no more than one partner, one associate and one paralegal. Any request for additional staffing should be made to the claims professional by e-mail. The request should state the reason and indicate the designation and billing rates for the additional staff.    Counsel should advise the claims professional promptly after initial communication which lawyers and paralegals will be working on the claim, including each person's level of experience and hourly billing rates. No changes to the amount of staff or billing rates will be permitted without prior consultation with the claims professional. Legal assistants, secretaries and other administrative personnel are not considered billable timekeepers.

To maximize efficiency, the responsibilities of the staff members should be appropriate to each individual's level of experience. More experienced lawyers should delegate work to lesser experienced lawyers or paralegals wherever possible without compromising quality. Duplication of effort within the firm should be avoided.

**B.    Billing.** All invoices must identify each person who has billed time to the case, his or her hourly rate, every task performed by each timekeeper and the time billed for each task. Work should be described specifically, including the subject of telephone calls and correspondence. Time must be billed in .10 of an hour increments. Block billing is not

permitted. All disbursements and out of pocket expenses must be paid directly by the law firm and itemized on the bill.

Unless otherwise agreed to in writing with the claims professional, counsel must submit invoices monthly. Covered fees and costs will be reimbursed through HCC Global on a quarterly basis.

    **C.**    **Legal Research.** Counsel should not charge for routine legal research or research of matters of common knowledge among reasonable experienced counsel in the same geographical location. Where circumstances exist that enable you to use your research data banks or brief banks, counsel should charge only for updating of this previously researched material. Lexis, Westlaw or similar database research charges are not reimbursable. All research entries should state the specific research issue.

    **D.**    **Costs/Activities Requiring Prior Consultation.**    **When seeking prior consultation, e-mail is encouraged, when appropriate. The e-mail should set forth all the information that the claims professional would need to consent to the cost/activity.** The following are costs/activities about which counsel should consult with the claims professional prior to incurring or engaging in, so as to avoid or minimize disputes regarding whether such cost/activities are reasonable and necessary:

- Initiating discovery, motions or other significant tasks not previously discussed with the claims professional or included in the *Litigation Plan*
- Hiring outside professionals or vendors (e.g., consultants, investigators, temporary attorneys, outside paralegals, etc.)
- Filing an appeal
- Joining other parties
- Filing cross or counterclaims or third party claims
- Travel expenses attendant to travel exceeding 75 miles in each direction
- Overnight stays
- Overnight/expedited delivery charges

    **E.**    **Non-reimbursable fees/expenses.** The following is a list of examples of tasks and expenses that are generally not reimbursable. This list is not intended to be exhaustive. If counsel wishes to be reimbursed for any task or expense on this list, he or she must obtain specific written consent from the claims professional in advance.

- Duplication of effort
- More than one individual charging for internal conferences or attendance at the same event
- Overhead and administrative costs, such as:
  - Secretarial and clerical activities, regardless of who performs the task. Clerical tasks include but are not limited to the following: receipt and distribution of mail, new file set up, maintenance of office and attorney calendars, copying, faxing, inserting or retrieving documents from file, file maintenance, stamping documents, tabbing, indexing, or assembling materials, scheduling or adjourning meetings or depositions.

- Non-professional time (individuals not included in the staffing agreement)
- Overtime charges
- Entertainment expenses
- Internal photocopy charges in excess of $0.10 per page
- Local telephone or fax charges
- Ordinary postage
- Travel expenses within 75 miles in each direction (tolls, taxis, mileage, meals etc.)
- Late fee charges
- Office supplies, books, subscriptions, educational expenses or professional association memberships
- Preparation and review of counsel's own invoices

## III.    BILL AND FILE REVIEW

HCC Global will review all invoices submitted by counsel for reasonableness and compliance with these Guidelines. HCC Global reserves the right to audit any file maintained by counsel in connection with which we have paid and/or are paying counsel's fees and costs. File audits are conducted in order to assess the quality and efficiency of counsel's representation and to verify the accuracy of invoices fees and expenses. In the event of such audit, HCC Global will work with counsel and the insured to ensure that the audit is performed in a manner that does not compromise any legal privilege or client confidences that may attach to any of the information within the scope of the audit.

If the insurer declines to pay or seeks reductions and/or refunds with respect to charges made by counsel, full explanation of such action shall be given by the insurer, and counsel shall be given the opportunity to explain the disputed items and appeal such declinations to the claims professional. The insurer will pay the undisputed portion of any legal bill in the interim.

## IV.    MEDIA POLICY

If you are contacted by any member of the press regarding a case in which HCC Insurance Holdings Inc., HCC Global Financial Products LLC or any of their subsidiaries, affiliates or related organizations ("HCC") is a party or is an insurer of any party, no comment should be made on behalf of, or that could be fairly attributed to, HCC. We ask that any such inquiry involving HCC be referred immediately to the HCC Global claims professional assigned to that matter.

# D'AMATO & LYNCH

## LAWYERS

70 PINE STREET

NEW YORK, N.Y. 10270-0110

TELEPHONE 212-269-0927
WWW.DAMATO-LYNCH.COM
CABLE ADDRESS
DAMCOSH
TELEX 960065 DCOS UI NYK
TELECOPIER: 212-269-3559

LONDON OFFICE

LLOYD'S
ONE LIME STREET
LONDON EC3M 7HA, ENGLAND

TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7887
Direct Dial: (212) 909-2052
E-Mail: JTolan@damato-lynch.com

GEORGE G. D'AMATO
LUKE D. LYNCH (1999)
KENNETH R. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR.
WILLIAM F. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY GARRISON

WILLIAM C. BURTON
CHARLES BRAHHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. MANIRE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROILI
FRANCES BUCKLEY
DAVID J. KUFFLER

LLOYD J. HERMAN
KEVIN P. CARROLL
LAURIE F. BEATUS
LIZA A. CHAFIIAN

JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD M. ROTH
MARIA T. EHRLICH
RICHARD F. FERRIGNO
DEEANNA M. GALLA
JUDY Y. CHUNG
R. DAVID ADES
JONATHAN L. KRANZ
ARTURO M. BOUTIN
WENDY J. KALNICK

JOHN C. MUCCIFORI
HOLLY Z. BROWN
MAXINE K. NAKAMURA
GERARDO LAPETINA
LAURA G. WEINER
DAVID BERGENFELD
E. REYNOLDS WILSON
JASON B. GRANT
GAVIN J. CURLEY
BRIAN M. MARGOLIES
ASSAF RONEN
ALEXANDER M. RAZI
ANITA G. BAKER
BOTHEARY JOHNMAR
MELEENA M. BOWERS

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
PETER J. THUMSER

VICTOR F. HUBTELIER
ROBERT GILROY
RICHARD G. McGAHREN

**October 20, 2006**

Via Facsimile (312)-627-6272 and Regular Mail
Ms. Andrea Lieberman
Marsh USA Inc.
500 West Monroe Street
Chicago, IL 60661

<table>
<tr><td>Re:</td><td colspan="2">Directors and Officers Liability and Corporation Reimbursement<br>Follow Form Excess Liability Policy</td></tr>
<tr><td></td><td>Insured</td><td>: Refco, LLC ("REFCO")</td></tr>
<tr><td></td><td>Matter</td><td>: In Re Refco Capital markets, LTD Brokerage<br>Customer Securities Litigation</td></tr>
<tr><td></td><td>Lexington Policy No.</td><td>: 162 0924</td></tr>
<tr><td></td><td>Our File No.</td><td>: 108-73096</td></tr>
</table>

Dear Ms. Lieberman:

    As you know we have been retained by Lexington Insurance Company ("Lexington") in connection with the above-referenced matter. We are in receipt of U.S. Specialty's letter dated October 10, 2006 issued by Ross, Dixon & Bell and we have had the opportunity to conduct a review of the coverage position taken by the primary carrier U.S. Specialty Insurance Company ("U.S. Specialty") with respect to its policy number 24-MGU-05-A10821 (the "Primary Policy") to which the Lexington's Excess Directors and Officers Liability and Corporation Reimbursement Policy No. 162-0924 (the "Lexington Excess Policy") is excess to. The October 10, 2006 letter issued by Ross, Dixon & Bell is issued with respect to the filing of the Consolidated Amended Complaint filed on September 5, 2006 in the In Re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation, No. 06 Civ 643 (GEL) (S.D.N.Y.) (the "RCM Brokerage Customer Action"). U.S. Specialty has advised that the RCM Brokerage Customer Action was previously captioned Global Management Worldwide Limited v. Bennett,

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 2

et al. 06 Civ 00564 (GEL) (the "Global Complaint"). In its October 10, 2006 letter U.S. Specialty has advised that the Global Complaint and the RCM Brokerage Customer Action make basically the same allegations. U. S. Specialty therefore refers to its coverage letters previously issued with respect to the Global Complaint.

Lexington reserves all its rights, privileges and defenses under the Lexington Excess Policy and at law at this time. Nonetheless, we would like to make the following general comments. In doing so, we do not wish to imply that we believe the allegations in the RCM Brokerage Customer Action to be true. To the extent that discovery or other developments in these matters may later indicate that the application of certain exclusions or provisions in the Lexington Excess Policy not discussed herein is appropriate, Lexington reserves the right to do so.

Please be advised that Lexington adopts the coverage position of the primary carrier U.S. Specialty as set forth by U.S. Specialty in its October 10, 2006 letter, as well as incorporating all the reservations of rights set forth in the letters it references therein dated November 10, 2005, December 7, 2006 and March 28, 2006 regarding the Global Complaint and the now amended RCM Brokerage Customer Action with the exception of any specific Lexington reservations or applicable Lexington Excess Policy provisions noted in this letter or Lexington's earlier letters.

Otherwise Lexington adopts all of the specific reservations of rights set forth in U.S. Specialty's October 10, 2006 letter and earlier letters referenced herein. Additionally, without waiver of any of the other reservations set forth by U.S. Specialty, Lexington adopts the coverage position set forth by U.S. Specialty that there is no coverage for the TH Lee related entities or for Refco Securities, LLC named in the RCM Brokerage Customer Action under either the U.S. Specialty Policy or the Lexington Excess Policy.

As a reminder please note that in its letter dated January 12, 2006 Lexington noted that the various securities class actions contain allegations that REFCO issued false financial statements and that the prospectus in connection with its IPO was materially false and misleading. The current RCM Brokerage Customer Action contains similar allegations. Additionally, REFCO itself has came out and advised that its financial statements for the period of 2002 to 2005 could no longer be relied upon. Lexington issued its Excess Policy based upon the REFCO financial statements provided to Lexington during the underwriting process. Also, as part of the Lexington underwriting process, as a condition to Lexington issuing its Excess Policy, REFCO had agreed to provide a copy of the U.S. Specialty application that was acceptable to Lexington. To date REFCO has failed to provide the Primary Policy application to Lexington. In this regard, and based upon REFCO's admissions that their financial statements for the time frame of 2002 to 2005 cannot be relied upon, Lexington reserved all of its rights to void the Lexington Excess Policy ab initio or rescind the Lexington Excess Policy in its entirety or at least with respect to the Company and those individual directors and officers responsible for disseminating the false financial documents to the public and Lexington and/or deny coverage based on REFCO's misrepresentations and conduct with respect to its false financial statements. Lexington continues to reserve its rights in that regard.

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 3

Additionally, Lexington earlier noted that pursuant to the Clause XII. Definitions, Loss does not include legal expenses. As such Defense Costs were not considered included within the Lexington Excess Policy's Limit of Liability and are not covered by the Lexington Excess Policy. At the request of the insurance broker, on behalf of its client, Lexington had been asked to review its position on Defense Costs coverage under its Lexington Excess Policy. As you know, Lexington, subject to a full reservation of rights has agreed to advance Defense Costs once the U. S. Specialty Policy primary limit of liability is eroded and subject to the Insured agreeing to repay any amounts not determined to be owed as set forth in our letter to Damian Brew dated July 26, 2006, which you were previously copied on.

### The Lexington's Excess Directors and Officers Liability Policy Number 1620924

Lexington issued to REFCO its Excess Directors and Officers Liability and Corporate Reimbursement policy number 1620924 defined above as the Lexington Excess Policy with a Policy Period[1] of August 11, 2005 through August 11, 2006 and a Limit of Liability of $7,500,000, excess of $10 Million and the Primary Policy retentions of $0 for Insuring Agreement A, $300,000 for Insuring Agreement B(1) and $500,000 for Insuring Agreement B(2). Please be advised that the Lexington Excess Policy is an indemnity policy and not a defense policy. The Lexington Excess Policy does not contain a duty to defend on the part of Lexington. Please note that pursuant to the Clause XII. Definitions, Loss does not include legal expenses. As such Defense Costs are not included within the Lexington Excess Policy's Limit of Liability and are not covered by the Lexington Excess Policy.

The $10 Million of underlying coverage is comprised of the following policy:

a.    Primary layer – $10 Million – U.S. Specialty Insurance Company ("U.S. Specialty") policy number 24-MGU-05-A10821 Directors, Officers and Corporate Liability Insurance Policy (the "Primary Policy");

The Lexington Excess Policy follows form to the Primary Policy.

Lexington directs your attention to the definition of Loss, located in the Definitions Clause (G) to the Primary Policy as amended by Endorsement Number 4. Potential coverage is limited to Loss as defined by the Primary Policy with the exception of Defense Costs for the Lexington Excess Policy as discussed above. Additionally, to the extent that the RCM Brokerage Customer Action seeks restitution and/or disgorgement of profits, Lexington notes that such damages may constitute uninsurable Loss and reserves its rights accordingly.

Lexington reserves all of its rights with respect to any other insurance available to the Insureds under the Primary Policy and has reserved its rights with respect to its Other Insurance Clause. Lexington also reserves its rights to an allocation for Loss for any covered and uncovered claims and for Loss attributable to uninsured persons. Lexington also reserves its

---

[1] All capitalized terms are defined in the Policy unless otherwise noted herein.

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 4

rights to deny coverage for any amount allocated to uncovered claims or uncovered persons and entities.

## Summary

Lexington continues to reserve all its rights, defenses and privileges under the U.S. Specialty Primary Policy, the Lexington Excess Policy, at law and in equity, including the right to apply other exclusions, endorsements or provisions of the Lexington Excess Policy as appropriate, supplement this coverage letter, deny coverage in the future, and recover any payments which may later be made under the Lexington Excess Policy to the extent not covered as the facts and law warrant and it will continue to monitor events in this litigation as they occur.

In view of the above, it is neither necessary nor appropriate to discuss all of the Lexington Excess Policy's potentially applicable limitations and exclusions at this time. This letter is not intended to be exhaustive or exclusive with respect to the coverage defenses that Lexington may assert.

Notwithstanding our preliminary analysis, please also provide us with an update on the present status RCM Brokerage Customer Action and continue to keep us informed of all significant developments in the litigation. Please provide us with copies of all future correspondence with U.S. Specialty relating to coverage for this matter under the Primary Policy. In addition, please provide us with copies of all correspondence with every other insurance carrier involved in this matter, including any general liability insurer(s) that may provide coverage for this matter. Please provide us with any notice of claim letters sent to any such carriers and any responses received thereto. In this regard, Lexington reserves all rights available to it under the Lexington Excess Policy. Please also provide Lexington with copies of any other pleadings or other pertinent documents related to the above referenced complaint.

Should you have any questions or comments regarding the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

James E. Tolan

JET/sdv

cc:    **Via Email**
       Daniel J. Standish, Esq.
       Wiley Rein & Fielding LLP
       1776 K Street, N.W.
       Washington, D.C. 20006

#202033v1

Ms. Andrea Lieberman
Marsh USA Inc.
October 20, 2006
Page 5


**Via Email**
John D. Hughes, Esq.
Edwards Angell Palmer & Dodge LLP
101 Federal Street
Boston, Massachusetts 02110-1800

**Via Email**
Robert Benjamin
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, NY 10595

#202033v1

# D'AMATO & LYNCH

## LAWYERS

### 70 PINE STREET

### NEW YORK, N.Y. 10270-0110

TELEPHONE 212-269-0927
WWW.DAMATO-LYNCH.COM
CABLE ADDRESS
DAMCOSH
TELEX 960085 DCOS UI NYK
TELECOPIER: 212-269-3559

### LONDON OFFICE

LLOYD'S
ONE LIME STREET
LONDON EC3M 7HA, ENGLAND
TELEPHONE 0207 816 5977
TELECOPIER 0207 816 7257
Direct Dial: (212) 909-2052
E-Mail: JTolan@damato-lynch.com

GEORGE G. D'AMATO
LUKE D. LYNCH (1999)
KENNETH A. SAGAT
LUKE D. LYNCH, JR.
ROBERT E. KUSHNER
RICHARD F. RUSSELL
RONALD H. ALENSTEIN
HARRY J. ARNOLD, JR.
ROBERT W. LANG
NEAL M. GLAZER
ANDREW R. SIMMONDS
JOHN P. HIGGINS
THOMAS F. BREEN
ALFRED A. D'AGOSTINO, JR
WILLIAM P. LARSEN, III
ROBERT D. LANG
DAVID A. BOYAR
MARY JO BARRY
BARBARA R. SEYMOUR
HARVEY GARRISON

WILLIAM C. BURTON
CHARLES BRANHAM
BILL V. KAKOULLIS
THOMAS W. HANLON
JOHN H. FITZSIMONS
MICHAEL L. HANINE
KEVIN J. WINDELS
SAMUEL F. PANICCIA
ROBERT S. FRASER
STEPHEN F. WILLIG
DEBORAH M. COLLINS
NEIL R. MORRISON
PETER A. STROLI
FRANCES BUCKLEY
DAVID J. KUFFLER

LLOYD J. HERNAN
KEVIN P. CARROLL
LAURIE F. BEATUS
LIZA A. CHAFIIAN

JAN H. DUFFALO
JAMES E. TOLAN, II
CATHERINE L. CASAVANT
ROY CAPLINGER
ANNEMARIE J. MAZZONE
EDWARD H. ROTH
MARIA T. EHRLICH
RICHARD F. FERRIGNO
DEEANNA M. GALLA
JUDY Y. CHUNG
R. DAVID ADES
JONATHAN L. KRANZ
ARTURO M. BOUTIN
WENDY J. KALNICK

JOHN C. NUCCIFORI
HOLLY Z. BROWN
MAXINE K. NAKAMURA
GERARDO LAPETINA
LAURA S. WEINER
DAVID BERGENFELD
E. REYNOLDS WILSON
JASON S. GRANT
GAVIN J. CURLEY
BRIAN N. MARGOLIES
ASSAF RONEN
ALEXANDER H. RAZI
ANITA G. BAKER
SOTHEARY JOHNNAR
NELEENA M. BOWERS

COUNSEL

ROBERT M. MAKLA
ALBERT B. LEWIS
PETER J. THUMSER

VICTOR F. MUSTELIER
ROBERT GILROY
RICHARD G. McGAHREN

## February 15, 2007

Via Email and Regular Mail
Ivan Kline, Esq.
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022

Via Email and Regular Mail
Joseph L. Chairez, Esq.
Helen B. Kim, Esq.
Baker Hostetler
600 Anton Boulevard
Suite 900
Costa Mesa, CA 92626-7221

Via Email and Regular Mail
Blake T. Hannafan, Esq.
Hannafan & Hannafan, LTD.
One East Wacker Drive
Suite 1206
Chicago, IL 60601

Via Email and Regular Mail
Debra K. Grobman, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036-2714

Via Email and Regular Mail
Holly Kulka, Esq.
Heller Ehrman, L.L.P.
Times Square Tower
7 Times Square
New York, NY 10036-6524

Via Email and Regular Mail
Christopher J. Morvillo, Esq.
Morvillo, Abramowitz, Grand,
Iason, Anello & Bohrer
565 Fifth Avenue
New York, NY 10071

Via Email and Regular Mail
Scott Hershman
Hunton & Williams
200 Park Avenue
New York, NY 10166

Via Email and Regular Mail
Paul Ferrillo, Esq.
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153

Via Email and Regular Mail
Jeffrey T. Golenbock, Esq.
Golenbock, Eiseman, Assor, Bell
& Pekoe, LLP
437 Madison Avenue
New York, NY 10022

Via Email and Regular Mail
Matthew J. Sava, Esq.
Shapiro Forman Allen Sava &
McPherson, LLP
380 Madison Avenue
New York, NY 100177

#257143v1

February 15, 2007
Page 2

Re:   Directors and Officers Liability and Corporation Reimbursement
      Follow Form Excess Liability Policy
      Insured                : Refco, LLC ("REFCO")
      Claimants              : Various
      Lexington Policy No. : 162 0924
      Our File No.          : 108-73096

Dear Counsel:

I write on behalf of Lexington Insurance Company ("Lexington") in connection with the above-referenced matter. As we all know the U.S. Specialty $10 million Primary Policy is quickly eroding. In light of the fact that it appears that the U.S. Specialty Primary Policy $10 million limit of liability will be fully eroded within the next two months, Lexington wanted again to make sure all Insureds were clear on Lexington's position with respect to the advancement of otherwise covered defense costs under the Lexington Excess Directors and Officers Liability and Corporation Reimbursement Policy No. 162-0924 (the "Lexington Excess Policy") issued to Refco. The Lexington Excess Policy is 1st layer excess to the U.S. Specialty Primary Policy.

As a follow up to Lexington's letter dated July 26, 2006, Lexington has received feedback from some of the directors and officers of Refco who are willing to sign an interim funding agreement in order to receive advancement of otherwise covered defense costs. Lexington again wants to make sure all insured directors and officers are aware that Lexington will advance otherwise covered defense costs under the Lexington Excess Policy subject to the Insured's signing the interim funding agreement discussed below.

It is Lexington's position, as outlined in its July 26, 2006 letter, that subject to Lexington's reservations of rights, and subject to Bankruptcy Court approval, upon the complete erosion of the U.S. Specialty Primary Policy, Lexington will advance otherwise covered defense costs relating of the underlying litigations against the directors and officers under the Lexington Excess Policy to any director or officer of Refco who seeks advancement under the Lexington Excess Policy as long as such director or officer signs an interim funding agreement whereby the director or officer agrees to repay to Lexington any advanced defense costs which are later determined not to be owed or covered under either the U.S. Specialty Primary Policy or the Lexington Excess Policy. Lexington will not advance any legal fees incurred by the Insureds with respect to the Arch Declaratory Judgment action nor any fees incurred for any coverage work done on behalf of the Insureds, which fees are not covered under the Lexington Excess Policy or the U.S. Specialty Primary Policy. Lexington is not requiring all directors and officers to sign an interim funding agreement in order for any one director or officer who executes an interim funding agreement to receive advancement of defense costs. However, Lexington will not advance any defense costs for any individual director or officer who does not sign an interim funding agreement with Lexington whereby the director or officer agrees to repay any such advanced defense costs which are later determined not to be covered under either the U.S. Specialty Policy or the Lexington Excess Policy. Lexington will be filing a motion to lift the bankruptcy stay for purposes of advancing defense costs under its Excess Policy similar to the motion filed by U.S. Specialty. Any advancement of defense costs under the Lexington Excess Policy is of course subject to Bankruptcy Court approval lifting the stay in order for

#257143v1

February 15, 2007
Page 3

Lexington to advance defense costs under its Excess Policy.    If any insured has any questions or comments, please do not hesitate to contact me.  Additionally, we will shortly be forwarding interim funding agreements for your review.

Lexington continues to reserve all its rights, defenses and privileges under the U.S. Specialty Primary Policy, to which the Lexington Excess Policy follows form with certain exceptions, and the Lexington Excess Policy, at law and in equity.  Lexington also reserves its right to apply other exclusions, endorsements or provisions of the Lexington Excess Policy as appropriate and supplement this coverage letter in the future as the facts and law warrant, and Lexington incorporates all its rights expressed in all the letters it has previously issued to the Insureds.  Additionally, Lexington continues to reserve its rights with respect to the specific reservations expressed by the primary carrier U.S. Specialty.

Should you have any questions or comments regarding the foregoing, please do not hesitate to contact the undersigned.

Very truly yours,

James E. Tolan

JET/sdv
cc:    **Via Email**
       Leslie Ahari
       Ross, Dixon & Bell, LLP
       2001 K Street, N.W.
       Washington, D.C.  20006

       **Via Email**
       Daniel J. Standish, Esq.
       Wiley Rein & Fielding LLP
       1776 K Street, N.W.
       Washington, D.C.  20006

       **Via Email**
       John D. Hughes, Esq.
       Edwards Angell Palmer & Dodge LLP
       101 Federal Street
       Boston, Massachusetts 02110-1800

       **Via Email**
       Robert Benjamin
       Kaufman Borgeest & Ryan LLP
       200 Summit Lake Drive
       Valhalla, NY 10595

#257143v1

# EXHIBIT D

## INTERIM FUNDING AGREEMENT

This Interim Funding Agreement ("Agreement") is made and entered into this ___

day of June 2006, by and between U.S. Specialty Insurance Company ("U.S. Specialty"),

and Dennis Klejna (the "Insured").

### W I T N E S S E T H :

WHEREAS, U.S. Specialty issued Directors, Officers and Corporate Liability Insurance

Policy No. 24-MGU-05-A10821 (the "Policy") to Refco, Inc. ("Refco") for the claims-made

period August 11, 2005 to August 11, 2006;

WHEREAS, subject to its terms, conditions, and limitations, the Policy affords coverage

for Loss resulting from Claims made against Insured Persons for Wrongful Acts;

WHEREAS, on or about December 8, 2005, the Insured was named with other Insured

Persons as a defendant in <u>Gensheimer v. Bennett, et al.</u> and <u>Teachers' Retirement System of the

State of Illinois v. Lee, et al.</u>, which suits subsequently were consolidated into <u>In re Refco, Inc.

Securities Litigation</u>, No. 05-CV-08626-GEL (S.D.N.Y.) (collectively the "<u>Refco Securities

Litigation</u>");

WHEREAS, on January 26, 2006, a complaint was filed against the Insured and others,

including other Insured Persons, in <u>Global Management Worldwide Limited v. Bennett, et al.</u>,

No. 06 CV 0643 (S.D.N.Y.) (the "<u>Global Management</u> Action");

WHEREAS, on April 13, 2006, a complaint was filed against the Insured and others,

including other Insured Persons, in <u>American Financial International Group – Asia, LLC v.

Bennett, et al.</u>, No. 05 CV 8988 (S.D.N.Y.) (the "<u>American Financial</u> Action");

WHEREAS, the <u>Refco Securities Litigation,</u> the <u>Global Management</u> Action and the

<u>American Financial</u> Action are collectively referred to herein as the "Litigation";

335501 v 1

WHEREAS, the Insured has requested coverage under the Policy with respect to the Litigation and advancement by U.S. Specialty of reasonable and necessary Defense Costs to defend the Litigation;

WHEREAS, the Insured has retained the law firm of Baker & Hostetler LLP and the Nathan Law Office (collectively, "Defense Counsel") to represent him in the Litigation;

WHEREAS, U.S. Specialty has reserved its rights generally and on certain specific grounds with respect to the Litigation;

WHEREAS, pursuant to Policy Conditions (D), U.S. Specialty has agreed to advance reasonable Defense Costs incurred by or allocable to the Insured in connection with the Litigation without waiver of any of its rights under its Policy or applicable law, including with respect to the applicability of the retentions under the Policy and allocation for uncovered matters or entities, and further subject to continued approval of such advancement by the United States Bankruptcy Court in the matter In re Refco, Inc., Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases;

NOW, THEREFORE, in consideration of the mutual promises, covenants, agreements and other undertakings herein, and for other good and valuable consideration, the adequacy and receipt of which consideration is hereby acknowledged, the parties agree as follows:

1.    **Advancement of Defense Costs**

Subject to the approval of the Bankruptcy Court in In re Refco, Inc., Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases, and any terms and conditions of any applicable orders entered by such Court, and further subject to the Policy, this Agreement, and compliance by the Insureds and Defense Counsel with U.S. Specialty's Defense Counsel Guidelines (the "Guidelines"), U.S. Specialty will advance reasonable and necessary Defense Costs incurred by

and allocable to the Insured in defense of the Litigation. Work by Defense Counsel shall be performed by the designated attorneys and paralegal(s) at hourly rates not to exceed the rates set forth below:

**CORE**
<u>Nathan Law Office</u>

| | |
|---|---|
| R.E. Nathan | $400 Principal (Securities, Futures and Derivatives) |

<u>Baker & Hostetler LLP</u>

| | |
|---|---|
| H.B. Kim | $475 Securities Partner – Overall Responsibility |
| M.D. Powers | $575 Securities Partner – local NY for filings |
| Ona Wang | $375 Jr. Securities Partner – Section 10b-5 |
| Lisa Carteen | $385 Jr. Securities Partner – Global Mgmt, AFIC cases |
| Antonio Villegas | $235 Securities Associate – Section 15, 20(a) claims |
| Lisa Lawrence | $235 Securities Associate – Section 15, 20(a) claims |
| Terry Blaber | $170 NY Paralegal |

**SUPPORT**

| | |
|---|---|
| J.J. Carney | $525 White Collar Partner |
| Andrew Reich | $385 Securities Counsel – Section 10b-5 |
| J.M. Grippo* | $275 Securities Associate – Section 11 claim |
| Justin Shigemi | $240 Securities Associate – Section 15, 20(a) claims |
| J.L. Chairez | $435 Litigation and Insurance Partner |
| F.R. Cabezas | $385 Litigation and Insurance Associate |
| E. Divok | $195 Litigation and Insurance Paralegal |
| F. Frank | $235 Litigation and Insurance Associate |
| W. Gibson | $375 Bankruptcy Partner |
| S. Maxwell | $130 Bankruptcy Paralegal |

* leaving Baker & Hostetler 7/10/06

The addition of any attorneys or law firms other than those listed above to work on the defense of the Litigation and/or any increase in hourly rates must be approved in advance by U.S. Specialty.

2.    **Submission and Review of Statements**

Defense Counsel shall, on a monthly basis, submit all statements for services directly to counsel for U.S. Specialty, Ross, Dixon & Bell, LLP. Each statement shall comply with Section

II(B) of the Guidelines. Each statement shall provide sufficient detail of the work performed so that U.S. Specialty can perform a meaningful review to determine whether the charges are reasonable and necessary, and performed in defense of a covered Claim under the Policy. Defense Counsel shall issue separate invoices for the Refco Securities Litigation, Global Management Action and American Financial Action. U.S. Specialty shall have the right to make reasonable inquiries regarding all statements submitted for advancement. In the event that a submitted statement or any part thereof is not approved for advancement by U.S. Specialty, the parties hereto agree to use their best efforts and good faith to resolve any issues raised by such statement. In the event that an agreement cannot be reached, U.S. Specialty shall advance those items submitted that are not in dispute, and the parties will reserve all rights with regard to the items not advanced.

### 3.    Bi-Monthly Advancements

Subject to the terms and conditions of any order entered by the Bankruptcy Court in In re Refco, Inc., Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases, and following the initial payment of fees and expenses, U.S. Specialty shall advance payment of Defense Costs in accordance with the terms and conditions of this Agreement on a bi-monthly basis.

### 4.    Agreement to Avoid Unreasonable and Unnecessary Fees and Costs and Duplication of Effort

Defense Counsel shall avoid incurring unreasonable and unnecessary legal fees and costs and shall avoid duplication of effort and expense.

### 5.    Advancements Credited Against Policy Limits

The Insured acknowledges and agrees that advancements of Defense Costs under this Agreement are made pursuant to the Policy and properly are credited by U.S. Specialty against the $10 million aggregate Policy limit and shall be applied toward exhaustion of such Policy

335501 v 1                              - 4 -

limit unless and until repayment to U.S. Specialty actually is made of any amount previously advanced.

### 6.     Undertaking of Repayment

Pursuant to Policy Conditions (D)(2), the Insured undertakes and agrees to repay U.S. Specialty any and all amounts, including Defense Costs, paid on his behalf in connection with the Litigation if it is finally determined that such amounts are not covered under the Policy.

### 7.     No Objection to Advancement of Defense Costs for Other Insureds

The Insured hereby agrees that he does not object to U.S. Specialty's advancement of Defense Costs under the Policy to any other person named as a defendant in the Litigation or in other lawsuits or proceedings and who is an "Insured Person" as that term is defined by the Policy. The Insured understands and agrees that advancements by U.S. Specialty to counsel for him and to counsel for other Insured Persons under the Policy will reduce and may exhaust the Policy's limit of liability, and that U.S. Specialty will process the invoices received from defense counsel for all Insured Persons in the order such invoices are received. In the event there are insufficient funds left in the Policy limit to pay all invoices in full, the Insured understands and agrees that U.S. Specialty is obligated to pay only that amount remaining under the Policy's limit of liability and that invoices from Defense Counsel may not be paid in full.

### 8.     U.S. Specialty's Reservation of Rights

U.S. Specialty is advancing Defense Costs pursuant to this Agreement on an interim basis, subject to a full and complete reservation of rights. Such reservation of rights may be amended or revised from time to time as circumstances warrant. Nothing herein shall constitute or be construed as a waiver or estoppel, either express or implied, of U.S. Specialty's rights under the Policy or applicable law. U.S. Specialty expressly reserves its rights with respect to the

applicability of the retentions under the Policy and the payment thereof by Refco, Inc.; provided, however, that U.S. Specialty agrees that it will not seek payment of the retentions from the Insured's personal assets, nor deny coverage for Defense Costs or other Loss under the Policy for the Litigation solely on the basis of Refco's failure to satisfy the retention should payment by Refco not be made. Nothing herein shall be construed as a waiver or limitation of U.S. Specialty's subrogation rights under the Policy or at law, including with respect to Refco's indemnification obligations. U.S. Specialty also reserves the right at the conclusion of the Litigation, or at any prior time, to contest the reasonableness or necessity of Defense Costs, and the fact that U.S. Specialty may have advanced such Defense Costs shall not be construed as an admission or waiver with respect to their reasonableness or necessity, or as to coverage under the Policy.

9.    **Mutual Reservation of Rights**

Except as otherwise specified in this Agreement, in entering into this Agreement, each of the parties hereto expressly reserves all rights it or he may have to make any contention whatsoever concerning the Policy, its coverage or scope, U.S. Specialty's duty, if any, to make interim advancements of Defense Costs, and all other matters connected with the Policy and the claims submitted thereunder.

10.    **Termination**

U.S. Specialty may terminate any or all payments under this Agreement thirty (30) days after written notice to Defense Counsel, which notice shall state the reason for such termination; provided, however, that U.S. Specialty's obligation to advance Defense Costs under this Agreement shall terminate immediately in the event that the $10 million Policy limit of liability is exhausted, including with respect to any unpaid fees or costs already incurred.

**11.    Construction of Agreement**

This Agreement is the result of negotiations among the parties, each of whom is represented by or has access to counsel. This Agreement shall not be construed against any party on the ground that counsel for that party drafted the Agreement or any provision thereof, and shall not be construed against U.S. Specialty because it is an insurance company. The terms "Defense Costs," "Loss," "Claim," and "Insured Persons" shall have the same meanings herein as defined by the Policy.

**12.    Successors and Assigns**

This Agreement shall be binding upon the parties hereto and their respective heirs, successors, and assigns. This Agreement shall not be assignable by any party without the prior written consent of the other parties hereto.

**13.    Authority**

The undersigned signature and execution of this Agreement is made and undertaken by individuals duly authorized to execute this Agreement.

**14.    Execution In Counterparts**

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

**15.    Entire Agreement**

This Agreement shall supersede any prior understandings and agreements, either written or oral, between the parties (except for the Policy) and shall, along with the Policy, constitute the entire agreement of the parties with respect to the matters contained herein.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

U.S. SPECIALTY INSURANCE COMPANY

By:_____

Title:_____


DENNIS KLEJNA


_____


DEFENSE COUNSEL:


By:_____
   Joseph L. Chairez


By:_____
   Richard E. Nathan

335501 v 1

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

U.S. SPECIALTY INSURANCE COMPANY

By:_____

Title:_____

**DENNIS KLEJNA**

_____

DEFENSE COUNSEL:

By:_____
    Joseph L. Chairez

By:_____
    Richard E. Nathan

335501 v 1

335501 v 1                    - 8 -

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed

on their behalf as of the date set forth above.

**U.S. SPECIALTY INSURANCE COMPANY**

By:_____

Title:_____


**DENNIS KLEJNA**

_____

DEFENSE COUNSEL:

By:_____
    Joseph L. Chairez

By:_____
    Richard E. Nathan

335901 v 1

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed

on their behalf as of the date set forth above.

U.S. SPECIALTY INSURANCE COMPANY

By: _____

Title: Claims Counsel _____


**DENNIS KLEJNA**

_____


DEFENSE COUNSEL:


By: _____
   Joseph L. Chairez


By: _____
   Richard E. Nathan

335501 v 1

## Interim Funding Agreement

This Interim Funding Agreement ("Agreement") is made and entered into this _____ day of June, 2007, by and between Lexington Insurance Company ("Lexington") and Dennis Klejna ("Mr. Klejna").

WHEREAS, Lexington issued a Directors and Officers Liability and Corporation Reimbursement Follow Form Excess Liability Policy No. 1620924 (the "Policy") to Refco, LLC ("Refco") for the claims-made period August 11, 2005 to August 11, 2006;

WHEREAS, subject to its terms, conditions, and limitations, the Policy affords coverage for Loss resulting from Claims made against Insured Persons for Wrongful Acts;

WHEREAS, Mr. Klejna has been named as a defendant, along with other Insured Persons, or is otherwise involved with, at least the following action: *In re Refco, Inc. Securities Litigation*, Master File No. 05-cv-8626 (GEL) (S.D.N.Y.), , ( the "Litigation");

WHEREAS, Mr. Klejna has been issued a subpoena in the In re Refco, LLC, Case No. 05-60134 (RDD) (Bankr. S.D.N.Y.) "In re Refco LLC";

WHEREAS, Mr. Klejna was dismissed without prejudice from the following actions: *In re Refco Capital Markets Ltd. Brokerage Customer Securities Litigation*, Case No. 06-cv-0643 (GEL)(S.D.N.Y.), *American Financial International Group-Asia, LLC v. Bennett, et al.,No. 05-*

1

*CV 8988 (S.D.N.Y.),* and thus should not have any more Defense Costs in connection with said actions.

WHEREAS, Mr. Klejna has requested coverage under the Policy with respect to the Litigation and advancement by Lexington of reasonable and necessary Defense Costs to defend the Litigation;

WHEREAS, Mr. Klejna has retained the law firms of Baker & Hostetler, LLP and the Nathan Law Office (collectively or individually, "Defense Counsel") to represent him in the Litigation;

WHEREAS, Lexington has reserved its rights generally and on certain specific grounds with respect to the Litigation ;

WHEREAS, pursuant to the terms of the Policy and, to the extent not contradicted by the Policy, the terms of the immediate underlying policy issued to Refco, Inc. by U.S. Specialty Insurance Company for the same period (U.S. Specialty Policy No. 24-MGU-05-A10821, the "Underlying Policy"), specifically Underlying Policy Conditions (D), Lexington has agreed to advance reasonable Defense Costs incurred by or allocable to Mr. Klejna in connection with the Litigation without waiver of any of its rights under its Policy or applicable law, including with respect to the applicability of the retentions under the Policy and allocation for uncovered matters or entities, and further subject to continued approval of such advancement by the United

2

States Bankruptcy Court in the matter *In Re Refco, Inc.*, Case No. 05-60006-RDD (Bankr. S.D.N.Y.) and consolidated cases (collectively the "*Refco* Bankruptcy");

WHEREAS, U. S. Specialty Insurance Company, pursuant to the Underlying Policy, has been advancing Defense Costs to Mr. Klejna and other Insured Persons defending against or otherwise involved in the Litigation, and the Underlying Policy's limits of liability have been completely exhausted by payment of defense costs;

NOW THEREFORE, in consideration of the mutual promises, covenants, agreements and other undertakings herein, and for other good and valuable consideration, the adequacy and receipt of which is hereby acknowledged, the parties agree as follows:

1.    Advancement of Defense Costs

Subject to the approval of the Bankruptcy Court in the *Refco* Bankruptcy, which Lexington agrees to promptly seek, and any terms and conditions of any applicable orders entered by such Court, and further subject to the Policy, the Underlying Policy (to the extent not contradicted by the Policy), this Agreement, and compliance by Mr. Klejna and Defense Counsel with U.S. Specialty Defense Counsel Guidelines (the "U.S. Specialty Guidelines"), Lexington will advance reasonable and necessary Defense Costs incurred by and allocable to Mr. Klejna in defense of the Litigation. Defense Costs shall be construed as defined by the Underlying Policy in Definitions (D). Defense Costs shall not include payment for any attorney's fees, costs, or other expenses incurred in connection with: 1) prosecution of any affirmative claims in the Litigation or otherwise, except with respect to proofs of claim and the preservation of any

3

indemnification rights against Refco or any Refco affiliate thereof, which may preserve Lexington and/or U.S. Specialties' subrogation or indemnification rights, and except with the written consent of Lexington; 2) any other fees or expenses not properly chargeable to the defense of the Litigation. Work by Defense Counsel shall be performed by the designated attorneys and paralegal(s) at hourly rates not to exceed the rates set forth below:

Nathan Law Office

| | |
|---|---|
| R.B. Nathan | $450.00 |

Baker & Hostetler, LLP

| | |
|---|---|
| H.B. Kim | $520.00 |
| M.D. Powers | $600.00 |
| Ona Wang | $445.00 |
| Lisa Carteen | $395.00 |
| Antonio Villegas | $265.00 |
| Lisa Lawrence | $265.00 |
| Terry Blaber | $200.00 |
| Sarah Poster | $230.00 |
| Support | |
| J.L. Chairez | $480.00 |
| J.J. Carney | $625.00 |
| F.R. Cabezas | $410.00 |
| B. Dviok | $225.00 |
| B. Frank | $260.00 |

4

| W. Gibson | $400.00 |
| S. Maxwell | $140.00 |
| Matthew Goldman | $610.00 |
| Kelly S. Burgan | $250.00 |

The addition of any attorneys or law firms other than those listed above to work on the defense of the Litigation and/or any increase in hourly rates must be approved in advance by Lexington.

2.    Submission and Review of Statements

Defense Counsel shall, on a monthly basis, submit all statements for services directly to counsel for Lexington, D'Amato & Lynch. Each statement shall comply with U.S. Specialty Guidelines . Each statement shall provide sufficient detail of the work performed so that Lexington can perform a meaningful review to determine whether the charges are reasonable and necessary, and performed in defense of the Litigation for which Lexington has reserved its rights under the Policy or with respect to proofs of claim and the preservation of any indemnification rights against Refco or any Refco affiliate thereof, which may preserve Lexington and/or U.S. Specialties' subrogation or indemnification rights. Defense Counsel shall issue separate statements for their work on each case included in the Litigation. Lexington shall have the right to make reasonable inquiries regarding all statements submitted for payment. In the event that a submitted statement or any part thereof is not approved for payment by Lexington, the parties hereto agree to use their best efforts and good faith to resolve any issues raised by such statement. In the event that an agreement cannot be reached, Lexington shall advance those items submitted that are not in dispute, and the parties will reserve all rights with regard to the items not advanced.

5

3.     **Bi-Monthly Advancements**

Subject to the terms and conditions of any order entered in the *Refco* Bankruptcy, and

following the initial payment of fees and expenses, Lexington shall advance payment of Defense

Costs in accordance with the terms and conditions of the Agreement on a bi-monthly basis.

4.     **Agreement to Avoid Unreasonable and Unnecessary Fees and Costs and Duplication of Effort**

Defense Counsel shall avoid incurring unreasonable and unnecessary legal fees and costs

and shall avoid duplication of effort and expense.

5.     **Advancements Credited Against Policy Limits**

Mr. Klejna acknowledges and agrees that advancements of Defense Costs under this

Agreement are made pursuant to the Policy and are properly credited by Lexington against the

$7.5 million aggregate limit of liability of the Policy, and shall be applied toward exhaustion of

the Policy limit.

6.     **Repayment**

Pursuant to the conditions and terms of the Policy and the Underlying Policy, specifically

Underlying Policy Conditions (D)(2) (to the extent not contradicted by the Policy), Mr. Klejna

agrees to repay Lexington any and all amounts, including Defense Costs, paid on his behalf in

connection with the Litigation if it is finally determined that such amounts are not covered either

under the Policy or the Underlying Policy. Such final determination includes but is not limited to

the final determination, including any appeals, in the action styled substantially Joseph Murphy

6

and Dennis Klejna v. Lexington Insurance Company et al., filed in the Superior Court of New Jersey Law Division: Hudson County Civil Action Docket No. L-5004-06 (the "Murphy Action").

7. **No Objection to Advancement of Defense Costs for Other Insured Persons**

Mr. Klejna hereby agrees that he does not object to Lexington's advancement of Defense Costs under the Policy, pursuant to substantially the same terms contained in this Agreement, to any other person who is named as a defendant in the Litigation or in other lawsuits or proceedings and who is an Insured Person under the Policy as that term is defined in the Policy. Mr. Klejna understands and agrees that the advancements by Lexington to Defense Counsel and to counsel for other Insured Persons under the Policy will reduce and may exhaust the Policy's limit of liability, and that Lexington will process the invoices received from defense counsel for all Insured Persons in the order such invoices are received. In the event there are insufficient funds left in the Policy limit to pay all invoices in full, Mr. Klejna understands and agrees that Lexington is obligated to pay only that amount remaining under the Policy's limit of liability, and that invoices from Defense Counsel may not be paid in full.

8. **Lexington's Reservation of Rights**

Lexington is advancing Defense Costs pursuant to this Agreement on an interim basis, subject to a full and complete reservation of rights, including its reservation of rights with respect to whether the Policy provides coverage for Defense Costs. Such reservation of rights may be amended or revised from time to time as circumstances warrant. Nothing herein shall constitute or be construed as a waiver or estoppel, either express or implied, of Lexington's rights under the

7

Policy, the Underlying Policy or applicable law. Lexington expressly reserves its rights with respect to the applicability of the retentions under the Underlying Policy and the Policy and the payment thereof by Refco; provided, however, that Lexington agrees that it will not seek payment of the retentions from the Mr. Klejna's personal assets, nor deny coverage for Defense Costs or other Loss under the Policy for the Litigation solely on the basis of Refco's failure to satisfy the retention should payment by Refco not be made. Nothing herein shall be construed as a waiver or limitation of Lexington's subrogation rights under the Policy or at law, including with respect to Refco's indemnification obligations. Lexington also reserves the right at the conclusion of the Litigation, or at any prior time, to contest the reasonableness or necessity of Defense Costs, and the fact that Lexington may have advanced Defense Costs shall not be construed as an admission or waiver with respect to their reasonableness or necessity, or as to coverage under the Policy.

9.    **Mutual Reservation of Rights**

Except as otherwise specified in this Agreement, in entering into this Agreement, each of the parties expressly reserves all rights it or he may have to make any contention whatsoever concerning the Underlying Policy, the Policy, its coverage or scope, Lexington's duty, if any, to make interim advancements of Defense Costs, and all other matters connected with the Policy and the claims submitted thereunder.

10.    **Termination**

Lexington may not terminate payment under this Agreement , unless there has been a final judgment of liability adverse to Mr. Klejna in the litigation and for which it is found there is

8

no indemnity coverage, or a final judgment in favor of Lexington in the Murphy Action;

provided, however, that Lexington's obligation to advance Defense Costs under this Agreement

shall terminate immediately without notice in the event that the $7.5 million Policy's limit of

liability is exhausted, including with respect to any unpaid fees or costs already incurred.

11.    Construction of Agreement

This Agreement is the result of negotiations among the parties, each of whom is

represented by or has access to counsel. This Agreement shall not be construed against any party

on the ground that counsel for that party drafted the Agreement or any provision thereof, and

shall not be construed against Lexington because it is an insurance company. Capitalized terms

not defined herein shall have the same meanings as defined by the Policy or, to the extent not

contradicted by the Policy, the Underlying Policy, except that nothing in this Agreement binds

either party to the meaning or interpretation of the terms "Loss" or "Costs" as used in the Policy

until there is a final determination of the meaning of said terms

12.    Successors and Assigns

This Agreement shall be binding upon the parties hereto and their respective heirs,

successors, and assigns. This Agreement shall not be assignable by any party without the prior

written consent of the other parties hereto.

13.    Confidentiality of Statements

(a)    Defense Counsel's submission of statements for professional fees and

costs to Lexington for payment and correspondence relating to or transmitting the statements

shall be CONFIDENTIAL and will not constitute a waiver of the Insured's attorney-client or

work product privilege with Defense Counsel. Lexington will treat such statements and letters as confidential and will not share them with third parties without the Insured's express written consent. Provided, however, that nothing herein will preclude Lexington from disclosure of such statements to its outside counsel, experts or consultants retained by Lexington or its outside counsel, any representative of an insurance commissioner or regulator, or department of insurance, or any auditor or reinsurer. Provided, further, however, that nothing in this Agreement will preclude Lexington from disclosing to third parties: (1) the dollar amount(s) of professional fees and/or disbursements reflected in the statements for Defense counsel; (2) the dollar amount(s) for professional fees and/or disbursements advanced by Lexington to Defense Counsel; (3) information that Lexington is required to disclose pursuant to the March 27, 2006 Order concerning the Policy entered in In re Refco, Inc., Case No. 05-60006 (RDD) (Bankr. S.D.N.Y.) and any subsequent orders and/or amendments entered by the Court in that matter concerning the Policy; and (4) information that Lexington obtains from persons other than the Insured or Defense Counsel.

(b)    In the event that Lexington receives a subpoena, document request, information request, demand, or any other legal process requiring the disclosure of the statements or information contained therein, it shall, to the extent permitted by law, provide written notice as soon as possible to Defense Counsel. The Insured may take such steps as he deems appropriate to protect his interest concerning disclosure of the Statements at his own expense. In no event shall Lexington have any obligation to incur legal fees or costs in connection with any efforts by the Insured to prevent, limit or condition disclosure of the statements or take any action that could expose Lexington to contempt or other sanctions.

10

(c)     The Parties acknowledge that no attorney-client relationship exists between the Insured and Lexington and/or Lexington's counsel, and nothing herein shall be construed as creating any such attorney client relationship between the Insured and Lexington. The Parties further acknowledge and agree that neither Lexington nor its counsel is representing or providing legal counsel to the Insured, and that it has no duty to defend the Insured in the Litigation.

14.     **Authority**

The undersigned signature and execution of this Agreement is made and undertaken by individuals duly authorized to execute this Agreement.

15.     **Execution in Counterparts**

This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument; and any of the parties hereto may execute this Agreement by signing any such counterpart. Facsimiles or scanned versions of signatures by the parties shall be treated as originals.

16.     **Entire Agreement**

This Agreement shall supersede any prior understandings and agreements, either written or oral, between the Parties, except for the Policy and, to the extent not contradicted by the Policy, the Underlying Policy.  Together with the Policy and the Underlying Policy, this Agreement shall constitute the entire agreement of the parties with respect to the matters contained herein.

11

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _Roger H Randall_

Title: _Financial Institutions Professional Liability_

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____

Helen Kim

By: _____

Richard E. Nathan

12

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _____

Title: _____

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____
Helen Kim

By: _____
Richard B. Nathan

12

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed on their behalf as of the date set forth above.

LEXINGTON INSURANCE COMPANY

By: _____

Title: _____

DENNIS KLEJNA

_____

DEFENSE COUNSEL:

By: _____
Helen Kim

By: _____
Richard B. Nathan

12

# EXHIBIT E

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN‡
WAYNE B. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ•
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN†
JUDITH M. FISHER•
A. MICHAEL FURMAN•
MICHAEL P. MEZZACAPPA•‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER•
CHRISTOPHER E. DIGIACINTO•
ANN MARIE COLLINS†‡
JONATHAN B. BRUNO•
PAUL J. COLUCCI

OF COUNSEL
MARIBETH SLEVIN
SHERRI M. FELDMAN‡
MARGARET J. DAVINO†‡

APPELLATE COUNSEL
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER•
CAROL S. DOTY†‡
ADEOLA I. ADELE
BARBARA-ANN M. COSTELLO
MELINDA R. MARGULIES•
JEFFREY S. WHITTINGTON
ROCCO E MATRA‡
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS•
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL•‡
JULIE A. KEEGAN
STEPHANIE E. GUTNIK
JEFFREY W. KLENK•
FRANK K. SFALVONI‡
JENNIFER FILZ
GINA M. HOGUE•
MICHAEL R. JANES
YAEL WEPMAN•
R. EVON HOWARD•
LEONARD B. COOPER‡‡

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

JULIE ANN LEVENSOHN•‡
JOHN R. MULLALY•
JEFFREY C. GERSON†‡
CATHERINE KELLEHER•
REBECCA GOODMAN
PETER IANNACCI‡
ANDREW R. JONES‡
CHRISTOPHER GOMPRECHT
JAMES T. DE SILVA
KEITH L. KAPLAN†‡
DANIEL C. LYNCH•
VINCENT C. ANZALDI•
BRENDA CORREA•
DAVID J. VARRIALE†‡
DOUGLAS J. DOMSKY
KIMBERLY CRESPO
TIMOTHY E. MCCARTHY•
JEFFREY A. GRALNICK
TRACEY EDJER-PERTOSON†
KATHERINE J. HOOPER†‡
DAMIEN SMITH
ANDREW S. KOWLOWITZ•‡
MATTHEW M. FERGUSON•
JEANNE M. VALENTINE

EDWARD R. NORIEGA•
MATTHEW SPENGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN•

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
∆ ALSO ADMITTED IN CT
• ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
† ALSO ADMITTED IN FL
* ADMITTED IN PL ONLY
□ ADMITTED IN NJ ONLY
◊ ADMITTED IN CA ONLY
∆ ADMITTED IN NJ & MA ONLY
* ADMITTED IN CA, NJ, DC ONLY
◊ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 1, 2006

**VIA FEDERAL EXPRESS**

Pam Sylwestrzak
Senior Vice President
Marsh USA, Inc.
500 West Monroe Street
Chicago, IL 60661-3630

|       |         |   |            |
|-------|---------|---|------------|
| Re:   | Insured | : | Refco, Inc. |
|       | Policy No. | : | RNN 506300 |
|       | Our File | : | 481.001 |

Dear Pam:

As you know, this office represents AXIS US Insurance ("Axis") in connection with the captioned Insureds and excess directors and officers liability insurance policy. Your office has requested, on behalf of the Insureds, that Axis issue and deliver that policy referenced in the August 11, 2005 Policy Binder previously issued by Axis. Accordingly, we now enclose Axis Policy No. RNN 506300 (the "Policy"). Please disseminate this to all Insureds.

Please note and communicate to all Insureds that in issuing and delivering this Policy, Axis reserves all rights under the Policy, in equity and at law, including the right to rescind the Policy based on material misrepresentations made to Axis. The issuance and delivery of the enclosed Policy by Axis should not be interpreted as a ratification of the existence of a valid insurance contract.

NEW YORK CITY OFFICE
99 PARK AVENUE
NEW YORK, NEW YORK 10016
TELEPHONE: 212-980-9600
FACSIMILE: 212-980-9291

LONG ISLAND OFFICE
1305 FRANKLIN AVENUE
GARDEN CITY, NEW YORK 11530
TELEPHONE: 516-248-6000
FACSIMILE: 516-248-0677

CALIFORNIA OFFICE
CORPORATE CENTER AT MALIBU CANYON
26655 WEST AGOURA ROAD
CALABASAS, CALIFORNIA 91502
TELEPHONE: 818-880-0992
FACSIMILE: 818-880-0993

NEW JERSEY OFFICE
9 CAMPUS DRIVE
PARSIPPANY, NEW JERSEY 07054
TELEPHONE: 973-451-9600
FACSIMILE: 973-451-0150

By issuing the Policy, Axis does not intend to waive any rights, privileges or defenses available to Axis under the Policy, at law, or in equity, all of which are expressly reserved.

We will be providing a more detailed coverage position regarding the many matters that have been submitted for coverage. In the interim, please do not hesitate to contact the undersigned with any questions.

<div style="text-align: center;">

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest

</div>

Enclosure

KAUFMAN BORGEEST & RYAN LLP



**SECUREXCESS DECLARATIONS**

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.  PLEASE READ THIS POLICY CAREFULLY.**

| COMPANY: Axis Reinsurance Company | POLICY NUMBER: RNN 506300 |
|---|---|

| Item 1.  Policyholder:<br>Refco, Inc.<br>550 West Jackson Boulevard<br>Suite 1300<br>Chicago, IL 60661 | Item 2.  Policy Period:<br>a.  Inception Date: August 11, 2005<br>b.  Expiration Date: August 11, 2006<br><br>Both dates at 12:01 a.m. at the<br>address listed in Item 1 |
|---|---|

| Item 3.   Limits of Liability (inclusive of defense costs): | |
|---|---|
| a.  Each Claim | $ 10,000,000 |
| b.  Maximum aggregate Limit of Liability for all Claim(s)<br>During the **Policy Period** of all **Insurance Products** | $ 10,000,000 |

**Item 4.  Underlying Insurance and Insurance Products:   See Endorsement No. 1**

Item 5.  Endorsements Attached at Inception: SE 1000, SE 1300, SE 0522, SE 1010, MU 1032, Manuscript #6

| Item 6.  Notices to Insurer: | |
|---|---|
| Notice of Claim(s) To Be Sent To:<br>Axis Financial Insurance Solutions Claims<br>Address:  Connell Corporate Park<br>Three Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357 | All Other Notices To Be Sent To:<br>Axis Financial Insurance Solutions<br>Address:  Connell Corporate Park<br>Three Connell Drive<br>P.O. Box 357<br>Berkeley Heights, NJ 07922-0357 |

| Item 7.  Pending and Prior Claim Date: 06/04/04 | Item. 8  Terrorism Coverage Premium:<br>$10,000 |
|---|---|

The Insurer has caused this Policy to be signed and attested by its authorized officers, but it shall not be valid unless also signed by another duly authorized representative of the Insurer.

_____
Authorized Representative

_____9/1/05_____
Date

Kevin D. McLean

Michael E. Morrell

Secretary

President

# SECUREXCESS POLICY

In consideration of the payment of the premium, and in reliance on all statements made in the application(s) for this Policy and the **Underlying Insurance** and all information provided to the **Insurer** and any or all of the **Underlying Insurers**, and subject to the provisions of this Policy, the **Insurer** and the **Policyholder**, on its own behalf and on behalf of all **Insureds**, agree as follows.

### I.    INSURING AGREEMENT

With respect to each **Insurance Product**, the **Insurer** shall provide the **Insureds** with insurance during the **Policy Period** excess of all applicable **Underlying Insurance**. Except as specifically set forth in the provisions of this Policy, the insurance afforded hereunder shall apply in conformance with the provisions of the applicable **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other applicable **Underlying Insurance**. In no event shall this Policy grant broader coverage than would be provided by the most restrictive policy constituting part of the applicable **Underlying Insurance**.

The insurance afforded under this Policy shall apply only after all applicable **Underlying Insurance** with respect to an **Insurance Product** has been exhausted by actual payment under such **Underlying Insurance**, and shall only pay excess of any retention or deductible amounts provided in the **Primary Policy** and other exhausted **Underlying Insurance**.

### II.    DEFINITIONS

**A.** **Claim(s)** means the event(s) which take place during the **Policy Period** and which trigger(s) coverage under the insuring agreement(s) of the **Underlying Insurance**.

**B.** **Insurance Product** means each separate type of insurance identified as an "**Insurance Product**" in Endorsement No. 1 to this Policy.

**C.** **Insured(s)** means any person(s) or entity(ies) that may be entitled to coverage under the **Primary Policy** at its inception.

**D.** **Insurer** means the company identified as "**Insurer**" in the Declarations.

**E.** **Policy Period** means the period from the inception date to the expiration date of this Policy stated in Item 2. in the Declarations, or its earlier cancellation or termination date, if any.

**F.** **Policyholder** means the person(s) or entity(ies) identified in Item 1. in the Declarations.

**G.** **Primary Policy** means the specific policy identified as the "**Primary Policy**" under the applicable **Insurance Product** listed in Endorsement No. 1 to this Policy.

**H.** **Sublimit** means any **Underlying Limits** which:

1.    applies only to a particular grant of coverage under such **Underlying Insurance**; and
2.    reduces and is part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in Item 4 of the Declarations.

**I.** **Underlying Insurance** means each insurance policy which constitutes all or part of an **Insurance Product**, as scheduled in Endorsement No. 1 to this Policy.

**J.** **Underlying Insurers** means any or all of the companies who issued the policies of **Underlying Insurance**.

**K.** **Underlying Limits** means, with respect to each **Insurance Product**, an amount equal to the aggregate of all limits of liability for each **Insurance Product** stated in Endorsement No. 1 to this Policy, plus the

uninsured retention or deductible, if any, applicable to the **Primary Policy** under such **Insurance Product.**

### III. CONDITIONS OF COVERAGE

A. For purposes of determining when insurance under this Policy shall attach and the limitations under which such insurance shall apply:

1. All of the **Underlying Insurance** in effect as of the inception date of the **Policy Period** shall be maintained in full effect with solvent insurers throughout the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** as provided in Section IV, below; and

2. All **Insureds** shall comply fully with all of the provisions of this Policy.

B. As a condition precedent to coverage under this Policy, the **Insured** shall give to the **Insurer** as soon as practicable, but in no event later than thirty (30) days thereafter, written notice and the full particulars of i) the exhaustion of the aggregate limit of liability of any **Underlying Insurance**, ii) any **Underlying Insurance** not being maintained in full effect during the **Policy Period**, or iii) an **Underlying Insurer** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

C. If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the **Insurer** of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change. No amendment to any **Primary Policy** or **Underlying Insurance** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the **Insurer** so agrees in writing. The **Insurer** may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Insurance** on the **Insured** paying any additional premium required by the **Insurer** for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Policyholder** must give the **Insurer** written notice of any additional or return premiums charged or allowed in connection with any **Underlying Insurance.**

### IV. REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A. If the **Underlying Limits** are partially reduced solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as excess insurance over the remaining **Underlying Limits.**

B. If the **Underlying Limits** are wholly exhausted solely due to actual payment under the **Underlying Insurance**, this Policy shall continue to apply as primary insurance with respect to the applicable **Insurance Product(s)** and the retention or deductible, if any, applicable under the **Primary Policy(ies)** shall apply under this Policy.

C. If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any **Claim** which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such **Claim** subject to such **Sublimit.**

### V. LIMITS OF LIABILITY

A. The amount stated in Item 3.a. in the Declarations shall be the maximum limit of the **Insurer's** liability for each **Claim** under the applicable **Primary Policy**, and shall be the maximum amount payable by the **Insurer** under this Policy for a single **Claim**, which amount shall be part of, and not in addition to, the amount stated in Item 3.b. in the Declarations.

B. The amount stated in Item 3.b. in the Declarations shall be the maximum aggregate amount payable by the **Insurer** under this Policy with respect to all **Claims** during the **Policy Period** for all **Insurance Products.**

C. This Policy does not provide coverage for any **Claim** not covered by the **Underlying Insurance**, and shall drop down only to the extent that payment is not made under the **Underlying Insurance** solely by reason of exhaustion of the **Underlying Insurance** through payments thereunder, and shall not drop down for any other reason. If any **Underlying Insurer** fails to make payments under such **Underlying Insurance** for any reason whatsoever, including without limitation the insolvency of such **Underlying Insurer**, then the **Insureds** shall be deemed to have retained any such amounts which are not so paid. If the **Underlying Insurance** is not so maintained, the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Insurance** been so maintained.

D. Payment by the **Insurer** of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

## VI. SETTLEMENTS AND DEFENSE

A. No **Insured** under this Policy may, without the **Insurer's** prior written consent, which consent shall not be unreasonably withheld, admit liability for or settle any matter for which insurance may be sought under this Policy.

B. The **Insurer** may, at its sole discretion, elect to participate in the investigation, defense and/or settlement of any claim under this Policy, regardless of whether the applicable **Underlying Insurance** has been exhausted.

C. The **Insured**, and not the **Insurer**, has the duty to defend all **Claims** under this Policy.

## VII. SUBROGATION

A. In the event of payment under this Policy, the **Insurer** shall be subrogated to all rights of recovery of each and all **Insureds** against any person or organization, and the **Insureds** shall do whatever is necessary to secure those rights to the satisfaction of the **Insurer**, including the execution of such documents necessary to enable the **Insurer** effectively to bring suit in the name of such **Insureds**.

B. Any amount recovered after payment under this Policy and any **Underlying Insurance** policies shall be apportioned among the Insurer and the **Underlying Insurers** net of the expense of such recovery in the reverse order of actual payment. The expenses attendant to such recovery shall be apportioned among those benefiting from the recovery in proportion to the amount of benefit to each party.

## VIII. AUTHORIZATION

Except as stated in paragraph IX.A. below, the **Policyholder** shall be the sole agent of all **Insureds** with respect to all matters, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notices of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

## IX. NOTICE

A. With respect to any **Claim**, situation that could give rise to a **Claim**, or other matter as to which insurance may be sought under this Policy, the **Policyholder** or any **Insured** must give the **Insurer** written notice contemporaneously with and in the identical manner required by the applicable **Primary Policy.**

B. All notices under this Policy shall be sent to the **Insurer** at the address set forth in Item 6. in the Declarations.

**X. MODIFICATION, CANCELLATION AND NONRENEWAL**

**A.** No modification of this Policy shall be effective unless made by endorsement signed by an authorized representative of the **Insurer**.

**B.** The **Policyholder** may cancel this Policy at any time by written notice stating when thereafter such cancellation is to be effective.

**C.** The **Insurer** may cancel this Policy only for nonpayment of premium, and only by delivering or mailing to the **Policyholder** written notice stating when, not less than ten (10) days thereafter, such cancellation shall become effective. The delivery or mailing of such notice shall be sufficient proof thereof and this Policy and the **Policy Period** shall terminate at the date and hour specified in the notice.

**D.** The **Insurer** shall refund the unearned premium, computed at the customary short rate, if the Policy is cancelled by the **Policyholder**.

**E.** The **Insurer** shall have no obligation to renew this Policy upon its expiration. If the **Insurer** decides not to renew this Policy, the **Insurer** shall provide written notice to the **Policyholder** by messenger, express delivery or first class mail at least sixty (60) days prior to the expiration of the Policy.

**F.** Notwithstanding anything to the contrary set forth elsewhere in the Policy, in the event that any **Underlying Insurance** is rescinded by agreement or legal process for fraud or other material misrepresentation by the **Policyholder** or any of the **Insureds**, then this Policy shall be deemed to be automatically and immediately rescinded, but only with respect to any **Insurance Product** containing such rescinded **Underlying Insurance**.

**XI. EXCLUSIONS**

The **Insurer** shall not be liable for any amount in any **Claim** taking place during the **Policy Period** and arising under any **Insurance Product**, which is based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

**A.** Any demand, suit or other proceeding pending, or order, decree or judgment entered, against any **Insured** on or prior to the Pending or Prior Claim Date set forth in Item 7 of the Declarations or any wrongful act, fact, circumstance or situation underlying or alleged therein; or

**B.** Any other wrongful act, fact, circumstance or situation whenever occurring, which together with a wrongful act, fact, circumstance or situation described in (a) above are causally or logically interrelated by a common nexus.

Endorsement No. 1

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## SCHEDULE OF UNDERLYING INSURANCE AND INSURANCE PRODUCTS

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

The Schedule of Underlying Insurance and Insurance Products is as follows:

A. Insurance Product:   Directors and Officers Liability

1. **Primary Policy**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| HCC | 24-MGU-05-A10821 | $10,000,000 | 08/11/05-08/11/06 |

2. **Other Underlying Policies**

| Insurer | Policy Number | Limits | Policy Period |
|---------|---------------|--------|---------------|
| Lexington | 1620924 | $7,500,000 | 08/11/05-08/11/86 |

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date     9/11/05

SE 10 00 (Ed. 02 03)          Page 1 of 1          Printed in U.S.A.

Endorsement No. 2

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

# IMPORTANT NOTICE TO ALL ILLINOIS POLICYHOLDERS

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In the event you need to contact someone about this Policy for any reason, please contact us at:

Axis Reinsurance Company
Connell Corporate Park
Three Connell Drive
P.O. Box 357
Berkeley Heights, NJ 07922-0357
Fax No.: 1 (908) 286-5600

If you have been unable to contact or obtain satisfaction from the Insurer, you may contact the Illinois Department of Insurance to obtain information or make a complaint at:

Illinois Department of Insurance
Consumer Division of Public
Services Section
Springfield, Illinois 62767

SE13 00 (Ed. 02 03)                    Page 1 of 1                    Printed in U.S.A.

Endorsement No. 3

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## ILLINOIS AMENDATORY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

SECUREXCESS POLICY

1.  Section X., MODIFICATION, CANCELLATION AND NONRENEWAL, paragraph C. is amended by deleting
    the words "delivering or" in the first sentence and the words "delivery or" in the second sentence of that
    provision.

2.  Section X., MODIFICATION, CANCELLATION AND NONRENEWAL, paragraph F. is deleted.  Provided,
    however, the Insureds and the Insurer hereby agree that the Insurer shall have the same rights under law
    to rescission that it had if Section X. F. had not been included in the Policy or deleted by this endorsement.

All other provisions remain unchanged.

_Jean Luker_
Authorized Representative

_9/1/05_
Date

SE 0522 (Ed. 0205)                                                          Printed in U.S.A.

Endorsement No. 4

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## PRIOR NOTICE EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that the Insurer shall not be liable for any amount from any **Claim** which is based upon, arising from, or attributable to or in consequence of any fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date

SE1010 0203

Endorsement No. 5

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

## MANUSCRIPT APPLICATION ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**SECUREXCESS POLICY**

In consideration of the premium charged, it is agreed by the Insurer and Insureds that the application or proposal signed *February 8, 2005* and submitted to *Axis Reinsurance Company* on *U.S. Specialty Insurance Company's* form shall be accepted by the Insurer as the Application for this Policy.

Any and all references to an Application or application in this Policy shall mean the application or proposal described above.  The Insurer has relied upon all statements, warranties and other information and documents contained in or submitted with such other application or proposal as if they were submitted directly to Insurer using its own Application form.

All other provisions remain unchanged.

_____
Authorized Representative

_____
Date    2/1/05

MU1032  2/2003

Endorsement No. 6

Effective date of this endorsement: 12:01 a.m. on: August 11, 2005
To be attached to and form part of Policy Number: RNN 506300
Issued to: Refco, Inc.
By: Axis Reinsurance Company

**Knowledge Exclusion**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

## SECUREXCESS POLICY

In consideration of the premium charged, it is agreed that this Policy does not respond to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, or event, which as of the inception date of the **Policy Period**, any **Insured** had knowledge and had reason to suppose might give rise to a **Claim** that would fall within the scope of the insurance afforded by this Policy.

All other provisions remain unchanged.

Authorized Representative

Date    9/11/05

Page 1 of 1

# EXHIBIT F

7CJAAMAGP2.txt

1

7CJAAMAGP                    Plea
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4          v.                         07 SD 312 (RLE)
4
5  SANTO C. MAGGIO,
5
6              Defendant.
6
7  ------------------------------x
7
8                                   New York, N.Y.
8                                   December 19, 2007
9                                   11:30 a.m.
9
10
10 Before:
11
11               HON. RONALD L. ELLIS,
12
12                                 Magistrate Judge
13
13
14                   APPEARANCES
14
15 JAMES B. COMEY
15      United States Attorney for the
16      Southern District of New York
16 NEIL BAROFSKY
17 CHRISTOPHER GARCIA
17      Assistant United States Attorney
18
18 PAUL SHECHTMAN
19      Attorney for Defendant Maggio
19
20 SCOTT E. HERSHMAN
20      Attorney for Defendant Maggio
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

0                                                              2

7CJAAMAGP                    Plea
1          (Case called)
2          MR. BAROFSKY:  Neil Barofsky and Christopher Garcia
3  for the government.
4          Good morning, your Honor.
5          MR. SCHECHTMAN:  Paul Shechtman, for Mr. Maggio, with
6  Scott Hershman, for Mr. Maggio.
7          THE COURT:  Okay.  I understand that he is going to be
8  pleading to an information.
9          MR. SCHECHTMAN:  Correct, your Honor.
10         THE COURT:  Has he waived indictment yet?
11         MR. SCHECHTMAN:  You have the paperwork.  We're ready
12 to waive.
                          Page 1

7CJAAMAGP2.txt

```
13          THE COURT:  We will do those separately.  Treat the
14     waiver as it should be and then I'll consider the taking of the
15     plea.
16          MR. SCHECTMAN:  Sounds right.
17          COURTROOM DEPUTY:  You are Santo Maggio?
18          THE DEFENDANT:  Yes.
19          COURTROOM DEPUTY:  Have you signed this waiver of
20     indictment.
21          THE DEFENDANT:  Yes.
22          COURTROOM DEPUTY:  Before you signed it did you
23     discussion it with your attorney?
24          THE DEFENDANT:  Yes.
25          COURTROOM DEPUTY:  Did he explain it to you?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    3

7CJAAMAGP                    Plea

```
1           THE DEFENDANT:  Yes.
2           THE COURT:  Do you understand what you are doing?
3           THE DEFENDANT:  Yes.
4           COURTROOM DEPUTY:  Do you understand that you are
5      under no obligation to waive indictment?
6           THE DEFENDANT:  Yes.
7           COURTROOM DEPUTY:  Do you understand that if you do
8      not waive indictment, if the government wants to prosecute you
9      they will have to present this case to a grand jury which may
10     or may not indict you?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Do you realize by that by signing this
13     waiver of indictment you have given up your right to have this
14     case presented to a grand jury?
15          THE DEFENDANT:  Yes, I do.
16          COURTROOM DEPUTY:  Have you seen a copy of the
17     information?
18          THE DEFENDANT:  Yes, I did.
19          THE COURT:  Would you like for me to read it to you?
20          THE DEFENDANT:  No.
21          COURTROOM DEPUTY:  How do you plead?
22          THE DEFENDANT:  Guilty.
23          COURTROOM DEPUTY:  The case has already been assigned
24     to Judge Stein.
25          MR. SCHECTMAN:  Correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    4

7CJAAMAGP                    Plea

```
1           MR. BAROVSKY:  Your Honor, we consent to the defendant
2      being released on his own recognizance.
3           MR. SCHECTMAN:  We don't object to that.
4           THE COURT:  Technically to the information you are
5      supposed to plead "not guilty".
6           MR. SCHECTMAN:  I think that is right and it is my
7      apologies.
8           THE DEFENDANT:  I plead not guilty now and then later
9      of guilty.
10          MR. SCHECTMAN:  Not guilty at this time, your Honor,
11     but we will be entering a guilty plea.
12          THE COURT:  Objection.  All right.  Now, the actual
13     plea has been referred by Judge Stein; is that it?
14          MR. BAROFSKY:  Yes, your Honor.
15          THE COURT:  And how many counts in the information?
16          MR. BAROFSKY:  Your Honor, there are four counts.
17          THE COURT:  What is he pleading to?
```
                              Page 2

7CJAAMAGP2.txt
```
18          MR. BAROFSKY:  All four counts, Judge.
19          THE COURT:  Okay.  Mr. Maggio, this matter has been
20  referred to me before Judge Stein for the purpose of taking
21  your plea.  Did you consent to proceed before a United States
22  magistrate judge on your felony plea allocution?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Before you signed it did you discuss it
25  with your attorneys?
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                5

7CJAAMAGP              Plea
```
 1          THE DEFENDANT:  Yes, your Honor.
 2          THE COURT:  Did they explain it to you?
 3          THE DEFENDANT:  Yes.
 4          THE COURT:  Do you understand that you have an
 5  absolute right to have this proceeding before a United States
 6  district judge?
 7          THE DEFENDANT:  Yes, I do.
 8          THE COURT:  You are voluntarily proceeding before a
 9  United States magistrate judge?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Mr. Maggio, you are charged in a four
12  count information.  Count One of the information charges you,
13  well, conspiracy to commit securities fraud, wire fraud, bank
14  fraud and money laundering and to make false filings with the
15  SEC and material misstatements to auditors in violation of
16  Title 18 U.S.C. Sections 371.  This crime carries a maximum
17  sentence of five years imprisonment, a maximum fine which is
18  the greatest of either $250,5000 or twice the gross pecuniary
19  gain derived from the offense or twice the gross pecuniary loss
20  to persons other than yourself as a result of the offense.
21  There is a $100 special assessment and a term of supervised
22  release of three years.
23          Counts Two and Three of the information charge you
24  with securities fraud in violation of Title 15 U.S.C. Section
25  78 (J) (B) and 78 (F) (F) and Title 17 Code of Federal
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                6

7CJAAMAGP              Plea
```
 1  Regulations Section 240, 10 (B) (5) and each of those counts
 2  carries a maximum sentence of 20 years imprisonment, a maximum
 3  fine which is the greatest of either five million dollars or
 4  twice the gross pecuniary gain derived from the offense and
 5  twice the gross pecuniary loss of persons other than yourself
 6  as a result of the offense.  Each also has a $100 special
 7  assessment and a term of supervised release of three years.
 8          Count four of the information charges you with wire
 9  fraud in violation of Title 18 U.S.C. Section 1343 and carries
10  a maximum sentence of 0 years imprisonment, a maximum fine
11  which is the greatest of either $250,000 or twice the gross
12  pecuniary gain derived from the offense, or twice the gross
13  pecuniary loss to person others than yourself as a result of
14  the offense.  It carries a $100 special assessment and a term
15  of supervised release of three years.
16          A total maximum sentence of incarceration on the
17  information is 65 years imprisonment.  In addition to the
18  foregoing the Court must order restitution with respect to the
19  information and in accordance with U.S.C.
20          In addition, if you are sentenced to any period of
21  supervised release and violate the conditions of your
22  supervised release you may be sentenced to all or part of the
```
                                Page 3

7CJAAMAGP2.txt
23  supervised release as authorized by statute without any credit
24  for time already served on supervised release.
25          Do you understand that?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                7
7CJAAMAGP              Plea
 1          THE DEFENDANT:  Yes.
 2          THE COURT:  So you understand these penalties as I've
 3  read them to you?
 4          THE DEFENDANT:  Yes, I do.
 5          THE COURT:  Have you seen a copy of the information in
 6  which the government makes these charges against you?
 7          THE DEFENDANT:  Yes, I do.
 8          THE COURT:  Have you discussed it with your attorneys?
 9          THE DEFENDANT:  Yes, your Honor.
10          THE COURT:  Are you prepared to enter a plea today?
11          THE DEFENDANT:  Yes, I am.
12          THE COURT:  Santo Maggio, how do you plead?
13          THE DEFENDANT:  Guilty.
14          THE COURT:  Mr. Maggio, before I can recommend that
15  your plea be accepted I must determine that you understand the
16  plea and its consequences, that the plea is voluntary and that
17  there's a factual basis for the plea.  For that purpose I must
18  ask you a number of questions and your answers must be under
19  oath.  Do you understand that the answers you give under oath
20  may subject you to prosecution for perjury if you do not tell
21  the truth?
22          THE DEFENDANT:  Yes, I do.
23          THE COURT:  Raise your right hand.
24          (Defendant Santo C. Maggio sworn)
25          THE COURT:  Thank you.  Please state your full name
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                8
7CJAAMAGP              Plea
 1  for record.
 2          THE DEFENDANT:  Santo C. Maggio.
 3          THE COURT:  How far did you go in school?
 4          THE DEFENDANT:  I finished high school.
 5          THE COURT:  Are you currently being treated by a
 6  doctor or psychiatrist for any reason?
 7          THE DEFENDANT:  No.
 8          THE COURT:  Are you currently on any medications which
 9  might effect you in being alert for this proceeding?
10          THE DEFENDANT:  No.
11          THE COURT:  Are you any difficulty seeing, hearing or
12  understanding anything that I am saying?
13          THE DEFENDANT:  No.
14          THE COURT:  Have you had enough time to discuss with
15  your attorneys how you wish to plead?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Are you satisfied with your attorneys?
18          THE DEFENDANT:  Yes.
19          THE COURT:  Do you understand what the government says
20  that you did?
21          THE DEFENDANT:  Yes.
22          THE COURT:  Do you understand that have you a right to
23  plead not guilty?
24          THE DEFENDANT:  Yes.
25          THE COURT:  Do you understand that you have a right to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                        Page 4

7CJAAMAGP2.txt

```
7CJAAMAGP                    Plea
1    trial by jury on these charges?
2              THE DEFENDANT:  Yes.
3              THE COURT:  Do you understand that if you are to plead
4    not guilty and go to trial you would be presumed innocent until
5    the government proved your guilt beyond a reasonable doubt?
6              THE DEFENDANT:  Yes, I do.
7              THE COURT:  Do you understand that if you were to go
8    to trial you would have a number of important constitutional
9    rights including the right to be represented by counsel and to
10   have counsel appointed for you if you cannot afford an
11   attorney?
12             THE DEFENDANT:  Yes.
13             THE COURT:  Do you understand that at trial you cannot
14   be forced to testify against yourself?
15             THE DEFENDANT:  Yes.
16             THE COURT:  Do you understand at a trial you would
17   have the right to confront and cross-examine witnesses called
18   by the government?
19             THE DEFENDANT:  Yes.
20             THE COURT:  Do you understand that at a trial you
21   would have the right to testify yourself and to call witnesses
22   on your behalf and to compel their attendance by subpoena if
23   necessary?
24             THE DEFENDANT:  Yes.
25             THE COURT:  Do you understand that if your guilty plea
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
7CJAAMAGP                    Plea
1    is accepted there will be no trial of any kind and the only
2    remaining steps in your case will be a presentence report and
3    sentencing by Judge Stein?
4              THE DEFENDANT:  Yes.
5              THE COURT:  Have you discussed with your attorney the
6    role that the sentencing guidelines play in sentencing?
7              THE DEFENDANT:  Yes.
8              THE COURT:  Do you understand that the district judge
9    will retain discretion regardless of what calculations there
10   are under the guidelines?
11             THE DEFENDANT:  Yes.
12             THE COURT:  Do you understand that the calculation
13   under the guidelines will take into account a number of factors
14   including the actual conduct in which you engaged, any victims
15   of the offense, the role that you played in the offense,
16   whether or not you have accepted responsibility for your acts,
17   whether you have any criminal history or whether you have
18   engaged in any obstruction of justice; do you understand that?
19             THE DEFENDANT:  Yes.
20             THE COURT:  Between now and the date of sentencing the
21   probation department will conduct an investigation and will
22   prepare a presentence report.  Your attorney, the government
23   and Judge Stein will receive copies.  Both your attorney and
24   the government will have the opportunity to object if they
25   believe anything in the report is inaccurate; do you understand
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
7CJAAMAGP                    Plea
1    that?
2              THE DEFENDANT:  Yes.
3              THE COURT:  Do you understand that until the
                          Page 5
```

7CJAAMAGP2.txt
```
 4   presentence report is prepared neither your attorney nor the
 5   government, nor Judge Stein will be able to determine precisely
 6   what range of penalties will be calculated under the
 7   guidelines.
 8           THE DEFENDANT:  Yes.
 9           THE COURT:  Do you understand than regardless of
10   calculation and the guidelines your sentence cannot exceed the
11   maximums that I advised you of earlier?
12           THE DEFENDANT:  Yes.
13           THE COURT:  Do you understand that under certain
14   circumstances both you and the government may have the right to
15   appeal the sentence imposed.
16           THE DEFENDANT:  Yes.
17           THE COURT:  Do you understand that if the sentence is
18   more severe than you expected you will be bound by your guilty
19   plea and will not be permitted to withdraw it?
20           THE DEFENDANT:  Yes.
21           THE COURT:  You understand that parole has been
22   abolished and that if you are sentenced to any term of
23   imprisonment you will be required to serve the entire term?
24           THE DEFENDANT:  Yes.
25           THE COURT:  Mr. Maggio, are you a citizen of the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

                                                                    12

7CJAAMAGP              Plea
```
 1   United States?
 2           THE DEFENDANT:  Yes, I am.
 3           THE COURT:  Mr. Maggio, I have been handed up a plea
 4   agreement from your case.  Have you had an opportunity to
 5   review and go over this agreement with your attorneys?
 6           THE DEFENDANT:  Yes.
 7           THE COURT:  Do you understand that one of the
 8   provisions in the plea agreement is that you admit the
 9   forfeiture allegation in the information and that you agree to
10   forfeit to the United States a sum of money equal to two
11   billion, four hundred million dollars?
12           THE DEFENDANT:  Yes.
13           THE COURT:  That is what it says, right?
14           MR. BAROFSKY:  Yes, your Honor, that number is
15   correct.
16           Your Honor, the plea cooperation agreement also
17   provides, however, that in satisfaction of that amount there
18   are certain schedules attached to the plea agreement which the
19   government will accept in satisfaction of that judgment.
20           MR. SCHECTMAN:  We don't have quite that much, your
21   Honor.
22           THE COURT:  Okay.  I thought had I too many zeros
23   myself at first.
24           MR. SCHECTMAN:  No, you read it right.
25           THE COURT:  That represents the amount of the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
```

                                                                    13

7CJAAMAGP              Plea
```
 1   proceedings obtained as a result of the offense; do you
 2   understand that?
 3           THE DEFENDANT:  Yes.
 4           THE COURT:  You also understand that any forfeiture
 5   would not be treated as satisfaction of any fine, restitution,
 6   cause of imprisonment or any other penalty the Court may
 7   impose?
 8           THE DEFENDANT:  Yes.
                     Page 6
```

7CJAAMAGP2.txt
```
 9              THE COURT:  And as indicated in the agreement, there
10    is a scheduled pay of assets.  You have seen the schedule and
11    you have gone over it with your attorneys?
12              THE DEFENDANT:  Yes.
13              THE COURT:  To make sure that it's accurate?
14              THE DEFENDANT:  Yes.
15              MR. SCHECTMAN:  Judge, I might point out for the
16    record there is a Schedule B as well, which are assets that are
17    in Mrs.~Maggio's name that are being forfeited as part of the
18    plea and there is a separate agreement that need not concern
19    your Honor in this matter involving Mrs.~Maggio.
20              THE COURT:  Is that correct, Mr. Maggio, there is also
21    a Schedule B?
22              THE DEFENDANT:  Yes.
23              THE COURT:  That's Mrs.~Maggio's assets?
24              THE DEFENDANT:  Yes.
25              THE COURT:  That is also covered by the agreement that
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    14
```
7CJAAMAGP                    Plea
 1    you made with the government?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  You are also understand the agreement
 4    provides that you cooperate fully with the United States
 5    attorney's office?
 6              THE DEFENDANT:  Yes.
 7              THE COURT:  And that in exchange for that cooperation,
 8    assuming that the office determines that you have made full and
 9    accurate disclosures to them, the government has agreed that it
10    will submit a motion pursuant to Section 5K1.1 of the
11    sentencing guidelines in your favor?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Do you understand that if for any reason
14    the government determines that it will not file such a motion
15    you will not be allowed to withdraw your plea?
16              THE DEFENDANT:  Yes.
17              THE COURT:  You understand that even if the government
18    files such a motion sentencing will still be at the sole
19    discretion of the Court?
20              THE DEFENDANT:  Yes, I did.
21              THE COURT:  Is there anything else in the agreement
22    that I might want to highlight?
23              MR. BAROFSKY:  No, your Honor.
24              THE COURT:  All right.  Other than the representations
25    in this agreement, have any promises been made to you by anyone
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    15
```
7CJAAMAGP                    Plea
 1    to influence you to plead guilty?
 2              THE DEFENDANT:  No.
 3              THE COURT:  This constitutes the sole agreement that
 4    you have?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  Has anyone promised you a specific
 7    sentence if you plead guilty?
 8              THE DEFENDANT:  No.
 9              THE COURT:  Has anyone made any threats to you to
10    influence you to plead guilty?
11              THE DEFENDANT:  No.
12              THE COURT:  Are you making this plea voluntarily of
13    your own freewill and choice?
```
                           Page 7

7CJAAMAGP2.txt
```
14        THE DEFENDANT:  Yes, I am.
15        THE COURT:  The elements of the offense is?
16        MR. BAROFSKY:  Your Honor, for Counts One defendant's
17   is charged with conspiracy.  The government would be required
18   to prove each of the elements beyond a reasonable doubt.
19        First, that there is an assistance of a an agreement or
20   understanding to commit one of the objects charged in the
21   information.
22        Second, the defendant knowingly became a member of
23   that agreement or understanding.
24        And third, that one of the conspirators or
25   coconspirators or Mr. Maggio knowingly committed at least one
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

                                                        16

7CJAAMAGP            Plea
```
1    overt act in furtherance of the conspiracy during its life.
2         With respect to the securities frauds counts in two
3    and three, first, the defendant in connection with the purchase
4    or sale of securities, here the notes that are described in
5    Count Two and the common stock of Revko that's referenced in
6    Count Three did one or more of the following:  Employed a
7    devise, scheme or artifice to defraud or made an untrue
8    statement of a material fact or admitted to state a material
9    fact which made what was said under the circumstances
10   misleading or engaged in an act, practice or course of business
11   that operated or would operate as a fraud or deceit upon a
12   purchase of a seller for securities.
13        Second the defendant acted knowingly, willfully with
14   the intent to defraud.
15        And third, the defendant used or caused to be used any
16   means or instruments of transportation or communication in
17   interstate commerce or use of the mails in furtherance of that
18   fraudulent conduct.
19        and with respect to the Count Four wire fraud, first,
20   that there was a scheme or artifice to defraud that existence
21   the defendant must have participated in the scheme with the
22   intent to defraud misrepresentations or omissions must have
23   related to a material fact, that the scheme was executed to
24   obtain money or property.
25        And finally, that in execution of the scheme the
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

                                                        17

7CJAAMAGP            Plea
```
1    defendant used or caused to be used interstate wires or that
2    such use was reasonably foreseeable to him.
3         THE COURT:  Mr. Maggio, did you hear that recitation?
4         THE DEFENDANT:  Yes.
5         THE COURT:  Did you understand that if the government
6    were to proceed to trial against you it would have the burden
7    of proving each element for each offense, that is, each count
8    beyond a reasonable doubt.
9         THE DEFENDANT:  Yes.
10        THE COURT:  Did you commit the offenses for which you
11   have been charged, Mr. Maggio?
12        THE DEFENDANT:  Yes.
13        THE COURT:  Tell me what you did.
14        MR. SCHECTMAN:  Judge, if it's acceptable to you
15   Mr. Maggio has written out a statement that I think speaks to
16   all four crimes.
17        THE COURT:  Considering the complexities here I'll
18   allow him to read and then if it's not he could fill in the
                        Page 8
```

7CJAAMAGP2.txt

19 gaps.
20          THE DEFENDANT: Your Honor, from the late 1990s to
21 October 2005 I was a senior executive at Revko Ink. During
22 that period I participated with others to hide the true
23 financial health of Revko from banks, counter-parties, auditors
24 and investors. With my knowledge and active participation
25 Revko's substantial losses were covered up as revenues padded
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

7CJAAMAGP                    Plea
1 and certain operating expenses were moved off its book. Among
2 the acts I personally engaged in the signing of loan agreements
3 referencing paragraphs 61-D and 61-P of the indictment.
4          As a result of my conduct and that of my
5 coconspirators false financial statements were issued to obtain
6 debt financing from the public including 9 percent senior
7 subordinated notes referenced in Count Two of the indictment.
8          To consummate the sale of 57 percent of Revko to a
9 group headed by Thomas H. Lee in 2004 and to obtain $800
10 million in bank financing the same year and to effect the Revko
11 initial public offering in 2005. Moreover, with my knowledge
12 false financial statements were filed with the SEC including
13 form 10K referencing Count Four. The mails and interstate
14 wires were used as part of the fraudulent scheme.
15          I deeply regret my conduct and the harm that it has
16 caused.
17          THE COURT: First of all, with respect to all of the
18 activities that you've indicate you participated in it
19 knowingly?
20          THE DEFENDANT: Yes.
21          THE COURT: Okay. Where did this take place.
22          THE DEFENDANT: In New York, New York. Manhattan, New
23 York.
24          THE COURT: You said coconspirators, so other people
25 had agreed with you to effectuate this scheme?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

7CJAAMAGP                    Plea
1          THE DEFENDANT: Yes.
2          THE COURT: And the intent of this scheme was to
3 defraud?
4          THE DEFENDANT: Yes.
5          THE COURT: Now, I know you mentioned the notes and I
6 think you mentioned the 2005 initial offering that was
7 addressed to Count Three of the information, that is, whether
8 or not you had a scheme to defraud people based on the value of
9 the stock?
10          THE DEFENDANT: Correct, your Honor.
11          THE COURT: Mr. Maggio?
12          THE DEFENDANT: Yes.
13          THE COURT: That did involve false statements?
14          THE DEFENDANT: Yes.
15          THE COURT: False filings that you've indicated?
16          THE DEFENDANT: Yes.
17          THE COURT: Now, you said you used the mails which
18 interstate -- I mean, you used the mails, a phone? How did you
19 use --
20          THE DEFENDANT: Yes, used regular mail. We used
21 Express Mail. We used e-mail all to effect the scheme.
22          THE COURT: You submitted false statements in the
23 mail?
Page 9

7CJAAMAGP2.txt

24        THE DEFENDANT:  False statements, loan agreements as
25    referenced here, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            20

7CJAAMAGP                    Plea
 1            THE COURT:  Okay.  Any --
 2            MR. BAROFSKY:  Your Honor, I'll just represent to the
 3    Court that with respect to Count Four, the wire transmission
 4    did in fact originate in the Southern District of New York in
 5    Manhattan and was wired outside of the Southern District to
 6    Virginia.
 7            THE COURT:  Anything else?
 8            MR. SCHECTMAN:  Nothing, your Honor.
 9            MR. BAROFSKY:  No, your Honor.
10            THE COURT:  I am depending on you here.  Does any
11    either counsel know of any reason why I should not recommend
12    that this plea not be accepted?
13            MR. BAROFSKY:  No, your Honor.
14            MR. SCHECTMAN:  No, your Honor.
15            THE COURT:  Based on defendant's allocution and the
16    recommendations by the government I find that the defendant
17    understands the nature, the charges and consequences of his
18    guilty plea.  I also find that the plea is voluntary and that
19    there is a factual basis for the plea.  I, therefore, recommend
20    that the plea be accepted and direct that a presentence report
21    be reaped.
22            Sentencing will take place before Judge Stein on.
23            MR. BAROFSKY:  May 9, at 2 p.m.
24            THE COURT:  Is there anything else that needs to be
25    addressed today.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            21

7CJAAMAGP                    Plea
 1            MR. BAROVSKY:  Not from the government, your Honor.
 2            MR. SCHECTMAN:  Not from the offense.
 3            THE COURT:  We are adjourned.
 4                          o O o
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                          Page 10

# EXHIBIT G

82FVBENP.txt

1

```
82FVBENP                    Plea
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------X
2
3   UNITED STATES OF AMERICA,
3
4                v.                    05 CR 001192 (NRB)
4
5   PHILLIP BENNETT,
5
6                    Defendant.
6
7   ------------------------------X
7
8                                      New York, N.Y.
8                                      February 15, 2008
9                                      5:40 p.m.
9
10
10  Before:
11
11                      HON. NAOMI REICE BUCHWALD,
12
12                                      District Judge
13
13
14                      APPEARANCES
14
15  MICHAEL J. GARCIA
15       United States Attorney for the
16       Southern District of New York
16  NEIL M. BAROFSKY
17  CHRISTOPHER L. GARCIA
17       Assistant United States Attorneys
18
18  KRAMER LEVIN NAFTALIS & FRANKEL
19       Attorneys for Defendant
19  GARY P. NAFTALIS
20  DAVID S. FRANKEL
20  ADAM C. FORD
21  DARREN A. LAVERNE
21
22  ALSO PRESENT:  WILLIAM JOHNSON, Postal Inspector
22                 KRIS MOON, Postal Inspector
23                 ANNE RAILTON, Law Student
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
82FVBENP                    Plea
1        (In open court)
2        (Case called)
3        THE DEPUTY CLERK:  The case is United States against
4   Phillip Bennett; docket number 05 CR 1192.  Is the government
5   ready to proceed?
6        MR. BAROFSKY:  Yes.  Neil Barofsky for the government.
7   With me at counsel table, with your Honor's permission, is
8   Christopher Garcia of our office, our postal inspectors on the
9   case, William Johnson and Kris Moon, as well as our legal
```
Page 1

82FVBENP.txt

10    intern, Annie Railton, who's been assisting the trial of this
11    matter.  Good evening, your Honor.
12              MR. GARCIA:  Good evening, your Honor.
13              THE DEPUTY CLERK:  Is the defense ready to proceed?
14              MR. NAFTALIS:  Yes, we are.  Gary Naftalis for
15    Mr. Bennett, along with David Frankel.
16              THE COURT:  Mr. Naftalis?
17              MR. NAFTALIS:  Your Honor, we have an application on
18    behalf of Mr. Bennett to withdraw his plea of not guilty to the
19    charges in the indictment and to offer to plead guilty to the
20    charges in the indictment.
21              THE COURT:  All right.  Mr. Bennett, would you stand
22    please.  Would you raise your right hand.
23              (Defendant sworn)
24              THE COURT:  And would you state your full name for me
25    please.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              3
82FVBENP                      Plea
1               THE DEFENDANT:  Phillip Roger Bennett.
2               THE COURT:  And Mr. Bennett, how old are you?
3               THE DEFENDANT:  59, your Honor.
4               THE COURT:  Why don't you sit down.  Mr. Bennett, what
5    was the highest grade in school that you completed?
6               THE DEFENDANT:  University.  Grade, twelfth grade, I
7    think it is, your Honor.
8               THE COURT:  You have the equivalent of a college
9    degree.
10              THE DEFENDANT:  Yes, master of arts.
11              THE COURT:  And are you now or have you currently been
12    under the care of a doctor or psychiatrist?
13              THE DEFENDANT:  No, your Honor.
14              THE COURT:  And have you ever been hospitalized or
15    treated for alcoholism or narcotics addiction?
16              THE DEFENDANT:  No, your Honor.
17              THE COURT:  Are you under the influence of any drug or
18    alcohol today?
19              THE DEFENDANT:  I'm not, no, your Honor.
20              THE COURT:  And how are you feeling physically today?
21              THE DEFENDANT:  Fine, your Honor.  Thank you.
22              THE COURT:  Mr. Bennett, have you had the opportunity
23    to review the charges against you and your plea with
24    Mr. Naftalis and Mr. Frankel and perhaps some other lawyers, as
25    well?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              4
82FVBENP                      Plea
1               THE DEFENDANT:  I have, your Honor, yes.
2               THE COURT:  And have you been satisfied with the
3    advice and counsel that Messrs. Naftalis and Frankel have given
4    to you?
5               THE DEFENDANT:  I have, yes.
6               THE COURT:  Are you ready to change your plea at this
7    time?
8               THE DEFENDANT:  I am, your Honor.
9               THE COURT:  And what is your plea at this time, guilty
10    or not guilty?
11              THE DEFENDANT:  It's guilty, your Honor.
12              THE COURT:  Mr. Bennett, in order to determine whether
13    your plea is voluntary and made with a full understanding of
14    the charges against you and the consequences of your plea, I
                              Page 2

82FVBENP.txt
15    will make certain statements to you and I will ask you certain
16    questions.  I want you to understand that I need not accept
17    your plea unless I am satisfied that you are, in fact, guilty,
18    and that you fully understand your rights.  I'm tempted to ask
19    the government to pick a few favorite charges instead of all of
20    these, but, okay.
21          Mr. Bennett, you've been charged in the 20-count
22    indictment.
23          The first count charges you with a conspiracy to
24    commit securities fraud, wire fraud, bank fraud, and money
25    laundering, and to make false filings to the SEC.  This crime
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    5
82FVBENP                        Plea
1     carries a maximum sentence under the law of five years
2     imprisonment, a maximum fine of the greatest of $250,000 or
3     twice the gross pecuniary gain derived from the offense or
4     twice the gross pecuniary loss to persons other than yourself
5     as a result of the offense, and a $100 special assessment, and
6     a maximum term of supervised release of three years.
7           Do you understand that those are the charges in Count
8     One of the indictment and the maximum statutory penalties
9     applicable to those charges?
10          THE DEFENDANT:  I do, your Honor, yes.
11          THE COURT:  Counts Two and Three of the indictment
12    charge you with securities fraud.  Each of these counts carries
13    a maximum sentence of 20 years in prison, a maximum fine of
14    $5,000,000 or twice the gross pecuniary gain derived from the
15    offense or twice the gross pecuniary loss to a person other
16    than yourself as a result of the offense, a $100 special
17    assessment, and a maximum term of supervised release of three
18    years.
19          Do you understand that those are the charges in Counts
20    Two and Three and the maximum penalties under law for those
21    charges of securities fraud?
22          THE DEFENDANT:  I do, your Honor.
23          THE COURT:  Count Four charges you with making a false
24    filing with the Securities and Exchange Commission.  And this
25    crime carries a maximum statutory penalty of 20 years in
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    6
82FVBENP                        Plea
1     prison, a maximum fine of the greatest of $5,000,000 or twice
2     the gross monetary gain derived from the offense or twice the
3     gross monetary loss to a person other than yourself as a result
4     of the offense, a $100 special assessment, and a maximum term
5     of supervised release of three years.
6           Do you understand that those are the charges in Count
7     Four and the maximum penalties applicable to those charges?
8           THE DEFENDANT:  I do, your Honor.
9           THE COURT:  Counts Five and Six of the indictment
10    charge you with making a false filing with the Securities and
11    Exchange Commission -- excuse me, with the Securities and
12    Exchange Commission.  Each of these counts carries a maximum
13    sentence under the law of five years imprisonment, a maximum
14    fine of the greatest of $250,000 or twice the gross pecuniary
15    gain derived from the offense or twice the gross pecuniary loss
16    to a person other than yourself as a result of the offense, and
17    a $100 special assessment, and a maximum supervised release
18    term of three years.  Do you understand that those are the
19    charges in Counts Five and Six of the indictment and the
                            Page 3

82FVBENP.txt
20  maximum penalties provided for by law for those crimes?
21        THE DEFENDANT:  Yes, I do, your Honor.
22        THE COURT:  And Counts Seven through Thirteen of the
23  indictment charge you with wire fraud.  Each of these counts
24  carries a maximum possible sentence of 20 years in prison, a
25  maximum fine of the greatest of $250,000 or twice the gross
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              7
82FVBENP                    Plea
1  pecuniary gain derived from the offense or twice the gross
2  pecuniary loss to a person other than yourself as a result of
3  the offense, a $100 special assessment, and a maximum term of
4  supervised release of three years.
5        Do you understand that those are the charges in Counts
6  Seven through Thirteen, and the maximum penalties under the
7  statute for those charges?
8        THE DEFENDANT:  Yes, I do, your Honor.
9        THE COURT:  All right.  Count Fourteen charges you
10  with making material misstatements to auditors.  And this crime
11  carries a maximum sentence of 20 years imprisonment, a maximum
12  fine of $5,000,000 or twice the gross pecuniary gain derived
13  from the offense or twice the gross pecuniary loss to a person
14  other than yourself as a result of the offense, a $100 special
15  assessment, and a maximum term of supervised release of three
16  years.
17        Do you understand that that is the crime charged in
18  Count Fourteen of the indictment, and the maximum penalty
19  provided for by statute for Count Fourteen?
20        THE DEFENDANT:  Yes, I do, your Honor.
21        THE COURT:  Count Fifteen of the indictment charges
22  you with bank fraud.  And this crime carries a maximum sentence
23  of 30 years in prison, a maximum fine of the greatest of
24  $1,000,000 or twice the gross pecuniary gain derived from the
25  offense or twice the gross pecuniary loss to a person other
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              8
82FVBENP                    Plea
1  than yourself as a result of the offense, a $100 special
2  assessment, and a maximum term of supervised release of five
3  years.
4        Do you understand that that is the charge in Count
5  Fifteen, and that those are the maximum penalties provided for
6  by law?
7        THE DEFENDANT:  Yes, your Honor.  Forgive me, yes,
8  your Honor.
9        THE COURT:  Counts Sixteen through Twenty charge you
10  with money laundering.  Each of these counts carries a maximum
11  possible sentence of ten years imprisonment, a maximum fine of
12  the greatest of $250,000, twice the gross pecuniary gain
13  derived from the offense or twice the gross pecuniary loss to a
14  person other than yourself as a result of the offense, and a
15  $100 mandatory special assessment, and a maximum supervised
16  release term of five years.
17        Do you understand that those are the crimes charged in
18  Counts Sixteen through Twenty, and the maximum possible penalty
19  provided by law?
20        THE DEFENDANT:  Yes, your Honor.
21        THE COURT:  Do you also understand that the Court must
22  impose an order of restitution by law?
23        THE DEFENDANT:  Yes, your Honor.
24        THE COURT:  And do you understand that you are also
                          Page 4

82FVBENP.txt
25    subject to mandatory asset forfeiture?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

82FVBENP                    Plea
1           THE DEFENDANT:  Yes, your Honor.
2           THE COURT:  And do you understand that you have the
3    right to plead not guilty and the right to a trial on the
4    charges against you and, in fact, the right to a jury trial?
5           THE DEFENDANT:  Yes, your Honor.
6           THE COURT:  At this time, I'd ask the government to
7    recite the elements of the crimes charged.
8           MR. BAROFSKY:  Yes, your Honor.  For Count One,
9    conspiracy, the government would have to prove the following
10   elements:
11          First, that an agreement or understanding existed to
12   commit the objects charged in the indictment.  Second, the
13   defendant knowingly became a member of that agreement or
14   understanding.  And third, that one of the conspirators
15   knowingly committed at least one overt act in furtherance of
16   the conspiracy during the life of the conspiracy.
17          With respect to Counts Two and Three, securities
18   fraud, the government would have to prove, first, that Bennett,
19   in connection with the purchase or sale of securities, and for
20   Count Two, that would be the notes described in the indictment,
21   and in Count Three, the common stock of Refco described in the
22   indictment, he did one or more of the following:  He either
23   employed a device, scheme, or artifice to defraud or made an
24   untrue statement of a material fact or omitted to state a
25   material fact which made what was said under the circumstances
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

82FVBENP                    Plea
1    misleading or engage in an act, practice, or course of business
2    that operated or would operate as a fraud or deceit on a
3    purchaser or seller.  Second, that Bennett acted knowingly,
4    willfully, and with intent to defraud.  And, third, that he
5    used or caused to be used any means or instruments of
6    transportation or communication in interstate commerce, but he
7    used the mails in furtherance of the fraudulent conduct.
8           With respect to Count Four, which charges false filing
9    under the Exchange Act, the first element the government would
10   have to prove is that Refco was required by the Securities
11   Exchange Act of 1934 to file the 10-K that's described in Count
12   Four.  And, second, the defendant knowingly and willfully made
13   or caused to be made a materially false or misleading statement
14   in that document or omitted to state any material fact required
15   to be stated therein or necessary to make the statements
16   therein not misleading.
17          With respect to Counts Five and Six, false filings
18   under the Securities Act, the government would have to prove,
19   again, first, that Refco was required under the Securities Act
20   of 1933 to file the S4, which is described in Count Five, and
21   the S1 registration statement described in Count Six.  And,
22   second, that Bennett knowingly and willfully made or caused to
23   be made a materially false or misleading statement in those
24   documents or omitted to state any material fact required to be
25   state therein or necessary to make the statements therein not
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

82FVBENP                    Plea
                            Page 5

82FVBENP.txt
1  misleading.
2          With respect to Counts Seven through Thirteen of wire
3  fraud, the government would have to prove, first, that a scheme
4  to defraud must have existed; that Bennett must have
5  participated in the scheme with intent to defraud; that
6  misrepresentations or omissions must have related to material
7  facts were made in furtherance of the fraud; that the scheme
8  was executed to obtain money or property; and that in the
9  execution of the scheme, Bennett used or caused to be used the
10 interstate wires listed in the indictment. And here for Count
11 Seven is the June 22nd of 2004 email from Robert Trosten; in
12 Count Eight, the August 3, '04 email from Robert Trosten; in
13 Count Nine, the April 6, '05 transmission of the S4 from New
14 York to Virginia; in Count Ten, the July 19th, 2005
15 transmission of 10-K from New York to Virginia; in Count
16 Eleven, the August 5th, 2004 transmission of $4,000,000 from
17 New York to Illinois; in Count Twelve, the August 5th, 2004
18 transmission of $40,000,000 from New York to Illinois; and in
19 Count Thirteen, the August 8th, 2005 transmission of the S1
20 registration statement from New York to Virginia.
21          For Count Fourteen, material misstatements to
22 auditors, the government would have to prove, first, that Refco
23 was a public company that was required to submit financial
24 statements to the SEC; second, that Bennett was a
25 director/officer of Refco; third, Bennett knowingly and
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82FVBENP                    Plea
1  willfully made, caused to be made, a materially false or
2  misleading statement or omitted to state a material fact
3  necessary order to make the statements made in light of the
4  circumstances under which such statements were made not
5  misleading to an accountant, and that the statement was made in
6  connection with the audit or examination of the financial
7  statements of Refco required to be made pursuant to the Act.
8          Count Fifteen charges the defendant with bank fraud.
9  And specifically, that on August 5th, 2004, defrauded HSBC.
10 And the government would have to prove, first, there was a
11 scheme to defraud a bank by means of materially false or
12 fraudulent pretenses, representations, or promises; second,
13 that Bennett executed or attempted to execute the scheme with
14 intent to defraud the bank, here, again, HSBC; and third, at
15 the time of the execution of the scheme, HSBC had its deposits
16 insured by the FDIC. And I'll represent to the Court that at
17 the relevant time periods, HSBC's deposits were insured by the
18 FDIC.
19          And finally, Counts Sixteen through Twenty charge the
20 defendant with money laundering. And the government would have
21 to prove, first, that Bennett engaged or attempted to engage in
22 monetary transactions involving criminally derived property of
23 a value greater than $10,000; second, that the property
24 involved in the monetary transaction was, in fact, derived and
25 specified unlawful activity; third, that Bennett acted
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

82FVBENP                    Plea
1  knowingly. And for these purposes, wire fraud, bank fraud, and
2  securities fraud are all specified unlawful activities and
3  would have to prove each of the transactions listed in the
4  indictment in Counts Sixteen through Twenty, basically the wire
5  transactions which are described therein.
                        Page 6

82FVBENP.txt

```
 6          THE COURT:  Mr. Bennett, do you understand that if you
 7     pled not guilty and went to trial, that the burden would be on
 8     the government to prove each and every element of every crime
 9     charged beyond a reasonable doubt in order to convict you of
10     that crime?
11          THE DEFENDANT:  I do, your Honor.
12          THE COURT:  Do you understand that at a trial you
13     would have the right to be represented by an attorney at all
14     stages of the proceeding and, if necessary, an attorney would
15     be appointed for you?
16          THE DEFENDANT:  Yes, I do.
17          THE COURT:  And do you understand that at a trial you
18     would have the right to confront and cross-examine witnesses
19     and the right not to be compelled to incriminate yourself?
20          THE DEFENDANT:  I do, your Honor.
21          THE COURT:  And do you understand that at a trial you
22     would be presumed innocent until such time, if ever, the
23     government established your guilt by competent evidence to the
24     satisfaction of the trier of fact beyond a reasonable doubt?
25          THE DEFENDANT:  Yes, your Honor.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                    14
82FVBENP                       Plea

```
 1          THE COURT:  And do you understand that at a trial you
 2     would have the right to testify and would also be entitled to
 3     compulsory process; in other words, the right to call other
 4     witnesses on your behalf?
 5          THE DEFENDANT:  Yes, your Honor.
 6          THE COURT:  And do you understand that if your plea is
 7     accepted, that there will be no further trial of any kind, so
 8     that by pleading guilty, you are waiving your right to a trial?
 9          THE DEFENDANT:  I do understand that, your Honor, yes.
10          THE COURT:  And do you understand that if you are
11     sentenced to a period of supervised release, and if you violate
12     the terms of your supervised release, that an additional period
13     of jail time may be imposed without credit for the time that
14     you've previously spent on supervised release?
15          THE DEFENDANT:  Yes, your Honor.
16          THE COURT:  Do you understand that in connection with
17     your plea of guilty, that the Court may ask you certain
18     questions about the offense to which you have pled; and if you
19     answer those questions under oath and on the record and in the
20     presence of your counsel, that your answers are false may later
21     be used against you in a prosecution against you for perjury or
22     false statement?
23          THE DEFENDANT:  Yes, your Honor.
24          THE COURT:  And I recall, Mr. Bennett, you're a
25     citizen of Great Britain.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                    15
82FVBENP                       Plea

```
 1          THE DEFENDANT:  I am, your Honor, yes.
 2          THE COURT:  Do you understand that following any
 3     sentence that you receive, that you will likely be deported?
 4          THE DEFENDANT:  That is my understanding, your Honor,
 5     yes.
 6          THE COURT:  And do you understand that in determining
 7     your sentence, that the Court is obligated to calculate the
 8     applicable sentencing guidelines range, and to consider that
 9     range and any possible departures under the guidelines and
10     other sentencing factors under the statute which entitles the
```
                               Page 7

82FVBENP.txt
11  Court to consider the nature and circumstances of the offense
12  and the history and characteristics of the defendant?
13          THE DEFENDANT:  Yes, your Honor.
14          THE COURT:  And have you reviewed with your counsel
15  the government's letter to them of yesterday which explains the
16  government's position as to the sentence that you face if the
17  sentencing guidelines are applied to your case?
18          THE DEFENDANT:  I have reviewed it, your Honor,
19  correct.
20          THE COURT:  Actually, that was said very badly.  Let
21  me just try it again so that there's no confusion.
22          Have you reviewed that letter with your lawyers which
23  sets forth the government's calculation of the sentence that
24  you face under the sentencing guidelines?
25          THE DEFENDANT:  I have reviewed it.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              16
82FVBENP                    Plea
1           THE COURT:  And do you understand that the government
2   calculates that under the guidelines, that you face a sentence
3   of life imprisonment; and that it has calculated that the
4   maximum possible statutory sentence is 315 years; and that the
5   fine range is from 25,000 to $5,000,000?
6           THE DEFENDANT:  I understand that, your Honor,
7   correct.
8           THE COURT:  And do you understand that that
9   calculation by the guidelines -- that by the government is just
10  based on the information they currently have?
11          THE DEFENDANT:  Yes, your Honor.
12          THE COURT:  And do you further understand that the
13  government's letter doesn't bind either the Court or the
14  probation department, and that ultimately the sentence that you
15  receive will be determined by the Court?
16          THE DEFENDANT:  Yes, your Honor.
17          THE COURT:  Mr. Bennett, have any threats or promises
18  been made to you to make you plead guilty?
19          THE DEFENDANT:  No, your Honor.
20          THE COURT:  Have any understandings or promises been
21  made to you concerning the sentence that you will receive?
22          THE DEFENDANT:  None.
23          THE COURT:  Is your plea voluntary?
24          THE DEFENDANT:  It is, your Honor.
25          THE COURT:  Mr. Bennett, did you commit the crimes
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              17
82FVBENP                    Plea
1   that you've been charged with in the indictment?
2           THE DEFENDANT:  I did, your Honor.
3           THE COURT:  Would you tell me in your own words what
4   you did?
5           THE DEFENDANT:  Your Honor, during the period that I
6   served as CEO of Refco, I agreed with other Refco executives to
7   enter into a series of transactions at the end of Refco's
8   financial reporting periods to make it appear as if a
9   receivable due to Refco from Refco Upholdings, Inc., a related
10  party, was instead due from an independent third-party
11  customer.
12          The IGHI receivable was composed of, amongst other
13  things, historical customer losses, bad debts, and expenses
14  that IGHI had incurred on behalf of Refco.
15          I, along with other Refco executives, have caused
                        Page 8

82FVBENP.txt

16  Refco to enter into these transactions in order to conceal the
17  size and nature of the IGHI receivable.  We concealed the
18  receivable from, amongst others, Refco's auditors, Thomas H.
19  Lee Partners, various lenders who, in 2004, participated in
20  Refco's senior secured credit facility, and the issuance of 9
21  percent senior subordinated notes, and also investors in
22  Refco's common stock.
23      Among the lenders to whom I knowingly caused the IGHI
24  receivable to be misrepresented was HSBC Bank, referenced in
25  Count Fifteen of the indictment.  I and other Refco executives
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    18
82FVBENP            Plea
1   also used the interstate wires to accomplish these acts within
2   this district, as referenced in Counts Seven through Thirteen.
3   Furthermore, I caused funds obtained from the transaction with
4   Thomas H. Lee Partners, referenced in paragraph 34 of the
5   indictment, to be wired to various parties receiving proceeds
6   from the transaction, as referenced in Counts Sixteen through
7   Twenty, knowing that this money had been unlawfully obtained.
8       The IGHI receivable and related party transaction used
9   to conceal it were material information that Refco investors
10  and lenders would have wanted to have known prior to investing
11  in or lending money to Refco.  While I believed that I would be
12  able to pay the IGHI receivable down over time, and did, in
13  fact, ultimately pay off the receivable balance in its
14  entirety, I knew that failing to disclose the receivable was
15  wrong; I knew that obtaining funds from Refco's investors and
16  lenders based on misleading financial statements was also
17  wrong.
18      I also caused Refco to file documents with the SEC,
19  namely S1, S4, and 10-K that did not disclose the full extent
20  of the IGHI receivable or the transactions used to conceal it;
21  and, thus, were false and misleading with respect to material
22  facts.  I knew that failing to disclose these facts in public
23  filings and in connection with Refco's sale and registration of
24  Refco's notes and common stock was wrong, and I deeply regret
25  having done so.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    19
82FVBENP            Plea
1       Your Honor, I take full responsibility for my actions.
2   I wish to publicly apologize to my family and to all of those
3   who have been harmed by my conduct.  Thank you, your Honor.
4       THE COURT:  Mr. Barofsky, is there anything else you
5   would want me to ask the defendant?
6       MR. BAROFSKY:  Your Honor, can we just have a moment
7   to review?  There's a lot of elements.  Thank you, your Honor.
8       THE COURT:  Certainly.
9       (Pause)
10      MR. BAROFSKY:  Your Honor, just a couple of areas for
11  clarification.  First, if you can please ask the defendant to
12  confirm that he was a director or officer of Refco during this
13  relevant time period.  Should I go one-by-one?
14      THE COURT:  Mr. Bennett, can you confirm that?
15      THE DEFENDANT:  I was, your Honor.
16      MR. BAROFSKY:  Second, your Honor, that the
17  misstatements made about Refco's auditor was in connection with
18  the auditor's preparation of a financial statement, and that
19  occurred after April of 2005.
20      THE COURT:  Can you confirm that?
                            Page 9

82FVBENP.txt
```
21          THE DEFENDANT:  That's correct, your Honor.
22          MR. BAROFSKY:  Your Honor, and if you can ask the
23     defendant to confirm he made reference to various wire
24     transfers and wire communications, as well as certain filings
25     in the indictment, if you could please confirm with the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    20
82FVBENP                        Plea
```
 1     defendant that those acts occurred on or about the dates set
 2     forth in the indictment.
 3          THE DEFENDANT:  They did, your Honor.
 4          MR. BAROFSKY:  And finally, your Honor, as I noted
 5     earlier, I will represent to the Court that HSBC was --
 6     deposits were insured by the FDIC during the relevant time
 7     period; and also that Refco was an entity that was required to
 8     file the various reports and documents and registration
 9     statements under the Exchange Acts of 1933 and 1934, as well as
10     to file financial statements with respect to the 10-K and the
11     misstatement to auditors account.  Thank you, your Honor.
12          THE COURT:  Mr. Bennett, do you still wish to plead
13     guilty?
14          THE DEFENDANT:  I do, your Honor, yes.
15          THE COURT:  Mr. Naftalis, do you know of any reason
16     that Mr. Bennett ought not plead guilty?
17          MR. NAFTALIS:  No, your Honor.
18          THE COURT:  Mr. Bennett, I'm satisfied that you
19     understand the nature of the charge against you and the
20     consequences of your plea; and that your plea is made
21     voluntarily and knowingly; and that there is a factual basis
22     for it.  Accordingly, I will accept your plea of guilty and
23     direct that a presentence report be prepared.
24          THE DEFENDANT:  Thank you, your Honor.
25          THE COURT:  As for a sentencing date, can I just
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    21
82FVBENP                        Plea
```
 1     basically count out the requisite number of days or does the
 2     government have a view that it should be maybe a little bit
 3     more off into the future in light of the trial that's still
 4     upcoming?
 5          MR. BAROFSKY:  Your Honor, we think we can be prepared
 6     in three months.
 7          THE COURT:  All right.  Why don't we set sentencing
 8     for May 20th at 4 o'clock.  And since I would anticipate some
 9     significant presentence submissions, I think we should set a
10     schedule for that.  Why don't we say that the government's
11     submission is due -- the defense submission is due on May 6th,
12     and the government's on May 13th.
13          MR. BAROFSKY:  That's fine, your Honor.
14          MR. NAFTALIS:  Your Honor, if there are things in the
15     government submission that we want to respond to, that's sort
16     of --
17          THE COURT:  Doesn't give you quite enough time.
18          MR. NAFTALIS:  We don't have -- you're having us
19     first, so we don't really sort of provide -- they could go
20     first, we could go second; we wouldn't object to that.
21          MR. BAROFSKY:  We could do simultaneous submissions,
22     as well, your Honor, on the 6th and then we could each respond.
23          THE COURT:  Sounds like fun.
24          MR. BAROFSKY:  Okay.
25          MR. NAFTALIS:  It's a living.
```
                            Page 10

82FVBENP.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

82FVBENP                    Plea
1      THE COURT:  Let's not go there.  Okay?  Are we done?
2      MR. BAROFSKY:  No, your Honor.  There is the issue of
3  bail.  And at this time, your Honor, the government does
4  request that defendant be remanded.  And if your Honor will let
5  me, I would like to speak briefly on the topic.
6      THE COURT:  Okay.
7      MR. BAROFSKY:  Obviously the standard has changed
8  under the Bail Act under 3143.  Before when we appeared before
9  your Honor several years ago, the burden was ours to prove the
10 defendant was a risk of flight.  Now, of course, it is the
11 defendant's burden to prove by clear and convincing evidence
12 that he is not likely to flee.  And respectfully, we submit
13 that there have been some extremely significant changed
14 circumstances, that we respectfully submit the defendant cannot
15 meet the burden in this case.
16      First of all, under the current bond, which, as your
17 Honor may recall, is a $50,000,000 bond, secured by $5,000,000
18 in cash and two properties, that security is now essentially
19 worthless; it's essentially an unsecured bond, because all of
20 those properties and that money are subject to asset
21 forfeiture.  The $5,000,000 we have traced as direct proceeds
22 from the IPO, which the defendant has just admitted was money
23 that was fraudulently obtained, and we already have lis pendens
24 on both of the properties, because basically under substitute
25 assets, we'd be able to take those, as well.  Those are all
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

82FVBENP                    Plea
1  subject to asset forfeiture and, therefore, don't provide any
2  security for the existing bond.
3      Secondly, the defendant is facing a $2.4 billion asset
4  forfeiture.  We don't think he has $2.4 billion, but we do
5  believe that will essentially -- through proceeds and
6  substitute assets, once this conviction is final -- will
7  basically deprive the defendant of all of his assets.  We have
8  restrained a number of his assets pretrial, but we have not
9  been able to restrain assets that we haven't been able to prove
10 are directly traceable.  And we don't know the exact amount of
11 those items, but we believe that they are in the $20,000,000
12 range, which would certainly facilitate the ability of the
13 defendant to flee.
14      Third, and I guess the most obvious point, is the
15 defendant now faces an advisory guideline range of 315 years of
16 imprisonment.  And that obviously changes the calculus a lot
17 from when we last appeared before your Honor.  We're not
18 suggesting that your Honor is going to --
19      THE COURT:  He always faced that, right?
20      MR. BAROFSKY:  Yes, your Honor; but before,
21 pretrial -- I'm sorry, pre-guilty plea, there was no certainty
22 that he was necessarily going to be convicted in this case.
23 Now, jail is an inevitability.  And I don't mean to presume
24 what the ultimate sentence will be in this case, because
25 there's obviously no way to predict what the precise sentence
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

82FVBENP                    Plea
1  will be, but the best guess, I think, from anyone's
Page 11

82FVBENP.txt

2  perspective, is that it will be a substantial prison sentence.
3  And for this defendant -- he is now with certainty facing such
4  a sentence that has -- under the guidelines is the equivalent
5  of a life sentence.
6          Defendant is 59 years old.  A sentence of -- a
7  significant sentence in this case may very well prove to be the
8  equivalent of a life sentence.  The defendant is facing certain
9  deportation after he serves that sentence.
10         THE COURT:  Not to a bad place though.
11         MR. BAROFSKY:  Not to a bad place, your Honor.  But it
12  does give the defendant a tremendous incentive to self-deport.
13  In other words, to flee the jurisdiction really with -- unlike
14  most cases, with very little downside.  The worse that happens
15  if he flees and gets caught is he's brought back to the United
16  States and does a jail sentence that probably will be the rest
17  of his life.  If he stays, he's facing pretty much the prospect
18  of the same result, a sentence that may, in fact, result in him
19  being in jail for the rest of his life, given his age.
20         And, your Honor, we respectfully submit that given the
21  shifting of the burden in these really remarkable circumstances
22  of a defendant who's not a U.S. citizen, who's facing the
23  equivalent of a life sentence, and who's now basically would be
24  free on an unsecured bond, that the circumstances dictate the
25  defendant should start serving his sentence, in effect,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              25
82FVBENP                     Plea
1  immediately.  And the defendant should be remanded on the
2  grounds that he cannot meet his burden of demonstrating by
3  clear and convincing evidence that he is not a risk of flight.
4          THE COURT:  Mr. Naftalis.
5          MR. NAFTALIS:  Most respectfully, I find this
6  application most surprising and a baseless one.  And I say it
7  with -- most advisedly.
8          You have a situation here where our client, for almost
9  two and-a-half years, has met every single condition of the
10  bond that was set here.  Your Honor got a report today from the
11  office of pretrial services, which we were given a copy of when
12  we entered the room, in which the office of pretrial services
13  has pointed out that he has complied with the terms of his bail
14  all the way through.
15         And I can sort of punctuate that a little bit because,
16  in fact, if you check with Officer Forelli, who he deals with
17  in pretrial services, you could hear anecdotal information such
18  as Mr. Bennett was the one who has set up the monitoring system
19  in the house in New Jersey because, whatever, I guess they're
20  technophobes, like I, the marshals service, he actually set up
21  the monitoring service which passed their muster in the
22  electronic stuff.  Once, when his bracelet broke down, he
23  immediately reported it to Officer Forelli that it was
24  malfunctioning and he went in.  He's been meticulous in
25  reporting to these people.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              26
82FVBENP                     Plea
1          And secondly, something that the government
2  consciously avoided bringing to your attention, his bond is
3  signed by the three immediate members of his family.  The three
4  of them who are American citizens:  His wife, his daughter, and
5  his son.  They have signed a $50,000,000 bond on his behalf,
6  and these are people with roots in the community.  The daughter
                           Page 12

82FVBENP.txt
```
 7   is a lawyer, works at a law firm; the son is an investment
 8   banker with a leading firm.  The notion that he would run away
 9   and do that to his family, I mean, is incomprehensible.  And
10   all we have is rhetoric from the government there.
11          You also have the strict monitoring conditions in
12   which he's under and which he's faithfully complied with for
13   the last two and-a-half years.  Of course, he has no passport;
14   his wife has given up his passport; he has no effective way of
15   leaving the country.
16          And with respect to other situations, in other
17   situations in high-profile cases where people were facing
18   enormous sentences, no such applications were ever granted.
19   For example, the Computer Associates case, where the CEO of
20   Computer Associates, Mr. Kumar, who, under the guidelines which
21   were then in effect, more applicable now, after the Gall case,
22   the guidelines are just, you know, one ingredient in the soup
23   for your Honor to consider under 3533.  He faced life
24   imprisonment under his guidelines.  After pleading guilty, he
25   continued to be free on bond, even though there were admissions
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

82FVBENP              Plea
```
 1   of obstruction of justice in that case.
 2          After Kumar was sentenced or he got a 12-year
 3   sentence, he continued to be allowed to be -- remained free on
 4   bond to work out various issues of restitution and the like.
 5          In the case in front of Judge Sand, the Adelphia case,
 6   which is one of the cases, the Rigases, who got 15 and 20-year
 7   sentences, one of them was an eighty -- somewhere in his
 8   eighties, they were allowed to remain free on bond pending
 9   appeal, even though they had the same sort of issues.  Even
10   Mr. Ebbers, who received the largest sentence in history I've
11   ever heard of, a real outlier sentence, 25 years, he was
12   allowed to remain free on bond pending appeal and the like.
13          And apart from the fact that there is not the
14   slightest bit of evidence for this most unfair application,
15   it's also prejudicial.  As your Honor knows, we have to put in
16   sentencing submissions.  And under 3533, your Honor has a lot
17   of things which you can properly consider in determining in
18   your best judgment what's a fair and just sentence under the
19   case here.  And obviously it's very prejudicial to us in being
20   able to work with our client, who for the last two and-a-half
21   years has been coming to our office every day on a daily basis
22   to work on the case with us.  So I don't see any good-faith
23   basis for any change in bond here whatsoever.
24          THE COURT:  Mr. Barofsky.
25          MR. BAROFSKY:  Your Honor, if there's any specific
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

82FVBENP              Plea
```
 1   points you'd like me to respond to.  The ones that jump out to
 2   me is, I mean the notion that a defendant can't chronically
 3   prepare for sentencing when he's incarcerated, obviously your
 4   Honor knows countless defendants who are able to prepare for
 5   sentencing when they are incarcerated; and having spent so much
 6   time with Mr. Naftalis, I think they are pretty much -- I'm
 7   sure they have contemplated this before, this is not the first
 8   time.
 9          As opposed to those other cases, defendants who are
10   released pending appeal after they've been convicted at trial
11   is a different situation.  There's obviously provisions within
```
Page 13

82FVBENP.txt

12  3143 when there are issues on appeal that the judge finds are
13  significant issues that need to be considered and possibly
14  could result in the reversal of a conviction. That's a
15  different -- those are different facts, and that's a different
16  standard. Here, we have a guilty plea. I don't think that
17  Mr. Bennett is going to be challenging his conviction in this
18  case. He just gave a very detailed guilty plea.
19      With respect to his assurances to his family, I don't
20  mean to minimize the bond between Mr. Bennett and his family,
21  but on the flip side, we're looking at a man who just admitted
22  to telling a series of lies to a large number of victims that
23  resulted in the defrauding of $2.4 billion. 1.7 or 8 billion,
24  which we will show for restitution at the time of sentencing,
25  has not been collected. People are out all of this money.
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                    29
82FVBENP                    Plea
1       So this man maybe may have some allegiance to his
2   family, but I think you have to look at the flip side as to how
3   strong that may be by a man if he is willing to tell whatever
4   lie is necessary to -- you know, on proportions that are
5   mind-boggling, in the billions of dollars.
6       So we would respectfully submit that -- and we don't
7   contest the fact, by the way, to be clear, that Mr. Bennett has
8   complied with the conditions. And that is certainly a relevant
9   factor that Mr. Naftalis points out and we don't contest it.
10  We just don't think that that's enough to meet his burden,
11  given his changed circumstances. And that to allow a defendant
12  like this, who's also not a U.S. citizen, unlike those
13  individuals, out on what is essentially an unsecured bond, it
14  simply isn't the right course of action here.
15      MR. NAFTALIS: Just one small point, which they
16  reminded me to mention. Although Mr. Bennett never changed his
17  citizenship, like his wife, or became an American citizen like
18  his children, he's lived in the United States for more than 30
19  years; so it's not like he has any roots anyplace else. So
20  it's a little unfair for this eleventh-hour application which
21  we heard about today to suggest as if he had someplace to go
22  to.
23      And the government ignored the situation in the Kumar
24  case. He said that all these other cases where people were on
25  appeal. In the Kumar case it was a plea of guilty with someone
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                    30
82FVBENP                    Plea
1   facing, if one took the government's view of the thing, a life
2   sentence. And he was allowed out, and he showed up. Even
3   after he got his sentence of 12 years he remained out on bond
4   to work out the restitution things.
5       And we don't necessarily agree at all with the amount
6   of the forfeiture issues here. I mean there's a forfeiture
7   issue in the case, but the numbers he tosses around are not
8   numbers that we have stipulated to or agreed to by any stretch
9   of the imagination, and he throws them around.
10      That's the only point I wanted to make.
11      THE COURT: All right. I'm not going to remand
12  Mr. Bennett, although I do think I can modify his bail
13  conditions to create greater security. And I'm not going to do
14  so for a number of reasons, the most important of which is that
15  this indictment was filed in 2005.
16      If Mr. Bennett had wanted to flee, he should have fled
                          Page 14

82FVBENP.txt

17  before he paid his lawyers all the money, and kept it, and gone
18  to an appealing location. In fact, having pled guilty, to
19  leave now, extraditing him will be much easier.  So there's a
20  balance there.
21          In addition, I note that just by statute, to release
22  someone on appeal requires the same finding as the finding now.
23  The judicial officer has to be persuaded by clear and
24  convincing evidence that the person is not likely to flee.
25  That's half of the standard.  The appellate issue is the other
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    31

82FVBENP                        Plea
1   half, so it's the same standard.
2           And I also think that -- and I want to make it
3   clear -- that I don't make any prejudgments about the substance
4   of the case, but this is a case in which there has been a lot
5   of information, publicly, at least, from the bankruptcy
6   proceeding, and so this is a situation in which Mr. Bennett has
7   had the opportunity to see an examiner put the evidence
8   together.  This is not a situation where as the case approaches
9   trial, the government finally turns over information.  I think
10  Mr. Bennett has had a pretty good idea of the nature of the
11  case and the evidence for at least some time, which makes the
12  fact that he stays more significant.
13          The pretrial officer tells me that it would be easier
14  and more effective to monitor Mr. Bennett if he stayed in one
15  home or the other.  And, I guess -- and tells me that basically
16  the minute he leaves home they know about it.  So given that it
17  would take some time to -- since make an escape without a
18  passport, I think that if we modified the bail conditions to
19  limit his location, pretrial tells me that that makes it a more
20  secure situation.  In addition, if the government has any
21  particular practical economic conditions that you can think of,
22  I'm always willing to listen to those.
23          MR. BAROFSKY:  Your Honor, the posting of additional
24  assets by the defendant, they are largely forfeitable assets,
25  but to the extent that there are assets that have not been --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    32

82FVBENP                        Plea
1   as I said, we estimate that it's in the range of approximately
2   $20,000,000.  If we could at least secure those assets, these
3   are assets that we've not yet secured by having him posted for
4   the bond.
5           In addition, because, frankly, we're going to get
6   those assets anyhow at the conclusion of this case, perhaps the
7   posting the requiring of assets from the children.  He
8   mentioned that the children are successful, one's an investment
9   banker.  And if they have property, that may increase the
10  incentive for Mr. Bennett to stay.
11          THE COURT:  I think it's enough that he's -- the bond
12  mortgages their future if he flees.  We're not taking his kids'
13  money.
14          MR. BAROFSKY:  We aren't.  I wouldn't suggest that we
15  would take it other than if he fled.  We would only be posting
16  whatever interest.  Because really right now the problem, your
17  Honor, and I hear what your Honor is saying, is that he has an
18  unsecured bond, and that just causes us a great deal of
19  concern.  I don't know what the circumstances are in Kumar or
20  Ebbers, but this is a situation if there is a third party
21  posting collateral --
                              Page 15

82FVBENP.txt

22       THE COURT:  For all those people, the bottom line is
23   that for any defendant who was older and who was facing
24   sentencing, in, lets call it, the post-Enron era, the situation
25   was the same as for Mr. Bennett.  The possibility that their

33

82FVBENP           Plea

1   sentence would be -- that their residence in the Bureau of
2   Prisons was the last residence they are going to have.
3       So I don't think this is really dramatically
4   different.  And I don't think the fact that he's a British
5   citizen changes the situation, that he has to -- I think he
6   gets the credit for having complied with all of his bail
7   conditions and having had two and-a-half years to reflect.
8       MR. BAROFSKY:  Your Honor, to be clear, I wasn't
9   rearguing the bail application.  I was merely trying to respond
10  to your Honor's question whether there were additional economic
11  circumstances.
12      THE COURT:  I'm not asking his children, okay?
13      MR. BAROFSKY:  Well, your Honor, then I would ask that
14  in the alternative, if the defendant could post additional
15  property or money that has not been seized or frozen by the
16  government to secure this bond to at least increase so that
17  there's some notional security of the bond.  And I would ask
18  for a number of $10,000,000 in cash or property.
19      MR. NAFTALIS:  Your Honor, I just think there is no
20  basis whatsoever for the application.  His children, the most
21  important things in the world, are on the hook for $50,000,000
22  if he were to leave.  As they've indicated, they don't have any
23  evidence of anything that he's ever done anything which would
24  indicate he would leave.  As your Honor said, quite correctly,
25  we've known about the evidence in this case; your Honor

34

82FVBENP           Plea

1   remembers the litigation with respect to the bankruptcy trusts,
2   these report the motion practice there.  There's no secret
3   about that.  He's showed up all the time; he's complied with
4   all the conditions.  And there's not a reason in the world and
5   there's not a basis in the world for any change here
6   whatsoever.
7       MR. BAROFSKY:  Your Honor, respectfully, I don't see
8   any harm in having him post additional property that could only
9   be used at this time for the purposes to facilitate flight.  He
10  can't transfer these properties without violating the money
11  laundering laws at this point, and I don't see -- I don't even
12  understand how upping the collateral so as to prevent him from
13  fleeing prejudices him in any way.  And we're not asking even
14  for all of the money that we believe is out there, we're asking
15  for $10,000,000 to provide some additional security on what is
16  now an essentially an uncollateralized bond.  It doesn't really
17  move the ball tremendously for us, but it helps.  And at least
18  it would limit his ability to flee, should he make that
19  decision, that it makes more sense to self-deport, since he's
20  going to be going back to England anyhow before he has to face
21  the sentence.  I don't think the government's request is
22  shocking or surprising or terribly dramatic, but we do think it
23  would help, given the situation.
24      MR. NAFTALIS:  They have not shown anything for this
25  eleventh-hour request.  It's totally and absolutely baseless.

82FVBENP.txt
(212) 805-0300

35

82FVBENP        Plea
1    And I don't think -- I don't know what property may or may not
2    exist, but I don't think that there's any justification. And
3    they just can't come into court without any basis whatsoever
4    and allege things where all the evidence shows that this
5    application is frivolous.
6            MR. BAROFSKY: Your Honor, I've listened to this for a
7    fair amount of time now. And to characterize our application
8    as frivolous and baseless and eleventh-hour I think is unfair.
9            THE COURT: At least the eleventh hour.
10            MR. BAROFSKY: I don't know when we were supposed to
11    have made this application. I don't know if Mr. Naftalis would
12    have had us make it when he notified us about the intent to
13    change his plea yesterday afternoon, I don't think so. I think
14    the only time we can make a plea based on the changed
15    circumstance of the defendant entering a guilty plea is after
16    he enters the guilty plea.
17            As far as it being baseless, the notion that a
18    defendant who's facing 315 years of prison time --
19            THE COURT: He wishes.
20            MR. BAROFSKY: -- is -- that it's baseless to seek his
21    remand when he is an English citizen subject to deportation --
22            THE COURT: Excuse me. We're not -- we're sending him
23    to one of the most civilized countries in the world. It's not
24    punishment to live in England, all right?
25            MR. BAROFSKY: Exactly, your Honor, which is why we
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

36

82FVBENP        Plea
1    would ask for additional collateral.
2            THE COURT: And there is an extradition treaty between
3    the United States and Great Britain, so...
4            MR. BAROFSKY: Your Honor, I just don't understand the
5    harm --
6            THE COURT: Because I'm not sure that the purpose of
7    bail is to help you collect, you know, whatever you claim is
8    your eventual restitution.
9            MR. BAROFSKY: Your Honor, if I wasn't clear on this
10    argument, I apologize. The reason why we're asking for this is
11    to assure the defendant's appearance. If that money is posted
12    as a bond, it's not so that we can eventually seize it. If
13    it's posted as a bond, it's not available for him to use to
14    facilitate flight. It's also to secure the bond. This
15    original bond was issued because it was secured by money and
16    property. Right now it's essentially not secured by money and
17    property.
18            THE COURT: But that argument applies to any
19    additional money that he would put up. You would say it was
20    just as forfeitable to you. So it then becomes unsecured, the
21    same way.
22            MR. BAROFSKY: But it's unrestrained property, Judge,
23    that's the difference. This property is actually restrained on
24    top of the fact that it's -- because it's their direct
25    proceeds.
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

37

82FVBENP        Plea
1            What I'm suggesting, these are other properties that
2    have not been restrained, because we're not able to restrain
            Page 17

82FVBENP.txt

3   certain properties that are not proceeds. So this is money
4   that is available to the defendant for use if he wants to
5   facilitate flight.
6          The purpose of a bond, obviously security of a bond,
7   and why your Honor endorsed the order of a secured bond, was
8   because more security means less likelihood of flight. And all
9   we're suggesting is taking this property that is now available
10  to the defendant and posting it as security for the bond. And
11  obviously if we are unable to prove, as Mr. Naftalis suggests,
12  that this is property that's subject to asset forfeiture or
13  restitution, he'll get it back when -- at the time of his
14  sentencing or the time that he reports.
15         So we're not taking anything; we're not putting our
16  hands on stuff that we're not entitled to; we're just asking
17  that this bond be really secured, because right now we're
18  basically -- it's the exact same situation we had in October of
19  2005, when he's going out on the same conditions, it's
20  essentially an unsecured bond. And I don't think that your
21  Honor would have ordered an unsecured bond back then, and we're
22  just asking for some additional security: Money that is
23  available for the defendant or property, and that we have that
24  to secure the bond in case the defendant flees, and to
25  encourage him not to flee.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

38

82FVBENP                 Plea
1          MR. NAFTALIS: Apart from the fact that the government
2   has proffered not a single fact that anything has changed, I
3   don't agree with the notion that this bond is unsecured. One
4   of the homes which is securing the bond -- there's $5,000,000
5   cash, there's two residences, is in a trust. So without going
6   through all the legalities, I don't think it's so quickly
7   forfeitable, as they say.
8          And the notion of ignoring -- and that will be worked
9   out; we're not here to litigate that issue, but I just -- and
10  the notion that they can continue to ignore the fact that his
11  wife and children have signed a $50,000,000 bond that they will
12  be on the hook for and their lives will be ruined, the notion
13  there's not the slightest reason to suppose that he would do
14  this to his children, he never has, and I have nothing else to
15  say.
16         THE COURT: I think $50,000,000 is a lot of money.
17  And it does directly affect wife, children, inheritances. So
18  what about the issue of where he's going to live?
19         MR. NAFTALIS: If your Honor wants -- feels it would
20  be better, pretrial services --
21         THE COURT: That's what pretrial tells me.
22         MR. NAFTALIS: I think he would -- there's a residence
23  in New York and a residence in New Jersey. I think he would
24  prefer to be in New Jersey where his wife is, and then subject
25  to the fact he could just come to our offices and work with us,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

39

82FVBENP                 Plea
1   which I think he's allowed to do, I think that would be his
2   preference in terms of the quality of the life until the
3   sentence, if that's --
4          THE COURT: I get the high sign from pretrial; so
5   he'll stay in New Jersey.
6          MR. NAFTALIS: Okay.
7          THE COURT: Other than when he goes to you and also
                          Page 18

```
                          82FVBENP.txt
 8    when you have to get him to pretrial for -- to probation for
 9    his interview.
10              MR. NAFTALIS:  Yes.
11              THE COURT:  which we do need to do within the two
12    weeks so that the sentencing schedule can proceed.  And the
13    same is true for the government's description of the crimes.
14              Okay?  I think we're done then.
15              MR. NAFTALIS:  Thank you, your Honor.
16              MR. BAROFSKY:  Thank you, your Honor.
17              MR. GARCIA:  Thank you, your Honor.
18              THE DEFENDANT:  Thank you, your Honor.
19                              *    *    *
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

Page 19

# EXHIBIT H

82KATROP.txt

1

82KATROPps
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -------------------------------x
2
3  UNITED STATES OF AMERICA,
3
4                 v.                          05 CR 1192 (NRB)
4
5  ROBERT TROSTEN,
5
6                 Defendant.
6
7  -------------------------------x
7
8                                        New York, N.Y.
8                                        February 20, 2008
9                                        5:30 p.m.
9
10
10 Before:
11
11                    HON. NAOMI REICE BUCHWALD
12
12                                        District Judge
13
13
14                         APPEARANCES
14
15 MICHAEL J. GARCIA
15      Acting United States Attorney for the
16      Southern District of New York
16 BY:  CHRISTOPHER GARCIA
17      NEIL BAROFSKY
17      Assistant United States Attorneys
18
18 MORVILLO, ABRAMOWITZ, GRAND, IASON,
19 ANELLO & BOHRER, P.C.
19      Attorneys for Defendant
20 BY:  ROBERT G. MORVILLO
20      CHRISTOPHER J. MORVILLO
21      RACHEL M. KORENBLAT
21
22
22 Also Present:  Robert W. Manchak, Criminal Investigator
23                Rua M. Kelly, Assistant United States Attorney
23                Mary Beth Allen, Paralegal
24                United States Attorney's Office
25
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

2

82KATROPps
1        (In open court)
2        THE CLERK:  The case is United States v. Robert
3  Trosten, Docket No. 05 Crim. 1192.  Is the government ready to
4  proceed?
5        MR. GARCIA:  Yes.  Good afternoon, your Honor.
6  Christopher Garcia on behalf of the government.  With me at
7  counsel table is Assistant United States Attorney Neil
8  Barofsky.  And with the Court's permission, also at counsel
9  table:  Robert Manchak, criminal investigator with our office;
                    Page 1

82KATROP.txt
10  Mary Beth Allen, paralegal with our office; and also Rua Kelly,
11  also an Assistant United States Attorney with our office.
12          THE CLERK:  And is the defense attorney ready to
13  proceed?
14          MR. R. MORVILLO:  We are, your Honor.  Mr. Trosten is
15  here.  For the record, my name is Robert Morvillo.  I represent
16  Mr. Trosten.  And seated to my left is Christopher Morvillo, my
17  co-counsel.
18          THE DEFENDANT:  Good afternoon.
19          THE COURT:  Good afternoon, Mr. Morvillo.
20          MR. R. MORVILLO:  I think it's my application, your
21  Honor.  We would apply to the Court for permission to withdraw
22  our previously entered plea of not guilty as to Counts One,
23  Two, Seven, Fifteen, and Seventeen of the indictment and enter
24  a plea of guilty.
25          THE COURT:  Mr. Trosten, if you will remain standing
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                              3
82KATROPps
1  for a moment, would you raise your right hand, please.
2          Do you solemnly swear that the answers to the
3  questions I am about to ask you will be the truth, the whole
4  truth, and nothing but the truth, so help you God?
5          THE DEFENDANT:  I do, your Honor.
6          THE COURT:  Would you state your full name for me,
7  please.
8          THE DEFENDANT:  Robert Charles Trosten, Sr.
9          THE COURT:  And, Mr. Trosten, how old are you?
10          THE DEFENDANT:  38.
11          THE COURT:  Why don't you sit down.
12          THE DEFENDANT:  Thank you.
13          THE COURT:  Mr. Trosten, what was the last grade or
14  level of school that you completed?
15          THE DEFENDANT:  I finished undergraduate college with
16  a B.S. in accounting.
17          THE COURT:  At this time are you under the care of a
18  doctor or psychiatrist?
19          THE DEFENDANT:  Yes, I am.
20          THE COURT:  Which?
21          THE DEFENDANT:  A doctor -- a psychiatrist.
22          THE COURT:  And what condition is he treating you for?
23          THE DEFENDANT:  Dr. Neiman is treating me for sleep
24  and anxiety on occasion.
25          THE COURT:  And are you taking any medicine as a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                              4
82KATROPps
1  result of or in connection with that treatment?
2          THE DEFENDANT:  I take sleep medicine as needed and
3  anxiety medicine as needed.
4          THE COURT:  At the moment, are you under the influence
5  of any drug or alcohol?
6          THE DEFENDANT:  No, I'm not.
7          THE COURT:  Have you in fact ever been hospitalized or
8  treated for either alcoholism or narcotics addiction?
9          THE DEFENDANT:  No, I have not.
10          THE COURT:  And how are you feeling physically today?
11          THE DEFENDANT:  I feel great.
12          THE COURT:  Have you had sufficient time to discuss
13  the charges against you and your proposed plea with your
14  counsel, the Messrs. Morvillo?
                            Page 2

82KATROP.txt
```
15          THE DEFENDANT:  I have, yes.
16          THE COURT:  And have you been satisfied with the
17   advice and counsel that they have given to you?
18          THE DEFENDANT:  I am.
19          THE COURT:  And at this time, are you ready to change
20   your plea?
21          THE DEFENDANT:  I am indeed.
22          THE COURT:  And what is your plea at the moment?
23   Guilty or not guilty?
24          THE DEFENDANT:  Guilty.
25          THE COURT:  All right.  Mr. Trosten, in order to
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    5

82KATROPps
```
1    determine whether your plea is voluntary and made with a full
2    understanding of the charges against you and the consequences
3    of your plea, I will make certain statements to you and I will
4    ask you certain questions.  I want you to understand that I
5    need not accept your plea unless I am satisfied that you are in
6    fact guilty and that you fully understand your rights.
7           Now, Count One of the indictment charges you with a
8    conspiracy to commit securities fraud, wire fraud, bank fraud,
9    and money laundering, and to make false filings with the SEC
10   and material misstatements to auditors.  This crime carries a
11   maximum statutory penalty of five years in prison, a maximum
12   fine of the greatest of $250,000 or twice the gross pecuniary
13   gain derived from the offense or twice the gross pecuniary loss
14   to a person other than yourself as a result of the offense, a
15   $100 special assessment, and a mandatory term of supervised
16   release of three years.  Do you understand that those are the
17   charges in Count One and the maximum statutory penalties
18   provided for that charge?
19          THE DEFENDANT:  I do.
20          THE COURT:  Count Two charges you with securities
21   fraud.  And this crime carries a maximum possible sentence of
22   20 years in prison, a maximum fine of the greatest of $5
23   million or twice the gross pecuniary loss derived from the
24   offense, or twice the gross pecuniary loss -- I'm sorry.  I
25   think I said twice pecuniary loss.  It's twice the gross
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    6

82KATROPps
```
1    pecuniary gain derived from the offense or twice the gross
2    pecuniary loss to a person other than yourself as a result of
3    the offense, a $100 special assessment, and a maximum term of
4    supervised release of three years.  Do you understand that
5    those are the charges in Count Two and the maximum possible
6    penalties provided by law?
7           THE DEFENDANT:  I do.
8           THE COURT:  Count Seven charges you with wire fraud,
9    and this crime carries a maximum possible sentence of 20 years
10   in prison, a maximum fine of the greatest of $250,000 or twice
11   the gross pecuniary gain derived from the offense or twice the
12   gross pecuniary loss to a person other than yourself as a
13   result of the offense, a $100 special assessment, and a maximum
14   term of supervised release of three years.  Do you understand
15   that those are the charges in Count Seven and the maximum
16   statutory penalty provided for the crime of wire fraud?
17          THE DEFENDANT:  I do, your Honor.
18          THE COURT:  Count Fifteen charges you with bank fraud.
19   And this crime carries a maximum possible sentence of 30 years
```
                            Page 3

82KATROP.txt

20  in prison, a maximum fine of the greatest of $250,000 or twice
21  the gross pecuniary gain derived from the offense or twice the
22  gross pecuniary loss to a person other than yourself as a
23  result of the offense, a $100 special assessment, and a
24  mandatory -- or a maximum term of supervised release of five
25  years.  Do you understand that those are the charges in Count
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

82KATROPps
1   Fifteen and the maximum statutory penalty provided therefor?
2               THE DEFENDANT:  I do, your Honor.
3               THE COURT:  Count Seventeen charges you with money
4   laundering, and this crime carries a maximum sentence of ten
5   years in prison, a maximum fine of the greatest of $250,000 or
6   twice the gross pecuniary gain derived from the offense or
7   twice the gross pecuniary loss to a person other than yourself
8   as a result of the offense, a $100 mandatory special
9   assessment, and a maximum supervised release term of three
10  years.  Do you understand that that is the charge in Count
11  Seventeen and the maximum penalty provided for it by statute?
12              THE DEFENDANT:  I do, your Honor.
13              THE COURT:  And do you understand that, in addition to
14  the punishments which I just described, that the Court must
15  order restitution with respect to the charges in the
16  indictment?
17              THE DEFENDANT:  I'm sorry, your Honor?
18              THE COURT:  I said, do you understand that in addition
19  to the punishments that I've just described, that the Court
20  must order restitution --
21              THE DEFENDANT:  I do.
22              THE COURT:  -- with respect to the charges to which
23  you are pleading?
24              THE DEFENDANT:  I do.
25              THE COURT:  Do you understand that as part of your
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

82KATROPps
1   plea agreement, that you have admitted the forfeiture
2   allegations in the indictment and that you agree to forfeit to
3   the United States the sum of $2,400,000,000, as well as all the
4   specific property listed in schedule A to your plea agreement?
5               THE DEFENDANT:  I do, your Honor.
6               THE COURT:  And that as part of this plea agreement,
7   that you have agreed to not file any claims for any of the
8   forfeited property, and also to take such steps as necessary to
9   clear title to the specific property?
10              THE DEFENDANT:  I do, your Honor.
11              THE COURT:  And do you understand that you have the
12  right to plead not guilty and the right to a trial on the
13  charges against you and in fact the right to a jury trial?
14              THE DEFENDANT:  I do.
15              THE COURT:  At this time, Mr. Garcia, I would ask you,
16  please, to recite the elements of the crimes to which
17  Mr. Trosten is pleading.
18              MR. GARCIA:  Yes, your Honor.  With respect to Count
19  One, there are three elements: first, that there existed an
20  agreement or understanding to commit the objects charged;
21  second, that Mr. Trosten knowingly became a member of that
22  agreement or understanding; and, third, that one of the
23  co-conspirators knowingly committed at least one overt act in
24  furtherance of the conspiracy during the life of the
                            Page 4

82KATROP.txt
25    conspiracy.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

82KATROPps
1       With respect to Count Two, the securities fraud count,
2    the first element is that Mr. Trosten, in connection with the
3    purchase or sale of securities, here the notes described in
4    Count Two, did one or more of the following: employed a device,
5    scheme, or artifice to defraud; or made an untrue statement of
6    material fact; or omitted to state a material fact which made
7    what was said, under the circumstances, misleading; or engaged
8    in an act, practice, or course of business that operated or
9    would operate as a fraud or deceit upon a purchaser or seller.
10   Second, that Mr. Trosten acted knowingly, willfully, and with
11   intent to defraud.  And, third, that Mr. Trosten used or caused
12   to be used any means or instruments of transportation or
13   communication in interstate commerce, or the use of the mails,
14   in furtherance of the fraudulent conduct.
15       With respect to Count Seven, the wire fraud count,
16   there are five elements: first, that a scheme to defraud
17   existed; second, that Mr. Trosten must have participated in the
18   scheme with intent to defraud; third, that misrepresentations
19   or omissions must have related to material facts; fourth, that
20   the scheme was executed to obtain money or property; and
21   finally, that in executing the scheme, Mr. Trosten used or
22   caused to be used interstate wires, or the use of such wires
23   were reasonably foreseeable to him, as listed in the
24   indictment.  And here, your Honor, with respect to Count Seven,
25   it is alleged that on June 22, 2004, Mr. Trosten sent an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

82KATROPps
1    e-mail.
2       With respect to Count Fifteen, the bank fraud charge,
3    your Honor, there are three elements: first, that there was a
4    scheme to defraud a bank by means of materially false or
5    fraudulent pretenses, representations, or promises; second,
6    that Mr. Trosten executed or attempted to execute the scheme
7    with intent to defraud the bank; and, third, that at the time
8    of the execution of the scheme, the bank had its deposits
9    insured by the Federal Deposit Insurance Corporation.
10      At this time, your Honor, the government would proffer
11   and represent that HSBC, which is identified in the indictment,
12   has its deposits, and had its deposits at the relevant period,
13   insured by the Federal Deposit Insurance Corporation.
14      Finally, your Honor, with respect to Count Seventeen,
15   the money laundering count, there are three elements: first,
16   that Mr. Trosten engaged or attempted to engage in monetary
17   transactions involving criminally derived property of a value
18   greater than $10,000; second, that the property involved in the
19   monetary transaction, or attempted transaction, was in fact
20   derived from specified unlawful activity; finally, that
21   Mr. Trosten acted knowingly.  And with respect to this count,
22   the specified unlawful activities are the wire fraud, bank
23   fraud, and securities fraud otherwise charged.
24      THE COURT:  Mr. Trosten, do you understand that if you
25   pled not guilty and went to trial, that the burden would be on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

82KATROPps

Page 5

82KATROP.txt
1  the government to prove each and every element of the crimes
2  charged beyond a reasonable doubt in order to convict you?
3       THE DEFENDANT:  Yes, your Honor.
4       THE COURT:  Do you understand that at a trial, you
5  would have the right to be represented by an attorney at all
6  stages of the proceeding and if necessary an attorney would be
7  appointed for you?
8       THE DEFENDANT:  I do, your Honor.
9       THE COURT:  Do you understand that at a trial you
10 would have the right to confront and cross-examine witnesses
11 against you and the right not to be compelled to incriminate
12 yourself?
13      THE DEFENDANT:  Yes, your Honor.
14      THE COURT:  And do you understand that at a trial you
15 would be presumed innocent until such time, if ever, the
16 government established your guilt by competent evidence to the
17 satisfaction of the trier of fact beyond a reasonable doubt?
18      THE DEFENDANT:  I do, your Honor.
19      THE COURT:  And do you understand that at a trial, you
20 would have the right to testify and would also be entitled to
21 compulsory process, in other words, the right to call other
22 witnesses on your behalf?
23      THE DEFENDANT:  I do, your Honor.
24      THE COURT:  And do you understand that if your plea is
25 accepted, that there will be no further trial of any kind, so
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                        12
82KATROPps
1  that by pleading guilty, you are waiving your right to a trial?
2       THE DEFENDANT:  I do.
3       THE COURT:  Do you understand that if you are
4  sentenced to a period of supervised release and if you violate
5  the terms of your supervised release, that an additional period
6  of jail time may be imposed without credit for the time that
7  you had previously spent on supervised release?
8       THE DEFENDANT:  I do.
9       THE COURT:  And do you understand that in connection
10 with your plea of guilty, that the Court may ask you certain
11 questions about the offense to which you have pled, and if you
12 answer those questions under oath and on the record and in the
13 presence of your lawyer, that your answers if false may later
14 be used against you in a prosecution for perjury or false
15 statement?
16      THE DEFENDANT:  I do, your Honor.
17      THE COURT:  And do you understand that, in determining
18 your sentence, that the Court is obligated to calculate the
19 applicable sentencing guidelines range and to consider that
20 range and possible departures under the guidelines, as well as
21 other factors concerning the nature and circumstance of the
22 offense and the history and characteristics of the defendant?
23      THE DEFENDANT:  I do, your Honor.
24      THE COURT:  Mr. Trosten, did you sign a plea agreement
25 earlier today?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                        13
82KATROPps
1       THE DEFENDANT:  I did, your Honor.
2       THE COURT:  And before you signed it, did you discuss
3  it with your lawyers?
4       THE DEFENDANT:  I did.
5       THE COURT:  And before you signed it, did you read it?
                         Page 6

82KATROP.txt
```
 6                THE DEFENDANT:  I did, your Honor.
 7                THE COURT:  Let's just put the plea agreement to one
 8      side for a moment.  Apart from the plea agreement, have any
 9      threats or promises been made to you to make you plead guilty?
10                THE DEFENDANT:  No, your Honor.
11                THE COURT:  Again, apart from the plea agreement, have
12      any understandings or promises been made to you concerning the
13      sentence that you will receive?
14                THE DEFENDANT:  No, your Honor.
15                THE COURT:  Is your plea voluntary?
16                THE DEFENDANT:  Yes, it is.
17                THE COURT:  I would like to review a few portions of
18      the plea agreement with you.  Do you understand that pursuant
19      to this plea agreement, that you have undertaken to truthfully
20      and completely disclose all information about yourself and
21      others as required of you by the U.S. Attorney's Office; and
22      that you have agreed to fully cooperate with the U.S.
23      Attorney's Office, the United States Postal Inspection Service,
24      the Securities and Exchange Commission, and any other law
25      enforcement agency designated by the Office; that you have
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

82KATROPps
```
 1      agreed to attend all meetings as your presence is requested,
 2      and to provide to the U.S. Attorney's Office any document or
 3      other tangible evidence relating to any inquiry from the U.S.
 4      Attorney's Office or other law enforcement agencies; that you
 5      have agreed to truthfully testify before the grand jury and at
 6      any other trial or court proceeding; that you have agreed to
 7      fully disclose to the U.S. Attorney's Office any crimes that
 8      you have committed and any civil or criminal proceedings in
 9      which you have been or are a subject target or a witness; and
10      that you have further agreed to commit no further crimes
11      whatsoever?
12                THE DEFENDANT:  Yes, your Honor.
13                THE COURT:  And do you understand that the U.S.
14      Attorney's Office has no authority to agree not to prosecute
15      you for any possible criminal tax violations?
16                THE DEFENDANT:  I do, your Honor.
17                THE COURT:  And do you understand that if you fully
18      comply with this agreement, that you will not be further
19      prosecuted by the U.S. Attorney's Office for any crime related
20      to your participation in the crimes described in the
21      indictment, Counts One, Two, Seven, Fifteen, and Seventeen,
22      except for a possible criminal tax violation?
23                THE DEFENDANT:  Yes, your Honor.
24                THE COURT:  And are you aware that this agreement
25      doesn't bind any other federal, state, or local prosecuting
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

82KATROPps
```
 1      office?
 2                THE DEFENDANT:  Yes, your Honor.
 3                THE COURT:  And do you understand further that the
 4      sentence that you will receive is within the sole discretion of
 5      the Court?
 6                THE DEFENDANT:  Yes, your Honor, I do.
 7                THE COURT:  And do you understand that if the United
 8      States Attorney's Office determines that you have provided
 9      substantial assistance in an investigation or prosecution and
10      fully complied with the understandings specified in this plea
```
Page 7

82KATROP.txt
11  agreement, that the U.S. Attorney's Office will file a motion
12  pursuant to Section 5K1.1 of the guidelines, requesting that
13  you be sentenced in accordance with the factors set forth in
14  that section?
15          THE DEFENDANT:  I do, your Honor.
16          THE COURT:  And do you understand that even if the
17  U.S. Attorney makes such a motion, that the issue of sentencing
18  remains within the discretion of the Court?
19          THE DEFENDANT:  I do.
20          THE COURT:  And do you understand that if the U.S.
21  Attorney's Office determines that you have not provided
22  substantial assistance, that they are released of any
23  obligation to file a 5K1.1 letter?
24          THE DEFENDANT:  I do, your Honor.
25          THE COURT:  And do you understand that, should you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                        16
ꕯ

82KATROPps
1   commit any further crimes or should it be determined that you
2   have given false, incomplete, or misleading testimony or
3   information, that you are thereafter subject to prosecution for
4   additional federal crimes?
5           THE DEFENDANT:  I do, your Honor.
6           THE COURT:  Do you understand that if it is determined
7   that you have committed further crimes or given false or
8   misleading testimony or otherwise violated this agreement, that
9   all statements made by you to the United States Attorney's
10  Office can be used against you in a subsequent prosecution?
11          THE DEFENDANT:  Yes, your Honor.
12          THE COURT:  And are you entering this plea because you
13  are in fact guilty?
14          THE DEFENDANT:  I am, your Honor.
15          THE COURT:  And do you understand that as part of this
16  plea agreement, that you are waiving any right you might have
17  to have the government preserve any physical evidence for
18  future DNA testing or any right you might have for DNA testing
19  at the present time?
20          THE DEFENDANT:  Yes, your Honor.
21          THE COURT:  And do you understand that this agreement
22  takes the place of any prior understanding that you may have
23  reached with the United States Attorney's Office and that there
24  are no conditions beyond those set forth in this written
25  agreement and that there cannot be any additional
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                        17
ꕯ

82KATROPps
1   understandings that are not entered into in writing and signed?
2           THE DEFENDANT:  Yes, your Honor.
3           THE COURT:  Mr. Trosten, did you commit the offenses
4   that you are pleading guilty to?
5           THE DEFENDANT:  I did, your Honor.
6           THE COURT:  Would you tell me, please, what you did.
7           THE DEFENDANT:  Your Honor, first, I just would like
8   to state for the record that, when I said I felt great, it was
9   relating to medicines that I had taken, as opposed to feeling
10  ill because of those medicines, not because of my conduct,
11  which I deeply regret, your Honor.
12          THE COURT:  I would just like -- are you under the
13  influence of any medicine today?
14          THE DEFENDANT:  I am not, no.  No.
15          THE COURT:  OK.  And you have not had any trouble
                         Page 8

82KATROP.txt
16  following any of the questions I have asked you?
17          THE DEFENDANT: No, I have not. No, I have not.
18          Your Honor, while I was employed at Refco, I agreed
19  with other Refco executives to hide the true nature of Refco's
20  finances on Refco's financial statements. I knew that Refco's
21  financial statements did not accurately reflect Refco's
22  financial condition, because the financial statements did not
23  disclose the full amount that Refco Group Holdings, Inc., a
24  related party, owed to Refco. I understood that the RGHI
25  receivable was underreported because Philip Bennett, Refco's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                18
82KATROPps
1  former chief executive officer, and other Refco executives,
2  including me, were involved in a series of transactions at the
3  end of Refco's financial reporting periods to make it appear as
4  if a receivable was due from third-party customers rather than
5  from a related party.
6          The RGHI receivable was composed of, amongst other
7  things, historic customer losses, bad debts, and expenses that
8  RGHI incurred on behalf of Refco.
9          In addition, I participated in a number of
10  transactions that padded or inflated Refco's income. For
11  example, I participated in transactions that shifted expenses
12  off the books of Refco and onto the books of Refco Group
13  Holdings, Inc.
14          I, along with other Refco executives, agreed to
15  conceal the true size and nature of the RGHI receivable from,
16  amongst others, Refco's auditors, Thomas H. Lee Partners; HSBC,
17  which, in 2004, participated in Refco's senior secured credit
18  facility, as referenced in paragraph 14 -- I'm sorry --
19  paragraph 41 and Count Fifteen of the indictment; and investors
20  who purchased bonds that Refco issued in 2004, as referenced in
21  Count Two of the indictment.
22          I left the company in August of 2004, one year before
23  the IPO of Refco. I and other Refco executives used the
24  interstate wires to accomplish these acts within this district,
25  as referenced in Count Seven of the indictment.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                19
82KATROPps
1          Furthermore, I received funds obtained from the
2  transaction with Thomas H. Lee Partners, referenced in
3  paragraph 34 of the indictment, which I knew were proceeds from
4  unlawful activity, as referenced in Count Seventeen.
5          The RGHI receivable and the transactions used to
6  conceal it were material information that Refco investors and
7  lenders would have wanted to know before investing in or
8  lending money to Refco.
9          I knew that obtaining funds from Refco investors and
10  lenders based on misleading financial information was wrong.
11          Excuse me.
12          Your Honor, I take full responsibility for my actions
13  and my conduct.
14          I wish to apologize to my family and those that I
15  harmed by my conduct, which I deeply and sincerely regret, your
16  Honor.
17          Thank you.
18          THE COURT: Mr. Garcia, is there anything else that
19  you wish me to ask Mr. Trosten?
20          MR. GARCIA: No, your Honor.
                        Page 9

82KATROP.txt
21      THE COURT:  Mr. Trosten, do you still wish to plead
22  guilty?
23      THE DEFENDANT:  I do, your Honor.
24      THE COURT:  Mr. Morvillo, do you know of any reason
25  that Mr. Trosten ought not to plead guilty?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          20

82KATROPps
1       MR. R. MORVILLO:  I do not, your Honor.
2       THE COURT:  All right.  Mr. Trosten, I am satisfied
3   that you understand the nature of the charge against you and
4   the consequences of your plea, and that your plea is made
5   voluntarily and knowingly, and that there is a factual basis
6   for your plea.  I will therefore accept your plea of guilty.
7       Mr. Garcia, do you want to give me a control date?
8       MR. GARCIA:  Your Honor, respectfully, the government
9   would request about a year for a control date.
10      THE COURT:  Let's just see if -- OK.  Well, February
11  20, 2009 is a Friday.  So you can write to me then.
12      All right.  Is there anything else at this time?
13      MR. GARCIA:  Nothing more, your Honor, from the
14  government.
15      THE COURT:  Mr. Morvillo?
16      MR. R. MORVILLO:  Nothing, your Honor.  Thank you for
17  accommodating my schedule by sitting as late as you are.
18      THE COURT:  We're always here at this time.
19      MR. GARCIA:  Thank you, Judge.
20                      oOo
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

# EXHIBIT I

# U.S. SPECIALTY INSURANCE COMPANY
## Houston, Texas

NOTICE: THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.

## DECLARATIONS

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

POLICY NUMBER: 24-MGU-05-A10821          RENEWAL OF: N/A

ITEM 1.   NAMED CORPORATION:   Refco Inc.
550 W. Jackson Blvd., Suite 1300
Chicago, IL 60661

ITEM 2.   POLICY PERIOD:   (a)  Inception Date: 8/11/2005
(b)  Expiration Date: 8/11/2006
at 12:01 a.m. at the Principal Address stated in Item 1.

ITEM 3.   LIMIT OF LIABILITY (inclusive of Defense Costs):
$10,000,000 in the aggregate, for INSURING AGREEMENTS A and B combined

ITEM 4.   RETENTIONS:
(a)  INSURING AGREEMENT A:      $0 or minimum required under applicable law, if any
(b)  INSURING AGREEMENT B(1):   $300,000 for Loss arising from Claims alleging the same
Wrongful Act or related Wrongful Acts (waivable under the
circumstances described in CONDITION (A)(5))
(c)  INSURING AGREEMENT B(2):   $500,000 for Loss arising from Claims alleging the same
Wrongful Act or related Wrongful Acts (waivable under the
circumstances described in CONDITION (A)(5))

ITEM 5.   PREMIUM: $395,000.00

ITEM 6.   NOTICES REQUIRED TO BE GIVEN TO THE INSURER MUST BE ADDRESSED TO:

HCC GLOBAL FINANCIAL PRODUCTS
P.O. Box 4018
Farmington, CT 06034
Attention: Claims Manager

ITEM 7.   DISCOVERY PERIOD:
(a)  Premium:  150% of the Annual Premium.
(b)  Duration:  365 days

ITEM 8.   ENDORSEMENTS ATTACHED AT ISSUANCE:
1117C-IL   991-301   991-302   991-319   991-322   991-412   991-415   991-442   991-444 991-701
991-804 991-830   991-861   991-876   991-1122   80016

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed on the Declarations Page by its President, a Secretary and a duly authorized representative of the Insurer.

Secretary                          President                   Authorized Representative

Date: September 23, 2005                                           USSIC-990 (04/2002)

**EXHIBIT**
B

# U. S. SPECIALTY INSURANCE COMPANY

### DIRECTORS, OFFICERS AND CORPORATE LIABILITY INSURANCE POLICY

#### This is a claims made policy. Please read it carefully.

In consideration of the payment of the premium, and in reliance upon the statements made in the Application, including attachments, all of which are made a part hereof and deemed attached hereto, and subject to the Declarations and the limitations, conditions, provisions, any endorsements to and all other terms of this Policy, the Insurer and the Insureds agree as follows:

## INSURING AGREEMENTS

(A)  The Insurer will pay to or on behalf of the Insured Persons Loss arising from Claims first made during the Policy Period or Discovery Period (if applicable), against the Insured Persons for Wrongful Acts, except when and to the extent that the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement.

(B)  The Insurer will pay to or on behalf of the Company Loss arising from:

    (1)  Claims first made during the Policy Period or the Discovery Period (if applicable) against the Insured Persons for Wrongful Acts, if the Company has paid such Loss to or on behalf of the Insured Persons as indemnification or advancement, and/or

    (2)  Securities Claims first made during the Policy Period or the Discovery Period (if applicable) against the Company for Wrongful Acts.

## DEFINITIONS

(A)  Application means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are deemed a part of the Policy.

(B)  Claim means:

    (1)  any written demand for monetary or non-monetary relief,

    (2)  any civil proceeding commenced by service of a complaint or similar pleading,

    (3)  any arbitration, mediation or other similar dispute resolution proceeding,

    (4)  any criminal proceeding commenced by return of an indictment,

    (5)  the receipt by an Insured Person of a target letter or similar document in connection with a criminal investigation of such Insured Person, or

    (6)  any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

including any appeal from any such proceeding.

(C)  Company means the Named Corporation and any Subsidiary thereof.

(D)  Defense Costs means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation,

U.S. SPECIALTY INSURANCE COMPANY 

adjustment, defense or appeal of a Claim against an Insured Person (or, with respect to Securities Claims, against any Insured), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the Company.

(E)    Insured means the Insured Persons and the Company.

(F)    Insured Person means:

   (1)    any past, present or future director or officer of the Company, including any person in a position which is the functional equivalent of a director or officer with respect to any entity included within the definition of Company or Outside Entity located outside the United States, and

   (2)    with respect only to Securities Claims, any past, present or future employee of the Company.

(G)    Loss means Defense Costs and any damages, settlements, judgments or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

   (1)    an Insured Person is legally obligated to pay as a result of any Claim, or

   (2)    the Company is legally obligated to pay as a result of any Securities Claim;

   provided, that Loss will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any Claim shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such Claim and is most favorable to the Insureds in that regard.

(H)    Named Corporation means the entity designated as such in Item 1 of the Declarations.

(I)    No Liability means all defendant Insureds obtain by reason of a motion to dismiss, motion for summary judgment or trial a final non-appealable judgment in their favor.

(J)    Outside Capacity means service by an Insured Person as a director, officer, trustee, regent or governor of, or in another equivalent executive position with respect to, an Outside Entity, during such time that such service is at the request of the Company.

(K)    Outside Entity means any not-for-profit corporation, association, organization or entity.

(L)    Policy Period means the period set forth in Item 2 of the Declarations, subject to prior termination or cancellation pursuant to CONDITION (E).

(M)    Pollutants means any seepage, pollution or contamination, including but not limited to any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and materials to be recycled, reconditioned or reclaimed.

(N)    Securities Claim means a Claim which:

   (1)    is brought by or on behalf of one or more securities holders of the Company in their capacity as such, or

U.S. SPECIALTY INSURANCE COMPANY 

(2)    arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(O)    **Subsidiary** means any entity:

(1)    during any time on or before the inception of the **Policy Period** in which the **Named Corporation** owns or owned more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**; or

(2)    created or acquired during the **Policy Period** during any time in which, as a result of such creation or acquisition, the **Named Corporation** owns more than 50% of the issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**.

An entity ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of its issued and outstanding securities representing the right to vote for the election of such entity's directors (or the legal equivalent thereof), either directly or indirectly through one or more other **Subsidiaries**. The coverage afforded under this Policy with respect to **Claims** against a **Subsidiary** or any **Insured Person** thereof will apply only in respect of **Wrongful Acts** committed or allegedly committed after the effective time that such entity becomes a **Subsidiary** and prior to the time that such entity ceases to be a **Subsidiary**.

(P)    **Wrongful Act** means any:

(1)    actual or alleged act, error, misstatement, misleading statement, omission or breach of duty:

(a)    by an **Insured Person** in his or her capacity as such, including in an **Outside Capacity**, or

(b)    with respect only to **Securities Claims**, by the **Company**; or

(2)    matter claimed against an **Insured Person** solely by reason of his or her service in such capacity or in an **Outside Capacity**.

## EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim**:

(A)    arising out of based upon or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, that this EXCLUSION (A) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** gained such a profit or advantage;

(B)    arising out of, based upon or attributable to the commission by any **Insured** of any criminal or deliberately fraudulent or dishonest act; provided, that this EXCLUSION (B) will apply only if there has been a final adjudication adverse to such **Insured** establishing that the **Insured** so acted;

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or

U.S. SPECIALTY INSURANCE COMPANY 

violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to **Securities Claims;**

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants;** provided, that this EXCLUSION (D) will not apply to **Securities Claims;**

(E)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; provided, that this EXCLUSION (E) will apply only to **Claims** involving employee pension or welfare benefit plans organized or sponsored by the **Company** for its own employees, and will not apply to **Securities Claims;**

(F)    brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person**, unless such **Claim** is:

    (1)    brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

    (2)    for an actual or alleged wrongful termination of employment, or

    (3)    brought or maintained by an **Insured Person** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

    (4)    brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company;**

provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company;**

(G)    by or on behalf of, or in the name or right of, any **Outside Entity**, whether directly or derivatively, against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Entity**, unless such **Claim** is brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Outside Entity**, the **Company** or any **Insured Person;**

(H)    arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related **Wrongful Acts** alleged or contained, in any claim which has been reported, or with respect to which any notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time; or

(I)    arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this Policy, or alleging or derived from the same or essentially the same facts or circumstances as alleged in such pending or prior litigation.

For purposes of determining the application of the above EXCLUSIONS, no **Wrongful Act** of any **Insured Person** will be imputed to any other **Insured Person** who did not have actual knowledge of, or directly participate in the commission of, such **Wrongful Act** and, except for **Wrongful Acts** of the **Company's** chairman of the board, chief executive officer, president, chief financial officer or general counsel, no **Wrongful Act** of any **Insured Person** will be imputed to the **Company**.

DISCOVERY PERIOD

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set

**U.S. SPECIALTY INSURANCE COMPANY** 

forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period. This clause and the right contained within will not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

### EXTENSIONS

(A)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, to the extent that such **Claims** would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy.

(B)     Subject to its terms and conditions, this Policy will afford coverage for **Claims** for **Wrongful Acts** of an **Insured Person** if such **Claims** are made against the **Insured Person's** lawful spouse solely by reason of such spouse's legal status as a spouse of the **Insured Person** or such spouse's ownership interest in property which the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**. For purposes of the Policy, amounts which such spouse becomes legally obligated to pay by reason of such **Claim** will be treated as **Loss** which the **Insured Person** is legally obligated to pay on account of the **Claim** made against the **Insured Person**. This coverage extension does not apply, however, to the extent the **Claim** alleges any wrongful act or omission by the **Insured Person's** spouse.

### CONDITIONS

(A)     <u>Limit of Liability and Retention</u>

(1)     The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period**, whether covered under one or more INSURING AGREEMENTS, will not exceed the Limit of Liability set forth in Item 3 of the Declarations.

(2)     **Defense Costs** will be part of and not in addition to the Limit of Liability, and payment of **Defense Costs** will reduce the Limit of Liability. **Defense Costs**, as incurred, will also be applied against the retention.

(3)     The retention stated in Item 4(b) of the Declarations will apply to **Loss**, including **Defense Costs**, which the **Company** is required or permitted to pay as indemnification or advancement to or on behalf of the **Insured Persons**, whether or not such **Loss** is actually paid, unless the **Company** is unable to pay such **Loss** as indemnification or advancement solely by reason of its financial insolvency. For purposes of this CONDITION (A)(3), the certificate of incorporation, charter, articles of association or other organizational documents of the Named Corporation, each **Subsidiary** and each **Outside Entity**, including the bylaws and resolutions thereof, will be deemed to have been adopted or amended to provide indemnification and advancement to the **Insured Persons** to the fullest extent permitted by law.

(4)     The Insurer will be liable only for the amount of **Loss** in connection with any **Claim**, which is in excess of the applicable retention stated in Item 4 of the Declarations. Such retention is to be borne by the **Insureds** and remain uninsured. A single retention will

U.S. SPECIALTY INSURANCE COMPANY 

apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or related **Wrongful Acts**.

(5)    Notwithstanding the foregoing, with respect to **Securities Claims** the retentions stated in Items 4(b) and 4(c) of the Declarations will apply only to **Defense Costs**; provided, that if a **Securities Claim** is finally resolved by a determination of **No Liability**, no retention will apply to such **Securities Claim** even as respects **Defense Costs** and the Insurer will thereupon reimburse **Defense Costs** within the retention which shall already have been paid by the **Insureds**.

(6)    One retention amount will apply to the covered portion of each and every single **Claim**. If a single **Claim** is covered under more than one INSURING AGREEMENT, the retentions stated in Item 4 of the Declarations will be applied separately to the portions of the **Claim** covered by each INSURING AGREEMENT, and the sum of the retentions so applied will constitute the retention for each single **Claim**, which in total will not exceed the largest of the applicable retentions.

(B)    <u>Notice of Claims and Reporting Provisions</u>

(1)    The **Insureds** must, as a condition precedent to the obligations of the Insurer under this Policy, give written notice, including full details, to the Insurer of any **Claim** as soon as practicable after it is made.

(2)    If written notice of a **Claim** has been given to the Insurer pursuant to CONDITION (B)(1) above, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** of which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, will be considered to have been made at the time such notice was given.

(3)    If, during the **Policy Period** or the Discovery Period (if applicable), the **Insureds** become aware of any circumstances which may reasonably be expected to give rise to a **Claim** against the **Insureds** and if, before the end of the **Policy Period** or the Discovery Period (if applicable), the **Insureds** give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, potential claimants and the consequences which have resulted or may result from such **Wrongful Act**, then any **Claim** subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** described in such notice will be considered to have been made at the time such notice of circumstances was given.

(4)    All notices under this CONDITION (B) must refer to the Policy Number, must be in writing, must request coverage under this Policy, and must be given by certified mail or prepaid express courier to the address set forth in Item 6 of the Declarations.

(C)    <u>Interrelationship of Claims</u>

All **Claims** alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transactions or events or to a series of related facts, circumstances, situations, transactions or events will be considered to be a single **Claim** and will be considered to have been made at the time the earliest such **Claim** was made.

(D)    <u>Defense Costs, Settlements, Allocation of Loss, Priority of Payments</u>

U.S. SPECIALTY INSURANCE COMPANY 

(1)    The Insurer will have no duty under this Policy to defend any Claim. The Insureds must defend any Claim made against them. The Insureds may not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the Insurer's prior written consent. Only those settlements, stipulated judgments and Defense Costs to which the Insurer has consented will be recoverable as Loss under this Policy. The Insurer's consent may not be unreasonably withheld; provided, that the Insurer will be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim.

(2)    The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer.

(3)    If Loss covered by this Policy and loss not covered by this Policy are both incurred in connection with a single Claim, either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons (or, with respect only to Securities Claims, against Insureds) and against others not included within the definition of Insured Person (or, with respect only to Securities Claims, the definition of Insured), the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the Claim and the relative benefits to be obtained by the resolution of the Claim. The Insurer will be obligated to pay only those amounts or portions of Loss allocated to covered matters claimed against Insured Persons (or, with respect only to Securities Claims, against Insureds). If the Insureds and the Insurer are unable to agree upon an allocation, then until a final allocation is agreed upon or determined pursuant to the provisions of this Policy and applicable law, the Insurer will be obligated to make an interim payment of that amount or portion of Loss, including Defense Costs, which the parties agree is not in dispute.

(4)    If the Insurer is obligated to pay Loss, including Defense Costs, under more than one INSURING AGREEMENT, whether in connection with a single Claim or multiple Claims, the Insurer will first pay any Loss payable under INSURING AGREEMENT (A) and, if the Insurer concludes that the amount of all Loss, including Defense Costs, is likely to exceed the Insurer's Limit of Liability, the Insurer shall be entitled to withhold some or all of any Loss payable under INSURING AGREEMENT (B)(1) or (B)(2) to ensure that as much of the Limit of Liability as possible is available for the payment of Loss under INSURING AGREEMENT (A). If no Loss is payable under INSURING AGREEMENT (A), or if the Insurer's obligations under INSURING AGREEMENT (A) have been satisfied, then, subject to the Insurer's Limit of Liability as set forth in Item 3 of the Declarations, the Insurer will pay such Loss as it is required to pay under INSURING AGREEMENT (B)(1) or (B)(2) in such manner and, in the event of multiple Claims, apportioned among such Claims as the Named Corporation shall direct in writing.

(E)    <u>Cancellation or Nonrenewal</u>

(1)    The Insurer may cancel this Policy for non-payment of premium by sending not less than ten (10) days notice to the Named Corporation at its last known address. The Insurer may not otherwise cancel this Policy.

(2)    The Named Corporation may cancel this Policy by mailing the Insurer written notice stating when such cancellation will be effective; provided, that the Named Corporation may not cancel this Policy after the effective date of any acquisition of the Named Corporation as described in CONDITION (F) below. If the Named Corporation cancels this Policy, the Insurer will retain the customary short rate premium. Premium adjustment may be made either at the time cancellation is effective or as soon as

U.S. SPECIALTY INSURANCE COMPANY 

practicable after cancellation becomes effective, but payment of unearned premium is not a condition of cancellation.

(3)    If the Insurer elects not to renew this Policy, the Insurer must give the **Named Corporation** notice of non-renewal no less than sixty (60) days before the end of the **Policy Period**.

(4)    If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period will be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

(F)    <u>Changes in Control</u>

(1)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to the **Named Corporation**:

(a)    the **Named Corporation** merges into or consolidates with another entity such that the **Named Corporation** is not the surviving entity, or

(b)    another entity, person or group of entities and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Named Corporation**, or

(c)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Named Corporation**;

then coverage under this Policy will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter and the premium will be considered fully earned in consideration of the coverage extended.

(2)    If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)    the **Subsidiary** ceases to be a **Subsidiary**, or

(b)    a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

(G)    <u>Other Insurance and Other Indemnification</u>

(1)    Such insurance as is provided by this Policy will apply only as excess over and will not contribute with any other valid and collectible insurance.

U.S. SPECIALTY INSURANCE COMPANY 

    (2)   All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with,

        (a)   any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and

        (b)   any indemnification available to such **Insured Persons** in connection with their service in **Outside Capacities** from any source other than the **Company**, including but not limited to **Outside Entities**.

(H)   Cooperation and Subrogation

    (1)   In the event of any notice under CONDITION (B) of a **Claim** or of circumstances which may reasonably be expected to give rise to a **Claim**, the **Insureds** will give the Insurer all information, assistance and cooperation that the Insurer may reasonably request with respect thereto.

    (2)   In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation the **Insured Persons'** rights to indemnification or advancement from the **Company**. The **Insureds** must execute all papers required and do everything necessary to secure such rights and to enable the Insurer to bring suit in their name.

(I)   No Action against the Insurer

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the Insurer. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insureds** to determine the Insurer's liability; nor may the Insurer be impleaded by the **Insureds** or their legal representatives in any such action.

(J)   Notices and Authority

By acceptance of this Policy, the **Insureds** agree that the **Named Corporation** may act on behalf of all **Insureds** with respect to the giving and receiving of any notices, the payment of premiums and the receiving of any return premium, the cancellation or renewal of this Policy and the acceptance of any amendments thereto.

(K)   Assignment

No assignment of interest under this Policy will bind the Insurer without the Insurer's written consent.

(L)   Titles and Headings

The titles and headings to the various paragraphs and sections in this Policy, including endorsements attached, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such paragraphs and sections to which they relate.

(M)   Representations and Severability

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations.

**U.S. SPECIALTY INSURANCE COMPANY**

No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(N)     Changes

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Insurer** will not effect a waiver or a change in any part of this Policy or stop the **Insurer** from asserting any right under the terms of this Policy. This Policy cannot be waived or changed, except by written endorsement issued to form a part of this Policy.

(O)     Entire Agreement

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the **Application** and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties with respect to this insurance.

(P)     Territory

This Policy applies to **Wrongful Acts** actually or allegedly taking place or **Claims** made anywhere in the world.

(Q)     Conformity to Statute

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, including any endorsement to this Policy which is required by any state Department of Insurance (or equivalent authority) ("State Amendatory Endorsement"), are hereby amended to conform to such laws. Nothing herein will be construed to restrict the terms of any State Amendatory Endorsement. In addition, to the extent permissible by law, nothing in any State Amendatory Endorsement will be construed to restrict the terms of this Policy.

In witness whereof the **Insurer** has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the **Insurer**.

Secretary                                                                President

..S. SPECIALTY INSURANCE CO...ANY

ENDORSEMENT NUMBER: 1

**ILLINOIS AMENDATORY ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on 8/11/05, forms part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company:

In consideration of the premium charged:

DEFINITIONS (D) <u>Defense Costs</u> of the policy has been amended to read:

**Defense Costs** means reasonable fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond) resulting from the investigation, adjustment, defense or appeal of a **Claim** against an **Insured Person** (or, with respect to **Securities Claims**, against any **Insured**), but excluding salaries, wages, benefits or overhead expenses of directors, officers or employees of the **Company** or the Insurer.

DISCOVERY PERIOD of the policy has been amended to read:

If the Insurer or the **Named Corporation** fails or refuses to renew this Policy or if the **Named Corporation** cancels this Policy, any **Insured** will have the right, upon payment of the Discovery Period Premium set forth in Item 7(a) of the Declarations, to an extension of the coverage granted by this Policy for the period set forth in Item 7(b) of the Declarations following the effective date of such cancellation or non-renewal (the "Discovery Period"), but only with respect to any **Wrongful Act** actually or allegedly taking place before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the Discovery Period Premium, must be made within thirty (30) days after the effective date of cancellation or non-renewal of the Policy. Such Discovery Period Premium will be deemed to be fully earned as of the inception of the Discovery Period.

CONDITIONS (G)(1) <u>Other Insurance and Other Indemnification</u> of the policy has been amended to read:

(1)    Such insurance as is provided by this Policy will share proportionately with similar coverages provided under any other valid and collectible insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

USSIC 1117C-IL (06/04)              Page 1 of 1

ENDORSEMENT NUMBER: 2

**EMPLOYMENT PRACTICES LIABILITY EXTENSION – NONENTITY**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged it is hereby understood and agreed that:

(1)     DEFINITION (P) Wrongful Act is amended to include any **Employment Practices Wrongful Act** by an **Insured Person** in his or her capacity as such.

(2)     DEFINITION (F) Insured Person, subsection (2) is amended to read:

   (2)     with respect only to **Securities Claims** and **Claims** for **Employment Practices Wrongful Acts**, any past, present or future employee of the **Company**.

(3)     The following DEFINITIONS are added to the Policy:

**Discrimination** means:

   (1)     any failure or refusal to hire, failure or refusal to promote, demotion or discharge of, or wrongful failure to grant tenure to, any person, or

   (2)     any limitation, segregation or classification of any employee or applicant for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee;

because of such person's race, color, age, sex, disability, pregnancy, sexual orientation or preference, national origin, religion, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**Employment Practices Wrongful Act** means any actual or alleged:

   (1)     **Discrimination,**
   (2)     **Retaliation,**
   (3)     **Sexual Harassment,**
   (4)     **Workplace Harassment,**
   (5)     **Workplace Tort,** or
   (6)     **Wrongful Termination.**

**Retaliation** means retaliatory treatment against an employee of the **Company** on account of such employee's exercise or attempted exercise of his or her rights under law.

**Sexual Harassment** means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature that is made a condition of employment with the **Company**, is used as a basis for employment decisions by the

991-301                         Page 1 of 2
Ed (01/03)

Company, creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Harassment** means conduct that creates a work environment with the **Company** that interferes with performance, or creates an intimidating, hostile or offensive working environment.

**Workplace Tort** means misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training or supervision, wrongful discipline or wrongful deprivation of career opportunity, if actually or allegedly related to the claimant's employment by the **Company**.

**Wrongful Termination** means actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any employee, which is in violation of law, against public policy or in breach of an implied agreement to continue employment.

(4)    EXCLUSION (C) will not apply to **Loss** for mental anguish, emotional distress, libel, slander, defamation or disparagement or violation of a person's right of privacy caused by an **Employment Practices Wrongful Act**.

(5)    EXCLUSION (F), subsection (2) is amended to read as follows:

    (2)    for an actual or alleged **Employment Practices Wrongful Act**;

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement: .

                By:_____

                          Attorney-in-fact

ENDORSEMENT NUMBER: 3

## ADD SPECIFIC INDIVIDUALS AS "INSURED PERSONS"

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (F) "Insured Person" is amended to include the following individuals:

Insurance Manager and General Counsel

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete Only When This Endorsement Is Not Prepared With The Policy Or Is Not To Be Effective With The Policy.

Effective Date of this endorsement:

By: _____
                Attorney-in-Fact

ENDORSEMENT NUMBER: 4

## AMEND "LOSS" TO INCLUDE PRE-JUDGMENT AND POST-JUDGMENT INTEREST

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, DEFINITION (G) **Loss** is amended to read as follows:

    (G)    **Loss** means **Defense Costs** and any damages, settlements, judgments, pre-judgment interest, post-judgment interest, or other amounts (including punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable by law) that:

        (1)    an **Insured Person** is legally obligated to pay as a result of any **Claim**, or

        (2)    the **Company** is legally obligated to pay as a result of any **Securities Claim**;

provided, that **Loss** will not include wages, fines, taxes or penalties or matters which are uninsurable under the law pursuant to which this Policy is construed. For purposes of determining whether punitive or exemplary damages or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the Insurer agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insureds** in that regard.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

        By: _____
                Attorney-in-Fact

991-319
Ed (06/03)

Page 1 of 1

ENDORSEMENT NUMBER: 5

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to
Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1)     DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)     DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement,
misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her
capacity as such, in the rendering or failure to render professional legal services for the
**Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement,
misleading statement, omission or breach of duty by such **Employed Lawyer** in
connection with any activities: (1) that are not related to such **Employed Lawyer's**
employment with the **Company**; (2) that are not rendered on the behalf of the **Company**
at the **Company's** written request; or (3) that are performed by the **Employed Lawyer**
for others for a fee.

(3)     The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the
**Company** who is admitted to practice law and who is employed at the time of any
alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)     The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of **Loss** in connection with any
**Claim** made against an **Employed Lawyer**:

(a)     alleging, arising out of, based upon or attributable to any **Wrongful Act**
occurring at a time when such **Employed Lawyer** was not employed as a lawyer
by the **Company**;

(b)     alleging, arising out of, based upon or attributable to any **Claim** made or any
prior or pending litigation as of 8/11/05, or alleging or derived from the same
facts or circumstances as alleged in such pending or prior litigation;

(c)     alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of
8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that
such **Wrongful Act** could give rise to a **Claim**;

(d)     alleging, arising out of, based upon or attributable to any activities by such
**Employed Lawyer** as an officer or director of any entity other than the
**Company**.

(5)     For purposes of the applicability of the coverage provided by this endorsement, the
**Company** will be conclusively deemed to have indemnified the **Employed Lawyer** to
the extent that the **Company** is permitted or required to indemnify him or her pursuant to

991-322                           Page 1 of 1
(Ed. 09/03)

law, common or statutory, or contract, or the charter or by-laws of the **Company** (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The **Company** hereby agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)  The coverage provided by this endorsement shall apply only to **Claims** made against an **Employed Lawyer**, provided that, and only for so long as, one or more **Insured Persons** (other than such **Employed Lawyer**) are and remain co-defendants in the proceeding along with such **Employed Lawyer**.

(7)  The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)  Solely for purposes of the coverage provided under this endorsement:

(a)  The **Insurer's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the same **Policy Period** will not exceed $100,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)  A retention of $100,000 shall apply to **Loss** resulting from each **Claim**; provided, such retention shall not apply to **Loss** incurred by any **Employed Lawyer** if indemnification of such **Loss** by the **Company** is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:  _____
                 Attorney-in-Fact

991-322
(Ed. 09/03)

Page 1 of 1

ENDORSEMENT NUMBER: 6

**ERRORS AND OMISSIONS EXCLUSION
WITH MANAGEMENT CARVEBACK**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of **Loss** in connection with a **Claim** arising out of, based upon or attributable to any actual or alleged rendering of or failure to render, whether by the **Company** or by any **Insured Person**, any service for others for a fee; provided, that this exclusion will not apply to a **Claim** against an **Insured Person** for a **Wrongful Act** in connection with the management or supervision of the **Company** or any division or group therein.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                Attorney-in-Fact

991-412                          Page 1 of 1
Ed (09/00)

ENDORSEMENT NUMBER: 7

SPECIFIC LITIGATION EXCLUSION

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with any Claim arising out of, based upon or attributable to the following litigation:

Edward McElwreath Case

or alleging or derived from the same or essentially the same facts or circumstances as alleged in such litigation.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
                        Attorney-in-Fact

ENDORSEMENT NUMBER: 8

**AMEND POLLUTION EXCLUSION ENDORSEMENT
(A-SIDE CARVEBACK)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (D) of this Policy is amended to read in its entirety as follows:

(D)    for the actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants** or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, that this EXCLUSION (D) will not apply to **Securities Claims**; provided further, that this EXCLUSION (D) will not apply to **Claims** for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
                   Attorney-in-Fact

991-442
Ed (05/04)

Page 1 of 1

ENDORSEMENT NUMBER: 9

## AMEND EXCLUSION (C) ENDORSEMENT –
## A-SIDE CARVEBACK

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that EXCLUSION (C) is amended to read in its entirety as follows:

(C)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from any actual or alleged libel, slander, defamation or disparagement or violation of a person's right of privacy; provided, that this EXCLUSION (C) will not apply to:

(1)    **Securities Claims**, or

(2)    Claims for **Loss** payable under INSURING AGREEMENT (A);

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
                        Attorney-in-Fact

ENDORSEMENT NUMBER: 10

FULL SEVERABILITY

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, CONDITION (M) <u>Representations and Severability</u> is amended to read as follows:

(M)     <u>Representations and Severability</u>

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete and are deemed material to the acceptance of the risk assumed by the Insurer under this Policy. This Policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
         Attorney-in-Fact

991-701                          Page 1 of 1
Ed (09/03)

ENDORSEMENT NUMBER: 11

## DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged:

(1) INSURING AGREEMENTS is amended by the addition of the following:

The Insurer will pay to or on behalf of the **Company** all **Derivative Demand Investigation Costs** incurred by the **Company** as a result of a **Derivative Demand** first received by the **Company's** Board of Directors and reported in writing to the Insurer during the **Policy Period** or the Discovery Period, if purchased, up to the amount of the **Derivative Demand Investigation Costs Sub-Limit.**

(2) DEFINITIONS is amended by the addition of the following:

**Derivative Demand** means a written demand by one or more shareholders of the **Company** made upon its Board of Directors to bring a civil proceeding in a court of law against an **Insured Person** for a **Wrongful Act.**

**Derivative Demand Investigation Costs** means reasonable fees, costs and expenses (including but not limited to attorneys' fees and experts' fees) incurred in connection with the investigation or evaluation of any **Derivative Demand**, but excluding wages, salaries, fees, benefits or overhead expenses of any **Insured Person.**

**Derivative Demand Investigation Costs Sub-Limit** means $250,000.

(3) The Insurer's maximum aggregate liability for **Derivative Demand Investigation Costs** resulting from all **Derivative Demands** shall be the amount set forth in the definition of **Derivative Demand Investigation Costs Sub-Limit**, regardless of the number of **Derivative Demands** received during the **Policy Period** or the Discovery Period, if purchased. The **Derivative Demand Investigation Costs Sub-Limit** shall be part of and not in addition to the Limit of Liability set forth in Item 3 of the Declarations, and payment of such **Derivative Demand Investigation Costs** shall reduce such Limit of Liability.

(4) There shall be no retention applicable to **Derivative Demand Investigation Costs.**

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By:_____
                    Attorney-in-Fact

991-804                     Page 1 of 1
Ed (06/00)

ENDORSEMENT NUMBER: 12

### SEPARATE RETENTION FOR SECURITIES CLAIMS
### UNDER INSURING AGREEMENT (B)(1)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, solely for purposes of Loss payable under INSURING AGREEMENT (B)(1) arising from any Securities Claim, the retention stated in Item 4(b) of the Declarations is amended to be $500,000.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By:_____
Attorney-in-Fact

991-830                              Page 1 of 1
Ed. 07/05

ENDORSEMENT NUMBER: 13

## NON-RESCINDABLE:
## INSURING AGREEMENT (A) ONLY

To be attached to and made a part of Policy No. 24-MGU-05-A10821 , issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that, notwithstanding anything in this Policy to the contrary, the Insurer shall not be entitled under any circumstances to rescind the coverage provided under Insuring Agreement (A) of this Policy.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:

By: _____
　　　　　Attorney-in-Fact

991-861　　　　　　　　　　Page 1 of 1
Ed (04/04)

ENDORSEMENT NUMBER: 14

**SPECIFIC EVENT(S) EXCLUSION**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that the Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any event described hereunder.

<u>Excluded Event(s):</u>
Wells Notice/SEC Investigation

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
                         Attorney-in-Fact

ENDORSEMENT NUMBER: 15

## CONTROLLING SHAREHOLDER COVERAGE – SPECIFIC PERSON(S)

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

In consideration of the premium charged, it is agreed that:

(1) The following INSURING AGREEMENT is added to the Policy:

The Insurer will pay to or on behalf of the **Controlling Shareholder Loss** arising from a **Securities Claim** first made during the **Policy Period** or the Discovery Period (if applicable) against such **Controlling Shareholder** for **Wrongful Acts**, provided, that one or more **Insured Persons** and/or the **Company** are and remain co-defendants in such **Securities Claim** along with such **Controlling Shareholder**.

(2) The following DEFINITION is added to the Policy:

**Controlling Shareholder** means the following person(s):

Philip Bennett

(3) DEFINITION (E) **Insured** is amended to read as follows:

(E)    **Insured** means:  (1) the **Insured Persons**; (2) the **Company**; or (3) the **Controlling Shareholder** but only with respect to **Securities Claims**.

(4) DEFINITION (G) **Loss**, subsection (2), is amended to read as follows:

(2)    the **Company** or **Controlling Shareholder** is legally obligated to pay as a result of any **Securities Claim**;

(5) DEFINITION (F) **Wrongful Act**, subsection (1)(b), is amended to read as follows:

(b)    with respect only to **Securities Claims**, by the **Company** or by the **Controlling Shareholder** in his or her capacity as such or any matter claimed against such **Controlling Shareholder** by reason of his or her status as such; or

(6) EXCLUSION (F) is amended to read as follows:

(F)    brought by or on behalf of, or in the name or right of, the **Company**, whether directly or derivatively, or any **Insured Person** or **Controlling Shareholder**, unless such **Claim** is:

(1)    brought and maintained independently of, and without the solicitation, assistance or active participation of, the **Company** or any **Insured Person**, or

991-1122                     Page 1 of 2
Ed. 09/05

(2)     for an actual or alleged wrongful termination of employment, or

(3)     brought or maintained by an **Insured Person** or a **Controlling Shareholder** for contribution or indemnity and directly results from another **Claim** covered under this Policy, or

(4)     brought and maintained by an employee of the **Company** solely to enforce his or her rights as a holder of securities issued by the **Company**;

provided, that this EXCLUSION (F) will not apply to **Claims** brought by a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official duly appointed with respect to the **Company**;

(7)     A retention of $300,000 will apply to **Loss** resulting from each **Claim** for which coverage is provided under this endorsement; provided, however, that such retention will apply only to Defense Costs and will not apply to any other **Loss**.

(8)     CONDITION (F) Changes in Control, subsection (2), is amended to read as follows:

(2)     If, during the **Policy Period**, any of the following transactions or events (each a "Change in Control") occurs with respect to a **Subsidiary**:

(a)     the **Subsidiary** ceases to be a **Subsidiary**, or

(b)     a trustee in bankruptcy, receiver, conservator, rehabilitator, liquidator or other similar official is duly appointed with respect to the **Subsidiary**;

then coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will continue in full force and effect until the end of the **Policy Period** with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such Change in Control, but coverage under this Policy with respect to **Claims** against such **Subsidiary** or any **Insured Person** or **Controlling Shareholder** thereof will cease with respect to **Claims** for **Wrongful Acts** committed or allegedly committed thereafter.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the Policy or is not to be effective with the Policy.

Effective date of this endorsement:

By: _____
               Attorney-in-Fact

ENDORSEMENT NUMBER: 16

## POLICYHOLDER DISCLOSURE – TERRORISM PREMIUM NOTICE

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

Your policy contains coverage for certain losses caused by terrorism. We are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act of 2002. The Act also requires us to provide disclosure of Federal participation in payment of terrorism losses. For a further description of an act of terrorism as provided under the Act, see below.

You should know that effective November 26, 2002 any losses caused by certified acts of terrorism would be partially reimbursed by the United States government, Department of Treasury, under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for this coverage is shown below; it does not include any charges for the portion of loss covered by the federal government under the Act.

The portion of your premium that is attributable to coverage for terrorist acts certified under the Act is $0.

The following excerpt from the Act is provided for your information:

According to Section 102(1) of the Terrorism Risk Insurance Act of 2002: "The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States — (1) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or (III) infrastructure; (iii) to have resulted in damage within the United States, or premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion." Section 102(1)(B) states: "No act shall be certified by the Secretary as an act of terrorism if (i) the act is committed as part of the course of war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000." Section 102(C) and (D) specify that the determination are final and not subject to judicial review and that the Secretary of the Treasury cannot delegate the determination to anyone.

ENDORSEMENT NUMBER: 17

**EMPLOYED LAWYERS EXTENSION**
**(SEPARATE LIMIT AND RETENTION)**

To be attached to and made a part of Policy No. 24-MGU-05-A10821, issued to Refco Inc. by U.S. Specialty Insurance Company.

This endorsement replaces and supersedes Endorsement Number 5 ("Employed Lawyers Extension (Separate Limit and Retention") as of the effective date of this endorsement.

In consideration of the premium charged:

(1)  DEFINITION (F) **Insured Person** is amended to include any **Employed Lawyer**.

(2)  DEFINITION (P) **Wrongful Act** is amended to include any act, error, misstatement, misleading statement, omission or breach of duty by an **Employed Lawyer**, in his or her capacity as such, in the rendering or failure to render professional legal services for the **Company**; provided, that **Wrongful Act** shall not include any act, error, misstatement, misleading statement, omission or breach of duty by such **Employed Lawyer** in connection with any activities: (1) that are not related to such **Employed Lawyer's** employment with the **Company**; (2) that are not rendered on the behalf of the **Company** at the **Company's** written request; or (3) that are performed by the **Employed Lawyer** for others for a fee.

(3)  The following DEFINITION is added to the Policy:

**Employed Lawyer** means any past, present or future full-time, salaried employee of the **Company** who is admitted to practice law and who is employed at the time of any alleged **Wrongful Act** as a lawyer full-time for and salaried by the **Company**.

(4)  The EXCLUSIONS section of the Policy is amended by the addition of the following:

The Insurer will not be liable to make any payment of **Loss** in connection with any **Claim** made against an **Employed Lawyer**:

(a)  alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring at a time when such **Employed Lawyer** was not employed as a lawyer by the **Company**;

(b)  alleging, arising out of, based upon or attributable to any **Claim** made or any prior or pending litigation as of 8/11/05, or alleging or derived from the same facts or circumstances as alleged in such pending or prior litigation;

(c)  alleging, arising out of, based upon or attributable to any **Wrongful Act**, if as of 8/11/05, such **Employed Lawyer** knew or could have reasonably foreseen that such **Wrongful Act** could give rise to a **Claim**;

991-322                           Page 1 of 1
(Ed. 09/03)

(d)     alleging, arising out of, based upon or attributable to any activities by such Employed Lawyer as an officer or director of any entity other than the Company.

(5)     For purposes of the applicability of the coverage provided by this endorsement, the Company will be conclusively deemed to have indemnified the Employed Lawyer to the extent that the Company is permitted or required to indemnify him or her pursuant to law, common or statutory, or contract, or the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines and defines such rights of indemnity). The Company hereby agrees to indemnify the Employed Lawyer to the fullest extent permitted by law including the making in good faith of any required application for court approval and the passing of any corporate resolution or the execution of any contract.

(6)     The coverage provided by this endorsement shall apply only to Claims made against an Employed Lawyer, provided that, and only for so long as, one or more Insured Persons (other than such Employed Lawyer) are and remain co-defendants in the proceeding along with such Employed Lawyer.

(7)     The coverage provided by this endorsement is specifically excess over any other valid or collectible lawyers professional liability insurance, including but not limited to legal malpractice or other errors and omissions insurance, and shall not drop down and serve as primary insurance unless and until such other insurance has been exhausted due to actual payment of losses paid thereunder.

(8)     Solely for purposes of the coverage provided under this endorsement:

(a)     The Insurer's maximum aggregate liability for all Loss on account of all Claims first made during the same Policy Period will not exceed $1,000,000 ("the Employed Lawyers Coverage Limit"). The Employed Lawyers Coverage Limit shall be separate from and in addition to the Limit of Liability set forth in ITEM 3 of the Declarations, and ITEM 3 of the Declarations is amended accordingly.

(b)     A retention of $100,000 shall apply to Loss resulting from each Claim; provided, such retention shall not apply to Loss incurred by any Employed Lawyer if indemnification of such Loss by the Company is not legally permitted or cannot be done solely by reason of its financial insolvency, subject to paragraph (5) above.

All other terms, conditions and limitations of this Policy will remain unchanged.

Complete the following only when this endorsement is not prepared with the policy or is not to be effective with the policy.

Effective Date of this endorsement:     8/11/2005

By: _____

Attorney-in-Fact

991-322
(Ed. 09/03)

Page 1 of 1

# EXHIBIT J

# U.S. SPECIALTY INSURANCE COMPANY

**HCC Global Financial Products**

8 Forest Park Drive
P.O. Box 4018
Farmington, CT 06034

### THE MAG
### APPLICATION FOR DIRECTORS, OFFICERS AND PRIVATE ORGANIZATION
### LIABILITY COVERAGE (INCLUDING EMPLOYMENT PRACTICES LIABILITY)

**NOTICE: THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES, SUBJECT TO ALL OF ITS TERMS, CONDITIONS AND LIMITATIONS, ONLY TO CLAIMS MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF APPLICABLE, THE DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY THE PAYMENT OF DEFENSE COSTS. DEFENSE COSTS WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL HAVE NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED.**

The term "Applicant" means the Named Organization and all Subsidiaries.

1.   (a)    **Named Organization:**    Refco Group Ltd., LLC
            Address:                200 Liberty Street, Tower A
            City, State, Zip Code:       New York, NY 10281
  (b)    Name and title of the officer of the Applicant designated as the representative to receive all notices from the Insurer on behalf of all persons and entities proposed for this insurance:   <u>Ellen Brooks</u>
            E-mail address:      <u>EBrooks@Refco.com</u>
  (c)    The Named Organization has been in continuous operation since: <u>1985</u>

2.    Please identify each Subsidiary and the date on which it became a Subsidiary:
      <u>Schedule Attached</u>

3.    Please provide the following information regarding the outstanding common stock of the Named Organization and of each Subsidiary, if any common stock thereof is held by any person(s) or entity (ies) other than the Named Organization or another Subsidiary:
  (a)    Total number of voting shares outstanding? <u>100,000,000</u>
  (b)    Total number of voting shareholders: <u>2</u>
  (c)    Total number of voting shares owned by the Applicant's Directors & Officer: <u>43,124,430.25</u>
  (d)    Are 5% or more of the Applicant's voting shares owned, directly or beneficially, by any single shareholder or group of shareholders?      ☒Yes
                ☐No
        If yes, please provide names and percentages of holdings by such shareholders or groups: <u>Refco Group Holdings, Inc. 43%, TH Lee 57%</u>

4.    Have any of the Applicant's current D&O or EPL carriers indicated an intent not to offer renewal terms?      ☐Yes ☒No
        If yes, please provide complete details:_____
      **(QUESTION NO. 4 NOT APPLICABLE TO MISSOURI INSUREDS)**

**U.S. SPECIALTY INSURANCE COMPANY**

5.  Have there been any changes in the Applicant's board of directors or within the
    Applicant's senior management during the past 3 years for any reason other than death
    or retirement?                                                      ☒Yes ☐No
        If yes, please provide complete details as an attachment.

6.  Have the Applicant's outside auditors stated that there are no material weaknesses in the
    Applicant's system of internal controls?  (see below *)            ☒Yes ☐No
        If no, please provide the latest CPA letter to management and management
        response thereto.

7.  Within the last 36 months, has the Named Organization or any Subsidiary completed
    or agreed to any of the following, whether or not any such transaction was completed?

    (a)  merger or consolidation with or acquisition of another entity whose consolidated
         assets exceeded 25% of the Applicant's consolidated assets?   ☐Yes ☒No
    (b)  sale, distribution or divestiture of any assets or stock in an amount exceeding 25%
         of the Applicant's consolidated assets?                       ☐Yes ☒No
    (c)  registration for public offering of securities?               ☒Yes ☐No
    (d)  private placement of securities?                              ☒Yes ☐No
    (e)  reorganization or arrangement with creditors under federal or state law?
                                                                       ☐Yes ☒No
         If yes to any of the foregoing, please provide complete details (use a separate
         sheet of paper, if necessary):
         _____

8.  Please give details of the present insurance. If none, so state:

|  | Insurer | Limit | Premium |
|---|---|---|---|
| D&O | HCC, BLU XL, AXIX | $30,000,000 | $393,593.00 |
| EPL (if separate) | AIG, STARR EXCELL | $10,000,000 | $195,500.00 |
| GL | The HARTFORD | $ 1,000,000 | $ 42,441.36 |

9.  (a)  Total number of employees: Current 1,738 1 year ago 1,725
    (b)  How many employees have been terminated during the past 2 years? 492

10. Does the Applicant anticipate any plant, facility, branch or office closing, consolidations
    or layoffs with the next 24 months?                                ☐Yes ☒No
        If yes, please provide complete details (use a separate sheet of paper, if
        necessary): _____

```
* Point 6.  The question is poorly worded.  The auditors would only issue a
statement if there were material weaknesses.  The auditors made no such
statement to management.
```

U.S. SPECIALTY INSURANCE COMPANY

11.    Does the Applicant:
    (a)    Have a full-time human resources coordinator?    ☒Yes ☐No
    (b)    Have a written policy with respect to sexual harassment?    ☒Yes ☐No
    (c)    Have written annual evaluations for employees?    ☒Yes ☐No
    (d)    Have a written policy with respect to progressive discipline
        for employees?    ☒Yes ☐No
    (e)    Have a written policy for Family Medical Leave?    ☒Yes ☐No
    (f)    Have a written human resources manual or equivalent
        written guidelines?    ☒Yes ☐No
    (g)    Use outside counsel for employment advice?    ☐Yes ☒No

**District of Columbia – refer to 3 years:**

12.    (a)    Have any claims been made during the last 5 years against any person or entity
        proposed for this insurance in his or her capacity as a director, officer or trustee of
        any corporation or organization?    ☐Yes ☐No
        If yes, please provide complete details (use a separate sheet of paper, if
        necessary):

    (b)    Is any person or entity proposed for this insurance aware of any fact,
        circumstance or situation involving the **Applicant** or any **Insured Person** or
        **Organization** which he, she or it has reason to believe might result in a **claim**
        being made?
                                              ☐Yes ☐No
        If yes, please provide complete details (use a separate sheet of paper, if
        necessary):

**Without prejudice to any other rights of the Insurer, it is understood and agreed that the
Insurer will not be liable under any policy that may be issued on the basis of this
Application to make any payment of Loss, including Defense Costs, in connection with any
Claim arising out of, based upon or attributable to any claim, fact, circumstance or
situation disclosed or required to be disclosed in response to questions 12(a) and 12(b).**

13.    Documents Required:

    Please submit one copy of each of the following documents, all of which will be deemed
    to be attached to and to be a part of this Application.
    (a)    Attachments providing complete details and/or additional information where
        required as a result of the Applicant's response to questions in this Application.
    (b)    The Applicant's most recent Annual Report (including complete audited
        financial statements for the last 2 years).
    (c)    Any registration statements filed with the SEC or any private placement
        memoranda within the last 12 months.
    (d)    Audited financial statements with any notes and schedules.

**U.S. SPECIALTY INSURANCE COMPANY**

    (e)    Summary and status of any litigation filed within the last 24 months against any person or entity proposed for this insurance (including any litigation that has been resolved).

FOR PURPOSES OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF ALL PERSONS AND ENTITIES PROPOSED FOR THIS INSURANCE DECLARES THAT, TO THE BEST OF HIS/HER KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS CONTAINED HEREIN, AND IN ANY ATTACHMENTS HERETO, ARE TRUE AND COMPLETE. THE INSURER IS AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. ACCEPTING THIS APPLICATION DOES NOT BIND THE INSURER TO COMPLETE THE INSURANCE.

THE INFORMATION CONTAINED IN AND SUBMITTED WITH THIS APPLICATION IS ON FILE WITH THE INSURER AND IS CONSIDERED TO BE PHYSICALLY ATTACHED TO AND PART OF THIS APPLICATION. THE APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, WILL BE CONSIDERED TO BE PHYSICALLY ATTACHED TO ANY POLICY ISSUED ON THE BASIS OF THIS APPLICATION AND WILL BECOME PART OF ANY SUCH POLICY. THE INSURER WILL HAVE RELIED UPON THIS APPLICATION, INCLUDING ALL ATTACHMENTS THERETO, IN ISSUING ANY SUCH POLICY.

IF ANY INFORMATION IN THIS APPLICATION, INCLUDING ANY ATTACHMENT THERETO, CHANGES MATERIALLY BEFORE THE EFFECTIVE DATE OF THE POLICY FOR WHICH APPLICATION IS MADE, THE APPLICANT MUST NOTIFY THE INSURER, AND THE INSURER MAY MODIFY OR WITHDRAW ANY QUOTATION.

NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING,

**U.S. SPECIALTY INSURANCE COMPANY**

INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF FLORIDA, KENTUCKY, MINNESOTA, NEW JERSEY, OHIO AND OKLAHOMA: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUDS OR DECEIVES ANY INSURER OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, IS GUILTY OF A FELONY AND IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

NOTICE TO APPLICANTS OF VIRGINIA, MAINE AND NEW MEXICO: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.
IF DISCOVERY IS ELECTED THE LIMIT WILL NOT BE REINSTATED.
MATERIALS SUBMITTED IN CONNECTION WITH THE APPLICTION WILL FORM A PART OF THE POLICY.

NOTICE TO APPLICANTS OF TENNESSEE: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

WARNING TO APPLICANTS OF DISTRICT OF COLUMBIA: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

| APPLICANT: | | | |
|---|---|---|---|
| BY: _(signature)_ | TITLE: Pres. + CEO. | DATE: 2/8/05. |

Note: This Application must be signed by the President and/or CEO of the Applicant acting as the authorized agent of the persons and entity(ies) proposed for this insurance.

Companies House Direct



**COMPANIES HOUSE**

| | HELP | COMPANY SELECTION | DIR/SEC ENQUIRIES | DOCUMENT DOWNLOAD | MONITOR SERVICE | MENU |

Directors & Secretary enquiries
**PERSONAL APPOINTMENTS WITH LIMITED COMPANIES**

Go Back

| | |
|---|---|
| **Name:** | PHILLIP ROGER BENNETT |
| **Nationality:** | BRITISH |
| **Latest Address:** | 125 COLT LANE |
| | GLADSTONE |
| | NEW JERSEY 07934 USA |

**Date of Birth:** 22/07/1948

Company Appointments: Current 5

To view company details, click on the appropriate company number.
Click HERE to include Resigned and Dissolved appointments

| | |
|---|---|
| **DIRECTOR** | **Appointed: pre 15/08/1992** |
| **Occupation:** | FINANCIER |
| **Company Number:** | 01678487 |
| **Company Name:** | REFCO EUROPE LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | **Appointed: pre 14/07/1992** |
| **Occupation:** | FINANCIER |
| **Company Number:** | 00784882 |
| **Company Name:** | REFCO OVERSEAS LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | **Appointed: 22/08/1998** |
| **Occupation:** | FINANCIER |
| **Company Number:** | 02634831 |
| **Company Name:** | TILNEY HOLDINGS LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | **Appointed: 21/03/2003** |
| **Occupation:** | FINANCIER |
| **Company Number:** | 04688772 |
| **Company Name:** | REFCO TRADING SERVICES (UK) LIMITED |
| | Active |

| | |
|---|---|
| **DIRECTOR** | **Appointed: 03/10/2003** |
| **Occupation:** | FINANCIER |
| **Company Number:** | 04920615 |
| **Company Name:** | WESTMINSTER CLEARING LIMITED |
| | Active |

This screen does not include appointments with LLP's or European Companies.

UK COMPANIES ONLY

NW 24/1/05

# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/07
```

-------------------------------------------------- X

AXIS REINSURANCE COMPANY,                    :        No. 07-CV-7924 (GEL)
                                             :
                        Plaintiff,           :
            v.                               :        **ORDER**
                                             :
PHILLIP R. BENNETT, et al.,                  :
                                             :
                        Defendants.          :
                                             :
-------------------------------------------------- X
                                             :
In re                                        :        Chapter 11
                                             :
REFCO, INC., et al.,                         :        Case No. 05-60006 (RDD)
                                             :
                        Debtors.             :        Jointly Administered
                                             :
-------------------------------------------------- X
                                             :
AXIS REINSURANCE COMPANY,                    :        Adv. Proc. No. 07-1712-RDD
                                             :
                        Plaintiff,           :
            v.                               :
                                             :
PHILLIP R. BENNETT, et al.,                  :
                                             :
                        Defendants.          :
                                             :
-------------------------------------------------- X
                                             :
TONE N. GRANT, et al.,                       :        Adv. Proc. 07-2005-RDD
                                             :
                        Plaintiffs,          :
            v.                               :
                                             :
AXIS REINSURANCE COMPANY,                    :
                                             :
                        Defendant.           :
                                             :
-------------------------------------------------- X

[caption continues on next page]

```
------------------------------------------------------------ X
                                                            :
LEO R. BREITMAN, et al.,                                    :        Adv. Proc. No. 07-2032-RDD
                                                            :
                              Plaintiffs,                   :
              v.                                            :
                                                            :
AXIS REINSURANCE COMPANY,                                   :
                                                            :
                              Defendant.                    :
                                                            :
                                                            :
------------------------------------------------------------ X
                                                            :
AXIS REINSURANCE COMPANY,                                   :        (1) No. 07-CV-9420-GEL
                                                            :        (2) No. 07-CV-9842-GEL
                              Plaintiff,                    :        (3) appeal not yet assigned
              v.                                            :
                                                            :
PHILLIP R. BENNETT, et al.,                                 :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------ X
                                                            :
TONE N. GRANT, et al.,                                      :        No. 07-CV-9843-GEL
                                                            :
                              Plaintiffs,                   :
              v.                                            :
                                                            :
AXIS REINSURANCE COMPANY,                                   :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------ X
```

GERARD E. LYNCH, United States District Judge:

In accordance with the Court's oral directions at the November 8, 2007 status conference held in the above-captioned matters:

1.     The appeals now pending before this Court from the decisions of the Bankruptcy Court (some of which have been docketed as Nos. 07-CV-9420-GEL, 07-CV-9842-GEL and 07-

2

CV-9843-GEL, and one of which has not yet been assigned a docket number in this Court) shall be briefed on the following schedule, which has been agreed to by all parties: Appellant Axis Reinsurance Company ("Axis") shall serve and file its opening brief on or before November 28, 2007. Appellees shall serve and file their opposition briefs on or before December 21, 2007. Axis shall serve and file its reply brief, if any, on or before January 9, 2008.

      2.      Pursuant to the agreement of the parties and 28 U.S.C. § 157(d), the bankruptcy reference is hereby withdrawn with respect to the remaining claims now pending in the Bankruptcy Court as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD. The Clerk of the Court is directed to assign such proceedings to this Court with appropriate district court docket numbers. The withdrawal of the reference is without prejudice to any party's rights or position regarding the appropriate venue for future coverage litigation (if any) involving carriers other than Axis.

      3.      In the event that Dennis Klejna (or any other party) wishes to file a motion for summary judgment in the cases now docketed as consolidated adversary proceedings No. 07-1712-RDD, 07-2005-RDD and 07-2032-RDD, such motion shall be made to this Court. Absent further order of this Court, no discovery shall take place unless such discovery (a) is stipulated to by the parties making and opposing such motion and (b) affects only the parties to such motion.

      4.      The civil action pending before this Court as No. 07-CV-7924-GEL is hereby stayed until 30 days have elapsed from this Court's decision regarding the appeals described in paragraph 1 of this Order.

SO ORDERED this 13th day of November, 2007.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT L

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE B. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DIGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO F MATRA◊
JOHN R. MULLANY*

OF COUNSEL
MARIBETH SLEVIN
SHERRI M. FELDMAN◊

APPELLATE COUNSEL
JACQUELINE MANDELL
———
JONATHAN R. HAMMERMAN
HEATHER LASCHEVER*
CAROL E. DOTT†‡†
BARBARA-ANN M. COSTELLO
MELINDA R. MARGOLIES*
JEFFREY E. WHITTINGTON*‡
ELIZABETH O'BRIEN TOTTEN
RICHARD A. FRETTI
REBECCA KILOUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
A. EVON HOWARD*
LEONARD B. COOPER††
REBECCA GOODMAN
ANDREW R. JONES

JAMES T. DE SILVA
KEITH L. KAPLAN††
VINCENT C. ANSALDI†‡†
DAVID J. WARHALE*†
DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. GRAINICK
TRACEY REISER-PERTOSOH
KATHERINE J. O'BRIEN†‡†
DAMIEN SMITH‡
ANDREW E. KOWLOWITZ*◊
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLAH
ELAN R. KANDEL*†
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR

JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON†‡
CORRIE A. HURM
DENNIS J. DOZIS*
LYNN M. DUZETTE
RISA D. TAKKOFF*
MILLI SHAH*
LAURA R. JUFFA
JOSEPH R. DEPAOLA
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLASSNMAN*
MELISSA A. MANNING*

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
♦ ALSO ADMITTED IN TX
✦ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
▪ ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
✧ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

August 3, 2007

## VIA EMAIL AND CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

Helen Kim, Esq.
Baker Hostetler LLP
600 Anton Boulevard, Suite 900
Costa Mesa, CA 92626-7221

| Re: | Insured | : | Refco, Inc. |
|---|---|---|---|
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Ms. Kim:

As you know, we represent Axis Reinsurance Company ("Axis"). This responds to your July 31, 2007 email demanding that Axis consent to and fund a settlement involving one of your clients, Dennis Klejna. Your email attaches an unexecuted Memorandum of Understanding between Mr. Klejna and Lead Plaintiffs in *In re Refco Securities Litigation* (SDNY 05cv8626). Your email also demands that Axis provide consent to the MOU within 72 hours.

As you are also aware, Axis disclaimed coverage for this matter under the captioned policy over a year ago. None of the insureds, including Mr. Klejna, ever challenged this coverage disclaimer – the only exception being certain filings made within the last twenty days in response to the Adversary Action that Axis filed against your client and others. None of the Insureds, including Mr. Klejna, have ever provided Axis with any information whatsoever about the matters they have submitted for coverage.[1] Moreover, your email demanding Axis's consent to settlement is the first indication Axis has had of any settlement discussions in this matter.

---

[1] Each of the various letters Axis has sent disclaiming coverage for this matter included the statement "Axis's denial of coverage of the captioned matter is necessarily based upon information that has been made available at this point. If you have any other information we should consider, please let us know."

As you also know, there is an automatic stay in effect imposed by 11 U.S.C. Sec. 362(a) which prevents Axis from paying any policy proceeds without a lifting of that stay. Additionally, the parties, including Axis and Mr. Klejna are currently in litigation with respect to Axis's denial of coverage in this matter.

Under the present circumstances – 1) a bankruptcy stay in effect; 2) no rational basis provided to Axis upon which to evaluate Mr. Klejna's alleged liability or the reasonableness of the proposed MOU[2]; 3) Axis's unchallenged denial of coverage over a year ago; 3) potential prejudice to other insureds based upon the express terms of the MOU which have not been disclosed to any other insured[3]; 4) litigation pending between the parties concerning the existence of coverage for Mr. Klejna or any other insured; and 5) the presentation of a substantially complete and already negotiated agreement with less than 72 hours to review and assess – Axis can not reasonably be expected to provide approval to fund or consent to the proposed settlement.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

cc:
(via email only)
Harold Neher, Axis

---

None of the Insureds, including your client, have ever provided Axis with any additional information in response to this request.
[2] Given your statements that Mr. Klejna is an "innocent" insured, the proposed settlement amount appears facially unreasonable.
[3] Axis can not show a preference for one insured against all other insureds. The proposed MOU would not only substantially deplete the entire Axis policy, Mr. Klejna would be actively working against all other insureds by virtue of the agreement to assist in the prosecution of the underlying action.

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN§
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL E. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*††
JONATHAN A. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO B. MATKA◊
JOHN B. MULLANY*

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN§

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTY†‡‡
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES‡
JEFFREY K. WHITTINGTON*
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD*
LEONARD B. COOPER††
REBECCA GOODMAN
ANDREW R. JONES

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

JAMES T. DE SILVA
KEITH L. KAPLAN††
VINCENT C. ANSALDI†‡
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
TIMOTHY E. McCARTHY*
JEFFREY A. GRAINICK
TRACEY REISER-PERTOSOH
KATHERINE J. CAPRI†‡
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◊
MATTHEW M. FERGUSON*◊
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA§
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR

JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
BILEDA R. FULLERTON††
CORRIE A. HURM
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MELLI SHAH*
LAURA B. JUFFA
JOSEPH B. DEMOLA
BETSY PHILIP
SARA K. WALKER
KERI R. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNINO*

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
* ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
= ADMITTED IN NJ ONLY
U ADMITTED IN CA ONLY
◊ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

August 7, 2007

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Helen Kim, Esq.
Baker Hostetler LLP
600 Anton Boulevard, Suite 900
Costa Mesa, CA 92626-7221

| Re: | Insured | : | Refco, Inc. |
|-----|---------|---|-------------|
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Ms. Kim:

We are in receipt of your August 3, 2007 letter and your August 6, 2007 letter. We disagree with the assertions made in both of those letters. We write to respond to the question raised at the beginning of your August 3, 2007 letter and the request for a meeting with Axis made in your August 6, 2007 letter.

As noted in our August 3, 2007 letter, Axis disclaimed coverage for this matter and filed coverage litigation seeking a declaration affirming its coverage disclaimer. Accordingly, Mr. Klejna should proceed as a prudent uninsured in connection with this matter. In light of Axis's coverage disclaimer, Axis will not raise non-consent to any settlement involving Mr. Klejna as an additional ground for disclaimer. However, Axis does not — and can not — take any view as to the reasonableness of any settlement or

whether settlement is advisable at this juncture. In this respect, Axis reserves its rights, and we understand that your client reserves all of his rights as well.

Notwithstanding Axis's position, Axis is willing to meet with you at a mutually convenient time and place as requested.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

cc:
(via email only)
Harold Neher, Axis

# KAUFMAN BORGEEST & RYAN LLP

**ATTORNEYS AT LAW**

**200 SUMMIT LAKE DRIVE**
**VALHALLA, NEW YORK 10595**

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†‡
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*†
JEFFREY C. GERSON†‡
ROCCO E MATRA◊
JOHN B. MULLAHY*

OF COUNSEL
MARISETH SLEVIN
SHERRI M. FELDMAN*†

APPELLATE COUNSEL
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTTI‡‡
BARBARA-ANN M. COSTELLO
MELINDA R. MARGOLIES‡
JEFFREY L. WHITTINGTON◊
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD◊◊
LEONARD B. COOPER‡‡
ANDREW R. JONES
JAMES T. DE SILVA

KEITH L. KAPLAN†‡
VINCENT C. ANSALDI†‡
DAVID J. VARRIALE*†‡
DOUGLAS J. DOMSKY
TIMOTHY R. McCARTHY*
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSON
KATHERINE J. O'BRIEN†
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◊
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPIEGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CALLELLA†‡
ELAN R. KANDEL*†‡
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG

THOMAS G. GALLIVAN
EILEEN R. FULLERTON‡‡
CORRIE A. HURM
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*
LAURA B. JUFFA
JOSEPH P. ESPAOLA
KATHLIN R. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING*
THOMAS LOCKSTEIN

† ALSO ADMITTED IN PA
‡ ALSO ADMITTED IN NJ
§ ALSO ADMITTED IN DC
*† ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
◊ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
* ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
◊ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

October 2, 2007

**VIA E-MAIL**

Helen B. Kim
Baker Hostetler LLP
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120

| | | |
|---|---|---|
| Re: | : | Axis Reinsurance Company v. Phillip Bennett, et al. |
| Index No. | : | 07-CV-07924 (GEL) |

Dear Ms. Kim:

This will respond to your September 22, 2007 letter concerning the Memorandum of Understanding signed by Mr. Klejna and Lead Plaintiffs in the *In re Refco Securities Litigation* ("MOU").

Axis has carefully considered the arguments set forth in your September 22nd letter as well as your September 6, 2007 letter, as well as objections received by other insureds to Axis's proposed funding of the MOU. For the reasons set forth below, Axis declines to fund the MOU. As set forth in our August 7, 2007 letter, Axis will not raise non-consent to any settlement in the event that your client decides to proceed with the MOU and ultimately a Court decides that the MOU is covered under the terms and provisions of the Axis policy.

As you well know, Axis denied coverage in its entirety for this matter by letter dated March 6, 2006. To date, although Axis commenced litigation seeking a declaration from the Bankruptcy Court concerning its coverage obligations under the policy, no Court has issued any such ruling. Indeed, the Bankruptcy Court dismissed Axis' complaint seeking a declaration with respect to its coverage obligations.

In addition to the reasons set forth in our earlier letters concerning the MOU, we note that the amount of the MOU, when considered in conjunction with the defense costs submitted on behalf of other insureds, exceeds the total limits of the Axis policy. Thus, under no circumstances could Axis agree to fund the MOU since it implicates coverage excess of the Axis policy limits.

Ltr. to Helen B. Kim
Page 2 of 2

We note that the reasoning set forth in your September 22, 2007 letter is flawed for several reasons, including the fact that the Axis policy defines "loss" to include only amounts that an insured person is legally obligated to pay. Until there is approval of the MOU by the District Court, Mr. Klejna is not legally obligated to pay the MOU. It is a condition precedent of the MOU that it is not final until it is approved. Moreover, we understand that you have stated on several occasions that the amount of the MOU is negotiable. As such, it is clearly not a legal obligation.

Finally, given the objections raised by the other insureds, and given that the terms of the MOU clearly are potentially prejudicial to Axis' other insureds, Axis could not fund the MOU. We urge you and your client to, at minimum, provide the MOU to the Bankruptcy Court for review, if not to all other insureds.

Your numerous references to comments by the Bankruptcy Court are taken out of context. At no point has the Bankruptcy Court, or any Court, expressed any opinion concerning the MOU or potential coverage for the MOU. Axis' attempt to obtain clarity from a Court with respect to the MOU and lack of coverage have been thwarted by its insureds.

Axis continues to maintain its disclaimer in this matter and expects that Mr. Klejna will act prudently under the circumstances.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride

cc:

Harold Neher
Wayne E. Borgeest
Ann Marie Collins
Robert Benjamin
Joseph L. Chairez

641095-1
KAUFMAN BORGEEST & RYAN LLP

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†*
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL E. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*†
JEFFREY C. GERSON†
ROCCO E MATRA◊
JOHN B. MULLANT*

OF COUNSEL
MARIBETH SLEVIN
SHERRI M. FELDMAN♦

APPELLATE COUNSEL
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER*
CAROL S. DOTY†‡
BARBARA-ANN M. COSTELLO
MELINDA R. MANGOLDS*
JEFFREY S. WHITTINGTON*
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KULDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
KELINDA DODOS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER EISENBAUM
MICHAEL K. JANES
R. EVON HOWARD*
LEONARD B. COOPER†‡
ANDREW R. JONES
JAMES T. DE SILVA

KEITH L. KAPLAN†‡
VINCENT C. ANSALDO†‡
DAVID J. VARRIALE*‡
DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. GRAUNICK
TRACEY KEISER-PERTOSO‡
KATHERINE J. O'BRIEN†‡
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◊
MATTHEW M. FERGUSON◊
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA†‡
ELAN R. KANDEL*†‡
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG

THOMAS L. GALLIVAN
EILEEN R. RULLKOETTER†‡
DENNIS J. DOZIS*
LYNN M. DUKETTE
ERIA D. TAKEOFF*
MILLI SHAH*
KATHLEEN M. WALSH
LAURA R. TUFFA
KATHLIN E. O'ROURKE
BETSY PHELP
SARA K. WALKER
KERI B. WASSERMAN*
REMI D. PLASSMAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
MICHAEL NERI
ROBERT E. FORTE
LORRAINE C. SYLVESTER*
JESSICA MOLINARES

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN CT
♦ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
◊ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
◊ ADMITTED IN NJ ONLY
◊ ADMITTED IN CA ONLY
♦ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES

November 12, 2007

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Helen Kim, Esq.
Baker Hostetler LLP
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120

| Re: | Insured | : | Refco, Inc. |
|---|---|---|---|
| | Policy No. | : | 506300 |
| | Claim No. | : | BH 9826 |
| | Our File No. | : | 481.001 |

Dear Ms. Kim:

We are in receipt of your November 9, 2007 letter. For all of the reasons detailed in our prior correspondence regarding Mr. Klejna's earlier proposed settlement, Axis also declines to fund the current proposed settlement.

We note that the proposed settlement attached to your November 9, 2007 letter is a draft settlement agreement with incomplete terms and has not been executed by the parties. As currently drafted, the current settlement proposal does not constitute a legal obligation by any party to pay until the settlement proposal has received approval by a court with proper jurisdiction to grant such approval. Accordingly, such settlement would not constitute Loss, as that term is defined in the primary policy and incorporated by the Axis Policy, until it is approved by a court.

On March 6, 2006, Axis disclaimed coverage to Mr. Klejna for this matter. Accordingly, Mr. Klejna should proceed as a prudent uninsured in connection with this matter. In light of Axis's coverage disclaimer, Axis will not raise non-consent to any settlement involving Mr. Klejna as an additional ground for disclaimer. However, Axis

does not — and can not — take any view as to the reasonableness of any settlement or whether settlement is advisable at this juncture. In this respect, Axis reserves its rights, and we understand that your client reserves all of his rights as well.

Axis also notes that it has received objection from several other Insureds to the prior proposed settlement. The current proposed settlement appears to be substantially identical to the earlier proposed settlement. Axis cannot prefer one Insured over another, and the current proposed settlement clearly requires Mr. Klejna to actively participate with and assist plaintiffs in the prosecution of claims against other Insureds.

Axis further notes that the current settlement proposal calls for payment of $50,000 by Mr. Klejna and $7,550,000 by the Insurers. This amount is in excess of the remaining limit of liability in the Axis Policy. As such, the current settlement proposal constitutes a demand in excess of remaining policy limits. Axis cannot bind Excess Insurers to any proposed settlement, and Axis is unable to consent to fund this proposed settlement.

Based on the foregoing, Axis requests that Mr. Klejna immediately disclose the current proposed settlement to the Excess Insurers and other Insureds.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE B. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DIGIACINTO*
ANN MARIE COLLINS*†
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*‡‡
JEFFREY C. GERSON††
ROCCO E. MATRA*
JOHN B. MULLAHY*

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN*

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HARWITZMAN
HEATHER LASCHEWER*
CAROL E. DOTY†††
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON*
ELIZABETH O'BRIEN TOTTEN
RICHARD A. FRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRENBAUM
MICHAEL R. JANES
R. EVON HOWARD*
LEONARD B. COOPER††
ANDREW R. JONES
JAMES T. DE SILVA

KEITH L. KAPLAN††
VINCENT C. ANSALDINO
DAVID J. VARRIALE*††
DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. CRAUNICK
TRACEY REZER-PERTOSO††
KATHERINE J. O'BRIENT†
DAMIEN SMITH
ANDREW S. KOWLOWITZ* ◊
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPENGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA†‡
ELAN R. XANDEL*††
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA R. SANDBERG

THOMAS J. GALLIVAN
EILEEN E. FULLERTON††
DENNIS J. DOZIS*
LYNN M. DURETTE
RISA D. TARKOFF*
MILLI SHAH*
KATHRYN M. WALSH
LAURA R. RIPER
KATHLIN E. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI R. WASSERSTEIN*
READ D. FLEISSMAN*
MELISSA A. MANNING*
THOMAS LOCKSTEIN
MICHAEL NERI
ROBERT J. FEISTE
LORRAINE C. SILVESTER*
JESSICA MOLINARES

† ALSO ADMITTED IN NJ
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN TX
◊ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
* ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
*BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

November 27, 2007

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Helen Kim, Esq.
Baker Hostetler LLP
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120

Re:       Insured         :    Refco, Inc.
           Matter        :    *In re Refco, Inc. Securities Litigation*
           Policy No.  :    506300
           Claim No.   :    BH 9826
           Our File No. :    481.001

Dear Ms. Kim:

       We are in receipt of your November 20, 2007 letter demanding that Axis confirm that it will reimburse Mr. Klejna for the costs of notice in connection with a proposed partial settlement of the captioned securities class action.

       Axis has previously communicated to you that it has denied coverage to Mr. Klejna for this matter. Judge Drain's October 19, 2007 Order requires Axis to advance Defense Costs. It is Axis's view that the costs of notice to the class extends beyond the definition of Defense Costs. Such notice costs are typically paid from the settlement amount – for which amount Axis has denied coverage. Also, the notice costs are only being incurred as a result of the settlement, not in defense of the Claim. Accordingly, Axis does not believe the notice costs fall within the costs Axis was ordered to advance by the Bankruptcy Court.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride

# KAUFMAN BORGEEST & RYAN LLP

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DIGIACINTO*
ANN MARIE COLLINS*†‡
JONATHAN B. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO†‡
JEFFREY C. GERSON†‡
ROCCO P. MATRA‡
JOHN B. MULLAHY*

OF COUNSEL
MARIBETH SLEVIN
SHERRI M. FELDMAN‡

APPELLATE COUNSEL
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER*
CAROL S. DOTY*†‡
BARBARA-ANN M. COSTELLO
MELINDA B. MARGOLIES‡
JEFFREY E. WHITTINGTON♦
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
CHRISTINE HEENAN
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD♦
LEONARD B. COOPER†‡
ANDREW A. JONES
JAMES T. DE SILVA

KEITH L. KAPLAN†‡
VINCENT C. ANSALDI†‡
DAVID J. VARRIALE*†‡
DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. CHALNICK
TRACEY REISEN-PERTOSOH‡
KATHLEEN J. O'BRIEN†‡
DAMIEN SMITH
ANDREW S. KOWLOWITZ*♦
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA♦
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA*†
ELAN R. KANDEL*†‡
BRIAN M. SHER*
PAIGE E. COOPERMAN
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG

THOMAS L. GALLIVAN
EILEEN R. FULLERTON†‡
DENNIS J. DOZIS*
LYNN M. DUXSTE
RISA D. TARKOFF*
MILLI SHAH*
KATHRYN M. WALSH
LAURA E. JURVA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KEIH R. WASSERSTEIN*
REMI D. FLASHMAN*
MELISSA A. MANNING*
THOMAS LOONSTEIN
MICHAEL NERI
ROBERT E. FEKETE
LORRAINE C. SYLVESTER*
JESSICA MOLINARES

† ALSO ADMITTED IN PA
‡ ALSO ADMITTED IN NJ
§ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
♦ ALSO ADMITTED IN TX
⊕ ALSO ADMITTED IN FL
■ ALSO ADMITTED IN DC
★ ADMITTED IN NJ ONLY
▣ ADMITTED IN CA ONLY
✦ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

December 13, 2007

## VIA EMAIL AND CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

Helen Kim, Esq.
Baker Hostetler LLP
12100 Wilshire Boulevard, 15th Floor
Los Angeles, CA 90025-7120

| Re: | Insured | : | Refco, Inc. |
|-----|---------|---|-------------|
|     | Policy No. | : | 506300 |
|     | Claim No. | : | BH 9826 |
|     | Our File No. | : | 481.001 |

Dear Ms. Kim:

We are in receipt of your December 11, 2007 letter. For all of the reasons detailed in our prior correspondence, Axis continues to decline to fund the current proposed settlement.

As previously noted, the current proposed settlement does not constitute a legal obligation by any party to pay until the settlement proposal has received approval by a court with proper jurisdiction to grant such approval. Accordingly, such settlement would not constitute Loss, as that term is defined in the primary policy and incorporated by the Axis Policy, until it is finally approved by a court.

On March 6, 2006, Axis disclaimed coverage to Mr. Klejna for this matter. Accordingly, Mr. Klejna should proceed as a prudent uninsured in connection with this matter. In light of Axis's coverage disclaimer, Axis has advised you several times it will not raise non-consent to any settlement involving Mr. Klejna as an additional ground for disclaimer. However, Axis does not – and can not – take any view as to the reasonableness of any settlement or whether settlement is advisable at this juncture.

NEW YORK CITY • WESTCHESTER • LONG ISLAND • NEW JERSEY • CALIFORNIA

Nevertheless, your December 11 letter makes note of several reasons you believe Mr. Klejna is an innocent insured "in a unique position in that he is the only Refco officer who has been identified affirmatively by the Refco Trustee as an innocent officer." While we do not agree with your characterization of the Trustee's allegations, if you believe you have such substantial evidence that Mr. Klejna is an innocent officer, the quantum of the proposed settlement appears to be facially unreasonable. In this respect, Axis reserves its rights, and we understand that your client reserves all of his rights as well.

In any event, the representations made to Axis, and upon which Axis relies to deny coverage, were made on behalf of all insureds, including Mr. Klejna. While we understand that you disagree with Axis's application of the Policy terms, Axis continues to assert that the knowledge of any Insured bars coverage for all Insureds.

Axis also cannot prefer one Insured over another, and the current proposed settlement clearly requires Mr. Klejna to actively participate with and assist plaintiffs in the prosecution of claims against other Insureds.

Axis further notes that the current settlement proposal calls for payment of $50,000 by Mr. Klejna and $7,550,000 by the Insurers. This amount is in excess of the remaining limit of liability in the Axis Policy. As such, the current settlement proposal constitutes a demand in excess of remaining policy limits. Axis cannot bind Excess Insurers to any proposed settlement, and Axis is unable to consent to fund this proposed settlement. Additionally, given the current "burn rate" on court-ordered defense costs Axis must pay, and the Court's December 10 comments regarding the timing of approval of the proposed settlement, it appears the proposed settlement will not constitute a legal obligation to pay until well after Axis's limit of liability has been exhausted.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

# KAUFMAN BORGEEST & RYAN LLP

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE††
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DIGIACINTO*
JONATHAN B. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON††
ROCCO E. MATRA◊
JOHN B. MULLAHY*
MELINDA R. MARGOLIES‡
JEFFREY S. WHITTINGTON*
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN*

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN B. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTY†††
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD*
LEONARD B. COOPER‡‡
ANDREW R. JONES
KEITH L. KAPLAN†
VINCENT C. ANSALDI††
DAVID J. VARNALE*††

ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*†
JEFFREY A. CHALNICK
TRACEY REISER-PERTOSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW E. KOWLOWITZ*◊
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
DENNIS J. DOZIS*
LYON M. DUXETTE
RISA D. YARKOFF*
MILI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN R. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI R. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING*
THOMAS LOCKSTEIN
ROBERT E. FEKETE
JULIE A. MICKIEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
* ALSO ADMITTED IN MA
◊ ALSO ADMITTED IN MN
◊ ALSO ADMITTED IN FL
◊ ALSO ADMITTED IN CA
◊ ADMITTED IN NJ ONLY
�‡ ADMITTED IN CA ONLY
◊ ADMITTED IN CT ONLY
☆ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

January 30, 2008

**VIA EMAIL AND FEDERAL EXPRESS**

Helen Kim, Esq.
Baker Hostetler LLP
12100 Wilshire Boulevard, 15ᵗʰ Floor
Los Angeles, CA 90025-7120

Re:  Insured        :  Refco, Inc.
     Policy No.     :  506300
     Claim No.      :  BH 9826
     Our File No.   :  481.001

Dear Ms. Kim:

We are in receipt of your January 22, 2008 letter. For all of the reasons detailed in our prior correspondence, Axis cannot agree to fund the current proposed settlement.

On March 6, 2006, Axis disclaimed coverage to Mr. Klejna for this matter. Accordingly, Mr. Klejna should proceed as a prudent uninsured in connection with this matter. In light of Axis's coverage disclaimer, Axis has advised you several times it will not raise non-consent to any settlement involving Mr. Klejna as an additional ground for disclaimer. However, Axis does not – and can not – take any view as to the reasonableness of any settlement or whether settlement is advisable at this juncture.

Moreover, the current settlement proposal calls for payment of $50,000 by Mr. Klejna and $7,550,000 by the Insurers (the "Insurer Payment"). As you are aware, and based on Mr. Klejna's summary judgment motion, Axis is subject to an October 19, 2007 Court Order, requiring Axis to advance Defense Costs to the Insureds until either: (1) there has been a determination on coverage; or (2) the Limit of Liability has been exhausted. Were Axis to agree to fund any portion of the Insurer Payment, it would be in violation of the Court Order.

Axis further notes, even if there were otherwise coverage, the current proposed settlement does not constitute a legal obligation by any party to pay until the settlement proposal has received final approval by a court with proper jurisdiction to grant such approval. Accordingly, such settlement would not constitute Loss, as that term is defined in the primary policy and incorporated by the Axis Policy, until it is finally approved by a court.

Your letter notes that the Court preliminarily approved the settlement. This approval pursuant to Rule 23 includes a determination that the Class is receiving adequate compensation – not a determination that the defendant is not paying too much in the settlement. For the reasons detailed in our December 13, 2007 letter, the quantum of the settlement does not appear to be reasonable. Accordingly, Axis reserves its rights in this respect.

Axis also cannot prefer one Insured over another, and the current proposed settlement clearly requires Mr. Klejna to actively participate with and assist plaintiffs in the prosecution of claims against other Insureds.

In addition, the Insurer Payment is in excess of the remaining limit of liability in the Axis Policy. As such, the current settlement proposal constitutes a demand in excess of remaining policy limits. Axis cannot bind Excess Insurers to any proposed settlement, and Axis is unable to consent to fund this proposed settlement. Given the current "burn rate" on court-ordered defense costs Axis must pay,[1] and the Court's January 22, 2008 Order, it appears the proposed settlement will not be the subject of a final approval hearing and, if granted, constitute a legal obligation to pay, until well after Axis's limit of liability has been exhausted through the court-ordered payment of defense costs.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

---

[1] We note that Axis attempted to secure a stay of the Bankruptcy Court Order to stay further payment of defense costs and further erosion of the Axis Policy. Your client, along with the other Insureds, opposed Axis's attempt to stay the Bankruptcy Court Order.

# KAUFMAN BORGEEST & RYAN LLP

**ATTORNEYS AT LAW**

ANDREW S. KAUFMAN†‡
WAYNE R. BORGEEST
JULIANNA RYAN
LEE R. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL E. MEZZACAPPA*†
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER E. DiGIACINTO*
JONATHAN B. BRUNO*
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON†‡
ROCCO E. MATRA◊
JOHN B. MULLAHY*
MELINDA R. MARGOLIES‡
JEFFREY S. WHITTINGTON◊
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN◊

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEWER*
CAROL L. DOTY††
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETTI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL*†
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
MICHAEL R. JANES
R. EVON HOWARD◊
LEONARD B. COOPER†‡
ANDREW R. JONES
KEITH L. KAPLAN†‡
VINCENT C. ANSALDI††
DAVID J. VARRIALE*††

DOUGLAS J. DOMSKY
TIMOTHY E. MCCARTHY*
JEFFREY A. GRALNICK
TRACEY KEISER-PERTOSOH
KATHERINE J. O'BRIEN†
DAMIEN SMITH
ANDREW S. KOWLOWITZ*†
MATTHEW M. FERGUSON*
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◊
MATTHEW SPENCER
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. GIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON†‡
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI R. WASSERSTEIN*
REMI D. FLADSHEAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
ROBERT E. FEKETE
JULIE A. MICKEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
◊ ALSO ADMITTED IN MA
✦ ALSO ADMITTED IN TX
▪ ALSO ADMITTED IN FL
○ ALSO ADMITTED IN CA
◊ ADMITTED IN NJ ONLY
◊ ADMITTED IN CA ONLY
◊ ADMITTED IN CT ONLY
◊ BARRISTER AT LAW
   ADMITTED IN ENGLAND & WALES

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595
‒‒‒‒‒‒
TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

February 19, 2008

## VIA EMAIL AND FEDERAL EXPRESS

Helen Kim, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East
Suite 2600
Los Angeles, CA 90067

|       |             |   |            |
|-------|-------------|---|------------|
| Re:   | Insured     | : | Refco, Inc. |
|       | Policy No.  | : | 506300     |
|       | Claim No.   | : | BH 9826    |
|       | Our File No. | : | 481.001   |

Dear Ms. Kim:

We are in receipt of your January 31, 2008 letter. For all of the reasons detailed in our prior correspondence, Axis cannot agree to fund the current proposed settlement.

We respond to the issues in your letter in the order presented:

1)    The Bankruptcy Court Order speaks for itself. Axis was ordered to advance defense costs until one of two things happen – the limit of liability is reached through such payments, or a court decides the underlying issue of coverage. Settlement demands were not included in the Order. If you wanted to have the Order modified to require Axis to fund Mr. Klejna's settlement, you should have made that motion. You didn't. Axis cannot simply ignore the Bankruptcy Court Order. Your letter mentions a motion Axis filed before Judge Lynch seeking a declaration of priority. Axis never made any such motion before Judge Lynch. Axis attempted to have Judge Drain address the issue of priority, but the Insureds – including Mr. Klejna – objected to that.

2)     The Policy speaks for itself. The settlement is not Loss until there is a "legal obligation to pay." Axis has informed you several times that it will not raise "consent" as an issue. We do not understand why you keep trying to make it one. Until the conditions in the settlement are met, including final approval, there is no "legal obligation to pay" -- and the settlement does not constitute Loss.

3)     The settlement proposal you submitted to Axis on August 30, 2007 was never finalized and became void by its terms. It never became Loss. The settlement which has now received preliminary approval is completely separate from the earlier proposed settlement. This new settlement, which received preliminary approval, was first received by Axis on December 12, 2007. When received on December 12, 2007, the proposed settlement called for a payment significantly in excess of Axis's remaining policy limit. Your assertion that "the Klejna settlement has priority over all settlements, judgments and legal fees tendered to Axis after that date" has already been rejected by the Court and is entirely misguided.

4)     Axis again notes that it has denied coverage for Mr. Klejna. A court has ordered Axis to advance defense costs in spite of this coverage denial. No court, however, has found that Axis's denial of coverage was incorrect. The proposed settlement is not a "defense cost" and, having denied coverage, Axis has no contractual or other basis to "advance" it.

5)     Axis denied coverage to Mr. Klejna on March 6, 2006. The Maggio and Bennett pleas further support this coverage denial. If any of the Insureds knew of anything which might give rise to a Claim, coverage is excluded for all Insureds. Messrs. Maggio and Bennett have now admitted that each knew of the fraud. This is yet another basis for Axis to deny coverage for all Insureds.

Nothing in this letter is intended to, or does waive any of Axis's rights, privileges or defenses under the captioned policy, at law, or in equity, all of which are expressly reserved.

Regards,

KAUFMAN BORGEEST & RYAN LLP

Joan M. Gilbride
Robert A. Benjamin

# EXHIBIT M

Hearing: October 12, 2007 10:00 a.m.

HELEN B. KIM (HK-8757)
BAKER & HOSTETLER LLP
12100 Wilshire Blvd, Suite 1500
Los Angeles, CA 90025
Telephone:     310-979-8460
Facsimile:     310-820-8859

MATTHEW R. GOLDMAN (MG-0719)
WENDY J. GIBSON
BAKER & HOSTETLER LLP
3200 National City Center
1900 E. 9th Street
Cleveland, OH 44114
Telephone:     216-621-0200
Facsimile:     216-696-0740
*Attorneys for Defendant Dennis A. Klejna*

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone:     212-832-8300
Facsimile:     212-763-7600
*Attorneys for Defendant Philip Silverman*

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone:     212-750-8700
Facsimile:     212-223-8391
*Attorneys for Defendants William M. Sexton
and Gerald M. Sherer*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re

REFCO INC., et al.,

                              Debtors.

------------------------------------------------------------x

AXIS REINSURANCE COMPANY,

                              Plaintiff,

          v.

PHILLIP R. BENNETT, et al.,

                              Defendants.

------------------------------------------------------------x

Chapter 11

Case No. 05-60006 (RDD)

Jointly Administered

Adv. Proc. No. 07-01712 RDD

[caption continued on next page]

**REPLY MEMORANDUM OF DEFENDANTS DENNIS KLEJNA, WILLIAM M.
SEXTON, GERALD SHERER AND PHILIP SILVERMAN IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT TO REQUIRE AXIS TO ADVANCE
DEFENSE COSTS IN THE UNDERLYING LITIGATIONS**

```
------------------------------x
TONE N. GRANT, et al.                 :       Adv. Proc. No. 07-2005-rdd

                Plaintiffs,           :

            v.                        :

AXIS REINSURANCE COMPANY,             :

                Defendant.            :
------------------------------x
LEO R. BREITMAN, et al.               :       Adv. Proc. No. 07-2032-rdd

                Plaintiffs,           :

            v.                        :

AXIS REINSURANCE COMPANY,             :

                Defendant.            :
------------------------------x
```

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.   AXIS DOES NOT MEANINGFULLY RESPOND TO THE MOVING
     INSUREDS' DEMONSTRATION THAT AXIS HAS A CLEAR DUTY TO
     ADVANCE DEFENSE COSTS ................................................................................ 3

     A.   Axis Does Not Dispute That Advancement Of Defense Costs Is Required
          Under New York Law Where, As Here, The Terms Of The Policy Require
          The Carrier To Pay Defense Costs On An As-Incurred Basis Pending A
          Final Determination of Coverage ....................................................................... 3

     B.   Axis Has Failed To Demonstrate The Existence Of Any Material Issues
          Of Fact Precluding Entry Of Summary Judgment Against It ............................. 10

II.  AXIS' REQUEST THAT THIS COURT DICTATE THE PRIORITY OF
     PAYMENTS IS NOT PROPERLY BEFORE THIS COURT .................................... 12

CONCLUSION ................................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Associated Elec. & Gas Ins. Services Ltd. v. Rigas,*
  382 F. Supp.2d 685 (E.D. Pa. 2004) .................................................................. 5, 10

*Brady v. I2Techs. Inc.,*
  No. CIV.A. 1543-N, 2005 WL 3691286, *3 (Del. Ch. 2005) ........................................ 3

*Century 21, Inc. v. Diamond State Ins. Co.,*
  442 F. 3d 79 (2d Cir. 2006) .................................................................................. 8

*Contemporary Mission, Inc. v. United States Postal Service,*
  648 F.2d 97 (2d Cir. 1981) .................................................................................. 12

*Federal Ins. Company v. Kozlowski,*
  18 A.D.3d 33, 792 N.Y.S.2d 397 (1st Dep't 2005)........................................ 3, 7, 8, 9, 10

*G-I Holdings, Inc. v. Reliance Ins. Co.,*
  No. 00-CV-6189(DMC), 2006 WL 776809 (D.N.J. Mar. 24, 2006) .............................. 3

*International Multifoods Corp. v. Commercial Union Ins. Co.,*
  309 F.3d 76 (2d Cir. 2002)................................................................................... 5

*Kincaid v. Simmons,*
  414 N.Y.S.2d 407 (4th Dept. 1979) ...................................................................... 8

*Little v. MGIC Indemnity Corp.,*
  836 F.2d 789 (3d Cir. 1987) ................................................................................ 5

*McCostis v. Home Ins. Co. of Indiana,*
  31 F.3d 110 (2d Cir. 1994).................................................................................. 5

*Morgan Stanley Group Inc. v. New England Ins. Co.,*
  225 F.3d 270 (2d Cir 2000) ................................................................................ 5

*National Union Fire Ins. Co. of Pittsburgh, PA v. Brown,*
  787 F. Supp. 1424 (S.D. Fla. 1991), *aff'd,* 963 F.2d 385 (11th Cir. 1992) .............................. 3, 9

*Net2Globe Int'l, Inc. v. Time Warner Telecom of New York,*
  273 F. Supp.2d 436 (S.D.N.Y. 2003).................................................................... 6

*Sereika v. Patel,*
  411 F. Supp.2d 397 (S.D.N.Y. 2006)................................................................... 12

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Servidone Constr. Corp. v. Security Ins. Co. of Hartford,*
  64 N.Y. 2d 419, 488 N.Y.S.2d 139 (1985) ............................................................... 8

*Sun-Times Media Group, Inc. v. Royal & Sunalliance Ins. Co. of Canada,*
  No. CIV.A. 06C-11108RRC, 2007 WL 1811265*10-11 (Del. Super. June 20, 2007) .......... 3, 10

*WorldCom, Inc. Securities Litigation, In re,*
  354 F. Supp. 2d 455 (S.D.N.Y. 2005) ........................................................... 3, 6, 9

*Zurich American Insurance Co. v. Atlantic Mutual Insurance Co.,*
  531 N.Y.S.2d 911 (1ˢᵗ Dept. 1988), *aff'd*, 74 N.Y. 2d 621, 541 N.Y.S.2d 970 (1989) ............... 8

## STATUTES

Federal Rule of Civil Procedure 56(f) ............................................................... 11

## OTHER AUTHORITIES

11 Williston on Contracts § 32.5 (4th ed. 1999) ........................................................ 6

Defendants Dennis Klejna, William M. Sexton, Gerald Sherer and Philip Silverman (the "Moving Insureds") submit this Reply in further support of their motion for summary judgment to compel plaintiff Axis Reinsurance Company ("Axis") to pay their defense costs as incurred in the underlying litigations relating to Refco.

## PRELIMINARY STATEMENT

In its opposition, Axis contends that the Axis Policy "is specifically drafted to prevent the advancement of Defense Costs unless Axis agrees they are covered under the Axis Policy" (Opp.[1] at 18). According to Axis, "the express terms of the Axis Policy leave the determination of coverage to Axis" for purposes of advancement of defense costs. (Id.) But Axis fails to cite any language that "expressly" so provides. The reason is clear: the Policy contains no such provision.

Axis also flatly asserts that "no Court has addressed the language which appears in the Axis Policy." (Opp. at 7.) But, in truth, this Court has twice addressed the language that appears in the Axis Policy and has rejected Axis' interpretation of its Policy on both occasions. See the Court's August 30, 2007 and September 11, 2007 Orders.

Axis does not dispute that the underlying litigations for which the Moving Insureds seek payment of their defense costs "constitute a Claim which falls within the Insuring Agreement," (Opp. at 12.) Nor does it dispute that, subject to possible repayment upon a final determination of coverage, the Axis Policy expressly requires "the payment of 'covered defense costs on an as-incurred basis.'" (e.g. Opp. at 6, 10). Axis argues, however, that it may avoid this express

---

[1] "Opp." refers to the Axis Reinsurance Company's Memorandum of Law In Opposition to the Defendants' motions for Summary Judgment.

obligation to pay defense costs "as incurred" merely by making a unilateral determination that coverage should ultimately be denied. (Opp. at 5, 12.)

But Axis' position is contrary to the plain terms of the Axis Policy. Moreover, it is a position that in similar cases has repeatedly been rejected by state and federal courts in New York and elsewhere. In fact, Axis is unable to cite a single case that has ever allowed an insurer to escape policy language calling for the advancement of defense costs as incurred based on the insurer's unilateral contention that that it will ultimately be able to establish facts sufficient to invoke an exclusion.

In anticipation of entry of summary judgment ordering Axis to pay defense costs as incurred, Axis requests that this Court adjudicate the allocation and priority of payments as between the individual Insureds. However, as there is no claim for apportionment pending before this Court, this request is improper.

Accordingly, the Moving Insureds' motion for summary should be granted.

## ARGUMENT

**I.    AXIS DOES NOT MEANINGFULLY RESPOND TO THE MOVING INSUREDS' DEMONSTRATION THAT AXIS HAS A CLEAR DUTY TO ADVANCE DEFENSE COSTS**

### A.    Axis Does Not Dispute That Advancement Of Defense Costs Is Required Under New York Law Where, As Here, The Terms Of The Policy Require The Carrier To Pay Defense Costs On An As-Incurred Basis Pending A Final Determination of Coverage

Axis does not dispute that an insurance carrier must advance defense costs pending a final determination of coverage where expressly required to do so by the terms of its insurance policy. In fact, Axis seems to concede the Moving Insureds' basic premise: as Judge Cote's opinion in *WorldCom* demonstrates, where the terms of its policy provide for the advancement of defense costs, an insurer must advance defense costs until there has been an adjudication of no coverage. (*See* Opp. at 9-11; *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005) (hereinafter "*WorldCom*"); *Federal Ins. Company v. Kozlowski*, 18 A.D.3d 33, 792 N.Y.S.2d 397 (1st Dep't 2005).

The obligation to advance defense costs as required by the terms of the policy is a legal principle that is not unique to New York substantive law. To the contrary, it is an obligation that is widely recognized under "general insurance contract principles." *See, e.g., Sun-Times Media Group, Inc. v. Royal & Sunalliance Ins. Co. of Canada*, No. CIV.A. 06C-11108RRC, 2007 WL 1811265, *10-11 (Del. Super. June 20, 2007) (recognizing duty under "general insurance contract principles" to advance defense costs as required by policy terms); *Brady v. i2Techs. Inc.*, No. CIV.A. 1543-N, 2005 WL 3691286, *3 (Del. Ch. 2005); *G-I Holdings, Inc. v. Reliance Ins. Co.*, No. 00-CV-6189(DMC), 2006 WL 776809 (D.N.J. Mar. 24, 2006); *National Union Fire Ins. Co. of Pittsburgh, PA v. Brown*, 787 F. Supp. 1424, 1431-34 (S.D. Fla. 1991), *aff'd*, 963 F.2d 385 (11th Cir. 1992).

Nor is there any dispute in the case at bar that the Axis Policy incorporates the language from the now-exhausted Primary policy with respect to the payment of defense costs, to wit, the provisions of Insuring Agreement A requiring the insurer to pay Defense Costs stemming from Claims for Wrongful Acts, and Condition D(2), which provides:

> The Insurer will pay covered Defense Costs on an as-incurred basis. If it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy, the Insureds agree to repay such non-covered Defense Costs to the Insurer."

(*See* Axis Reinsurance Company's Statement of Add'l Facts and Response to Statement of Undisputed Material Facts Submitted by Klejna, Sexton, Sherer and Silverman ("Axis 56.1 Statement") at ¶ 12.) Condition D(2) plainly contemplates a two-step process: first, payment by Axis of "covered Defense Costs *on an as-incurred basis*" and, second, the Insureds' "repay[ment]"of Defense Costs in the event it is "finally determined that any Defense Costs paid by the Insurer are not covered." *Id.*

As Axis acknowledges, both U.S. Specialty, the primary carrier, and Lexington Insurance Company, the first excess carrier, while reserving their rights, advanced defense costs pursuant to these terms of the U.S. Specialty Policy (Axis 56.1 Statement ¶¶ 24, 25.) Nevertheless, throughout these proceedings and again on this motion for summary judgment, Axis argues for a novel interpretation of Condition D(2) -- an interpretation never asserted by either U.S. Specialty or Lexington.

Axis recognizes an obligation to advance Defense Costs, but argues that it is required to do so only where coverage is undisputed. Axis repeatedly asserts that "[t]he Axis Policy expressly allows Axis to make the initial determination of whether or not something is covered." (Opp. at 5; *id.* at 18.) But it fails to cite any provision to that effect. This is not surprising: there is no such provision in the Axis Policy. Nevertheless, on that basis, Axis asks this Court to rule

- 4 -

that it is obligated to "pay covered Defense Costs" only at the conclusion of a coverage dispute, in the face of language in the Policy expressly requiring that Axis "pay covered Defense Costs ... *as incurred*" and requiring that the Insureds "repay ... non-covered Defense Costs" if and when "it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy." (Axis 56.1 Statement ¶ 12.)

Indeed, the provisions for advancement of defense costs would be rendered illusory if, as Axis claims, it may avoid any obligation to advance Defense Costs simply by disclaiming coverage. Its disclaimer would eviscerate the Insurer's express obligation to "pay covered Defense Costs on an as-incurred basis" and render meaningless the Insureds' obligation to "*repay* ... [any] non-covered Defenses Costs" only in the event of a final adverse determination regarding coverage. *Id.*

If an insurer wishes to exercise a unilateral right to avoid advancing defense costs by asserting the applicability of an exclusion that would ultimately bar coverage for a claim, it must include language in its policy that clearly and unambiguously gives it such right. *See Associated Elec. & Gas Ins. Sec. Ltd. v. Rigas,* 382 F. Supp. 2d 685, 699-702 (E.D. Pa. 2004) ) (citing *Little v. MGIC Indemnity Corp.,* 836 F.2d 789 (3d Cir. 1987)). In the absence of language in the policy granting that unilateral right to the insurer, any ambiguity arising from Axis' failure to address this issue in the Axis Policy must be construed against Axis and in favor of coverage for the Insureds. *See, e.g., International Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83, 88 n.7 (2d Cir. 2002); *Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir. 2000); *McCostis v. Home Ins. Co. of Indiana,* 31 F.3d 110, 113 (2d Cir. 1994).

Since the interpretation urged by Axis renders superfluous and meaningless both the obligation to pay "on an as-incurred basis" and the insureds' obligation to "repay ... non-covered

Defense Costs" only upon a "final" determination, that interpretation must be rejected. It is axiomatic that contracts should be interpreted "in a manner that gives reasonable meaning to all of its provisions," and that "an interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable." 11 Williston on Contracts § 32.5 at pp. 427-28 (4th ed. 1999); *see, e.g., Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp.2d 436, 445 (S.D.N.Y. 2003).

Axis devotes the bulk of its Opposition to the presence of the word "covered" in the first sentence of Condition D(2). (Opp. at 9-19.) Axis contends that the inclusion of the word "covered" critically distinguishes the language of the Axis Policy from the language in the *WorldCom* policy. (Opp. at 10.) But the meaning of the Axis Policy is as clear as the *WorldCom* policy on the insurer's obligation to pay defense costs as incurred.

Like the *WorldCom* Policy, the Axis Policy unambiguously contemplates the payment by the insurer of Defense Costs, "as incurred," for any Claim that could fall within the coverage of the policy, and repayment by the insured "if it is finally determined that any Defense Costs paid by the Insurer are not covered under this Policy." Indeed, if it were true that "[t]he Axis Policy [was] specifically drafted to prevent the advancement of Defense Costs unless Axis agrees they are covered under the Axis Policy" (Opp. at 18), there would never be any occasion for the Insureds to repay "non-covered Defense Costs." Similarly, while Axis contends that the Insureds' obligation to repay non-covered Defense Costs applies only "in situations where the insurer advances defense costs subject to a reservation of rights" (Opp. at 14), under Axis' interpretation, that could never happen; the insurer's declination of coverage would be sufficient to avoid a reservation of rights under any circumstances.

In short, the term "covered" in the first sentence of Condition D(2) does not have remotely the significance Axis suggests. It serves merely to limit the Insurer's obligation to advance Defense Costs to the sort of claims that are covered by the policy.[2] Thus, the Moving Insureds are not arguing, as Axis suggests (Opp. at 15 n.9), that Axis would have to advance defense costs for a claim that on its face could not fall within the coverage of the Axis Policy.[3]

That this is the proper meaning of the term, "covered," as used in Condition D(2) is made clear by Condition D(3) of the U.S. Specialty Policy, the provision that immediately follows Condition D(2). Condition D(3) explains that a single "Claim" can include both "Loss covered by this Policy and loss not covered by this Policy ... either because the Claim includes both covered and uncovered matters, or because the Claim is made both against Insured Persons ... and against others not included within the definition of Insured Person." U.S. Specialty Policy at p. 8 of 11. The U.S. Specialty Policy also defines a single "Claim" to include all claims "alleging, arising out of, based upon or attributable to the same facts, circumstances, situations, transaction or events or a series of related facts, circumstances, situations, transactions or events." U.S. Specialty Policy at p. 7 of 11. Thus, the U.S. Specialty Policy expressly contemplates that a "Claim" may include both "Loss" covered by the Policy and "loss not covered by the Policy."

Our interpretation of the term "covered" is confirmed by the approach taken in *Kozlowski*, 18 A.D.3d 33, 792 N.Y.S.2d 397. There, the court specifically recognized that "the

---

[2] As "Defense Costs" is defined in the Primary Policy so as to include costs in *any* action of any type against an Insured, absent the insertion of "covered" into the first sentence, Condition D(2) would require the Insurer to advance Defense Costs for Claims that on their face cannot fall within the coverage of the policy.

[3] Indeed, if the Insureds had attempted to seek defense costs regarding the Edward McElwreath case or any other "indisputably" excluded matter, as Axis posits in its Opposition (at 15 n.9), the Insureds presumably would fail on any motion for preliminary injunctive relief. Further, in such a case where an exclusion is indisputably triggered on the face of a claim, Axis could seek and obtain summary judgment, since such a claim would not significantly overlap with any issues in the Underlying Actions and could be adjudicated immediately, as a matter of law.

-7-

duty to ... pay defense costs turns solely on whether, as to each of the underlying actions, the complaint alleges any facts or grounds that bring the action within the liability coverage purchased." 18 A.D.3d at 40; 792 N.Y.S.2d at 402.[4] The *Kozlowski* court concluded that the insurer could not avoid advancement of defense costs merely by alleging facts that would, if ultimately proven, result in a determination of no coverage. *Id.* That same logic applies here.

Axis acknowledges that "the Underlying Actions constitute a Claim which falls within the Insuring Agreement." (Opp. at 12.) Thus, the Underlying Actions constitute Losses that are expressly covered by the U.S. Specialty Policy and the costs of defending them are "covered Defense Costs" under Condition D(2).

Citing *Kozlowski*, 18 A.D.3d 33, 792 N.Y.S.2d 397, Axis also argues that, in this case, rather than seeking rescission, it seeks to apply an exclusion – the "prior knowledge" exclusion – and that its mere invocation of an exclusion is somehow entitled to deference by this Court. (Opp. at 19-21.) But, as we demonstrated in our moving brief, an insurer's invocation of an exclusion is *not* entitled to deference. To the contrary, under generally accepted principles of insurance contract interpretation, an exclusion clause must be construed strictly to give the interpretation most beneficial to the insured. (Moving Br. at 14-15.) Moreover, Axis' claims are

---

[4]  This holding in *Kozlowski* plainly refutes Axis' "policy" argument (*see* Opp. at 15, 21-22) that the Insureds' interpretation of the Axis Policy should be rejected because it may require insurers to advance defense costs for claims for which there is ultimately held to be no coverage. Of course, the language of Condition (D)(2) expressly contemplates that very result. Moreover, it is well-established from case law addressing the comparable "duty to defend" that an insurer will be required to bear the costs of defending an insured even where it appears clear that an exclusion from coverage will ultimately be established. *See, e.g., Zurich American Insurance Co. v. Atlantic Mutual Insurance Co.,* 531 N.Y.S.2d 911, 139 A.D.2d 379 (1st Dept. 1988) (insurer required to defend individuals in action even where their answers took themselves out of possible coverage), *aff'd,* 74 N.Y. 2d 621, 541 N.Y.S.2d 970 (1989); *Kincaid v. Simmons,* 414 N.Y.S.2d 407, 66 A.D.2d 428 (4th Dept. 1979) (insurer required to defend insured even where he made admission to insurer that would trigger exclusion). *See also Century 21, Inc. v. Diamond State Ins. Co.,* 442 F. 3d 79, 82-83 (2d Cir. 2006) (under New York law, "a defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach;" *quoting Servidone Constr. Corp. v. Security Ins. Co. of Hartford,* 64 N.Y. 2d 419, 424, 488 N.Y.S.2d 139, 142 (1985).

- 8 -

tantamount to a request for rescission, as it seeks to avoid coverage for all Insureds for all of the

Underlying Actions on the ground that Bennett committed a fraud.

Nor does *Kozlowski* support Axis' position. As in *WorldCom*, the *Kozlowski* court

*enforced* a duty to advance defense costs pending a final determination of coverage. 18 A.D.3d

at 41-42, 792 N.Y.S.2d at 403-404. As the *Kozlowski* court held:

> under a directors and officers liability policy calling for the reimbursement of
> defense expenses ... 'insurers are required to make contemporaneous interim
> advances of defense expenses where coverage is disputed, subject to recoupment
> in the event it is ultimately determined no coverage was afforded.'"

18 A.D.3d at 42, 792 N.Y.S.2d at 403, *quoting National Union Fire Ins. Co. of Pittsburgh, Pa. v.*

*Brown*, 787 F. Supp. at 1430.

The Kozlowski court interpreted the "personal profits" exclusion relied on by the insurer

as applicable to any claim that *alleged* improper profits or gain (i.e., regardless of the merits of

any such claim), and was thus able to analyze whether certain claims *on their face* fell entirely

within the exclusion.[5] The Court did *not* allow the insurer to seek to establish extraneous facts

which might establish an exclusion, as Axis seeks to do here.

Furthermore, no one in *Kozlowski* disputed the existence of the exclusion cited by the

insurer. In sharp contrast to *Kozlowski*, the Moving Insureds/Counterclaimants in this case

affirmatively allege that, in March 2006, after the Moving Insureds' claims had already been

made, in violation of both the Condition Policy Binder that Axis issued on August 11, 2005 and

the automatic bankruptcy stay, Axis improperly added the Knowledge Exclusion to the policy

purporting to make the exclusion retroactive to August 11, 2005. Declaration of Helen B. Kim,

---

[5] That the Court interpreted the "personal profits" exclusion in this manner is apparent from its reference only to the
allegations in the underlying actions, and the lack of citation by the court to any evidence or any determination that
any of the insureds had in fact obtained any improper profits or gain. *See* 792 N.Y.S.2d at 403.

dated Sept. 25, 2007 ("Kim Decl."), Ex. 11, Counterclaim ¶¶ 43-46; Ex. 12, Counterclaim ¶¶ 43-46; Ex. 13, Counterclaim ¶¶ 43-46.

We are not aware of any case – and Axis cites none – in which advancement of defense costs was denied, based on an exclusion the very existence of which is disputed, or based on an exclusion that requires proof of a disputed fact.  To the contrary, where an exclusion is disputed or arguably inapplicable, courts will construe the policy in favor of coverage, absent the insurer's ability to demonstrate that the exclusion is "definitely" applicable.  *See Sun-Times, supra, 2007 WL 1811265,* at \*6; *Associated Elec. & Gas Ins. Services Ltd. v. Rigas,* 382 F. Supp. 2d 685 (insurer cannot unilaterally determine that it was entitled to rescind policy or to apply a prior knowledge exclusion; insurer obligated to honor contractual obligation to advance defense costs as incurred pending determination of coverage); *see* Moving Br. at 14-15.[6]

**B.    Axis Has Failed To Demonstrate The Existence Of Any Material Issues Of Fact Precluding Entry Of Summary Judgment Against It**

Axis has not pointed to any material fact in dispute that could alter the Moving Insureds' entitlement as a matter of law to payment of defense costs as incurred in the Underlying Actions.  Summary judgment would not be precluded even if there were an ambiguity in the policy notwithstanding its clear requirement for the payment of defense costs as incurred.  The claimed existence of possible differing interpretations of a policy does not require a trial when the issue can be resolved on the basis of the policy alone.  *See, e.g., Japour v. Ed Ryan & Sons Agency,* 215 A.D.2d 817, 818, 625 N.Y.S. 2d 750, 751 (3d Dep't 1995) ("The existence of an ambiguity,

---

[6] *Kozlowski* also enforced a severability provision that "preclude[d] [the insurer] from imputing to Kozlowski statements or knowledge of other insureds." 18 A.D.3d at 39, 792 N.Y.S.2d at 401. The Axis Policy at bar also contains a severability provision – Endorsement No. 10 to the U.S. Specialty Policy as to which the Axis Policy follows form – that "precludes [Axis] from imputing to [the Moving Insureds] statements or knowledge of other insureds" such as Bennett, upon whose alleged knowledge Axis' invocation of the disputed Prior Knowledge exclusion depends.

however, does not necessarily require that the matter be decided by a trier of fact, for the interpretation of any contract presents a question of law to be determined by the court when the ambiguity can be resolved on the basis of the contract alone, without reference to extrinsic evidence"; "[a]n insurer must demonstrate that its interpretation is not only reasonable, but the only fair interpretation."). This is particularly so given the fundamental principles requiring insurance policy ambiguities to be resolved against insurers as the drafters of their policies, and requiring insurers to demonstrate the applicability of exclusions by clear and unmistakable policy language. *See, e.g., Westview Assoc. v. Guaranty Nat. Ins. Co.*, 95 N.Y. 2d 334, 339, 717 N.Y.S. 2d 75, 77 (2000) ("At the very least, defendant's interpretation presents an ambiguity in the umbrella policy which must be resolved against the insurer [on summary judgment], as drafter of the agreement.").

Axis does note that the Moving Insureds have not addressed in their moving papers certain "other issues of contract interpretation" they previously asserted were in dispute. These concern whether a so-called Warranty Letter, the alleged "Knowledge Exclusion" or an omission in the application to the U.S. Specialty Policy may provide a basis on which coverage could ultimately be denied to the Moving Insureds. Axis suggests that the Moving Insureds have waived such issues. (*See* Opp. at 20 n.15).

But as we have demonstrated above and in our original memorandum in support of summary judgment, Condition D(2) of the primary U.S. Specialty policy, as to which the Axis Policy follows form, without more, requires that Axis pay defense costs "as-incurred." Based on that provision alone, under all applicable authorities, summary judgment should be entered in the Moving Insureds' favor.

- 11 -

To the extent that Axis believes that these "other issues of contract interpretation" are relevant to the instant motion and might somehow provide a defense regarding its advancement obligation, Axis should have raised and argued them in its Opposition. Having failed to properly present whatever facts its considers relevant to this motion, and having failed to fully brief whatever arguments it might have made, it is Axis, not the Moving Insureds, who have waived any argument based on those matters.[7]

Nor is a blanket reference to Axis' sudden desire to conduct discovery sufficient grounds for denying a motion for summary judgment. As we noted in our moving papers, a nonmoving party cannot create a genuine issue of material fact by providing evidence that is "merely colorable, conclusory, speculative or not significantly probative." (Moving Br. at 9.) Here, Axis has not sought any discovery in these adversary proceedings, nor indicated through affidavits what relevant and material evidence discovery might possibly produce or why a continuance is needed, as required by Fed. R. Civ. Pro. 56(f). *See, e.g., Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 107 (2d Cir. 1981) (party cannot defeat motion for summary judgment through mere speculation as to what discovery might uncover); *Sereika v. Patel*, 411 F. Supp.2d 397, 408-09 (S.D.N.Y. 2006) (summary judgment granted where opposing party had not requested discovery, did not set forth specific discoverable information that would raise a material issue of fact, and did not submit an affidavit pursuant to Rule 56(f)).

## II.    AXIS' REQUEST THAT THIS COURT DICTATE THE PRIORITY OF PAYMENTS IS NOT PROPERLY BEFORE THIS COURT

In its Opposition, Axis requests that this Court "include a finding of priority of payments in its order." (Opp. at 23.) Axis' request for such affirmative relief, on the last page of its

---

[7] The Moving Insureds' position regarding the so-called Warranty Letter, the "Knowledge Exclusion" and the application omission were fully set forth in the Moving Insureds' briefs in support of their motion for preliminary

Opposition, is improper. There is no pleading or motion before this Court – by either the Moving Insureds or Axis – that requests any directive as to priority of payments, or any apportionment among the individual insureds. Whatever the rights or obligations of the parties may be in this regard, Axis cannot properly seek to adjudicate them through its opposition to the Insureds' motions for summary judgment on payment of defense costs.

## CONCLUSION

Based on the foregoing, the Moving Insureds' motion for summary judgment for a permanent injunction to compel Plaintiff Axis Reinsurance Company to pay their defense costs, as incurred, in certain underlying litigations relating to Refco should be granted.

Dated: October 10, 2007

Respectfully submitted,

HELEN B. KIM (HK-8757)
BAKER & HOSTETLER LLP

/s/ Helen B. Kim
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA 90025
Telephone: 310-979-8460
Facsimile: 310-820-8859

MATTHEW R. GOLDMAN (MG-0719)
WENDY J. GIBSON
BAKER & HOSTETLER LLP
3200 National City Center
1900 E. 9th Street
Cleveland, Ohio 44114
Telephone: 216-621-0200
Facsimile: 216-696-0740
*Attorneys for Defendant Dennis A. Klejna*

---

injunction, which was granted by this Court on August 30, 2007.

STUART I. FRIEDMAN (SF-9186)
IVAN KLINE (IK-9591)
FRIEDMAN & WITTENSTEIN
A Professional Corporation


 /s/ Ivan Kline
600 Lexington Avenue
New York, NY  10022
Telephone:  212-750-8700
Facsimile:  212-223-8391
*Attorneys for Defendants William M. Sexton*
*and Gerald M. Sherer*

RICHARD CASHMAN (RC-4769)
HELLER EHRMAN LLP


 /s/ Richard Cashman
Richard Cashman (RC-4769)
Times Square Tower
7 Times Square
New York, NY  10036-6524
Telephone:  212-832-8300
Facsimile:  212-763-7600
*Attorneys for Defendant Philip Silverman*

- 14 -

## CERTIFICATE OF SERVICE

A copy of the foregoing has been served via email, on October 10, 2007, on the attached service list.

/s/ Helen B. Kim
Helen B. Kim

J. Gregory Milmoe
Skadden, Arps, Slate, Meagher & Flom LLP
Four Time Square
New York, NY 10036-6522

Steven Wilamowsky
Bingham McCutchen
399 Park Avenue
New York, NY 10022-4689

Andrew D. Velez-Rivera
Office of the U.S. Trustee
33 Whitehall Street, Suite 2100
New York, NY 10004

Robert M. Novick
Jeffrey R. Gleit
Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY 10019

Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin
Kaufman Borgeest & Ryan LLP
200 Summit Lake Dr.
Valhalla, New York 10595

Stuart I. Friedman
Ivan Kline
Friedman & Wittenstein
600 Lexington Avenue
New York, NY 10022

Richard Cashman
Chakshu S. Patel
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

Barbara Moses
Rachel Marissa Korenblat
Morvillo, Abramowitz, Grand, Lason, Anello &
Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017

Luc A. Despins
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

Donald S. Bernstein
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Timothy B. DeSieno
Mark W. Deveno
Bingham McCutcheon LLP
399 Park Avenue
New York, NY 10022-4689

Susheel Kirpalani
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
New York, NY 10017

Jeffrey T. Golenbock
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022

Scott E. Hershman
Stephen R. Blacklocks
Richard Soto
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166

Greg A. Danilow
Paul A. Ferrillo
Weil Gotshal & Manges LLP
767 Fifth Avenue, 35th Floor
New York, New York 10153

Laura E. Neish
Norman L. Eisen
Thomas G. Macauley
Zuckerman, Spaeder LLP
1540 Broadway, Suite 1604
New York, NY 10036-4039

Gabriel Del Virginia
Law Offices of Gabriel Del Virginia
641 Lexington Avenue, 21st Floor
New York, New York 10022

Daniel J. Standish
Jonathan M. Jacobs
Cara T. Duffield
Wiley Rein LLP
1776 K Street NW
Washington DC 20006

Michael S. Etkin
Ira M. Levee
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ  07068

Stuart M. Grant
James J. Sabella
Megan McIntyre
Grant & Eisenhofer PA
485 Lexington Avenue
New York, NY  10017

Blake Tyler Hannafan
Michael T. Hannafan & Associates, Ltd.
One East Wacker Drive, Suite 1208
Chicago, IL 60601

Dylan G. Trache
Wiley Rein LLP
7925 Jones Branch Drive
McLean, VA 22102

Michael S. Etkin
Ira M. Levee
Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, NY  10020

John P. Coffey
John C. Browne
Jeremy Robinson
Bernstein Litowitz Berger & Grossman LLP
1285 Avenue of the Americas
New York, NY  10019

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Greg A. Danilow (GD 1621)
Michael F. Walsh (MW 8000)

Attorneys for Appellees Leo R.
Breitman, Nathan Gantcher, David V.
Harkins, Scott L. Jaeckel, Thomas H.
Lee, Ronald L. O'Kelley, and Scott A.
Schoen

BAKER & HOSTETLER LLP
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA 90025
Telephone: (310) 979-8460
Facsimile: (310) 820-8859
Helen B. Kim (HK 8757)

Attorneys for Appellee Dennis A.
Klejna

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile: (212) 672-1920
John J. Jerome (JJ 2413)

Attorneys for Appellee Joseph Murphy

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391
Stuart I. Friedman (SF 9186)
Ivan Kline (IK 9591)

Attorneys for Appellees William M.
Sexton and Gerald M. Sherer

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 832-8300
Facsimile: (212) 763-7600
Richard Cashman (RC 4769)

Attorneys for Appellee Philip
Silverman

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Telephone: (212) 704-9600
Norman L. Eisen (NE 1198)
Thomas G. Macauley (TM 3944)
Laura E. Neish (LN 0040)

-and-

HANNAFAN & HANNAFAN, Ltd.
One East Wacker Drive, Suite 2800
Chicago, IL 60601
Telephone: (312) 527-0055
Michael T. Hannafan
Blake T. Hannafan

Co-attorneys for Tone N. Grant

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 907-7300
Jeffrey T. Golenbock (JG 2217)
Adam C. Silverstein (AS 4876)

Attorneys for Appellee Phillip R.
Bennett

MORVILLO, ABRAMOWITZ,
GRAND, IASON, ANELLO &
BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494
Barbara Moses (BM 2952)
Rachel Korenblat (RK 0170)

- and -

LAW OFFICES OF GABRIEL DEL
VIRGINIA
641 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 371-5478
Gabriel Del Virginia (GV 4951)

Co-Attorneys for Appellee Robert C.
Trosten

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

AXIS REINSURANCE COMPANY,                  :
                                           :
                      Appellant,           :        No. 07-CV-7924 (GEL)
                                           :
         v.                                :
                                           :
PHILLIP R. BENNETT, et al.,                :        [caption continued on next page]
                                           :
                      Appellees.           :
---------------------------------------------------x

**APPELLEE INSUREDS' JOINT RESPONSE TO AXIS
REINSURANCE COMPANY'S SUPPLEMENTAL BRIEF
CONCERNING EFFECT OF MAGGIO PLEA**

413555.1

```
---------------------------------------x
In re                                  :
                                       :    Chapter 11
REFCO, INC., et al.,                   :    Case No. 05-60006 (RDD)
                                       :    (Jointly Administered)
                  Debtors.             :
---------------------------------------x
AXIS REINSURANCE COMPANY,              :
                                       :
                  Plaintiff,           :
                                       :    Adv. Proc. No. 07-01712 (RDD)
            v.                         :
                                       :
PHILLIP R. BENNETT, et al.,            :
                                       :
                  Defendants.          :
---------------------------------------x
TONE N. GRANT, et al.,                 :
                                       :
                  Plaintiffs,          :
                                       :
            v.                         :    Adv. Proc. No. 07-2005 (RDD)
                                       :
AXIS REINSURANCE COMPANY,              :
                                       :
                  Defendant.           :
---------------------------------------x
LEO R. BREITMAN, et al.,               :
                                       :
                  Plaintiffs,          :
                                       :
            v.                         :    Adv. Proc. No. 07-2032 (RDD)
                                       :
AXIS REINSURANCE COMPANY,              :
                                       :
                  Defendant.           :
---------------------------------------x
AXIS REINSURANCE COMPANY,              :    (1) No. 07-CV-9420 (GEL)
                                       :    (2) No. 07-CV-9842 (GEL)
                  Plaintiff,           :    (3) No. 07-CV-10302 (GEL)
                                       :
            v.                         :
                                       :
PHILLIP R. BENNETT, et al.,            :
                                       :
                  Defendants.          :
---------------------------------------x
TONE N. GRANT, et al.,                 :
                                       :
                  Plaintiffs,          :
                                       :
            v.                         :    No. 07-CV-9843 (GEL)
                                       :
AXIS REINSURANCE COMPANY,              :
                                       :
                  Defendant.           :
---------------------------------------x
```

413555.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

AGRUMENT ....................................................................................................................... 5

AXIS'S MOTION FOR A STAY PENDING APPEAL
SHOULD BE DENIED YET AGAIN.................................................................................. 5

    A.    Axis Has Not Shown a Strong Likelihood, or Even a Substantial
           Possibility, of Success on the Merits ....................................................... 6

    B.    Axis Has Not Demonstrated That It Will
           Suffer Irreparable Injury Absent a Stay .................................................. 9

    C.    The Insureds Will Be Severely and Immediately
           Harmed by a Stay................................................................................... 11

    D.    A Stay Would Not Be in the Public Interest ............................................ 13

CONCLUSION.................................................................................................................... 14

413555.1

i

### TABLE OF AUTHORITIES

#### CASES

*In re Adelphia Commc'ns Corp.,*
    323 B.R. 345 (S.D.N.Y. 2005).......................................................................12

*In re Adelphia Commc'ns Corp.,*
    361 B.R. 337 (S.D.N.Y. 2007)......................................................................5, 6

*In re Allied Digital Tech. Corp.,*
    306 B.R. 505 (Bankr. D. Del. 2004) ...........................................................12

*Bergonzi v. Rite Aid Corp.,*
    No. Civ. A-20453, 2003 WL. 22407303 (Del. Ch. Ct. Oct. 20, 2003)...................... 8-9

*In re Bogdanovich,*
    No. 00 Civ. 2266 (JGK), 2000 WL 1708163 (S.D.N.Y. Nov. 14, 2000) .....................5

*Brenntag Int'l Chems., Inc v. Bank of India,* .......................................................10
    175 F.3d 245 (2d Cir. 1999)

*Dubose v. Pierce,*
    761 F.2d 913 (2d Cir. 1985)...........................................................................5

*In re Enron Sec., Deriv. & ERISA Litig.,*
    391 F. Supp. 2d 541 (S.D. Tex. 2005) ...........................................................8

*Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.,*
    No. 99 Civ. 10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ......................10

*Great Am. Ins. Co. v. Gross,*
    No. 3:05CV159, 2005 U.S. Dist. LEXIS 8003 (E.D. Va. May 3, 2005).......8-9, 11-13

*Hirschfeld v. Bd. of Elections in the City of N.Y.,*
    984 F.2d 35 (2d Cir.1993)..............................................................................5

*Mitsubishi Power Sys., Inc. v. The Shaw Group, Inc.,*
    No. 04 Civ. 1251 (RMB), 2004 WL 527047 (S.D.N.Y. Mar. 16, 2004)....................10

*In re Prudential Lines, Inc.,*
    No. 93 Civ. 1481, 1994 WL. 142017 (S.D.N.Y. Apr. 20, 1994)..............................6-7

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999)............................................................................5

*In re Tower Automotive Inc.*,
    241 F.R.D. 162 (S.D.N.Y. 2006) ...................................................................................6

*United States v. Gottlieb*,
    817 F.2d 475 (8th Cir. 1987) ........................................................................................9

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    44 F.3d 1082 (2d Cir. 1995)........................................................................................12

*In re W.T. Grant Co.*,
    432 F. Supp. 105 (S.D.N.Y. 1977) ...............................................................................7

*In re WorldCom, Inc. Sec. Litigation*,
    354 F. Supp. 2d 455 (S.D.N.Y. 2005)................................................................... 12-14

## STATUTES

Fed. R. Bank. P. 9024 .......................................................................................................7

Fed. R. Civ. P. 60(b) .........................................................................................................7

## PRELIMINARY STATEMENT

By Order dated January 2, 2008 (the "January 2 Order"), this Court denied the letter application of Axis Reinsurance Company ("Axis") for an immediate stay of the October 19, 2007 Order (the "October 19 Order") of the Bankruptcy Court (Drain, B.J.), requiring Axis to advance defense costs, pending this Court's determination of Axis's appeal from that Order. Axis based its request on the recent guilty plea of Santo C. Maggio, a former officer of Refco and an insured under the Axis policy. In denying Axis's request in the January 2 Order, the Court held that Axis's letter brief had "failed to make an adequate showing of the first three factors" pertinent to a stay application. The Court nevertheless directed the parties to "address the issues raised by the Maggio plea in supplemental briefs to the Court."

Axis did submit a supplemental brief, but, as is clear from even a cursory reading, that brief largely repeats the contents of Axis's prior letter application to the Court and rehashes its arguments on appeal, rather than addressing any issues purportedly raised by the Maggio plea. Indeed, Axis discusses the Maggio plea only in passing, and provides the Court with no additional facts or arguments to cure its previous "fail[ure] to make an adequate showing" in support of a stay.

As discussed below, the Court should once again deny Axis's request for a stay. Axis has made no showing that the Maggio plea -- the lynchpin of its stay motion -- has even marginally improved, let alone established a likelihood of success on, the merits of its appeal. Nor could Axis make such a showing, given that the Maggio plea, which occurred well after entry of the October 19 Order, had no bearing on the Bankruptcy Court's rulings from which Axis now appeals and is not relevant to any issue on appeal. Axis believes that the plea is relevant to the ultimate issue of coverage under Axis's policy -- an issue not before this Court on

*413555.1*

appeal -- but even as to that issue, in denying Axis's initial request for a stay pending appeal, the Court observed that "whether the guilty plea of the insured Santo Maggio defeats coverage for all the insureds depends on whether certain 'warranty' documents form part of the policy, a contested issue the merits of which cannot be discerned adequately on the minimal briefing submitted." Axis's supplemental submission does nothing to advance the merits of that contested issue.

Nor does Axis's submission cure the deficiencies in its prior effort to show that it will be irreparably injured in the absence of a stay or that, on the other hand, the insureds would not suffer substantial harm if a stay were granted. In its January 2 Order, the Court found that "since the advancement of fees represents simply the payment of money that in principle can be recovered if the Order is reversed, Axis has not established irreparable injury," whereas "the insureds, including certain individuals who face criminal prosecution, will likely be severely and immediately harmed if advancement of their legal fees is suddenly stopped pending resolution of the pending case." Axis's supplemental brief provides no basis for altering those conclusions -- conclusions on which the Maggio plea necessarily has no bearing. Furthermore, even if the Court were to consider the public interest in deciding Axis's stay motion (which it should not), it is clear that the public interest favors denying the motion. The availability and enforcement of D&O policies, including their provisions on advancement obligations, are important factors in attracting individuals to serve public corporations as officers and directors. The Maggio plea does not change that fact.

In sum, in response to a directive from the Court to show how the Maggio plea affects Axis's motion for a stay pending appeal and/or the merits of the appeal itself, Axis has

come forward with nothing of substance. Its stay motion should be denied for a second time, and the October 19 Order should be affirmed.

## STATEMENT OF FACTS

This Court is aware of the basic facts underlying Axis's appeal from the October 19 Order, having received completed briefing on the appeal, which remains under consideration. We set forth the salient facts and procedural history pertinent to Axis's supplemental brief.

Axis appeals from the October 19 Order of the Bankruptcy Court granting the insureds' motions for summary judgment and requiring Axis to advance defense costs pending a final determination of coverage issues. (Axis also appeals from the Bankruptcy Court's denial of Axis's motion to dismiss counterclaims seeking a declaratory judgment of coverage.) While rejecting Axis's position that Axis has the right to unilaterally determine the applicability of exclusions for the purposes of advancing defense costs, the Bankruptcy Court did not rule on the applicability of any of the exclusions or other alleged defenses to coverage relied on by Axis. Instead the court concluded that those issues would need to be determined in the underlying coverage litigation.

In opposing the insureds' summary judgment motion, Axis advanced the same argument it now makes, *i.e.*, that certain warranty documents, which Axis claims are part of the policy, exclude coverage.[1] Then, as now, the insureds disputed the effect of these documents, arguing that neither document was properly part of the policy. In granting summary judgment, the Bankruptcy Court concluded that the issues relating to these items would have to be

---

[1] The two principal documents on which Axis relies are a warranty letter signed by Philip R. Bennett in which he stated that no insured had knowledge of any fact which might afford grounds for any claim, and a "knowledge exclusion" endorsement which purports to bar coverage for all insureds for claims arising out of any facts as to which any insured had knowledge as of the inception of the policy.

determined as part of the underlying coverage dispute. (Transcript of Hearing on Summary

Judgment Motion Before the Honorable Robert D. Drain, October 12, 2007 (attached as Ex. H to

the Gilbride Declaration submitted on Axis's appeal, at 41-43.)

On December 19, 2007, while Axis's appeal from the October 19 Order was

pending, Santo C. Maggio pleaded guilty to four counts of fraud, including two counts of

securities fraud, one count of conspiracy to commit fraud and one count of wire fraud. On

December 20, 2007, Axis's counsel wrote to this Court, and requested an immediate stay of the

October 19 Order pending its appeal from that Order. Axis argued that such a stay was

warranted because Maggio in his plea admitted to participation in fraudulent activities at Refco

prior to the inception of the Axis policy, and implicated other insureds in that activity. (Letter to

Court from Joan M. Gilbride, Esq., dated December 19, 2007, at 2.) Axis argued that Maggio's

plea "established" that Axis's unilateral denial of coverage was "correct, as a matter of law."

(Id.) It further argued that absent the requested stay, Axis's appeal would become moot, because

if it succeeded on the appeal, Axis would have little realistic hope of recovering the

advancements from the insureds. (Id., at 2-3.)

The Court denied Axis's request for a stay by the January 2 Order, holding that

the argument that the Maggio guilty plea defeats coverage for all insureds "depends on whether

certain 'warranty' documents form part of the policy, a contested issue the merits of which

cannot be discerned adequately on the minimal briefing submitted." The Court also held that

since the advancement of fees "represents simply the payment of money that in principle can be

recovered if the Order is reversed," Axis had not established irreparable injury. Additionally, the

Court recognized that the insureds, including the three indicted insureds (who face trial in March

2008), "will likely be severely and immediately harmed if advancement of their legal fees is

suddenly stopped pending resolution of the pending case." Nevertheless, the Court "directed

[the parties] to address the issues raised by the Maggio plea in supplemental briefs to the Court."

## ARGUMENT

### AXIS'S MOTION FOR A STAY PENDING APPEAL
### SHOULD BE DENIED YET AGAIN

The Court recited the applicable standard for granting a stay pending appeal in its

January 2 Order: "To obtain a stay pending appeal [of an order of the Bankruptcy Court], [a

party] must show: (1) a strong likelihood of success on the merits of the appeal; (2) that the

movant will suffer irreparable injury if the stay is denied; (3) that no substantial harm will be

suffered by others if the stay is granted; and (4) that the stay is in the public's interest." *In re*

*Bogdanovich*, No. 00 Civ. 2266 (JGK), 2000 WL 1708163, at *3 (S.D.N.Y. Nov. 14, 2000)

(*citing Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).[2]

---

[2]   In its supplemental brief, Axis recites a slightly different standard.  In particular, Axis cites to cases observing that, on motion for a stay pending appeal, a court is to consider "whether a movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal" -- not, as this Court previously noted, a "strong likelihood of success on the merits." (Axis Supp. Br. at 4-5.)  In fact, the Second Circuit and District Courts within the Circuit have recited both formulations of the standard.  *Compare Rodriguez*, 175 F.3d at 234 ("To determine whether a stay of an order pending appeal is appropriate, a court must evaluate . . . (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits.") *with Hirschfeld v. Bd. of Elections in the City of N.Y.*, 984 F.2d 35, 39 (2d Cir.1993) ("In this Circuit, four factors are considered before staying the actions of a lower court [including] (3) whether the movant has demonstrated a 'substantial possibility, although less than a likelihood of success' on the appeal.") (*quoting Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir.1985)); *and compare In re Bogdanovich, supra*, 2000 WL 1708163, at *3 (quoted above) *with In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 346 (S.D.N.Y. 2007) ("Four factor are considered [on a motion for stay pending appeal, including] . . . (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal").

Axis also cites case law for the proposition that "[t]he decision to grant the stay involves a balancing of four factors, wherein a stronger showing on one factor may excuse a lesser showing on another." (Axis Supp. Br. at 5 (*citing In re Adelphia Commc'ns Corp.*, 361 B.R. at 346)). Even the cases Axis cites for that proposition, however, recognize that "[a] number of lower courts within the Second Circuit have concluded that the failure of the movant to satisfy any one

In the January 2 Order, the Court held that Axis failed to make an adequate showing of any of the first three factors (and, as a result, found it unnecessary to consider the fourth factor, *i.e.*, the public interest.) Axis's supplemental brief provides the Court with no basis for altering that conclusion.

**A.      Axis Has Not Shown a Strong Likelihood, or Even a Substantial Possibility, of Success on the Merits**

Axis does not argue that the Maggio plea is dispositive of the merits of its appeal. It does not even argue that the plea materially alters the merits. Axis contends only that the plea is supportive or corroborative of its existing arguments. According to Axis, the Maggio plea "serves to *underscore* what Axis has been arguing all along," *i.e.*, that it rightfully determined that there is no coverage under the policy and thus is not required to pay defense costs as incurred. (Axis Supp. Br. at 4 (emphasis added).)   Although Axis used different words, it made the same argument in its letter application to the Court. The Court properly rejected the argument then, and should reject it again now.

As a matter of law, the Maggio plea -- which occurred a full two months after the October 19 Order -- cannot give rise to a substantial possibility of success on the merits of Axis's appeal; indeed, it cannot impact the appeal at all.  It is well settled that a court's appellate review of a bankruptcy court order is "limited to 'all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision.'" *In re Tower Automotive Inc.*, 241 F.R.D. 162, 171 n.8 (S.D.N.Y. 2006) (*quoting In re Prudential*

---

of the four factors a motion for a stay pending appeal of a bankruptcy court 'dooms the motion.'" *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346–47.

In deciding Axis's motion, the Court need not reconcile these differences in the case law. Under even the most favorable reading to Axis of the standard, it is clear that Axis's motion for a stay pending appeal -- regardless of the Maggio plea -- should be denied.

*Lines, Inc.*, No. 93 Civ. 1481, 1994 WL 142017, at *2 (S.D.N.Y. Apr. 20, 1994)); *accord In re W.T. Grant Co.*, 432 F.Supp. 105, 107 (S.D.N.Y. 1977) ("The record on appeal should contain all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision."), *aff'd*, 559 F.2d 1206 (2d Cir. 1977). The Maggio plea, which did not yet exist on October 19, was obviously not a document that bore on or was considered by the Bankruptcy Court in issuing the October 19 Order. Accordingly, the Court cannot consider it now in the context of Axis's appeal.[3] Moreover, since the Bankruptcy Court did not make any ruling on the applicability of any of the exclusions relied on by Axis (but determined instead that any such ruling would have to await determination in the underlying coverage litigation), Axis's belief that the Maggio plea is relevant to coverage could not make that plea -- no matter when it occurred -- relevant to the merits of the pending appeal.

Even if it were appropriate for the Court to consider the Maggio plea in the context of the appeal, Axis fails to offer anything more in its supplemental brief than what it offered in its letter application, which was rejected as insufficient. In the January 2 Order, the Court observed that the issue of whether the Maggio plea defeats coverage for all insureds "depends on whether certain 'warranty' documents form part of the policy, a contested issue the merits of which cannot be discerned adequately on the minimal briefing submitted."[4] Having

---

[3] The recourse that the Federal Rules of Civil Procedure, and hence the Bankruptcy Rules (which incorporate them), provide to litigants, such as Axis, who believe they are entitled to relief from an order based on subsequent events is a motion for reconsideration. *See* Fed. R. Civ. P. 60(b); Fed. R. Bank. P. 9024. Axis has not made such a motion.

[4] The parties' dispute concerning the validity of the warranty documents is described in various motion papers submitted below, which now form part of the record on appeal, and is not repeated at length herein. In brief, the insureds contend that: (1) the January 14, 2005 warranty letter signed by Bennett is not part of the Axis policy, because the letter is not incorporated or referred to in the policy, the endorsements or the binder for the policy and evidence indicates that the letter was executed in connection with a prior policy; (2) the knowledge exclusion also is not party of the Axis policy, because it, too, is not included in the binder for the policy and evidence

been afforded the opportunity to supplement its "minimal briefing" in order to describe the effect of the Maggio plea, Axis has nothing to add. It argues that because "Maggio, an Insured under the Axis Policy, pleaded guilty to – among several other things – securities fraud – and admitted knowledge of the fraud at Refco prior to the underwriting of the Axis Policy[,] . . . [i]t is now beyond cavil that the claim is excluded from coverage" under exclusions in certain warranty documents. (Axis Supp. Br. at 6-7). But this argument begs the question whether the warranty documents form part of the policy in the first place. Axis simply assumes -- without any factual or legal showing -- that the exclusions apply.

Moreover, assuming *arguendo* that the warranty documents were part of the Axis policy, Axis still has not shown that the Maggio plea excuses it from paying defense costs. As the Bankruptcy Court concluded, the plain language of the Axis policy provides that "absent a final determination by an objective fact finder, the insurer is obligated to pay defense costs that the insured reasonably contends are covered, notwithstanding the insurer's view that those costs are excluded or not covered under the policy." (Axis Desig. Item 36, at 13.) Ample case law holds that a guilty plea is not a final determination, and thus does not excuse an insurer from its advancement obligations on the basis of an exclusion. *See, e.g.*, *In re Enron Sec., Deriv. & ERISA Litig.*, 391 F.Supp. 2d 541, 574-75 (S.D. Tex. 2005) (concluding that "the majority view, requiring payment of defense expenses up until a final adjudication, is the better rule" and that a guilty plea is not a final adjudication); *Great Am. Ins. Co. v. Gross*, No. 3:05CV159, 2005 U.S. Dist. LEXIS 8003, at * 18 (E.D. Va. May 3, 2005) (finding that the "mere entry of [insureds']

---

indicates that the exclusion was not intended to be part of the policy; and (3) Bennett's failure to answer an entire question in the application, as a matter of law, cannot constitute grounds for denial of coverage. *See, e.g.*, Reply Memorandum of Defendants Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip Silverman in Support of Motion to Require Axis to Pay Defense Costs, at 10-16.

guilty pleas is not enough to bar entitlement to Policy benefits [*i.e.*, defense costs] under the

Fraud Exclusion"); *Bergonzi v. Rite Aid Corp.*, No. Civ. A-20453, 2003 WL 22407303, at *2-3

(Del. Ch. Ct. Oct. 20, 2003) (noting that "there is Delaware Supreme Court and United States

Supreme Court authority that the entry of a guilty plea, before sentencing, is *not* a final

disposition," and thus holding that, notwithstanding the insured's guilty plea, he "has a presently

enforceable right to advancement"); *accord United States v. Gottlieb*, 817 F.2d 475, 476 (8th Cir.

1987) (holding that the denial of a motion to withdraw a guilty plea is not a final judgment

because the "court still must sentence [the defendant] and enter judgment"). Axis's

supplemental brief does not even address, let alone distinguish, this body of case law.[5]

In short, Axis's supplemental brief provides no basis for the Court to alter its prior

conclusion that Axis has failed to make a sufficient showing on the merits to justify a stay.

**B.   Axis Has Not Demonstrated That It Will Suffer Irreparable Injury Absent a Stay**

Axis effectively concedes that the Maggio plea is irrelevant to the Court's

consideration of the irreparable harm factor. Indeed, Axis does not even mention the plea in the

context of arguing that it will be irreparably harmed if its stay motion is denied. Rather, Axis is

left merely to expand upon the argument it previously advanced — *i.e.*, that, absent a stay, it will

be irreparably injured because, if its appeal is granted, "it will have no practical ability to recover

the amounts paid" while the appeal is pending. (Axis Supp. Br. at 8.) In denying Axis's prior

motion for a stay in the January 2 Order, the Court rejected this argument.

---

[5] In addition, as the insureds pointed out in motion papers below, the severability provisions in
the primary (U.S. Specialty) policy, to which the Axis policy follows form, preclude the
imputation of Maggio's actions or knowledge to other insureds, and thus Maggio's plea could
only be a basis for denying coverage as to Maggio. *See, e.g.*, Memorandum of Defendants
Dennis Klejna, Joseph Murphy, William M. Sexton, Gerald Sherer and Philip Silverman in
Support of Motion to Require Axis to Pay Defense Costs, at 8 n.7.

Axis's citation to additional case law does not warrant a different result. While the language of the cases cited by Axis broadly states that irreparable injury exists when "there is a substantial chance that upon the final resolution of the action the parties cannot be returned to the positions they previously occupied," the actual holdings of the cases are not nearly as broad. (Axis Supp. Br. at 9 (*quoting Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).) Rather, the cases recognize an "exception" to the general rule that monetary injury does not constitute irreparable harm -- known as the "insolvency" exception -- where "the defendant is insolvent or insolvency is threatened." *Federated Strategic Income Fund v. Mechala Group Jamaica Ltd.*, No. 99 Civ. 10517 (HB), 1999 WL 993648, at * 8 (S.D.N.Y. Nov. 2, 1999) (cited by Axis); *see Brenntag Int'l Chems., Inc.*, 175 F.3d at 249 ("[C]ourts have excepted from the general rule regarding monetary injury situations involving obligations owned by insolvents"); *Mitsubishi Power Sys., Inc. v. The Shaw Group, Inc.*, No. 04 Civ. 1251 (RMB), 2004 WL 527047, at * 2 (S.D.N.Y. Mar. 16, 2004) ("Courts have generally applied this limited exception where insolvency is imminent"). Axis has not made any showing that this "limited exception" applies under the circumstances here. In fact, Axis has presented no evidence to support its allegation as to its purported inability to recoup monies advanced from any of the insureds.

Notably, Axis has not cited a single case involving D&O insurance where a court has permitted the insurer to withhold defense costs because the insured might not be able to pay back the advanced funds if the insurer ultimately wins the coverage dispute. To the contrary, at least one court has held that while advancing defense costs to insureds -- even insureds who have pled guilty to criminal charges -- may expose the insurer to increased monetary liability, "this monetary liability was contractually agreed to by the parties"; hence, the insurer "cannot be

irreparably harmed by doing that which it agreed to do under the plain language under the Policy or by doing what it was contractually obligated to do." *Great Amer. Ins. Co.*, 2005 U.S. Dist. LEXIS 8003, at * 15-16.

Any other conclusion would countenance the Catch-22 that Axis and other insurers seek to employ in order to evade their advancement obligations:  If the insured is of modest means, then the insurer would be entitled to withhold defense costs pending a determination of coverage on the theory that "it will have no practical ability to recover the amounts paid" if it later prevails in its coverage dispute. (Axis Supp. Br. at 8.)  On the other hand, if the insured has means, then the insurer would be entitled to withhold defense costs pending a determination of coverage on the theory that the insured will not suffer substantial harm if he has to pay attorneys' fees out of his or her own pocket while coverage is decided. (Axis Supp. Br. at 10-11.)  While such a Catch-22 is favored by Axis and other insurers, it is not favored by the law.  Accordingly, notwithstanding the Maggio plea, Axis's supplemental brief, like its letter brief, fails to establish the second stay factor -- that Axis will be irreparably harmed in the absence of a stay.

## C.    The Insureds Will Be Severely and Immediately Harmed by a Stay

In the January 2 Order, the Court found that "the insureds, including certain individuals who face criminal prosecution, will likely be severely and immediately harmed if advancement of their legal fees is suddenly stopped pending resolution of the pending case." The Maggio plea does not alter that finding, and Axis, in its supplemental brief, does not contend otherwise.  Rather, Axis disputes the Court's prior finding on the basis of its bare assertion -- ungrounded in any evidentiary showing -- that "[i]t certainly is not uncommon for law firms to bill clients on bi-monthly or even quarterly schedules" and thus that a delay in payment of

defense costs would not disrupt the insured's defense efforts or arrangements. (Axis Supp. Br. at 10.)[6]

Axis's position finds no support in the case law, which overwhelmingly holds that insureds, such as the Appellees, face irreparable harm absent advancement. *See In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005) ("The failure to receive defense costs when they are incurred constitutes 'an immediate and direct injury'") (*quoting Wedtech Corp. v. Fed. Ins. Co.*, 740 F. Supp. 214, 221 (S.D.N.Y. 1990)); *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 374 (inability of directors and/or officers to defend themselves has serious consequences, and is irreparable); *Great Am. Ins. Co.*, 2005 U.S. Dist. LEXIS 8003, at * 18 (denial of preliminary injunction requiring advancement "would essentially cripple [insureds'] defense and leave them with no ability to defend their interests"); *In re Allied Digital Tech. Corp.*, 306 B.R. 505, 513 (Bankr. D. Del. 2004) (granting directors and officers relief from stay to obtain payment for defense costs, finding that they otherwise would be prevented from conducting a meaningful defense to the Trustee's claims "'and may suffer substantial and irreparable harm'" (citation omitted)). Not surprisingly, Axis does not cite a single case supporting its position that, under the circumstances here, the insureds would not be substantially harmed if Axis were permitted to cease advancing defense costs.

---

[6]  Axis also faults the insureds for not having provided the Court with proof of their economic circumstances. In so doing, Axis improperly seeks to shift the burden on its motion. As the movant, it is Axis's burden to demonstrate that the factors to be considered on a stay motion weigh in its favor; it is not the insureds' burden to demonstrate that the requirements for a stay are not satisfied. *See United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082,1084 (2d Cir. 1995) (the party seeking a stay bears the burden of proving its entitlement to that relief). Moreover, even if Axis's assumptions concerning the insureds' arrangements with their lawyers were correct, its position would be unavailing. Axis points to no authority -- and we are aware of none -- permitting an appellant to obtain a stay on appeal by showing that the harm resulting from such a stay would be borne by the appellees' counsel, rather than solely by the appellees themselves.

In sum, the January 2 Order properly held that, if a stay were granted, the insureds would suffer severe and immediate injury, and Axis's supplemental brief does not demonstrate otherwise.

**D.    A Stay Would Not Be in the Public Interest**

The Court previously found that, because Axis had failed to establish that any of the first three factors weigh in favor of a stay, the Court need not address the fourth factor, *i.e.*, whether public interest supports the granting of a stay. Nothing in Axis's supplemental brief requires the Court to alter that approach. Nevertheless, to the extent the Court determines to consider the public interest factor, it should find that that factor supports denying Axis's stay motion.

Axis claims that "no public policy is served by gifting the Insureds millions of dollars to reward them for successfully defrauding their Insurer." (Axis Supp. Br. at 11.) In other words, Axis's position is that permitting *accused* wrongdoers -- for at this point that is all the insureds are -- to collect insurance, even as advancement subject to repayment if there is no coverage, is contrary to the public interest. (Axis Supp. Br. at 11.) But insuring accused wrongdoers is precisely what D&O insurers contract to do. Thus, as one court put it, "[p]ublic policy is served by requiring [the insurer] to continue forwarding the costs of defense to [insureds] because it is in the public interest to see parties abide by their contractual obligations." *Great Am. Ins. Co.*, 2005 U.S. Dist. LEXIS 8003, at * 19 (granting preliminary injunction obligating insurer to advance defense costs to insureds who pled guilty). Moreover, as Judge Cote recognized in *Worldcom,* if the insureds cannot rely on the coverage provided by D&O insurance policies, companies will find it difficult to retain capable officers and directors. *See In*

*re WorldCom Sec. Litig.*, 354 F. Supp. 2d at 470. These policy considerations weigh against granting Axis's stay motion.

Accordingly, Axis's supplemental brief, just like its letter brief, fails to establish that any of the factors to be considered on a stay motion favor Axis.

## CONCLUSION

For the reasons set forth above, Axis's request for a stay of the Order of the Bankruptcy Court dated October 19, 2007 should be denied. Moreover, because Axis has not demonstrated that the Maggio plea has any effect on its appeal, the October 19 Order should be affirmed.

Dated: January 28, 2008
        New York, New York

/s Michael F. Walsh

Greg A. Danilow, Esq. (GD 1621)
Michael F. Walsh, Esq. (MW 8000)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Appellees Leo R. Breitman,*
*Nathan Gantcher, David V. Harkins,*
*Scott L. Jaeckel, Thomas H. Lee,*
*Ronald L. O'Kelley, and Scott A. Schoen*

/s Helen B. Kim

Helen B. Kim, Esq. (HK 8757)

BAKER & HOSTETLER LLP
12100 Wilshire Blvd., Suite 1500
Los Angeles, CA 90025
Telephone: (310) 979-8460
Facsimile: (310) 820-8859

*Attorneys for Appellee Dennis A. Klejna*

/s Norman L. Eisen

Norman L. Eisen, Esq. (NE 1198)
Thomas G. Macauley (TM 3944)
Laura E. Neish (LN 0040)

ZUCKERMAN SPAEDER LLP
1540 Broadway, Suite 1604
New York, NY 10036
Telephone: (212) 704-9600

-and-

HANNAFAN & HANNAFAN, Ltd.
One East Wacker Drive, Suite 2800
Chicago, IL 60601
Telephone: (312) 527-0055
Michael T. Hannafan
Blake T. Hannafan

*Co-Attorneys for Appellee Tone N. Grant*

/s Ivan O. Kline

Stuart I. Friedman, Esq. (SF 9186)
Ivan Kline, Esq. (IK 9591)

FRIEDMAN & WITTENSTEIN
A Professional Corporation
600 Lexington Avenue
New York, NY 10022
Telephone: (212) 750-8700
Facsimile: (212) 223-8391

*Attorneys for Appellees William M.
Sexton and Gerald M. Sherer*

/s John J. Jerome

John J. Jerome (JJ 2413)
Timothy E. Hoeffner (TH 4195)

SAUL EWING LLP
245 Park Avenue, 24th Floor
New York, NY 10167
Telephone: (212) 672-1996
Facsimile: (212) 672-1920

*Attorneys for Appellee Joseph Murphy*

/s Jeffrey T. Golenbock

Jeffrey T. Golenbock, Esq. (JG 2217)
Adam C. Silverstein, Esq. (AS 4876)

GOLENBOCK EISEMAN ASSOR
BELL & PESKOE LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Telephone: (212) 907-7300

*Attorneys for Appellee Phillip R. Bennett*

/s Richard Cashman

Richard Cashman, Esq. (RC 4769)

HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 832-8300
Facsimile: (212) 763-7600

*Attorneys for Appellee Philip Silverman*

/s Barbara Moses

Barbara Moses, Esq. (BM 2952)
Rachel Korenblat, Esq. (RK 0170)

MORVILLO, ABRAMOWITZ,
GRAND, IASON, ANELLO &
BOHRER, P.C.
565 Fifth Avenue
New York, NY 10017
Telephone: (212) 856-9600
Facsimile: (212) 856-9494

-and-

LAW OFFICES OF GABRIEL DEL
VIRGINIA
641 Lexington Avenue, 21st Floor
New York, NY 10022
Telephone: (212) 371-5478
Gabriel Del Virginia (GV 4951)

*Co-attorneys for Appellee Robert C.
Trosten*

# EXHIBIT N

# KAUFMAN BORGEEST & RYAN LLP

### ATTORNEYS AT LAW

200 SUMMIT LAKE DRIVE
VALHALLA, NEW YORK 10595

TELEPHONE: 914-741-6100
FACSIMILE: 914-741-0025
www.kbrlaw.com

ANDREW S. KAUFMAN†
WAYNE E. BORGEEST
JULIANNA RYAN
LEE E. BERGER
LORETTA A. KREZ*
JOAN M. GILBRIDE†‡
JONATHAN D. RUBIN‡
JUDITH M. FISHER*
A. MICHAEL FURMAN*
MICHAEL P. MEZZACAPPA*‡
DOUGLAS J. FITZMORRIS
STEVEN D. WEINER
SCOTT A. SCHECHTER
CHRISTOPHER R. DiGIACINTO*
JONATHAN B. BRUNO‡
PAUL J. COLUCCI
MARGARET J. DAVINO*††
JEFFREY C. GERSON†††
ROCCO P. MATRA◇
JOHN B. MULLAHY*
MELINDA B. MARGOLIES*
JEFFREY S. WHITTINGTON◇
CHRISTINE HEENAN

OF COUNSEL:
MARIBETH SLEVIN
SHERRI M. FELDMAN◇

APPELLATE COUNSEL:
JACQUELINE MANDELL

JONATHAN R. HAMMERMAN
HEATHER LASCHEVER*
CAROL S. DOTY†††
BARBARA-ANN M. COSTELLO
ELIZABETH O'BRIEN TOTTEN
RICHARD A. PRETI
REBECCA KILDUFF
KRISTOPHER M. DENNIS*
BELINDA DODDS-MARSHALL*‡
JULIE A. KEEGAN
STEPHANIE B. GITNIK
JEFFREY W. KLEINER*
JENNIFER BIRNBAUM
JENNIFER C. JANES
R. EVON HOWARD*
LEONARD B. COOPER‡†
ANDREW R. JONES
KEITH L. KAPLAN††
VINCENT C. ANSALDI††
DAVID J. VARRIALE*††

DOUGLAS J. DOMSKY
TIMOTHY E. McCARTHY*
JEFFREY A. GRALNICK
TRACEY REISER-PERTOSO††
KATHERINE J. O'BRIEN††
DAMIEN SMITH
ANDREW S. KOWLOWITZ*◇
MATTHEW M. FERGUSON◇
D. RYAN BLOOMQUIST
CRISTINA LA MARCA
EDWARD R. NORIEGA◇
MATTHEW SPERGEL
PAUL T. CURLEY
ROBERT A. BENJAMIN*
KATHRYN C. COLLINS
JANINE C. CIALLELLA††
ELAN R. KANDEL*††
BRIAN M. SHER*
MARGARET M. O'CONNOR
JOSHUA B. SANDBERG
THOMAS L. GALLIVAN
EILEEN R. FULLERTON††
DENNIS J. DOZIS*
LYNN M. DUKETTE
RISA D. TARKOFF*
MILLI SHAH*

KATHRYN M. WALSH
LAURA B. JUFFA
KATELIN B. O'ROURKE
BETSY PHILIP
SARA K. WALKER
KERI B. WASSERSTEIN*
REMI D. FLAISHMAN*
MELISSA A. MANNING*
THOMAS LOOKSTEIN
ROBERT E. FIKETE
JULIE A. MICKIEWICZ*
LORRAINE C. SYLVESTER*
JESSICA MOLINARES
JENNIFER M. HAMILTON

† ALSO ADMITTED IN PA
* ALSO ADMITTED IN NJ
‡ ALSO ADMITTED IN DC
†† ALSO ADMITTED IN CT
‡ ALSO ADMITTED IN MA
◇ ALSO ADMITTED IN TX
◆ ALSO ADMITTED IN FL
◇ ALSO ADMITTED IN CA
■ ADMITTED IN NJ ONLY
□ ADMITTED IN CA ONLY
● ADMITTED IN CT ONLY
☆ BARRISTER AT LAW
ADMITTED IN ENGLAND & WALES

March 12, 2008

**VIA FEDEX and EMAIL**
Honorable Robert D. Drain
United States Bankruptcy Court for the
Southern District of New York
Alexander Hamilton U.S. Custom House,
Room 610
One Bowling Green
New York, NY 10004

| Re: | Adversary Proceeding | : | Grant v. Illinois National Ins. Co., et al. |
|---|---|---|---|
| | District Court Proceeding | : | AXIS v. Bennett, et al. |
| | Index Nos. | : | 08-1129-RDD and 07-7924-GEL, et al. |

Your Honor:

As Your Honor may recall, we represent AXIS Reinsurance Company ("AXIS"). We write to bring to Your Honor's attention the fact that serious and consequential misrepresentations were made to this Court and to AXIS in connection with prior proceedings before Your Honor. It has just come to the attention of AXIS that other counsel misled this Court and AXIS into believing that, absent an immediate injunctive Order requiring AXIS to advance their defense costs, their clients would be without the ability to fund their defense of criminal and civil actions. Two days ago, AXIS learned that this was not true. Based on the complaint filed two days ago in *Grant v. Illinois National Ins. Co., et al.* (Bankr. SDNY, 08-1129-RDD, Doc. 1), AXIS has now learned that, at the time they sought preliminary injunctive relief from this Court, another insurer already had agreed to fund their defense, and counsel withheld this critical information from this Court. Moreover, and regretfully, counsels' misrepresentations were made in order to obtain Orders from this Court that directly and financially benefited counsel and worked a grave injustice to our client, AXIS.

Throughout the late summer and early fall of 2007, Your Honor was presented with motions for preliminary injunctive relief, and ultimately for permanent injunctive relief through

partial summary judgment.[1] Over the objections of AXIS, Your Honor ordered AXIS to advance defense costs to the Insureds, including the Indicted Insureds such as Mr. Grant.[2]

The history of the Indicted Insureds' motion for preliminary injunctive relief is well documented. On September 4, 2007, Mr. Grant and the other Indicted Insureds filed a complaint seeking declaratory and injunctive relief requiring AXIS to advance their defense costs prior to an adjudication of coverage under the AXIS Policy. The following day, on September 5, 2007, the Indicted Insureds filed a motion for preliminary injunction requiring AXIS to advance their defense costs. This motion for preliminary injunction was supported by the Declaration of counsel and brought by Order to Show Cause.[3]

An essential prerequisite to obtaining a preliminary injunction in the Second Circuit is, of course, a showing of irreparable harm. Counsel represented to the Court and to AXIS that, absent an order requiring AXIS to pay their defense costs, the Insureds would left helpless and financially unable to fund the defense of the criminal and civil actions. The Insureds and their counsel argued they were at the mercy of AXIS and that their very freedom and liberty were at

---

[1] On July 12, 2007, the Officer Insureds filed a motion for preliminary injunction requiring AXIS to advance their defense costs. A hearing was held on that motion on August 30, 2007, and this Court granted the preliminary injunction motion. The Indicted Insureds filed a similar motion for preliminary injunction on September 5, 2007, and a hearing was held on September 11, 2007, where this Court granted the preliminary injunction motion. The Director Insureds filed a complaint seeking similar relief on September 17, 2007. All three dockets were then consolidated and motions for summary judgment seeking a permanent injunction were filed on September 25, 2007. A hearing on the summary judgment motions was held on October 12, 2007, and this Court entered an Order granting summary judgment on October 19, 2007. On November 13, 2007 the District Court (J. Lynch) withdrew the reference to the Bankruptcy Court. AXIS filed appeals of the Bankruptcy Court Orders in the District Court. Those appeals were fully briefed on January 9, 2008, and are currently awaiting a decision by the District Court.

[2] AXIS has now paid its $10 million Limit of Liability to the Insureds, including approximately $2.7 million to Mr. Grant's counsel. A total of approximately $6.7 million was paid to counsel for the Indicted Insureds.

[3] In addition to misrepresenting a necessary basis for injunctive relief, counsel also misrepresented the basis upon which this Court granted the Order to Show Cause. Norman Eisen, counsel to Mr. Grant, filed a Declaration supporting the Order to Show Cause which asserted, under penalty of perjury:

> Good reason exists for the Court to shorten the notice period so that the Motion may be heard on September 11, 2007: 1) the Moving Defendants are confronting not only civil proceedings but also a criminal trial, and so face an even more **urgent need for resolution** of advancement issues than did the Counterclaim Defendants; 2) that urgency is heightened because the previous layer of coverage has now been fully exhausted and **Axis' delay is presently disrupting the defense of the criminal and civil matters**; and 3) the issues presented by the Motion have already been extensively briefed, argued, and ruled upon, so expedited treatment will not prejudice Axis. Declaration of Norman L. Eisen, at p. 2 (07-2005-RDD, doc. 4) (emphasis added).

Importantly, Mr. Eisen also signed the complaint filed two days ago. In that complaint, Mr. Eisen asserts that "By letter dated June 8, 2007, Illinois National acknowledged its duty to advance defense costs for [Mr. Grant's] defense to the Underlying Actions." Complaint, at p. 5 (08-1129-RDD, doc. 1) (hereinafter "Grant Complaint"). Accordingly, it appears that the Declaration made by Mr. Eisen under penalty of perjury in support of the Order to Show Cause was untrue, because, at the time he filed the declaration, Mr. Eisen was well aware that another insurer had already agreed *in writing* to pay Mr. Grant's defense costs.

KAUFMAN BORGEEST & RYAN LLP

Refco Insurance Litigation
Page 3 of 5

issue.[4] This was not true. In fact, as AXIS and the Court learned two days ago, counsel were well aware that another insurer (the primary insurer in a different tower of D&O insurance) had already agreed in writing to fund their defense. In truth, counsel to the Indicted Insureds *knew* – at the time of the hearings – that if this Court did not require AXIS to pay their defense costs, those defense costs would have been paid by another insurer. Counsels' material misrepresentations to this Court and to AXIS provided the basis for the relief granted by this Court (the payment of millions of dollars to counsel by AXIS).

The evidence of counsels' misrepresentations during the various hearings led Your Honor to believe that if AXIS did not provide them with payment of their defense costs, they had nowhere else to turn for payment of their fees. Counsel to the Indicted Insureds led Your Honor to believe that, absent payment from AXIS, their clients would not receive a defense in their criminal trials. The litigation they have now filed against Illinois National Ins. Co. makes clear that "since mid-2007, Illinois National had agreed to advance fees for [the criminal] trial." Grant Complaint at 1. Mr. Eisen, counsel for Mr. Grant and *speaking for all of the Indicted Insureds at the hearing*, knew that another insurer had already agreed in writing to pay his defense costs when he stood before Your Honor on September 11, 2007, seeking emergency relief – based on irreparable harm – requiring AXIS to pay Mr. Grant's defense costs.

Examples of such misrepresentations in the September 11, 2007 preliminary injunction hearing transcript abound (07-2005-RDD, Doc. 22, Exhibit C) (hereinafter, "September 11 Tr."):

- On the balance of the harms, we would submit that, again, as noted by the Court the harms are even more severe because the criminal defendants are facing trial; it's not merely a question of a risk of financial loss, it is a liberty interest and the most serious liberty interest and **any disruption in the preparation for trial as the Court noted is a very, very serious harm indeed**. September 11 Tr. at p.4 (emphasis added).

- Indeed, for the criminal defendants it is crucial because the pipeline is building up and we have so much work to do and **the consequences are so great**. September 11 Tr. at p.7 (emphasis added).

- Your Honor, the criminal defendants, though, would submit to the Court that there are different **exigencies that apply to our need** and if I may the clients will be facing the prospect of uncertainty as you've heard from Axis very substantial August bills on top of very substantial September bills. It's not just the question of Axis having agreed to pay and waiting a reasonable amount of time for the invoice to be honored, it is th [sic] uncertainty and **the precise chilling effect on the ability to defend the case** that the

---

[4] Throughout the proceedings on the motion for preliminary injunctive relief, AXIS argued that the Insureds were obligated under Second Circuit law to make an evidentiary showing of irreparable harm – to wit – that they would be unable to fund their criminal and civil defense absent payment from AXIS, who had denied any coverage obligation. This Court did not require the Insureds to present any evidence of irreparable harm as part of the preliminary injunction proceedings. It now is apparent that the Indicted Insureds (at least) would have been completely unable to make such a showing, because they already had received a written commitment from another insurer promising to pay their defense costs. That fact was concealed from this Court and from AXIS.

KAUFMAN BORGEEST & RYAN LLP

Refco Insurance Litigation
Page 4 of 5

> Worldcom Court was concerned with when it balanced the harms. September 11 Tr. at p. 16 (emphasis added).

Your Honor summarized counsel's argument:

- They also contend that given the amount of defense costs that have been incurred to date and the fact that they are criminal defendants subject to freeze orders the failure to advance the defense costs **irreparably harms them in that it impairs their ability to mount an effective defense in this case of a criminal indictment**. September 11 Tr. at p. 54 (emphasis added).

Counsel also made material misrepresentations in their pleadings wherein they sought a preliminary injunction requiring AXIS to pay their defense costs:

- Absent preliminary and permanent injunctive relief, **Plaintiffs face an imminent risk of irreparable harm**, including but not limited to the risk of an adverse outcome in the Criminal Action or the Civil Actions caused by their **inability to mount an adequate defense**. Complaint, at p. 12 (07-2005-RDD, doc 1) (emphasis added).

- There is an **urgent need** for the relief sought, as the policies underlying Axis's policy have been exhausted, the Moving Insureds are incurring significant defense costs. . .. Preliminary Injunction Motion, at p. 1 (07-2005-RDD, doc 3) (emphasis added).

- The balance of the hardships tips decidedly in the Moving Insureds' favor because, *inter alia*, **their ability to access defense cost reimbursements will jeopardize their ability to maintain an effective defense**, resulting in a materially heightened risk of an adverse result in the Criminal Action or the other Underlying Actions. . . Such harm would of course be irreparable. Preliminary Injunction Motion, at p. 9 (07-2005-RDD, doc 3) (emphasis added).

- As set forth above, the Lexington Policy has been exhausted, and **the Moving Insureds are now forced to shoulder the burden of their own defense unless Axis is ordered to advance defense costs**. This is a serious blow to the ability of the Moving Insureds to protect heir interests – including, in the case of the Criminal Action, their liberty as well as their financial and reputational interests. Preliminary Injunction Motion, at p. 14 (07-2005-RDD, doc. 3) (emphasis added).

- [I]nsureds such as **the Moving Insureds face irreparable harm absent an advancement order**, as they may otherwise be unable to effectively defend themselves in the underlying actions against them. Preliminary Injunction Motion, at p. 14 (07-2005-RDD, doc. 3) (emphasis added).

- [I]f convicted in the Criminal Action, the Moving Insureds face possible sentences of lifetime imprisonment under the Sentencing Guidelines if they are convicted. Accordingly, **they must be able to fund an adequate defense**. At the August 30, 2007

KAUFMAN BORGEEST & RYAN LLP

hearing, this Court recognized that "**the risk of not having counsel proceed or to substantially cut back on their efforts because of unpaid bills** is a tremendous potential harm particularly in a criminal context." Preliminary Injunction Motion, at p. 15 (07-2005-RDD, doc. 3) (emphasis added).

- [B]ecause of the **urgency of receiving payments**, the Moving Insureds wish to obtain an order confirming that no obstacles exist to such payment. Preliminary Injunction Motion, at p. 16 (07-2005-RDD, doc. 3) (emphasis added).

All the while, counsel knew that another D&O insurer already had committed in writing to pay their defense costs. Counsel also concealed from AXIS and from this Court the existence of the Illinois National Ins. Co. policy, and the fact that Illinois National had agreed to pay their defense costs. This, despite AXIS's specific written request more than a year earlier (by letter dated March 6, 2006) that the Insureds disclose to AXIS "any applicable insurance available to Refco, Inc., any Subsidiaries, or any Insured Persons." None of the Insureds responded to AXIS about other insurance, nor did they apprise this Court about this other D&O insurance.

Most troublesome about counsels' misrepresentations is that it was counsel themselves – and not just their clients – that reaped the direct economic benefit from their repeated misrepresentations to this Court. For example, Mr. Eisen's firm was paid over $1.9 million by AXIS. Of course, AXIS also was victimized by these misrepresentations because AXIS was ordered to pay millions that should have been paid by another insurer. Adding to this injury, it is unclear whether AXIS ever will be able to recoup the monies expended because the Indicted Insureds, on whose behalf AXIS was ordered to advance approximately $6.7 million, have had their assets frozen and there are competing demands by creditors and litigants.

AXIS is not requesting any relief in this letter. We simply write, as officers of the Court, to bring these material misrepresentations to the Court's attention. Please do not hesitate to contact us if we can provide the Court with any further information or be of any assistance.

Respectfully,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Joan M. Gilbride
Robert A. Benjamin

cc:    all counsel (via email only)
       Hon. Gerard E. Lynch (via overnight delivery)

KAUFMAN BORGEEST & RYAN LLP

# EXHIBIT O

Refco Group Ltd., LLC
550 West Jackson Boulevard
Suite 1300
Chicago, IL 60661
ph 312 788 2000
www.refco.com

 **REFCO**

January 14, 2005

Axis
Connell Corporate Park
Three Connell Drive
Berkeley Heights, NJ 07922

To Whom It May Concern:

With respect to the 2nd excess layer of insurance for Axis Reinsurance Company the undersigned officer of Refco Group, Ltd., LLC declares that the following statements are true:

a. No person(s) or entity(ies) proposed for this insurance is cognizant of any fact, circumstance, situation, act, error or omission which he/she/it has reason to suppose might afford grounds for any Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance, EXCEPT:

_See attached_

b. No person(s) or entity(ies) proposed for this insurance is cognizant of any inquiry, investigation or communication which he/she/it has reason to suppose might give rise to a Claim, as such term is defined within the Policy, such as would fall within the scope of the proposed insurance.

It is agreed by the undersigned on behalf of all Insureds under the Policy, that with respect to the above statements, that if such knowledge exists, any claim arising therefrom is excluded from the proposed insurance.

This letter, together with other documents and information publicly available to and obtained by the Insurer, shall be deemed incorporated into and become part of the Application and the Policy.

Company name: _Refco Group LTD. LLC_

Signature: _Nip Bur_

Title: _PRESIDENT & CEO._
(Chairman of the Board or President)

Date: _Jan 21. 2005._

**MEMORANDUM**

TO:       **Phillip Bennett**

FROM:     **Ellen Brooks**

SUBJECT:  **Directors and Officers Coverage**

DATE:     **January 14, 2005**

Axis Reinsurance Company is one of three insurance carriers for our present D&O coverage that was placed August 5, 2004. Due to the $30,000,000 total limit that T.H. Lee required us to purchase, we had to layer the coverage. Axis is the 2nd layer with $10,000,000 limit. They are requiring you to sign a warranty letter confirming that we currently do not have a claim against our D&O policy.

We did not reveal this case at the time the Axis underwriter was reviewing our application, therefore, they are now asking for a copy of the complaint and also a copy of the court filing of the dismissal. The complaint is attached, but we are still waiting on the court to send Herrick, Feinstein LLP the dismissal order.

If you have any questions, please do not hesitate to give me a call.

Thank you.

# HERRICK, FEINSTEIN LLP

A NEW YORK LIMITED LIABILITY PARTNERSHIP INCLUDING NEW YORK PROFESSIONAL CORPORATIONS

2 PARK AVENUE
NEW YORK, NY 10016-9301

| | | |
|---|---|---|
| 104 CARNEGIE CENTER<br>PRINCETON, N.J. 08540-6232 | TELEPHONE: (212) 592-1400<br>FACSIMILE: (212) 592-1500 | WRITER'S DIRECT DIAL:<br>(212) 592-1588 |
| 2 PENN PLAZA<br>NEWARK, N.J. 07105-2245 | WEB: www.herrick.com | E-MAIL: gcoen@herrick.com |

January 14, 2005

BY E-MAIL

Ms. Ellen Brooks
Refco, LLC
550 West Jackson Boulevard
Suite 1300
Chicago, Illinois 60661

Re:    Louis Capital Markets, L.P., v. Refco Group Ltd., LLC, et al.

Dear Ms. Brooks:

Pursuant to your request to Therese Doherty for the status of the above-referenced litigation, please be advised of the following:

This matter is pending in the Supreme Court of the State of New York, County of New York, and is filed under Index No. Case No. 04601028/04. On April 14, 2004, plaintiff filed a complaint against Refco Group ltd., LLC, an employee of Refco Securities SA, and four registered representatives and employees of Refco Securities, LLC. The complaint arises out of the termination of employment by four of the individual defendants with plaintiff and alleges that Refco Group Ltd., LLC, "acting through its subsidiaries" and "their agents," (a) tortiously interfered with contractual relationships between plaintiff and several of its employees; (b) aided and abetted breach of fiduciary duty by each of several former employees of plaintiff; (c) committed unfair business practices; (d) breached an implied-in-fact contract with plaintiff; and (e) tortiously interfered with plaintiff's economic advantage. The complaint seeks damages as follows: (a) on the first three causes of action, "not less than $4.5 million per year in lost profits" plus 9% interest, as well as future profits to be determined; (b) on the fourth cause of action, "not less than $4.5 million per year" plus 9% interest per year; and (c) on the fifth cause of action, "an amount in excess of $18 million"; together with 9% interest, punitive damages and other relief. On September 23, 2004, the court granted the defendants' motion to dismiss the complaint. We have been advised by the Court to expect an order to be issued before the next conference date of January 27, 2005.

HFNY2: #809103 v.1 #05704-0000

HERRICK, FEINSTEIN LLP

Ms. Ellen Brooks
January 14, 2005
Page 2

As you requested, we have attached a copy of the complaint with exhibits. We will forward to you a copy of the court order as soon as we receive it. Please feel free to contact me if we can be of further assistance.

Very truly yours,

Grant R. Cornehls

cc:     Therese M. Doherty

HFNY2: #809103 v.1 #05704-0000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : IAS PART

------------------------------------------------------------x

LOUIS CAPITAL MARKETS, LP, Successor to
LOUIS CAPITAL MARKETS, LLC,

                     Plaintiff,

        - against -

REFCO GROUP LTD., LLC, ALAIN FELLOUS,
MICHAEL BENISTY, HENRI CONDRON,
BENJAMIN CHOUCHANE, LIONEL MELLUL and
MARCOS PAGANI,

                     Defendants.

------------------------------------------------------------x

**ORIGINAL**

Index No.

04601028

<u>COMPLAINT</u>

**FILED**

APR 14 2004

NEW YORK
COUNTY CLERK'S OFFICE

Plaintiff, LOUIS CAPITAL MARKETS, LP, successor to LOUIS

CAPITAL MARKETS, LLC ("LCM"), by its attorneys Bolin & Boone, for its Complaint

alleges as follows:

<u>THE NATURE OF THE ACTION</u>

I.     This is an action for: (1) tortious interference with employment

agreements, (2) aiding and abetting the breach of LCM's employees' fiduciary duties to

LCM; (3) unfair business practices; (4) breach of implied-in-fact contract; and (5)

tortious interference with LCM's expectancy of an economic advantage, against REFCO

Group Ltd., LLC, (acting through its subsidiaries, such as Refco Overseas Ltd., and

Refco Securities Paris, S.A., and their agents, such as Alain Fellous) (the "REFCO

Defendants"); and for: (6) conversion and misappropriation of intangible business assets

1

and opportunities, (7) breach of agreement, and (8) breach of fiduciary duties by and among LCM's former employees (the "Former LCM Employees").

2.      The action arises out of the REFCO defendants' attempts in 2001 to form a business combination with LCM, and the REFCO defendants' scheme, deliberately and methodically carried out over the ensuing years, to steal LCM's proprietary business through corporate espionage, to interfere with LCM's agreements with its Former Employees, and to misappropriate through them and by other means LCM's trade secrets and business opportunities.

## THE PARTIES

3.      Louis Capital Markets, LP is a limited partnership organized in 2003 and existing under the laws of the State of New York. It is the successor to Louis Capital Markets LLC (collectively "LCM"). LCM is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") and it is a member of the National Association of Securities Dealers, Inc. It is principally engaged in retailing corporate equity securities "over-the-counter." Its principal place of business is located at 67 Wall Street, New York, New York.

4.      Upon information and belief, REFCO Group Ltd., LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at One World Financial Center, 200 Liberty Street, Tower A, New York, New York. It is a global financial giant which offers a broad range of financial products and services through its subsidiaries and affiliates

throughout the world including Refco Overseas Ltd. and REFCO Securities Paris, S.A. (collectively "REFCO").

5.   At all relevant times, Alain Fellous was President of REFCO Securities Paris, S.A., which, upon information and belief, is owned or controlled by REFCO Group Ltd., LLC.

6.   Michael Benisty is now employed by REFCO as an Executive Vice President in New York. Before 2002, he was also employed by REFCO. In February 5, 2002, he resigned from REFCO and started work as a Senior Vice President at LCM. As alleged in the paragraphs that follow, Benisty was a corporate "mole" or spy for RECFO while he was employed at LCM. He was fired by LCM on December 6, 2002, after LCM discovered he intended to return to REFCO to set up and duplicate LCM's unique equity trading business for REFCO in New York City.

7.   Benjamin Chouchane was hired by LCM on May 20, 2002 as a Sales Assistant. On December 9, 2002, he suddenly resigned from LCM to join Benisty at REFCO.

8.   Henri Condron was hired by LCM on March 24, 2002 as a Middle and Front Office Operator. On December 31, 2002, he suddenly resigned from LCM to join Benisty and Chouchane at REFCO.

9.   Lionel Melful was hired by LCM on July 1, 2002, as a Vice President. On February 14, 2003, he accepted the offer from LCM to become a Senior Vice President to develop LCM's Institutional Sales Department. On February 4, 2004, he suddenly resigned from LCM to join Benisty and the other Former LCM Employees at

3

REFCO the next day. A copy of Mellul's Employment Agreement with LCM is attached as Exhibit "A."

10. Marcos Pagani was hired by LCM in August 2001. On February 14, 2003, he accepted the offer from LCM to become a Director to develop its Institutional Sales Office. On February 4, 2004, he suddenly resigned with Mellul to join the other Former Employees at REFCO the next day. A copy of Pagani's Employment Agreement with LCM is attached as Exhibit "B."

## THE FACTS

11. Success in the business of trading securities or commodities of any kind depends in large measure on two key capabilities: (a) cultivation and maintenance of relationships with customers; and (b) familiarity with specific markets and the development and execution of trading strategies carefully tailored to those markets. Both capabilities are intangible. But both capabilities constitute crucial components of the intellectual capital employed by Firms engaged in the trading business. Like any other service business, this intellectual "know how" is usually the decisive key to success or failure in the trading industry.

12. Prior to 2000, REFCO was best known in the financial community as a global giant in the international commodities markets. In particular, REFCO was (and is) known as a dominant presence in the trading of such commodities as metals, agricultural products, energy, and currencies – and with instruments and contracts related to the exchange of such commodities.

4

13.    Prior to 2000, REFCO had only a relatively small presence and participation (and then only derivatively) in the markets for equity securities – especially the equity markets in the United States.

14.    Prior to 2000, REFCO participated in the U.S. equity markets primarily through its relationship with Raymond James & Company.

15.    In or about August 2000, defendant Fellous, then President of Refco Securities, S.A., met with Michael Benamhou, one of the Managing Partners of LCM, during a dinner in Saint Tropez.

16.    Over the following months, the relationship begun in August 2000 between the principals of LCM and Fellous ripened and grew.

17.    Upon information and belief, in or about March 2001, REFCO terminated its relationship with Raymond James.

18.    The growing relationship between LCM and REFCO culminated in a "Piggy Back" Clearing Agreement on about March 27, 2001, between REFCO and LCM in which LCM agreed to handle and execute equity security transactions for REFCO's European customers.

19.    LCM and REFCO began conducting business under their Clearing Agreement and asked their attorneys to draw up papers to formalize their agreement.

20.    During the following year and a half, the attorneys for LCM and REFCO exchanged many drafts of a definitive Introducing Broker Agreement (the "Broker Agreement") to formalize and fill in the details of the then existing Clearing Agreement under which LCM and REFCO were conducting their business relationship.

21.    Prominent among the drafts of the Broker Agreement exchanged

5

between the parties' attorneys for many months was a non-solicitation clause in which REFCO agreed not "…to hire, contract with, or solicit to hire or contract with, any person who has performed services…" by LCM for REFCO under the Broker Agreement.

22.    By November 19, 2001, REFCO itself requested a reciprocal "non-solicitation/non-compete" clause from LCM regarding REFCO's clients introduced to LCM by REFCO.

23.    The mutual "non-solicitation/non-compete" clauses were intended to memorialize and confirm a vital and essential aspect of the business relationship and business practices then existing between REFCO and LCM which LCM honored in all respects.

REFCO's New Overtures to LCM in 2001

24.    The new business relationship between REFCO and LCM proved to be mutually gratifying, so much so, that during the months while negotiations regarding the definitive Broker Agreement were still in progress, Fellous floated the idea that LCM and REFCO might form a Joint Venture under LCM's name to give REFCO an even more direct presence in the U.S. equity securities markets in order to better service REFCO's European accounts.

25.    The principals of LCM did not greet this overture with unbridled enthusiasm. They saw the overture as a proposal to take over LCM. They wanted, instead, to maintain LCM's independence as entrepreneurial equity traders on Wall Street with a growing reputation for success in the domestic securities industry. Nevertheless, the principals at LCM and Fellous discussed the idea of some sort of Joint Venture on

6

many occasions over the following months, but the discussions of such an arrangement essentially ended by December 2001.

REFCO's "Mole" Benisty

26.     At about the same time in the winter of 2001, while negotiations of the definitive Broker Agreement were still in progress, Benisty (who was then employed as a sales representative at Refco Securities Paris, S.A.) approached LCM about the possibility of employment with LCM in New York. Benisty professed to have a strong interest in leaving France and working in the equity securities business in New York City.

27.     The principals of LCM immediately told Benisty they could not even begin to entertain such an idea because it would violate the terms of the draft Broker Agreement as well as the spirit of LCM's existing business relationship with REFCO.

28.     Surprisingly, Fellous called LCM shortly afterwards in early 2002 and urged LCM to employ Benisty in New York, ostensibly so that Benisty would not accept other employment in New York City and "go to work for the competition."

29.     As an accommodation to Fellous, LCM hired Benisty on February 5, 2002, as Senior Vice President as alleged before.

30.     After he was hired in 2002, Benisty acquired first hand knowledge of LCM's trading strategies, became well acquainted with LCM's key marketing and operations employees, and he thereby acquired essentially all of the "intellectual capital" of LCM's business.

7

31.     Upon information and belief, throughout 2002, however, Benisty maintained almost daily contact with Fellous at REFCO (although none of his responsibilities at LCM required any such contact with Fellous).

32.     Upon information and belief, Fellous and REFCO were plotting throughout 2002 to duplicate for themselves LCM's equity trading business in New York City.

33.     By early December 2002, Benisty had so insinuated himself into the heart of LCM's business and had so gained the trust of the principals of LCM that decided to offer him a partnership interest in the Firm.

34.     In the meantime, negotiations regarding the Broker Agreement finally concluded after more than 18 months, and LCM sent REFCO the final execution copy of the Broker Agreement for signature on or about December 3, 2002.

35.     After over eighteen months of negotiations, LCM assumed the signing would be perfunctory.

36.     To the astonishment of LCM, however, Fellous and REFCO refused to sign the final definitive Broker Agreement, primarily because of the "non-solicitation/non-compete" clause which, by then, had been included in the drafts of the Broker Agreement previously exchanged between the parties' attorneys for months.

37.     Three days later, Benisty was forced to reveal to the principals of LCM that REFCO intended to essentially duplicate LCM's business in New York City.

38.     LCM fired Benisty on the spot on December 6, 2002.  A copy of LCM's termination letter to Benisty, dated December 6, 2002, stating the reasons for his termination is attached as Exhibit "C."

8

<u>REFCO Completes its Theft of LCM's Business</u>

39.      As alleged before, throughout 2002, REFCO through Benisty essentially was engaged in corporate espionage and theft against LCM by appropriating LCM's intellectual capital.

40.      The remaining step in the scheme involved REFCO's systematic recruitment of LCM's marketing staff – the individuals whose job it was to develop and maintain LCM's account relationships and who were, for all practical business purposes, LCM's public "face" to its accounts and customers.

41.      Almost immediately after LCM discovered REFCO's plot and fired Benisty on December 6, 2002, REFCO recruited two of LCM's key employees: Benjamin Chouchane was hired by REFCO three days later on December 9, 2002 and Henri Condron was hired within the month on December 31, 2002.  Both quit LCM and went directly to REFCO.

42.      To say the least, LCM was alarmed at the discovery of the REFCO plot and quickly acted to require its other key employees (such as Mellul and Pagani) including all of its seven sales traders and 14 other employees to sign new employment agreements to try to stop the raid in progress by REFCO.

43.      The employment agreements were specifically intended to stop the raid as clearly shown by Exhibits "A" and "B" under the first heading entitled "Terms and Conditions of Employment with LCM" and elsewhere in other provisions of the agreements.

44.      It was now obvious that REFCO intended to buy the remaining part of LCM's business it had not already stolen from LCM by offering LCM's already

9

well-compensated employees extraordinarily lucrative compensation packages (all out of proportion to their nominal jobs) instead of forthrightly offering to buy the business directly and outright from LCM's owners.

45. Upon information and belief, REFCO quickly learned about the new employment agreements and temporarily suspended its raid.

46. After a relatively brief interval, presumably for cosmetic purposes, REFCO resumed its raid on LCM employees in early February 2004. It began by hiring both Mellul and Pagani on February 5, 2004.

47. Since the departure of Benisty and the other key LCM employees, LCM has lost many of its accounts and untold opportunities to further grow their business.

48. Before Benisty's termination and the beginning of REFCO's raid of LCM's employees, LCM's operating income had grown at an ever accelerating annual rate of over 35% per year. Within two weeks of the sudden departure of Mellul and Pagani, LCM's weekly operating income plunged by more than 50%.

49. The REFCO Defendants deceptive acts and practices in the conduct of their business violate the New York State General Business Law §349, especially §§349(a) and (h).

### AS AND FOR A FIRST CAUSE OF ACTION
(Tortious Interference With Contractual Relations
Against the REFCO Defendants and Benisty)

50. LCM repeats and realleges the allegations contained in ¶¶ 1 through 49.

10

51.    As alleged before, the REFCO defendants and Benisty were well aware and knew of the employment agreements between LCM and its employees.  In fact, Benisty knew all about the agreements first hand.

52.    The REFCO defendants and Benisty nevertheless actively enticed, encouraged, and ultimately succeeded in the causing the defendants Mellul and Pagani to breach their employment agreements with LCM.

53.    As a result of these defendants' interference with LCM's contractual relationships, LCM has sustained and will continue to sustain pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting the Breach of Fiduciary Duties Against the REFCO Defendants and Benisty)

54.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 53.

55.    At all relevant times, the Former LCM Employees, including Benisty, were privy to the private and confidential workings of LCM's business.

56.    At the time of their employment with LCM, the Former LCM Employees (including Benisky) stood in a fiduciary relationship with their employer, LCM, and at all times they owed LCM the duty of loyalty and the duty of utmost good faith and fair dealing.

57.    By deserting LCM and absconding with its confidential information, the Former LCM Employees breached their fiduciary duties to LCM.

11

58.    The REFCO defendants and Benisty knowingly and deliberately encouraged, enticed, aided and abetted the Former LCM Employees to breach their fiduciary duties to LCM.

59.    As a result of these defendants' acts, LCM has suffered and will continue to suffer lost revenue, the benefit of the loyalty of its key employees and their productivity, has lost business opportunities, has incurred costs and has otherwise been damaged while the Former LCM Employees and the REFCO defendants continue to benefit from their wrongful acts, all to LCM's injury and detriment.

## AS AND FOR A THIRD CAUSE OF ACTION
(Unfair Business Practices Against the REFCO Defendants and Benisty)

60.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 59.

61.    The REFCO Defendants' acts alleged before, including most particularly their deliberate piracy of the Former LCM employees *en masse* as a means of appropriating to themselves LCM's business, constitute devious, malicious, unscrupulous and Unfair Business Practices, crippling LCM's business in the process.

62.    LCM has suffered and will continue to suffer ever-mounting damage to its business as a result, including, but not limited to, lost profits now flowing to the REFCO defendants which must be disgorged, as well as lost business opportunities.

12

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Implied-In-Fact Contract Against the REFCO Defendants)

63.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 62.

64.    As alleged before, the successive drafts of the Broker Agreement prepared and exchanged by the parties' attorneys over the course of many months accurately reflected the actual agreement and business practices carried on between LCM and REFCO.

65.    Central to the business arrangement and practice between LCM and REFCO was the agreement not to "poach" or solicit employees or business from one another.

66.    By their consistent course of conduct and dealing spanning many months, LCM and REFCO manifested their agreement and confirmed its existence in fact.

67.    REFCO's piracy of LCM's employees, and through them a substantial portion of LCM's business, constituted a breach of their long-standing, implied-in-fact agreement.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Tortious Interference with an Economic Advantage
### Against the REFCO Defendants)

68.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 67.

13

69.    Founded in April 1999, LCM until February 2002, had quickly established itself on Wall Street as a thriving, prospering, and rapidly growing entrepreneurial broker dealer.

70.    Since its operations began in February 2002, LCM experienced accelerating operating income growth, almost doubling every year.

71.    LCM had every reason to expect to continue maintain its revenue and income growth derived from its brokerage business at comparable or accelerating rates well into the future, having survived the costs and dangers typical of a small business in its "start up" stages, and LCM was finally poised and well-positioned to begin to compound the rate of its income growth based upon the solid revenue base it had developed.

72.    LCM had developed and established a customer base and a reputation for their skills and savy in the equity markets that appeared to assure that the Firm would meet or surpass its expectations for business growth.

73.    In addition to, and to the piracy of the Former LCM Employees, its violations of New York General Business Law §349, and other malicious and wrongful acts, the REFCO Defendants tortiously interfered with LCM's customer base and intentionally undermined the financial underpinnings of its anticipated business growth, a collateral effect of which will be to deprive LCM of future opportunities for business growth.

74.    As a result of these defendants' wrongful conduct, LCM has suffered and will continue to suffer pecuniary losses, lost business opportunities, lost profits, the lost value of its contracts and has otherwise been damaged.

14

## AS AND FOR A SIXTH CAUSE OF ACTION
(Conversion of Intangible Business Assets and Property
Against the Former LCM Employees and Benisty)

75.     LCM repeats and realleges the allegations contained in ¶¶ 1 through 74.

76.     As alleged more extensively before, the Former LCM Employees and Benisty during the course of their employment at LCM were exposed and thus came into possession of valuable intangible intellectual property including customer and account relationships and LCM's trading and other business strategies (collectively, the "Assests").

77.     The Former LCM Employees and Benisty appropriated the Assests to their own use and effectively sold them to REFCO in exchange for lucrative employment arrangements with REFCO which the could nver have obtained without having first appropriated and offered the Assets to REFCO.

78.     The Former LCM Employees and Benisty thus converted the Assets to their own personal use and benefit.

79.     As a result of the conversion of LCM's Assets by the Former LCM Employees and Benisty to their own use and benefit, those benefits must be disgorged and surrendered to LCM in their entirety.

15

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Breach of Agreements Against Defendants Mellul and Pagani)

80.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 79.

81.    Defendants Mellul and Pagani voluntarily signed  agreements (Exhibits "A" and "B") with LCM and agreed to abide by "The Terms and Conditions of Employment with LCM," as well as the other provisions contained in the agreements.

82.    By suddenly quitting work at LCM and immediately accepting "employment" with REFCO (in addition to appropriating LCM's Assets for themselves), Mellul and Pagani knowingly and deliberately breached their agreements with LCM , including the provisions of ¶¶ 1, 2, 3 and 4 thereof.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
(Breach of Fiduciary Duties Against the Former LCM Employees and Benisty)

83.    LCM repeats and realleges the allegations contained in ¶¶ 1 through 82.

84.    As alleged before, the Former LCM Employees and Benisty as employees stood in a fiduciary relationship with LCM and owed to LCM the duty of the utmost good faith and fair dealing.

85.    As alleged more extensively before, the Former LCM Employees and Benisty breached their duties of loyalty, good faith and fair dealing, and instead they deliberately betrayed the trust reposed in them for their own selfish gains and benefit all to the great damage of LCM.

16

APR-19-04 12:58 FROM:DENNIS KLEJNA    ID:12123898850    PAGE    3/11



# LOUIS CAPITAL MARKETS, LLC

Monday, ~~July 31st 2002~~ Feb 14th, 2003    VK

<u>Attention:</u> Lionel Melilul

Dear Lionel:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

<u>Your Compensation and Benefits are as follows:</u>

1.  A minimum draw against future commission of $10,000 per month (up to march 31st 2003);

2.  An incentive of 25% of the gross commissions generated by the customers you will bring in to LCM (with a minimum of 1.25c/ share to be eligible);

3.  An incentive of 35% of the net profit you will bring to your department;

4.  A fully paid health insurance plan[1];

5.  A fully paid dental insurance plan[2]; and

6.  Two weeks of vacation per year the first year, three weeks after two years of employment.

---

[1] Does not include a family plan

[2] Does not include a family plan

1122582.2

87 WALL STREET, SUITE 1805 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 809-4400, FACSIMILE (212) 809-8274

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

11225822

1. Non-Solicitation. For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2. Nondisclosure of Confidential Information. Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and



WB



exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.    Non-Compete.    While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other than Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.    Work Product/Business Opportunities.    You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11223822

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

5.      **Protection of Company's Name.** You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

APR-18-94  12:58  FROM:DENNIS KLEJNA                    ID:12123000050           PAGE  8/11



without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inures to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC -- 67 Wall Street -- Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

11225812

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely,

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
     Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____                    02 . 30 . 2003
Signature                                       Date

1122382.2

APR-19-04 12:59 FROM:DENNIS KLEJNA    ID:12123808850    PAGE 11/11

EXHIBIT "A"

CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

Marie-Laure HERVET (CIC) _____

Nicolas MERCIER (CIC) _____

Patrice FLAMBA (CIC) _____

Chafik YASSINE (CIC) _____

Younis BOUBA (CIC) _____

Karin Benguigui (Bque d'Orsay) _____

Christian FLEURY (Bque d'Orsay) _____

Michael IBRAYOUSSEF (First NY) _____

Dan LANE (First NY) _____

Michael GALANTE (First NY) _____

Marc de LIMA (First NY) _____

Roger MUELLER (Sunderfund) _____

Stephane ROFFIER (ING-BBL) _____

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible for introducing to Louis Capital Markets, LLC.

MELLUL Lionel _____

(Name of Employee)    Date

11225822

APR-18-04 13:01 FROM:DENNIS KLEJNA        ID:12123808860        PAGE   3/11



# L O U I S   C A P I T A L   M A R K E T S ,   L L C
### M E M B E R   N A S D / S I P C

~~Monday November 17ᵗʰ 2002~~  feb 14ᵐ, 2005   MB

<u>Attention:</u> Mr. Marcos Pagani-Toledano

Dear Mr. Pagani-Toledano:

It is with great pleasure that we offer you the position of Vice-President on behalf of Louis Capital Markets, LLC ("LCM"). Your responsibilities and duties include developing the Institutional Sales Department for LCM, increasing the number of customers using the brokerage services of LCM and developing a range of financial products and markets on behalf of LCM, its affiliates and subsidiaries.

This letter is not a contract of employment for a specified term. Your employment relationship with LCM is on an at-will basis. That is, either you or LCM (or the subject affiliate and/or subsidiary, as the case may be) may terminate such arrangement, with or without cause or advance notice to each other, at any time.

<u>Your Compensation and Benefits are as follows:</u>

- A guaranteed draw against commission of $10,000/month until the end of 2003

- An incentive of 25% of the gross commission generated by the customers you will bring in to LCM

- An incentive of 35% of the net profit generated on mark-up

- A fully paid health insurance plan[1]; (eligible after 2 months)

- A fully paid dental insurance plan[2]; (eligible after 2 months)

- Three weeks of vacation per year

- .An E2 working permit

- Sponsorship for Series 7 & 63

---

[1] Does not include a family plan

[2] Does not include a family plan

MB   MP

1122582.2

67 WALL STREET, SUITE 1806 • NEW YORK, NEW YORK 10005 • TELEPHONE (212) 509-4400, FACSIMILE (212) 509-8374

APR-19-04 13:01 FROM:DENNIS KLEJNA                ID:12123808869           PAGE  4/11

## Terms and Conditions of Employment with LCM

You acknowledge and agree that as a result of your employment or association with LCM, you will obtain knowledge, contacts, know-how, training and experience as a broker in the securities industry and will be exposed to LCM's: (a) trading methodology; (b) business arrangements, including its contracts, with each of its: (i) associated persons, including each and every employee or independent contractor providing services to, or on behalf of, LCM, regardless as to whether such person is registered or licensed on behalf of LCM with any self-regulatory organization (i.e., the National Association of Securities Dealers, Inc.) or any state in any capacity (an "Associated Person"); (ii) suppliers and other vendors, including, without limitation, its clearing firm(s), telecommunication and computer providers, internet providers, equipment vendors and services, etc. (iii) other domestic and foreign broker-dealers with whom it may now, or hereafter, have a relationship with; (iv) banks; (v) counterparties; (vi) domestic and foreign finders; and (vii) current and future customers; (c) operating systems; (d) marketing strategies; (e) training systems; and (f) all other means related to the business, operations and affairs of LCM ((a) through (f) are hereinafter collectively referred to as "LCM Matters"), and there is a substantial probability that LCM Matters could be used to the substantial advantage of a competitor of LCM and to LCM's substantial detriment. You understand and agree, therefore, that the undertakings set forth in paragraphs 1 through 5 below are material and essential to LCM in offering you a position with LCM. Accordingly you expressly acknowledge and agree that:

11225822

1.  **Non-Solicitation.** For the period commencing on the date that you execute this letter and ending 270 days after the termination of your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries) for any reason (the "Restricted Period"), you will not, whether for your own account or for the account of any domestic or foreign limited liability company, corporation, partnership or other business organization, or on behalf of any individual, directly or indirectly, solicit, recruit, endeavor to entice away from LCM, its current or future affiliates or subsidiaries, or otherwise directly interfere with the relationship of LCM, its now or hereinafter established affiliates or subsidiaries, with any person who, to your knowledge, is then an Associated Person or any other person or entity engaged to perform services for, or deliver products to, LCM, its now or hereinafter established affiliates or subsidiaries (including, but not limited to, any independent sales representatives or organizations) or who is, or was, within the then most recent twelve-month period, a customer or client of LCM, its current or future affiliates or subsidiaries. Notwithstanding any provision set forth above in this paragraph, upon your termination of association or employment with LCM or the subject affiliate or subsidiary, you may contact, solicit or do business those customers or clients you are solely responsible for introducing to LCM, the subject affiliate or subsidiary as specifically identified on Exhibit "A" attached hereto and made a part hereof (and only such customers or clients), so long as you make no defamatory, slanderous or disparaging statements, whether transmitted orally, in writing, electronically or otherwise to such customers, clients or third parties, about LCM, its affiliates and subsidiaries, their respective management or personnel, or the handling of the account(s) of such customers and clients, or other customers and clients of LCM, its affiliates and subsidiaries.

2.  **Nondisclosure of Confidential Information.** Except in connection with your employment, you will not disclose to any person or entity or use, while employed by LCM or any of its then existing affiliates or subsidiaries, or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by you while employed by, or associated with LCM or any of its affiliates or subsidiaries, or, if acquired after your employment or association has been terminated, such information which, to your knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to LCM or any of its affiliates or subsidiaries, which relates to LCM or any of its affiliates or subsidiaries, including, but not limited to, information regarding any LCM Matters (including without limitation, its customers, vendors and suppliers), trade secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any products or services offered, or intended to be offered by LCM, its affiliates or subsidiaries), business plans, code books, invoices, financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, in whatever form maintained (including, without limitation, on diskette, cassette, film, pictures or otherwise), which is or was used in the business of LCM or of any of its affiliates or subsidiaries, or which you know is intended to be used by LCM or of any of its affiliates or subsidiaries. You agree and acknowledge that all such information, in any form, and copies and extracts thereof, are and shall remain the sole and

1122582.2

exclusive property of LCM or its affiliates or subsidiaries, as the case may be, and, upon termination of your employment or association with LCM, its affiliates and/or subsidiaries, as the case may be, you will return the originals and all copies of any such information provided to or acquired by you in connection with the performance of your duties for LCM or any of its affiliates or subsidiaries. You also agree to return all files, correspondence and/or other communications received, maintained and/or originated by you during the course of your employment or association with LCM, its affiliates and subsidiaries.

3.     **Non-Compete.**     While you are employed or associated with LCM (and each of its existing or to-be-established affiliates and subsidiaries), you will not, without the prior consent of LCM, directly or indirectly, commence the organization, formation or establishment, or otherwise be employed by or be engaged in the affairs of any other company, business or enterprise. You may, however, acquire or own by way of investment only, less than one percent (1%) of any class of any security of a corporation that is listed on a recognized United States stock exchange or is otherwise traded in the over-the-counter market regulated by the United States Securities and Exchange Commission. You further agree that, unless LCM has materially breached this letter Agreement (and you acknowledge that dismissal without cause shall not be considered a material breach) for 180 days following your termination of association or employment with LCM (or any of its affiliates or subsidiaries), you will not, intentionally associate with any other then Associated Person of LCM (or any of its affiliates or subsidiaries), or who had been an Associated Person of LCM (or any of its affiliates or subsidiaries) within the previous 180 days, in any other business, company or venture which offers, or intends to offer, the same products and services as then offered by LCM (or any of its affiliates or subsidiaries), provided that such other Associated Person worked within the same department or group, in a similar capacity (i.e., as a salesperson) as you while each of you were employed or associated with LCM, the subject affiliate or subsidiary, and whether or not you were both then associated or employed by LCM, the subject affiliate or subsidiary at the same time.

4.     **Work Product/Business Opportunities.**     You will not, without the prior written consent of LCM or the subject affiliate and/or subsidiary thereof, use equipment or services provided by LCM, the subject affiliate and/or subsidiary thereof, including, without limitation, electronic mail, instant messaging, voice mail, telephones, Internet access, postage, its overnight carrier or messenger services (who bill LCM or the subject affiliate and/or subsidiary thereof directly for such services), copy and facsimile machines, computer equipment, including, without limitation, personal computers, Personal Digital Assistants, other hardware/software, mainframe access and networks, subscriptions to publications or other services and communications media, for personal use or other reasons other than in the course of performing your services for and on behalf of LCM, the subject affiliate and/or subsidiary thereof, as the case may be. You acknowledge that all ideas, discoveries, programs, systems, methods, interfaces, protocols, databases, creations, artwork, articles, programming, processes, designs, inventions, or improvements, including, without limitation, any contribution by you to published works, whether or not capable of being patented or copyrighted, conceived by you while employed or associated by or with LCM, or any of its affiliates and/or subsidiaries, whether or not during regular working hours, provided that they are either related in some manner to the business (present and contemplated) of LCM, its affiliates and/or subsidiaries, or are conceived or made on the time of LCM, its affiliates and/or subsidiaries, or with the use of the facilities or materials of LCM, its affiliates and/or subsidiaries (the "Work Product"), was produced or

11225822

prepared, or will be produced or prepared, within the scope of your employment by, or association with, LCM, its affiliates and/or subsidiaries. You agree that all Work Product, all derivatives thereof, and your contributions thereto shall be considered "works made for hire" as contemplated in the U.S. Copyright Act, as amended. If any portion of the Work Product is not ruled to be a "work made for hire," by executing this letter you hereby assign and transfer all right, title, and interest in and to such Work Product, including the right to use it in any and all versions of the Work Product and in any other works in any media published or licensed by LCM, its affiliates and/or subsidiaries, and the right to recover for past or future infringements thereof, to LCM, its affiliates and/or subsidiaries, and their respective successors and assigns, absolutely and forever. You further acknowledge that, unless LCM, its affiliate or subsidiary thereof, as the case may be, otherwise agrees in writing, you will have no personal interest in or right to use the Work Product. You covenant, and thereafter, represent and warrant that the Work Product produced by you in connection with your employment by, or association with, LCM, its affiliates and/or subsidiaries, as the case may be, will be original and that such Work Product will not violate or infringe any copyright, trademark, right of privacy or publicity, or other proprietary right of any person, or constitute libelous, obscene, or unlawful matter. You will deliver promptly to LCM (or the appropriate affiliate and/or subsidiary thereof), upon termination of your employment or association with LCM (or the appropriate affiliate and/or subsidiary thereof), or at any other time requested by LCM (or the appropriate affiliate and/or subsidiary thereof), all memoranda, notes, documentation, equipment, files, flowcharts, program listings, data listings, records, reports, diskettes, cassettes, film, pictures and other tangible manifestations of Work Product (and all copies thereof), that you may then possess or have under your control. You will not, without the prior written consent of LCM (or the appropriate affiliate and/or subsidiary thereof), directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected in any capacity with any entity or person providing services, receiving compensation for services, or selling products in direct or indirect competition with LCM during the period that you render services to LCM and/or to its affiliates and subsidiaries. You will, unless LCM (or the appropriate affiliate and/or subsidiary thereof) otherwise agrees in writing, and without additional compensation: (A) promptly disclose to LCM (or the appropriate affiliate and/or subsidiary thereof) all Work Product and business opportunities related to the present or contemplated business of LCM, its affiliates and/or subsidiaries ("Business Opportunities"); (B) assign to LCM (or the appropriate affiliate and/or subsidiary thereof), upon request, the entire rights to all Work Product and Business Opportunities; (C) give testimony in support of your authorship or creation in any appropriate case; and (D) execute such other documents and take such other action as LCM (or the appropriate affiliate and/or subsidiary thereof) may request to protect the rights of LCM (or the appropriate affiliate and/or subsidiary thereof) in any such Work Product and Business Opportunities, including such patent, trademark, and copyright applications as may be necessary or desirable in the sole discretion of LCM (or the appropriate affiliate and/or subsidiary thereof) to obtain, maintain, protect, or vest in LCM (or the appropriate affiliate and/or subsidiary thereof) the entire right, title, and interest in and to the Work Product.

     5.    **Protection of Company's Name.**  You covenant and agree not to engage in any business during or after the expiration of this letter agreement, anywhere in the world, using the name "Louis Capital Markets" or the initials "LCM" as part of the name, or the name of any affiliate or subsidiary of LCM, or any derivative or phonetic equivalent thereof, including,

1122582.2

without limitation, the use of the designation "division of Louis Capital Markets or LCM" without the express written consent of LCM.

You acknowledge and agree that a breach of any of the covenants in paragraphs 1 through 5 of this letter agreement may result in material irreparable injury to LCM, its affiliates and/or subsidiaries for which there would be no adequate remedy at law, that it will not be possible to measure damages for such injury precisely, and that, in the event of such a breach or threat thereof, LCM (or the appropriate affiliate and/or subsidiary thereof) will be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach, restraining you from engaging in such prohibited activities and providing other relief as may be required specifically to enforce any of the covenants contained in those paragraphs. In furtherance thereof, you expressly waive any requirement that LCM and/or the affected affiliate or subsidiary thereof, be required to post any cash, bond or other collateral as a condition or term for securing or maintaining such injunctive or equitable relief. You acknowledge that LCM (nor any of its affiliates or subsidiaries) is in any way limited from seeking any other remedy, whether in the form of damages or otherwise, in addition to the injunctive remedies set forth in the previous sentence and that, in addition to such injunctive and other remedies, the Restricted Period will be extended by any amount of time during which you are found by any arbitration panel or court of competent jurisdiction to be in violation of any of the restrictive covenants set forth in paragraphs 1 through 5.

The restrictions set forth in paragraphs 1 through 5 of this letter agreement are considered by LCM (and each of its existing or to-be-established affiliates and subsidiaries) and you to be reasonable for the purposes of protecting the business of LCM (and each of its existing or to-be-established affiliates and subsidiaries). However, if any such restriction is found by an arbitration panel or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities, it is the intention of the parties that such restriction be interpreted to extend only over the maximum period of time or range of activities as to which it may be enforceable. The existence of any claim or cause of action you may have against LCM, an affiliate or subsidiary thereof, shall not constitute a defense to the enforcement by LCM, the subject affiliate and/or subsidiary, of the foregoing restrictive covenants. Rather, you agree that such claim or cause of action shall be litigated separately. You further agree that you will not be entitled to rely upon, or assert as a defense in any legal or equitable proceeding, any claim that LCM, and/or the subject subsidiary and/or affiliate, has waived a similar breach by any other Associated Person or otherwise not enforced such provisions against such other Associated Person(s).

You agree that the restrictions set forth in paragraphs 1 through 5 shall survive the termination of this letter agreement.

Should there arise any dispute, controversy or question under the terms of this letter agreement, you hereby consent to the personal jurisdiction of the arbitration program administered by the National Association of Securities Dealers, Inc. or any successor organization thereof, or to any court of competent jurisdiction within the City, County and State of New York, to the exclusion of any other forum or venue, and that LCM (and each of its existing or to-be-established

1122582.2

affiliates and subsidiaries) shall not be not precluded from commencing any action or proceeding in either or both of such forums in connection with enforcing its rights hereunder.

Each of us agrees that the prevailing party, as determined by the arbitration panel and/or New York based court, shall be entitled to its reasonable professional fees and expenses, including without limitation, its reasonable legal fees, in connection with pursuing or defending its rights under this letter agreement, through and including, such fees and expenses as may be incurred in investigating any allegations, preparing for and attending each preliminary and actual hearing or trial days, seeking temporary, preliminary and permanent relief, preparing any legal memoranda in connection therewith, through and including the appeal, enforcement and collection processes until the prevailing party has actually received all monies due it.

You represent and warrant that your employment or association with LCM (and each of its existing or to-be-established affiliates and subsidiaries), and the performance of your duties on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries) will not cause a breach of any agreement or obligation you may have with any existing or prior employer or third-party, and that you are not subject to the terms of any non-compete, non-solicitation, or other similar agreement. You further represent and warrant that your application on Form U-4 and all other materials, forms and instruments, including, all tax withholding forms, visas, passport, application with the United States Immigration and Naturalization Service, etc., you completed or submitted in connection with your proposed employment and association with LCM or entry into the United States (collectively, "Your Employment Documentation") are true and complete in all respects and acknowledge that LCM is relying upon such Employment Documentation in extending you this letter agreement.

It is agreed that a waiver by either party of a breach of any provision of this letter agreement shall not operate or be construed as a waiver of any subsequent breach by that same party. This letter agreement, Exhibit "A," and Your Employment Documentation, contains the entire agreement and understanding of each of us with respect to the subject matter hereof, and neither of us is relying upon any promises, representations or inducements, written, oral or otherwise, which are not set forth in this letter agreement. This letter agreement shall be binding upon, and inure to the benefit of each of us and our respective legal representatives, successors and assigns, provided, however, that you may not assign your rights or obligations under this letter agreement.

Regardless as to where you may, in fact, provide services on behalf of LCM (and each of its existing or to-be-established affiliates and subsidiaries), this letter agreement has been entered into in the State of New York and shall be governed and interpreted in accordance with the internal laws of the State of New York without regard to the conflict of law provisions thereunder.

If this offer and the conditions identified are acceptable to you, please sign the original of this letter and return it to Michael Benhamou and Laurent Imbert at Louis Capital Markets, LLC – 67 Wall Street – Suite 1806, New York, New York 10005. We recommend that you retain a copy for your own personal information.

11225R2.2

APR-18-04 13:04 FROM DENNIS KLEJNA                ID:12123988858           PAGE 18/11

We are pleased to be able to offer you this opportunity, and are confident that your skills will enhance and support an already productive department.

Sincerely

LOUIS CAPITAL MARKETS, LLC

By: Michael C. Benhamou
Managing Member

I accept the above offer and have received a copy of this letter for my files.

_____                    02/18/03
Signature                                     Date

1122582.2

APR-18-04 13:04 FROM:DENNIS KLEJNA    ID:12123908860    PAGE 11/11

## EXHIBIT "A"

### CLIENTS INTRODUCED BY _____ TO LOUIS CAPITAL MARKETS, LLC

The undersigned certifies that the foregoing is the entire list of clients he was solely responsible for introducing to Louis Capital Markets, LLC.

_____        _____

(Name of Employee)                Date

1122582.2



# Louis Capital Markets, LLC

To: Michael Beasley
530 Park Avenue Apt. 11C
New York N.Y. 10021

December 6, 2002

As of today Friday December 6th 2002, I Laurent Imbert Managing Partner of Louis Capital Markets, LLC. Here by inform Michael Beasley he is immediately terminated. We cannot carry on our business relationship since we found out Mr. Beasley is in the process of setting up a competing business and has taken proprietary and confidential information out of the office for that purpose. Moreover, his attitude has been unprofessional and contrary to Louis Capital Markets policies.

Laurent B. Imbert
Managing Member
Louis Capital Markets, LLC

# EXHIBIT P

# VEDDERPRICE

VEDDER PRICE P.C.
1633 BROADWAY, 47TH FLOOR
NEW YORK, NEW YORK 10019
212-407-7700
FAX: 212-407-7799

CHICAGO • NEW YORK CITY • WASHINGTON, DC • ROSELAND, NJ

JOHN H. EICKEMEYER
212-407-7760
jeickemeyer@vedderprice.com

April 17, 2008

**BY HAND**

Hon. Helen E. Freedman
New York County Supreme Court, Commercial
Division
60 Centre Street
New York, NY 10007

    Re:   <u>Arch Insurance Company v. Agoglia, et al.; Index No. 08/600029</u>

Your Honor:

    We represent plaintiff Arch Insurance Company in the above action and enclose a courtesy copy of a Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett ("Bennett") executed by counsel for plaintiff and Bennett, with annexed proposed Judgment Against Bennett, filed earlier today with the Clerk of the Court.

    We ask that the Court review the enclosed and, if they meet with your satisfaction, So Order the Stipulation and direct that the Clerk enter the Judgment.

    We thank the Court for its consideration in this matter.

                  Respectfully submitted,

                  John H. Eickemeyer

Enclosure
cc:    Cara Tseng Duffield (by electronic mail)
       Marc E. Rindner (by electronic mail)
       Daniel J. Standish (by electronic mail)

       All Defense Counsel (by electronic mail)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARCH INSURANCE COMPANY,                    )
                                            )
                Plaintiff,                  )        Index No.: 08/600029
                                            )
v.                                          )
                                            )
JOHN D. AGOGLIA, *et al.*,                  )        **STIPULATED ORDER FOR ENTRY**
                                            )        **OF JUDGMENT AGAINST**
                Defendants.                 )        **DEFENDANT PHILLIP R. BENNETT**
                                            )
                                            )
                                            )

Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett ("Bennett"), by and through their undersigned attorneys, jointly file this Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett.

**WHEREAS**, Bennett previously sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

**WHEREAS**, Bennett has since acknowledged that he is not entitled to any coverage under the Arch Policy for the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

**NOW, THEREFORE**, Arch and Bennett stipulate and agree as follows:

1.  Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2.  Bennett stipulates and agrees that the Arch Policy does not afford him any coverage whatsoever for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.   Bennett stipulates, agrees and consents to the entry of judgment against him on Counts I and II of the FAC in the form annexed hereto as Exhibit A;

4.   Bennett waives any right to appeal the judgment entered against him pursuant to this stipulation;

5.   Arch and Bennett stipulate and agree that each party is to bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Date:   April 17, 2008                     Respectfully submitted,

_____                    _____
Jeffrey T. Golenbock                       John H. Eickemeyer
GOLENBOCK EISMAN ASSOR BELL                Daniel C. Green
  & PESKOE                                 VEDDER PRICE P.C.
437 Madison Avenue                         1633 Broadway, 47th Floor
New York, NY  10022                        New York, New York 10019
(212) 907-7373                             (212) 407-7700

*Attorneys for Defendant Phillip R. Bennett*

                                           Daniel J. Standish
                                           Marc E. Rindner
                                           Cara Tseng Duffield
                                           WILEY REIN LLP
                                           1776 K Street, N.W.
                                           Washington, D.C. 20006
                                           (202) 719-7000

                                           *Attorneys for Plaintiff Arch Insurance Company*


**SO ORDERED, this _____ day of _____, 2008**


**By:** _____


-2-

# EXHIBIT Q

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ARCH INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>v.<br><br>JOHN D. AGOGLIA, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Index No.: 08/600029

**[PROPOSED] JUDGMENT AGAINST
DEFENDANT PHILLIP R. BENNETT**

Before the Court is Plaintiff Arch Insurance Company ("Arch") and Defendant Phillip R. Bennett ("Bennett")'s Stipulated Order for Entry of Judgment against Defendant Phillip R. Bennett. The Parties' Stipulated Order having been "so ordered" and entered by the Court, it is hereby adjudged and declared that:

1. Bennett waived formal service of process under C.P.L.R. 308 and acknowledged service and receipt of Arch's Amended Summons and the FAC on February 28, 2008;

2. Pursuant to the Parties' stipulation, Bennett is not entitled to any coverage whatsoever under the Arch Policy for any of the Underlying Matters or for any action, proceeding, investigation or other matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3. Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count I of the FAC;

4. Pursuant to the Parties' stipulation, judgment is entered against Bennett on Count II of the FAC;

5. Bennett has waived any right to appeal the judgment entered against him; and

6. Each party shall bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

By: _____
    Clerk

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |  |
|---|---|---|
| ARCH INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Index No.: 08/600029 |
| v. | ) ) ) | |
| JOHN D. AGOGLIA, *et al.*, | ) ) | **STIPULATION OF PARTIAL** |
| Defendants. | ) ) ) | **DISCONTINUANCE WITH** **PREJUDICE** |
| | ) ) ) | |

Plaintiff Arch Insurance Company ("Arch") and Defendant Robert C. Trosten ("Trosten"), by and through their undersigned attorneys, jointly file this Stipulation of Partial Discontinuance with Prejudice.

WHEREAS, certain individuals have sought coverage under the "Arch Policy" for the "Underlying Matters," as those terms are defined in the First Amended Complaint for Declaratory Judgment (the "FAC") filed by Arch on February 22, 2008;

WHEREAS, Trosten has acknowledged that he presently is not seeking, and will not seek in the future, coverage under the Arch Policy for the Underlying Matters or for any other demand, action, proceeding or investigation, including, but not limited to, any demand, action, proceeding or investigation based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters; and

WHEREAS, no party to this action is an infant, incompetent or person for whom a committee has been appointed.

**RECEIVED**

APR 25 2008

**NEW YORK**
**COUNTY CLERK'S OFFICE**

**NOW THEREFORE IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned, who have been duly authorized by Arch and Trosten to enter into this Stipulation, as follows:

1.     Trosten waives formal service of process under C.P.L.R. 308 and acknowledges service and receipt of Arch's Amended Summons and the FAC on March 3, 2008;

2.     Trosten relinquishes, waives and forever releases any and all claims that he may have had, have now or have in the future for coverage or payment under the Arch Policy for the Underlying Matters or for any other demand, action, proceeding or investigation, including, but not limited to, any matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

3.     Trosten agrees that he is not now and will not ever seek coverage or payment under the Arch Policy for any demand, action, proceeding or investigation, including, but not limited to, any matter based upon, arising out of, or involving the facts and circumstances underlying or alleged in any of the Underlying Matters;

4.     Arch's causes of action asserted in the FAC are discontinued with prejudice as against Trosten only; and

5.     Each party shall bear its or his respective attorneys' fees and costs incurred in connection with this action and any other coverage litigation between the parties.

Dated: April 25, 2008

_[signature]_

Barbara Moses
MORVILLO, ABRAMOWITZ, GRAND,
IASON & SILBERBERG, PC
565 Fifth Avenue
New York, New York 10017
(212) 880-9540

*Counsel for Defendant Robert C. Trosten*

_[signature]_

John H. Eickemeyer
Daniel C. Green
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019
(212) 407-7700

Daniel J. Standish
Marc E. Rindner
Cara Tseng Duffield
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel for Plaintiff Arch Insurance Company*

**SO ORDERED, this ____ day of _____, 2008**

**By:** _____

-3-

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                           ) ss.:
COUNTY OF NEW YORK  )

      JOHN H. EICKEMEYER, being sworn, says:

      1.    I am not a party to the action, am over 18 years of age and reside in Eastchester, New York.

      2.    On April 25 2008, I caused a true copy of the within **STIPULATION OF PARTIAL DISCONTINUANCE WITH PREJUDICE** to be served by electronic and U.S. mail upon each defendant in this action through their counsel as follows:

| Defendant(s) | Counsel |
|---|---|
| Agoglia, John D.<br>McCarthy, Peter J. | William Fleming, Esq.<br>Gage Spencer & Fleming, LLP<br>410 Park Avenue<br>New York, NY 10022<br>(212) 768-4900<br>wfleming@gagespencer.com |
| Bennett, Phillip R. | Jeffrey T. Golenbock, Esq.<br>Golenbock Eisman Assor<br>  Bell & Pesko LLP<br>437 Madison Avenue<br>New York, NY 10022<br>(212) 907-7373<br>jgolenbock@golenbock.com |
| Breitman, Leo R.<br>Gantcher, Nathan<br>Harkins, David V.<br>Jaekel, Scott L.<br>Lee, Thomas H.<br>O'Kelley, Ronald L.<br>Schoen, Scott A. | Paul A. Ferrillo, Esq.<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>(212) 310-8372<br>Paul.ferrillo@weil.com |
| Cox, Edwin | Martin R. Bennett, Esq.<br>Kugle, Skelton & Bennett<br>130 E. Corsicana, Ste. 302<br>Athens, TX 75751<br>(903) 675-5151<br>mbennett@ksbpc.com |

| Defendant(s) | Counsel |
|---|---|
| Dhillon, Sukhmeet<br>Lipoff, Eric | Neil A. Goteiner, Esq.<br>Farella, Braun & Martel<br>235 Montgomery Street, 30th Floor<br>San Francisco, CA 94104<br>(415) 954-4485<br>ngoteiner@fbm.com |
| Dittmer, Thomas H. | Thomas C. Wolford, Esq.<br>Neal Gerber & Eisenberg, LLP<br>2 North LaSalle Street<br>Chicago, IL 60602<br>(312) 269-5675<br>Twolford@ngelaw.com |
| Grady, Stephen | Lawrence J. Kotler, Esq.<br>Duane Morris & Heckscher, LLP<br>30 South 17th Street<br>Philadelphia, PA 19103<br>(215) 979-1514<br>ljkotler@duanemorris.com |
| Grant, Tone | William A. Schreiner, Jr., Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street, NW, Suite 1000<br>Washington, D.C. 20036<br>(202) 778-1858<br>wschreiner@zuckerman.com |
| Klejna, Dennis | Helen Kim, Esq.<br>Katten Muchin Rosenman, LLP<br>2029 Century Park East, Suite 2600<br>Los Angeles, CA 90067<br>(310) 788-4525<br>Helen.kim@kattenlaw.com |
| Maggio, Santo C. | Scott E. Hershman, Esq.<br>Hunton & Williams<br>200 Park Avenue, 43rd Floor<br>New York, NY 10166<br>(212) 309-1053<br>shershman@hunton.com |

| Defendant(s) | Counsel |
|---|---|
| Mutterer, Frank | Janet Costello, Esq.<br>Gibbons, P.C.<br>One Gateway Center<br>Newark, NJ 07102<br>973-596-4825<br>jcostello@gibbonslaw.com |
| Murphy, Joseph | John R. Jerome, Esq.<br>Saul Ewing, LLP<br>245 Park Avenue<br>24th Floor<br>New York, NY 10167<br>jjerome@saul.com |
| Outridge, Richard N. | Claire P. Gutekunst<br>Proskauer Rose, LLP<br>1585 Broadway<br>New York, NY 10036<br>(212) 969-3421<br>cgutekunst@proskauer.com |
| Sexton, William M.<br>Sherer, Gerald | Ivan Kline, Esq.<br>Friedman & Wittenstein, P.C.<br>600 Lexington Avenue<br>New York, NY 10022<br>(212) 750-8700<br>ikline@friedmanwittenstein.com |
| Silverman, Philip | Richard Cashman, Esq.<br>Heller Ehrman, LLP<br>Times Square Tower<br>7 Times Square<br>New York, NY 10036<br>(212) 847-8796<br>Richard.cashman@hellerehrman.com |
| Trosten, Robert C. | Barbara Moses, Esq.<br>Morvillo, Abramowitz, Grand, Iason &<br>Silberberg, PC<br>565 Fifth Avenue<br>New York, NY 10017<br>(212) 880-9540<br>bmoses@magislaw.com |

3.    On April 25, 2008, I caused a true copy of the within **STIPULATION OF PARTIAL DISCONTINUANCE WITH PREJUDICE** to be served by U.S. mail upon Richard N. Outridge at 24 Pennbrook Drive, Lincoln University, Pennsylvania 19352.

JOHN H. EICKEMEYER

Sworn to before me this
25th day of April, 2008

Notary Public

FRANCINE TORMEY
Notary Public, State of New York
Registration No. 01TO6143179
Qualified in Queens County
Commission Expires April 3, 2010
Certificate on File in New York County

# EXHIBIT R

84H9GRAF1.txt

3078

84H9GRAF
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,              New York, N.Y.
3
4              v.                           S4 05 Cr. 1192 (NRB)
4
5    TONE GRANT,
5
6                   Defendant.
6
7    ------------------------------x
7
8
8                                           April 17, 2008
9                                           @ a.m.
9
10
10   Before:
11
11                   HON. NAOMI REICE BUCHWALD,
12
12                                           District Judge
13
13
14                           APPEARANCES
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   BY:  NEIL BAROFSKY
17        CHRISTOPHER GARCIA
17        Assistant United States Attorneys
18
18   ZUCKERMAN SPAEDER, LLP
19        Attorneys for Defendant
19   BY:  ROGER ZUCKERMAN
20        AITAN GOELMAN
20        NORMAN EISEN
21
21
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

□                                                                 3095

84H9GRAF
1    the jury because I actually didn't have the verdict form.
2             MR. ZUCKERMAN:  All right.
3             THE COURT:  Josh, do you want to give this to
4    Mr. Zuckerman.
5             (Recess pending verdict)
6             (In open court; jury not present)
7             THE COURT:  The last note which is timed at 2:40,
8    although the jurors apparently don't know what day it is
9    because they said it was April 19.  The note reads:  "We have
10   reached our verdict."
11             So at this time call the jury back in.
                           Page 1

84H9GRAF1.txt

12                (Jury renders verdict; time noted:  2:52 p.m.)
13           THE COURT:  Please be seated.  We have received your
14  note that you've reached a verdict.  And we will now proceed to
15  take that verdict.  Josh.
16           THE DEPUTY CLERK:  Will the jurors please answer
17  present when your name is called.
18                (Jury roll called; all present)
19           Will the foreperson please rise.
20           Has the jury agreed upon a verdict?
21           THE FOREPERSON:  Yes.
22           THE DEPUTY CLERK:  With respect to Count 1, conspiracy
23  to commit securities fraud, wire fraud, bank fraud and/or money
24  laundering, how do you find the defendant with respect to Count
25  1?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              3096

84H9GRAF
1            THE FOREPERSON:  Guilty.
2            THE DEPUTY CLERK:  Count 2, securities fraud.  How do
3   you find the defendant with respect to Count 2?
4            THE FOREPERSON:  Guilty.
5            THE DEPUTY CLERK:  Count 3, wire fraud.  How do you
6   find the defendant with respect to Count 3?
7            THE FOREPERSON:  Guilty.
8            THE DEPUTY CLERK:  Count 4, bank fraud.  How do you
9   find the defendant with respect to Count 4?
10           THE FOREPERSON:  Guilty.
11           THE DEPUTY CLERK:  Count 5, money laundering.  How do
12  you find the defendant with respect to count five?
13           THE FOREPERSON:  Guilty.
14           THE DEPUTY CLERK:  Ladies and gentlemen of the jury,
15  listen to your verdict as it stands recorded.
16           With respect to Count 1, the defendant is found
17  guilty.
18           With respect to Count 2, the defendant is found
19  guilty.
20           With respect to Count 3, the defendant is found
21  guilty.
22           With respect to Count 4, the defendant is found
23  guilty.
24           With respect to Count 5, the defendant is found
25  guilty.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              3097

84H9GRAF
1            THE COURT:  Ladies and Gentlemen, is that your
2   verdict?
3            THE JURY:  Yes.
4            THE COURT:  Is there any further request to poll the
5   jury?
6            MR. ZUCKERMAN:  Yes, your Honor, please poll jury.
7                (Jury polled; each juror answered in the affirmative)
8            THE DEPUTY CLERK:  Jury polled.  Verdict unanimous.
9            THE COURT:  Counsel, other than my thanking the jury
10  for their service, do we need to keep them any further?
11           MR. ZUCKERMAN:  No, your Honor.
12           MR. BAROFSKY:  No, your Honor.
13           THE COURT:  Ladies and Gentlemen, when I was talking
14  to you yesterday and excusing the alternate jurors, I told you
15  then that I thank you for your service.  I never thank a jury
16  for its particular verdict.  That is always your decision.  And
                              Page 2

84H9GRAF1.txt
```
17    I think -- I explained fairly clearly yesterday why it is that
18    we thank you and it's for your service and taking the time out
19    of your lives and in your case for being such a really terrific
20    jury.  We never had to wait for you in the morning, and I know
21    some of you came from quite a distance.  And you were
22    attentive.  And you worked hard.  And we very much appreciate
23    your service.  And I thank you again.  And you're excused.
24    Okay.  Thank you very much.
25                (Jury discharged)
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

# EXHIBIT R

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | **Chapter 11** |
| **REFCO, INC., et al.,** | : | |
| | : | **Case No. 05-60006 (RDD)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| **AXIS REINSURANCE COMPANY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Adv. Proc. No. 07-01712 (RDD)** |
| | : | |
| | : | |
| **PHILLIP R. BENNETT, et al.,** | : | |
| | : | [caption continued on next page] |
| Defendants. | : | |

-------------------------------------------------------------------x

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

*402488.1*

```
---------------------------------------------------------------x
TONE N. GRANT, et al.,                          :
                                                :
                Plaintiffs,                     :
                                                :
        v.                                      :    Adv. Proc. No.  07-2005 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                Defendant.                      :
---------------------------------------------------------------x
LEO R. BREITMAN, et al.,                        :
                                                :
                Plaintiffs,                     :
                                                :
        v.                                      :    Adv. Proc. No.  07-2032 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
                Defendant.                      :
---------------------------------------------------------------x
```

Upon the motions (the "Motions"), dated September 25, 2007, of Tone N. Grant, Robert C. Trosten, Phillip R. Bennett, Dennis Klejna, William M. Sexton, Gerald Sherer, Philip Silverman, Joseph Murphy, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L. O'Kelley, and Scott A. Schoen (the "Moving Insureds"), for entry of an order, pursuant to Fed. R. Civ. P. 56, applicable to this proceeding pursuant to Fed. R. Bankr. P. 7056, granting summary judgment against Axis Reinsurance Company ("Axis"), all as more fully set forth in the Motions; and the Court having jurisdiction to consider the Motions and the relief requested therein pursuant to 28 U.S.C. §§ 157, 1334, and 2201; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motions having been provided; and the Court having reviewed the Motions and the objections and other pleadings related thereto; and upon the record of the October 12, 2007

2

hearing thereon; and after due deliberation and sufficient cause appearing therefor, the Court having found for the reasons stated in Exhibit A hereto, which amends and supersedes the Court's bench ruling appearing in the October 12, 2007 hearing transcript, that no genuine issue of material fact exists and that the Moving Insureds are entitled to judgment as a matter of law, it is hereby

ORDERED that the Motions are granted in all respects; and it is further

ORDERED that under the terms of the Axis Policy Axis shall advance, subject to a complete reservation of rights, privileges, and defenses of the parties under the Axis Policy,[1] Defense Costs incurred by the Moving Insureds in defense of the various matters asserted against them related to the demise of Refco, Inc. (the "Claim"), unless and until: (1) there is a final determination that (a) the Claim is not covered by the Axis Policy, or (b) such Defense Costs are not covered under the Axis Policy; or (2) the Limit of Liability of the Axis Policy has been exhausted; and it is further

ORDERED that Axis shall notify counsel to the Plan Administrators of the Modified Joint Chapter 11 Plan (the "Refco Plan") of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Plan Administrators") when the advancement of Defense Costs hereunder exceeds $2 million in the aggregate, and in increments of $100,000 thereafter; provided, that if individual statements for Defense Costs exceed $100,000, Axis need only notify the Plan Administrators of payment of such bills, without breaking such advances into $100,000 increments; and it is further

ORDERED that entry of this Order shall be without prejudice to the right of the Plan Administrators or any party in interest to seek the re-imposition of the injunction provided

---

[1] Capitalized terms used but not defined herein having the meanings ascribed to such terms in the Motions and the insurance policies referred to therein.

3

for in the Refco Plan, on a prospective basis with respect to any advances of Defense Costs not yet made, for cause shown on appropriate notice to the Insureds and Axis; and it is further

ORDERED that nothing in this Order shall modify this Court's Order confirming the Refco Plan, including paragraph 34(b) thereof, or constitute a determination that the automatic stay under 11 U.S.C. § 362(a) applies to the actions described in the third decretal paragraph hereof; and it is further

ORDERED that Axis' (a) motion seeking a declaratory judgment with regard to the Moving Insureds' obligations under the Axis policy to refund advanced Defense Costs and (b) request for a determination of the priority and proper allocation of Defense Costs or other Losses under the Axis Policy and denied without prejudice to the rights of all parties to and beneficiaries of the Axis Policy regarding such issue; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Moving Insureds file a memorandum of law in support of the Motion is hereby waived, and it is further

ORDERED that this Order shall be deemed to constitute a separate order on each of the Motions.


Dated: October 19, 2007
       New York, New York


                              /s/Robert D. Drain
                              UNITED STATES BANKRUPTCY JUDGE


4



1   UNITED STATES BANKRUPTCY COURT
2   SOUTHERN DISTRICT OF NEW YORK
3
4
5
6            **EXHIBIT A**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2

1

2          THE COURT:  All right.  I have before me in this

3   adversary proceeding motions for summary judgment in respect of

4   the claim that Axis Reinsurance Company is obligated to advance

5   defense costs to the insureds under its excess liability policy

6   on behalf of directors and officers of Refco, Inc.

7          The movants, all former directors or officers of

8   Refco, are Messrs. Klejna, Sexton, Sherer and Silverman,

9   Murphy, Breitman, Gantcher, Harkins, Jaeckel, Lee, O'Kelley and

10  Shoene and Grant, Trosten and Bennett.  I believe that includes

11  all the moving insureds.

12         Federal Rule of Civil Procedure 56(c), which is made

13  applicable in adversary proceedings in bankruptcy cases

14  pursuant to Bankruptcy Rule 7056, controls the standard in

15  respect of these motions for summary judgment.  Rule 56(c)

16  provides that summary judgment shall be granted if the

17  pleadings, depositions, answers to interrogatories and

18  omissions on file together with the affidavits, if any, show

19  that there is no genuine issue as to any material fact and that

20  the moving party is entitled to judgment as a matter of law.

21  Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986).

22         In deciding a motion for summary judgment, the Court

23  must determine if there are any material factual issues to be

24  tried while at the same time, since the nonmoving party would

25  be precluded from a trial if the relief were granted, the Court

3

1  should resolve ambiguities and draw reasonable inferences in

2  favor of the party opposing the motion.  Matsushita v. Zenith

3  Radio Corporation, 475 U.S. 574, 587 (1986); Knight v. U.S.

4  Fire Insurance Company, 804 F.2d 911 (2d Cir. 1986).

5       The burden ultimately rests on the moving party to

6  establish the absence of a genuine issue as to any material

7  fact, Celotex, 477 U.S. at 322-23.  The nonmoving party may

8  oppose a summary judgment motion only by making a showing that

9  there's a genuine issue as to a material fact in support of a

10 verdict for that party, Anderson v. Liberty Lobby, Inc., 477

11 U.S. 242, 247-48 (1986).  That is, the mere existence of a

12 scintilla of evidence in support of its position will be

13 insufficient.  There must be evidence on which a jury could

14 reasonably find for the nonmoving party.  Id.

15      Thus, the nonmoving party may not defeat a summary

16 judgment motion by relying on self-serving or conclusory

17 statements.  There must be something more than some

18 metaphysical doubt as to a material fact.  There needs to be

19 specific evidence of a material fact at issue, although of

20 course, once that evidence is shown, the Court moves on to the

21 trial stage; that is, the evidence need not be probative at the

22 summary judgment stage.  See generally, again, Matsushita v.

23 Zenith, 475 U.S. at 586.

24      In this case, the question before the Court is

25 whether there's a genuine issue of material fact as to whether

4

1   Axis' unilateral decision to deny payment of defense costs to
2   the plaintiff insureds breaches the Axis policy.  In
3   determining that issue on summary judgment, the parties have
4   directed me primarily to the terms of the policy and, in
5   particular, the terms of the provision governing the
6   advancement of defense costs, paragraph (d)(2), as well as
7   various alleged coverage exclusions in the policy and other
8   claimed defenses to payment.  They have submitted their
9   statements of undisputed material facts, and in Axis's case a
10  response in certain instances controverting the plaintiffs'
11  statements.

12          In reviewing that record, it is clear to me that this
13  is a dispute upon which the Court must focus primarily on the
14  language of the relevant provisions of the insurance policy.
15  Accordingly, this type of dispute, involving as it does the
16  scope of insurance coverage for defense costs, is a
17  particularly appropriate vehicle, as noted by numerous courts,
18  for summary judgment. See United Capital Corporation v.
19  Travelers Indemnity Company of Illinois, 237 F. Supp. 2d 270,
20  274 (S.D.N.Y. 2002).  And that is because, generally, insurance
21  policy disputes hinge, as this one does, on the terms of the
22  contract, and contract determination often lends itself to
23  summary judgment analysis.

24          I previously determined in this proceeding that the
25  dispute -- and in particular the interpretation of the contract

5

1  at issue -- is governed by New York law, having applied a New
2  York choice of law analysis and determined, as I set forth on
3  the record the hearing on August 30, 2007, that New York
4  choice of law principles, given the locus of the dispute and
5  the domicile of the parties, would lead to the application of
6  New York law.

7        That transcript is attached to the parties'
8  submissions, to both Ms. Kim's declaration as well as
9  Ms. Gilbride's declaration in support of Axis's cross motion at
10  Exhibit B.

11        Under New York law, a written contract is to be
12  interpreted so as to give effect to the intention of the
13  parties as expressed in the unequivocal language they've
14  employed, Kruden v. Bank of New York, 957 F.2d 961, 976 (2d
15  Cir. 1992).  Under New York law, if a contract is unambiguous
16  on its face its proper construction is a question of law.  The
17  Court should not look beyond its confines to extrinsic evidence
18  if its relevant provisions are clear and unambiguous.  See
19  generally Metropolitan Life Insurance Company v. RJR Nabisco,
20  Inc., 906 F.2d 884, 889 (2d Cir. 1990); W.W.W. Associates, Inc.
21  v. Giancontieri, 77 NY 2d 157, 162 (1990); and Vermont Teddy
22  Bear Company, Inc. v. 538 Madison Realty Company, 1 NY 3d 470
23  (2004).

24        Giving the terms of the contract their plain meaning,
25  a court should find contractual provisions ambiguous only if

6

1  they are reasonably susceptible to more than one interpretation

2  by reference to the contract alone. Krumme v. Westpoint

3  Stevens, Inc., 238 F.3d 133, 139 (2d Cir. 2000). Contract

4  language is unambiguous if it has a definite and precise

5  meaning unattended by danger of misconception in the purport of

6  the contract itself and concerning which there's no reasonable

7  basis for a difference of opinion. Metropolitan Life Insurance

8  v. RJR Nabisco, 986 F.2d at 889. Language whose meaning is

9  otherwise plain is not ambiguous merely because the parties

10 urge different interpretations in the litigation. Id.

11        Those contract interpretation rules are generally

12 followed in New York in respect of insurance policies, but, in

13 addition to those general principles, there are specific

14 contract interpretation rules that apply to insurance policies

15 that are relevant to this dispute, or potentially relevant.

16        Thus, with regard to the interpretation of an

17 insurance contract, the courts view the plain language of the

18 contract as the best and, if plain, the only, measure of the

19 parties intentions; and the initial interpretation of the

20 contract is a matter of law for the Court to decide, as set

21 forth in, among other decisions cited by the parties, In Re:

22 WorldCom, Inc. Securities Litigation, 354 F.Supp. 2d 455, 463-

23 464 (S.D.N.Y. 2005).

24        However, in that opinion District Judge Cote goes on

25 to state additional, well-established rules with regard to  the

7

1   interpretation of insurance contracts under the law of New
2   York.   First, to the extent an ambiguity exists in respect of
3   an insurance contract governed by New York law that is
4   unresolved by extrinsic evidence, such ambiguity must be read
5   against the insurer. WorldCom, 354 F.Supp.2d at 464. See also
6   McCostis v. Home Insurance Company of Indiana, 31 F.3d 910, 113
7   (2d Cir. 1994).  Second, Judge Cote notes that the rule that
8   insurance policies are to be construed in favor of the insured
9   is most rigorously applied in construing the meaning of
10  exclusions incorporated into a policy of insurance or
11  provisions seeking to narrow the insurer's liability. WorldCom,
12  354 F.Supp.2d at 464.  And, finally, under New York law where a
13  contract of insurance includes the duty to defend or to pay for
14  the defense of the insured (and I note that Judge Cote makes no
15  distinction between the two concepts, i.e., the duty to defend
16  and the duty to pay for the defense of the insured), that duty
17  is "a heavy one" and, indeed, has been found for many years to
18  apply even if the policy of indemnity does not specifically
19  provide for advancement. Id.  "In sum" -- again I'm quoting
20  from the WorldCom opinion at page 464 -- "the duty to pay
21  defense costs is construed liberally and any doubts about
22  coverage are resolved in the insured's favor."

23          My review of Axis's statement of uncontroverted facts
24  and its response to the statements of undisputed material facts
25  submitted in various of the movants' Rule 7056(1) statements
26  confirms that most of the issues in this case are

8

1 uncontroverted, including, obviously, the terms of the

2 underlying policy, which incorporates, with the specific

3 exceptions stated in the Axis policy, the primary policy issued

4 by the primary insurer.  In addition, Axis does not dispute

5 that claims in the underlying litigation against the insureds

6 constitute "claims" as a defined term in the primary policy for

7 "wrongful acts," as also defined in the primary policy, or that

8 the movants here are insured or are "insureds," and that they

9 have incurred and will continue to incur defense costs under or

10 in response to the underlying litigations.

11 There's also no dispute, and of course the policy

12 speaks for itself, that the term "loss" in the primary policy,

13 as incorporated with specific exceptions by the Axis policy,

14 includes defense costs that an insured is legally obligated to

15 pay as a result of any claim.  It's also not disputed that the

16 insureds have given Axis notice on a timely basis of their

17 claims under the policy.

18 What is disputed by Axis is, first, whether

19 exclusions unique to its policy, which I primarily take to be

20 the prior knowledge exclusion set forth in endorsement number

21 six to the policy, but also other potential exclusions and

22 defenses, apply here to prevent the defense costs from being

23 covered claims under the Axis policy.

24 In addition, the parties also dispute whether, under

25 the language of the primary policy -- specifically paragraph

26 (d)(2) -- Axis is obligated to pay defense costs on an as-

9

1   incurred basis in light of Axis' contention that the exclusions

2   that it has noted apply here to preclude coverage.  The issue

3   was first raised by Axis apparently in a letter, attached as

4   Exhibit 9 to the Kim declaration, disclaiming coverage on the

5   basis of various exclusions as well as an alleged breach of

6   warranty.

7           Notably, Axis has not offered any material fact as to

8   any extrinsic aid to interpretation of paragraph (d)(2) in the

9   primary policy or as to any other provision, for that matter,

10  of the applicable insurance policies.

11          I conclude based on the record before me for purposes

12  of these motions that, in fact, there is a hotly contested

13  dispute as to whether the policy exclusions alleged by Axis

14  would apply here to render the insureds' losses, including

15  defense costs, to not be covered by the policy.  Specifically,

16  each of the movants, each of the insureds, has in this

17  adversary proceeding taken the position that it is not

18  precluded from coverage by the knowledge exclusion in the Axis

19  policy or the prior acts exclusion or breach of warranty

20  defense, and, furthermore, certain of the insureds (as set

21  forth in Exhibits 10, 12 and 13 of the Kim declaration at

22  paragraphs 43 through 45) have in addition taken the position

23  that the knowledge exclusion itself is an improper endorsement

24  to the policy.

25          I previously ruled, as set forth in the transcript of

26  the August 30, 2007 hearing, that the issue of whether, in

10

1  fact, the insureds' losses are covered under the Axis policy in
2  light of the prior knowledge exclusion -- as well as the other
3  exclusions and defenses raised by Axis -- should not be decided
4  at this time in light of the substantial overlap of those
5  issues, *i.e.*, whether in fact there was prior knowledge of a
6  claim and/or loss, with the issues pending before the District
7  Courts in the multi-district securities litigation as well as
8  in respect of certain of the insureds' pending criminal
9  litigation in the Southern District.  I won't repeat that
10 ruling now except to note that in my view it was dictated by
11 clear precedent which, as was brought out at the hearing as set
12 forth in the transcript, essentially subordinates the interest
13 of the insurer to have a prompt determination of such a
14 coverage dispute behind the interest of the insured to pursue
15 its overlapping defense in the primary litigation that
16 allegedly gives rise to the insured claim or loss.

17        That context is important to keep in mind in
18 connection with the present motions, because it sets the stage
19 for the fairly narrow issue before me -- whether Axis is
20 contractually bound to advance defense costs before the final
21 determination of a dispute over whether a claim therefor is
22 covered under the Axis policy.

23        Again, that issue ultimately depends upon the Court's
24 interpretation of the following provision, paragraph (d)(2) of
25 the primary policy, which is incorporated by reference into the
26 Axis policy.  Section (d)(2) states: "The insurer will pay

11

1   covered defense costs on an as-incurred basis.  If it is
2   finally determined that any defense costs paid by the insurer
3   are not covered under this policy, the insured has agreed to
4   repay such noncovered defense costs to the insurer."

5           Axis contends that it is permitted by the foregoing
6   language to determine unilaterally not to pay defense costs on
7   an as-incurred basis if it believes that such defense costs are
8   not covered under its policy, that is, that they would be
9   subject to the exclusion or the exclusions under the policy or
10  another valid defense.  The movants contend, to the contrary,
11  that Axis is obligated under the paragraph that I just read --
12  particularly when construed in light of relevant case law and
13  the presumptions that I noted earlier that apply to exclusions
14  and insurance policies generally -- to advance their defense
15  costs until there is a final determination by an objective fact
16  finder that the defense costs are not covered. They take this
17  position, again, because they contend, and I conclude that the
18  record supports this, that there is a legitimate dispute as to
19  whether defense costs are covered, or not, under the terms of
20  the policy.

21          Both sides have asserted principles or maxims of
22  contract interpretation to assist the Court in determining
23  whether the language that I just quoted is ambiguous or not.
24  Not surprisingly, they both contend that the language is not
25  ambiguous, although, perhaps equally not surprisingly they both
26  contend that it means the opposite of what the other says it

12

1 means.

2          The interpretive principle they rely on primarily is

3 that a court should read a contract as a whole, giving meaning

4 to all of its parts, and should avoid an interpretation that

5 would render other provisions useless and meaningless; and I

6 have looked, as they have urged, at the other provisions of the

7 contract, including paragraph (d)(3) as well as the interplay

8 of the two sentences in paragraph (d)(2), in light of that

9 maxim.

10          Frankly, after having done so, I do not believe,

11 however, that the contract interpretation maxim that I just

12 recited is of much help, in that one could at least conceive of

13 uses for all of the language in paragraph (d)(2) to support

14 both sides' position.  I believe that paragraph (d)(3),

15 moreover, is really a provision going to a separate proposition

16 and consistent with, again, the principles pursuant to which

17 courts in New York interpret insurance policies, and,

18 particularly, policy exclusions bearing on the advancement of

19 defense costs, (d)(3) should be read narrowly, stand on its

20 own, and not be used to extend over, or into, an interpretation

21 of (d)(2).  See <u>Associated Electronic & Gas Insurance Services,</u>

22 <u>Ltd. v. Rigas</u>, 382 F.Supp.2d 685, 696-700 (E.D. Pa. 2004).

23          However, there is a more meaningful point to note

24 about the rest of the policy, which is that nowhere does it

25 state that, or even imply, except in (d)(3) in the specific and

26 limited instance covered thereby, that the insurer can

13

1  unilaterally or in the exercise of its reasonable judgment or

2  in any other way withhold defense costs absent a court

3  determination in the event of a dispute as to whether defense

4  costs are covered.  In light of the case law that I will go

5  into in a minute, which emphasizes the logic and policy behind

6  requiring the advancement of disputed defense costs, I conclude

7  that the absence of such language, in addition to the language

8  of (d)(2), which, again, says that the insurer will pay covered

9  costs and in the next sentence provides for a refund mechanism

10 if defense costs are finally determined to have not been

11 covered, that the reasonable and ordinary course colloquial

12 interpretation of paragraph (d)(2) is that, absent a final

13 determination by an objective fact finder, the insurer is

14 obligated to pay defense costs that the insured reasonably

15 contends are covered, notwithstanding the insurer's view that

16 those costs are excluded or not covered under the policy. In

17 other words, unless the insured's position on coverage is

18 clearly, facially wrong, the agreement contemplates that

19 defense costs will be advanced subject to later refund if the

20 coverage dispute ultimately is determined in the insurer's

21 favor.

22        As I said, I believe this interpretation is clear in

23 the context of the entire agreement, particularly because of

24 the refund mechanism in (d)(2) and the absence in the agreement

25 of any provision conferring on the insurer the unilateral

26 ability to make such a determination, but I note, too, that to

14

1   the extent that an ambiguity exists the insurer has offered up

2   no extrinsic evidence to support its interpretation of

3   paragraph (d)(2).  Consequently, I believe that under the law

4   of New York, in the absence of Axis offering up such evidence,

5   such an ambiguity would have to be interpreted against the

6   insurer.  Again, see McCostis v. Home Insurance Company in

7   Indiana, 31 F.3d 110, 113 (2d Cir. 1994), as well as the

8   discussion in Multi-Foods Corporation v. Commercial Union

9   Insurance Company,309 F.3d 76, 78 n.7 (2d Cir. 2002).

10          As I alluded to a moment ago, I'm not writing on a

11  clean slate with regard to this issue.  As far as I can tell,

12  every court that has considered the issue (and again I believe

13  it's a narrow issue as to whether, during the pendency of a

14  dispute as to coverage under a policy, an insurer may

15  unilaterally withhold the payment of defense costs) has

16  concluded that, to the contrary, the insurer is obligated to

17  advance the defense costs -- with the caveat that if it is

18  clear from the policy itself that all claims made against the

19  insured would not be covered, for example on a motion to

20  dismiss or summary judgment basis, the defense costs would need

21  to be advanced.

22          Here, as I noted, the applicability of the prior

23  knowledge exclusion and Axis' other defenses are hotly disputed

24  and the resolution of that dispute is not clear from the face

25  of the policy and the undisputed facts and may not be decided

26  until the overlapping issues are resolved in the underlying

15

1  district court securities and criminal litigation against the
2  insureds. Consequently, I believe that the case law would
3  support my conclusion that Axis is obligated to advance the
4  defense costs pending such determination. This issue has most
5  recently been dealt with, quite thoroughly, in <u>Federal</u>
6  <u>Insurance Company v. Tyco International Limited</u>, 784 N.Y.S.2d
7  920 (N.Y.Sup. 2004), <u>aff'd</u> <u>in part</u> <u>mod.</u> <u>in part</u>, <u>Federal</u>
8  <u>Insurance Co. v. Kozlowski</u>, 792 N.Y.S.2d 397 (1st Dep't. 2005),
9  in which the court, after noting numerous cases that considered
10 the issue in other jurisdictions, found that it is "... well
11 settled that the duty of an insurer to defend its insured or
12 pay its defense costs is distinct from and broader than its
13 duty to indemnify.  The duty exists whenever a complaint
14 against the insured alleges claims that may be covered under
15 the insurer's policy.  If any portion of a complaint might
16 result in coverage, the insurer must defend or pay defense
17 expenses for all claims, both covered and noncovered.
18 Conversely, the insurer has no duty if, as a matter of law, the
19 allegations in the complaint could not give rise to any
20 obligation to indemnify, or the allegations fall within the
21 policy exclusion.  But the duty to defend or pay defense costs
22 is construed liberally and any doubts about coverage are
23 resolved in insured's favor.  Furthermore, an insurer can only
24 evoke a policy exclusion to avoid coverage if it can show that
25 the allegations in the complaint cast that pleading solely and
26 entirely within the policy exclusions."  And, as noted in the

16

1  Appellate Division opinion, "[W]hile Federal must pay defense

2  costs as they are incurred in the securities action and the

3  criminal proceeding, its ultimate liability for such costs is

4  only with respect to such liabilities as fall under the

5  coverage provided. To the extent such liabilities are excluded

6  from coverage by the personal profit exclusion, Federal is not

7  required to pay for defense costs. Since this allocation cannot

8  be made at this juncture and the duty to defend is broader than

9  the duty to indemnify, Federal must pay all defense costs as

10 incurred, subject to recoupment when Kozlowski's liabilities,

11 if any, are determined." Federal Insurance Co. v. Kozlowski,

12 792 N.Y.S.2d at 404.

13      Thus, given the doubt raised by Mr. Kozlowski, the

14 insured, in his summary judgment motion as to whether the

15 insurer had met those stringent tests, the Appellate Division

16 concluded that pending a final determination of the disputed

17 coverage issues the insurer would need to advance defense

18 costs.  (I note that the court did so notwithstanding

19 allegations by the insurer regarding the obvious merits of its

20 various alleged defenses to payment, as Axis has alleged in

21 this proceeding that at least with regard to the alleged

22 conduct of Mr. Bennett the prior knowledge exclusion "clearly"

23 applies here.)

24      The New York courts have twice since the Koslowski

25 case adopted its rationale, although in one case in dicta.  In

26 Ghose v. CNA Reinsurance Company Limited, 841 N.Y.S.2d 519 (1st

17

1 Dept. 2007), the court stated, "We note, however, that if the

2 complaint were not being dismissed on grounds of inconvenient

3 forum, the interim award of defense costs would not be

4 disturbed.  New York law requires that a judicial order is a

5 condition precedent to the cessation of payment for defense

6 costs in circumstances where a claim has already been made,"

7 citing <u>Koslowski</u>.

8        Similarly, in <u>Trustees of Princeton University v.</u>

9 <u>National Union Fire Insurance Company of Pittsburgh</u>, 839

10 N.Y.S.2d 437 (Sup. Ct. 2007), the court, after noting many of

11 the same rules of construction that I quoted from the <u>Koslowski</u>

12 and <u>WorldCom</u> cases, stated,  "The insurer's duty to pay defense

13 costs arises when the insured incurs the expenses.  Where

14 coverage is disputed, insurers are required to make

15 contemporaneous interim advances of defense expenses subject to

16 recoupment in the event it is ultimately determined the policy

17 does not cover the claim."

18        A similar finding, albeit in respect of slightly

19 different policy language, was reached by Judge Cote in the

20 <u>WorldCom</u> opinion that I cited earlier, <u>In re WorldCom</u>

21 <u>Securities Litigation</u>, 354 F.Supp.2d at 455.  Axis has

22 attempted to distinguish the <u>WorldCom</u> opinion on two bases,

23 neither of which succeed.  The first is that Judge Cote was

24 dealing with a defense of rescission as opposed to a specific

25 alleged exclusion in the policy.  I don't accept that

26 distinction, however, because I believe that, in either case,

18

1  the key point was that there was a dispute as to whether there
2  was any obligation to pay on the insurer's part.

3          The second basis is that the advancement language in
4  the policy in WorldCom did not contain the word "covered"
5  before "defense costs," and used the word "shall" as opposed
6  to "will" before the word "pay." But, for the same reason that
7  I don't believe the first distinction is meaningful, I don't
8  believe the second one is, either. In either case, the issue
9  hinged upon whether the insurer could unilaterally act to
10 withhold payment based on its interpretation of whether it was
11 obligated to pay: here, whether the claim was excluded from
12 coverage, in WorldCom, whether the policy was void ab initio.
13 I believe Judge Cote's logic in finding a duty to pay pending
14 judicial determination of the underlying dispute would apply
15 under either scenario.

16         The claimed distinction that I just discussed was
17 addressed expressly, moreover, by the District Court for the
18 Eastern District of Pennsylvania in Associated Electric and Gas
19 Insurance Services Limited v. Rigas, 382 F. Supp. 2d 685 (E.D.
20 Pa. 2004). Because of a prior Third Circuit opinion, Little v.
21 MGIC Indemnity Corporation, 836 F.2d 789 (3d Cir. 1987), the
22 court in the Rigas case had little trouble finding that the
23 insurer's rescission allegation did not give it the unilateral
24 right to withhold defense costs. The Rigas court then
25 separately considered, however, whether a unilateral right
26 existed in respect to withholding advancement of defense costs

19

1  because of alleged applicable exclusions from coverage,
2  including a prior knowledge exclusion, which, like the Axis
3  policy exclusion, did not expressly require a final
4  adjudication for the exclusion to take effect.  As here,
5  however, the court in the _Rigas_ case noted that the prior
6  knowledge exclusion also did not contain any language to
7  suggest that it operated at the discretion of the insurer.

8          In the _Rigas_ case, the court determined that the
9  carrier had a duty to contemporaneously pay the disputed
10  defense costs, given the policy's language in respect of
11  defense costs and the generally recognized obligation under an
12  indemnity policy to pay whenever the insured is legally
13  obligated to pay such costs.  As here, there was no dispute in
14  the _Rigas_ case that the insureds owed money to the lawyers
15  defending them and that this was a legal obligation.  Thus, the
16  carriers had a duty to contemporaneously pay such defense costs
17  unless that duty was altered by some other provision in the
18  policy.

19          The _Rigas_ court concluded that the policy's knowledge
20  exclusion and other provisions were ambiguous on this point,
21  permitting two different interpretations of whether a
22  unilateral right to withhold payment was lodged in the insurer
23  (although, here, no other policy provision gave the insurer
24  such a right.)  However, since under Pennsylvania law,
25  similarly to New York law, the policy exclusion had to be
26  construed in favor of the insureds and against the insurer, the

20

 1  ambiguity would not be read to permit unilateral insurer

 2  action. Rigas, 382 F.Supp.2d at 700.

 3          Here, as I said, I go further and find that the

 4  absence of a provision giving the insurer the unilateral right

 5  to withhold defense costs, especially in light of paragraph

 6  (d)(2)'s second sentence, means that (d)(2) is not ambiguous;

 7  but as I said before, based on the absence of any extrinsic

 8  evidence offered to clarify any alleged ambiguity, under New

 9  York law the provision would in any event be construed in favor

10  of the insureds and against the insurer here, as in Rigas.

11          Two recent cases from other jurisdictions which

12  generally have the same basic insurance law contract

13  interpretation principles as New York are also worth noting.

14  First, in G-1 Holdings, Inc. v. Reliance Insurance Company,

15  2006 U.S. District Lexis 17597 (D.N.J. March 22, 2006), the

16  court concluded that although the defendants argued that

17  various exclusions operated to bar coverage, "An insurer's duty

18  to defend is determined by comparing the allegations in the

19  underlying complaint with the language of the policy at issue.

20  Here, the Court has already found that there is a potential for

21  coverage should the alleged facts be proven true... Moreover,

22  should it later be adjudicated that the policy does not apply

23  to the underlying allegations, the policy specifically provides

24  for the insurer to be reimbursed." Thus the insurer was

25  required to advance the defense costs.

26          The court in Sun-Times Media Group, Inc. v. Royal &

21

1  <u>Sunalliance Insurance Company of Canada</u>, 2007 WL 1881 265 (Del.

2  Super. June 20, 2007), makes a similar point:  "Furthermore,

3  the personal exclusions do not override a present contractual

4  duty to advance defense costs unless the defendants can

5  unequivocally now show that all of the obligations in the

6  underlying Illinois class action complaint fall within the

7  personal conduct exclusions....  Because the defendants have

8  failed to show at this time the applicability of the exclusions

9  to International, the Court need not decide the potential

10 applicability of the exclusions at this time."  Again, the <u>Sun-</u>

11 <u>Times</u> court noted that the policy provided, as paragraph (d)(2)

12 does here, that "Such advance payments by the insurer shall be

13 repaid to the insurer to the extent that any such insured shall

14 not be entitled under the policy ultimately to such payment."

15 And then it concluded, "Therefore, the plain language of the

16 policy guaranteeing an advancement of defense costs is not

17 precluded by any imputation of exclusions to International, as

18 well as (as explained earlier) to the outside directors."

19        In light of that case law, I find that under the

20 language of the Axis policy -- including its implicit

21 incorporation of the extensive case law regarding how such

22 policies are to be interpreted under New York law -- that

23 pending a resolution of the coverage dispute, Axis is obligated

24 to advance defense costs.  That coverage dispute is an issue

25 that the Court could and would normally decide promptly.

26 However, as I ruled on August 30, 2007, that issue cannot be

1   decided by me here because of the substantial overlap doctrine.
2   But that is not a reason for changing the rule that I have just
3   articulated, as is, again, I believe, supported by the Rigas
4   case, where the District Court was precluded by the stay in the
5   Adelphia bankruptcy case from deciding the coverage issue but
6   nevertheless concluded that the insurer was obligated to
7   advance the defense costs pending the resolution of the
8   coverage dispute. 382 F.Supp.2d at 700. The holding also
9   comports with the policy, discussed in WorldCom, Tyco, and
10  Rigas, of not depriving the director and officer insureds of
11  the means to contest their underlying liability.

12          So, for those reasons, I will grant the insureds'
13  motions for summary judgment.

14          Let me turn then to the cross motion for summary
15  judgment by Axis, which seeks a declaratory judgment that if,
16  in fact, it is subsequently determined by a court that the
17  defense costs are not covered, i.e., that an exclusion applies,
18  or for some other reason the defense costs are not covered by
19  the policy, the insureds who have been paid their defense costs
20  by Axis are obligated to reimburse Axis for those costs.

21          Obviously, the contract provision that I quoted
22  earlier, paragraph (d)(2), says what it says. And the fact
23  that it provides for repayment is an element of my reasoning,
24  as were similar refund or recoupment provisions in numerous
25  other cases that I have cited.  However, I do not believe that
26  Axis has set forth the basis under the Declaratory Judgment Act

23

1  for a ruling on its motion, given that I believe there is no
2  justiciable controversy before me, as no insured has refused to
3  return any funds (obviously because there's yet to be any
4  determination that such payments were not covered or such
5  losses were not covered under the policy).

6        Nor, to my knowledge, has any insured disclaimed that
7  the refund of defense costs would be the appropriate result if
8  such a determination of non-coverage eventually is made, and
9  Axis has not pointed out any such disclaimer to me or cited
10 another basis to sustain an argument that, notwithstanding the
11 apparent absence of a ripe controversy it has a legitimate
12 concern that such contractual provision would be breached and,
13 therefore, it would be entitled to a determination now.  So,
14 consequently, I will deny that motion, without prejudice, on
15 the basis that, again, it does not set forth the basis under
16 the Declaratory Judgment Act for relief, given the absence of a
17 case or controversy and a lack of ripeness for declaratory
18 judgment purposes.

19       There was no formal motion for an allocation of the
20 priority of the payments to be made by Axis.  I have, I
21 believe, dealt with this issue before in my prior rulings in
22 this matter.  I do not believe that Axis' request on this
23 issue, made at the end of its initial memorandum of law in
24 opposition to the summary judgment motions, is properly before
25 me in the form of a motion or a properly raised controversy.
26 It may ultimately be one, but in the first instance I believe

24

1  that there has to be some actual dispute as to the allocation
2  or priority of payments under the policies and that in the
3  absence of such a dispute the terms of the contract will guide
4  the parties' conduct.

5       So the order granting the summary judgment motions
6  should provide that the Court has not determined any issue with
7  respect to the priority of the advancement of defense costs and
8  that all parties' rights and indeed all nonparties' rights in
9  respect of priority allocations under the Axis policy are fully
10 preserved and reserved.

11      As I normally do when I give a lengthy bench ruling,
12 particularly when I quote cases, I'll go over the transcript of
13 my ruling and reserve the right to amend it, both to correct it
14 and to add something if I believe it should be properly added,
15 but my ruling won't change, which is that the summary judgment
16 motions are granted.

17      So I would ask each of the -- well, not each of you,
18 but the respective counsel for the groups of movants and
19 Mr. Murphy to submit orders for their respective clients
20 consistent with my ruling.

21

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                              :
                                                   :    **Chapter 11**
REFCO, INC., et al.,                               :
                                                   :    **Case No. 05-60006 (RDD)**
                                                   :
              Debtors.                             :    **(Jointly Administered)**
----------------------------------------------------------------x
                                                   :
AXIS REINSURANCE COMPANY,                          :
                                                   :
              Plaintiff,                           :
                                                   :
              v.                                   :    **Adv. Proc. No. 07-01712 (RDD)**
                                                   :
                                                   :
PHILLIP R. BENNETT, et al.,                        :
                                                   :    [caption continued on next page]
              Defendants.                          :
----------------------------------------------------------------x

## ERRATA ORDER

```
------------------------------------------------x
                                                :
TONE N. GRANT, et al.,                          :
                                                :
              Plaintiffs,                       :
                                                :
         v.                                     :   Adv. Proc. No. 07-2005 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
         Defendant.                             :
------------------------------------------------x
                                                :
LEO R. BREITMAN, et al.,                         :
                                                :
              Plaintiffs,                       :
                                                :
         v.                                     :   Adv. Proc. No. 07-2032 (RDD)
                                                :
AXIS REINSURANCE COMPANY,                       :
                                                :
         Defendant.                             :
------------------------------------------------x
```

**ORDERED**, that the Order Granting Motions for Summary Judgment, dated October 19, 2007,

Docket Number 125, be amended as follows:

1. Page 4, second full paragraph, second line from the bottom, reading, "...Losses under

   the Axis Policy and denied without prejudice..." should be corrected to read as follows:

   "...Losses under the Axis Policy are denied without prejudice..."

Dated: New York, New York
       October 22, 2007

                                   /s/Robert D. Drain_____
                                   HON. ROBERT D. DRAIN
                                   UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT S

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
In re                                              :    **Chapter 11**
REFCO, INC., *et al.*,                             :    **Case No. 05-60006 (RDD)**
                              Debtors.             :    **(Jointly Administered)**
--------------------------------------------------------------------x
AXIS REINSURANCE COMPANY,                          :

                              Plaintiff,           :

        v.                                         :    **Adv. Proc. No. 07-01712 (RDD)**

                                                   :
PHILLIP R. BENNETT, LEO R. BREITMAN,               :
NATHAN GANTCHER, TONE GRANT,                       :
DAVID V. HARKINS, SCOTT L. JAECKEL,                :
DENNIS A. KLEJNA, THOMAS H. LEE,                   :
SANTO C. MAGGIO, JOSEPH MURPHY,                    :
RONALD L. O'KELLEY, SCOTT A. SCHOEN,               :
PERRY ROTKOWITZ, GERALD SHERER,                    :
WILLIAM M. SEXTON, PHILIP SILVERMAN,               :
ROBERT C. TROSTEN, AND DOES 1 TO 10,               :

                                                   :
                              Defendants.          :
--------------------------------------------------------------------x

## ORDER DISMISSING THE COMPLAINT
## OF AXIS REINSURANCE COMPANY

Upon the motion (the "Motion"), dated July 12, 2007, of Defendants Leo R.

Breitman, Nathan Gantcher, David V. Harkins, Scott L. Jaeckel, Thomas H. Lee, Ronald L.

O'Kelley, and Scott A. Schoen (the "Director Defendants"), for an order dismissing the

Complaint, dated May 23, 2007, of Axis Reinsurance Company ("Axis") pursuant to Rule

7012(b) of the Federal Rules of Bankruptcy Procedure, as more fully set forth in the Motion; and

the Court having jurisdiction to consider and determine the Motion pursuant to 28 U.S.C. §§ 157,

1334 and 2201; and due notice of the Motion having been provided; and upon all pleadings filed

with this Court, and the hearing held before the Court on August 30, 2007 (the "Hearing"); and it

appearing that the relief requested is appropriate; and all objections to the relief requested having

been overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor for the reasons stated by the Court on the record of the Hearing:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

      A.    Applying New York choice of law rules, the Court concludes that New York law applies to the Axis directors and officers liability insurance policy referenced in the Complaint, the interpretation and application of the policy, and the dispute raised by the Complaint.

      B.    Under New York law, a declaratory judgment action commenced by an insurer seeking a determination of coverage under an insurance contract should be dismissed without prejudice or stayed where there is a substantial overlap of the underlying factual issues in such coverage determination action and factual issues that will be adjudicated in a pending underlying tort action or criminal proceeding.

      C.    There is substantial overlap of the factual issues raised in this coverage determination action commenced by Axis and the underlying tort and criminal proceedings referenced in the Complaint pending before the United States District Court for the Southern District of New York.

NOW, THEREFORE, It Is Ordered that:

      1.    The Motion is granted in all respects.

      2.    The Axis Complaint filed in the above-captioned adversary proceeding is dismissed, without prejudice.

Dated:    August 31, 2007
         New York, New York

                                   /s/ Robert D. Drain
                                 United States Bankruptcy Judge

2